## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LT. COL. ALEXANDER VINDMAN
c/o Protect Democracy Project, Inc.
2020 Pennsylvania Avenue, NW, #163
Washington, D.C. 20006

            Plaintiff,

    v.

DONALD TRUMP, JR., RUDOLPH GIULIANI,
JULIA HAHN, and DANIEL SCAVINO, JR.,

            Defendants.

Civil Action No. 1:22-cv-00257

**COMPLAINT**

## INTRODUCTION

1.  This lawsuit seeks long-overdue accountability for unlawful actions knowingly undertaken by close associates and allies of former President Donald J. Trump to help him obstruct a constitutional proceeding by intimidating and retaliating against a key witness.

2.  In late 2019 and early 2020, President Trump and his allies—including members of his White House staff, members of his family and personal legal team, and at least one on-air personality employed by an allied media outlet—engaged in an intentional, concerted campaign of unlawful intimidation and retaliation against a sitting Director of the National Security Council and decorated military officer, Lieutenant Colonel Alexander Vindman, to prevent him from and then punish him for testifying truthfully before Congress during impeachment proceedings against President Trump. This campaign of intimidation and retaliation has had

severe and deeply personal ramifications for Lt. Col. Vindman. It also left a stain on our democracy.

3.       On July 25, 2019, during the course of his official duties as the Director for Eastern European, Caucasus, and Russian Affairs at the National Security Council (NSC), Lt. Col. Vindman listened to a phone call in which President Trump attempted to coerce the President of Ukraine to publicly undertake an investigation into former Vice President and now President Joseph R. Biden and his son, Hunter, in exchange for an official White House visit and the release of critically important security assistance funds that Congress had directed be provided to Ukraine.

4.       Concerned that President Trump's actions were potentially illegal and put our national security at risk, Lt. Col. Vindman promptly reported the content of the call through official channels at the NSC.

5.       Lt. Col. Vindman was subsequently subpoenaed by the House of Representatives to testify in an impeachment inquiry related to President Trump's actions with respect to Ukraine.

6.       As the result of being called to testify before Congress, Lt. Col. Vindman immediately became the target of a dangerous campaign of witness intimidation by President Trump and a group of conspirators. The conspirators agreed on common, unlawful objectives—to deter Lt. Col. Vindman from testifying in the future and to retaliate against him after he did so. The conspirators included Defendants Donald Trump, Jr., Rudy Giuliani, Dan Scavino, Julia Hahn, and others not presently named as defendants.

7.       The attacks on Lt. Col. Vindman did not simply happen by accident or coincidence, nor were they the result of normal politics or modern newscycles. Rather, the

coordinated campaign was the result of a common understanding and agreement among and between President Trump, Defendants, and others comprising a close group of aides and associates inside and outside of the White House, to target Lt. Col. Vindman in a specific way for the specific purpose of intimidation and retaliation. The coordination and agreement on purpose and strategy is exactly what made this unlawful campaign against Lt. Col. Vindman so damaging.

8.     Defendants and other conspirators acted on their agreed-upon objectives of intimidation and retaliation through: meetings to coordinate strategy regarding impeachment witnesses, including Lt. Col. Vindman; preparing, issuing, and using talking points aimed at coordinating and advancing false narratives about Lt. Col. Vindman's loyalty to the United States; publishing, repeating, and amplifying false claims that Lt. Col. Vindman was a spy for Ukraine and had disparaged the United States to foreign officials; leaking classified information for the purpose of furthering the false disloyalty narrative; falsely accusing Lt. Col. Vindman of lying under oath; publicly removing Lt. Col. Vindman and his brother, who was serving as an attorney for the NSC, from their White House jobs; and attempting to derail Lt. Col. Vindman's promotion to full Colonel.

9.     Defendants' attacks on Lt. Col. Vindman were specifically tailored to falsely paint him as disloyal to the United States, engaged in "espionage," and a politically motivated "leftist" within the military who was insubordinate and even broke the law.

10.     Defendants' campaign against Lt. Col. Vindman was designed to inflict maximum damage by creating and spreading disinformation that they knew would be picked up and amplified by anchors at Fox News, other right-wing media outlets, and across social media—all while Lt. Col. Vindman's active duty status prevented him from effectively defending himself.

11.     The campaign destroyed Lt. Col. Vindman's ability to serve in any national security position or foreign affairs role, and indeed, to continue the career he had pursued for his entire adult life. Ultimately, after his career was effectively taken from him by the pervasive, false attacks on his loyalty and service, Lt. Col. Vindman was left with little choice but to retire from the military altogether.

12.     Importantly, the conspiracy to intimidate and retaliate against Lt. Col. Vindman for testifying in the impeachment proceedings also had the intended and foreseeable effect of encouraging other supporters of President Trump to attack Lt. Col. Vindman in even more dangerous and frightening ways, including by threatening the physical safety of Lt. Col. Vindman and his family.

13.     The actions taken by Defendants against Lt. Col. Vindman sent a message to other potential witnesses as well: cooperate and tell the truth at your own peril. The message reverberates to this day, as witnesses subpoenaed by Congress in connection with its investigation into the events of January 6, 2021, continue to heed former President Trump's instructions to defy those subpoenas, undermining Congress's constitutional oversight role and the fundamental principle of checks and balances between three co-equal branches of government.

14.     The targeted campaign against Lt. Col. Vindman violated federal civil rights laws that have long protected federal officials from intimidation and retaliation. Specifically, Defendants' actions violated several provisions of the Ku Klux Klan Act of 1871, codified at 42 U.S.C. § 1985(1) and (2).

15.     Section 1985 was enacted, among other things, to provide tools to ensure the effective functioning of the federal government. Congress recognized that attempts to use threats

and intimidation to impede federal officials and courts from carrying out their responsibilities harm not only those targeted, but the very capacity of our democracy to function. Thus, the statute makes it unlawful to conspire to interfere with a federal official's ability to hold office or to carry out the duties of office, or to interfere with any witness's ability to testify.

16.     In this case, the threat to our democracy came from a conspiracy among people within the highest reaches of our government and their close allies. President Trump and his aides and other close associates, including Defendants, waged a targeted campaign against Lt. Col. Vindman for upholding his oath of office and telling the truth. That they attacked Lt. Col. Vindman with such coordinated precision should come as no surprise. It is implausible that there would *not* be a high degree of coordination by the White House and close allies responding to a presidential impeachment. In fact, President Trump and his allies employed a familiar playbook for attacking a number of political enemies. But in this case, Defendants employed the playbook with an agreed-upon unlawful purpose—in essence, witness intimidation and obstruction of justice. That purpose was made explicit from the start when President Trump promised "big consequences" for anyone who cooperated in the proceedings against him.

17.     Whatever one thinks of the merits of the underlying impeachment, purposefully attacking witnesses for participating in an official proceeding and telling the truth cannot be dismissed as politics as usual and cannot be tolerated in a nation built on the rule of law. However toxic our politics may have become, this kind of unlawful conduct must not be accepted as "normal" in any healthy democracy.

18.     And in fact, it violated the law: Defendants and others, including President Trump, agreed to intimidate Lt. Col. Vindman to prevent him from testifying to Congress and to

retaliate against him for his truthful testimony, and then took steps to carry out those objectives, in violation of 42 U.S.C. § 1985(1) and (2).

19.     This complaint seeks redress for the harms Lt. Col. Vindman suffered as a result of the unlawful conspiracy.

## PARTIES

20.     **Plaintiff Lt. Col. Alexander Vindman** is a decorated veteran who served in the United States Army for more than 21 years before retiring in July 2020. He is a resident of Virginia who, at all relevant times, was an officer in the U.S. Army and Department of Defense detailed to the White House for duty as a Director of the National Security Council.

21.     **Defendant Donald Trump, Jr.** is former President Trump's eldest son, an Executive Vice President of The Trump Organization, and one of the former president's most prominent surrogates. He frequently serves as President Trump's emissary in the media and often uses his own social media account to peddle and amplify fringe, extremist, and entirely unsubstantiated content to attack his father's perceived rivals and otherwise further his father's political interests. He is a resident of Florida who travels frequently to the District of Columbia for business, personal, and political reasons.

22.     **Defendant Rudolph ("Rudy") Giuliani** is a close friend and advisor of former President Trump who served as his personal attorney at all relevant times. He frequently speaks on behalf of President Trump in the media and has been under investigation for his own allegedly illegal activity with respect to Ukraine. He is a resident of New York who travels frequently to the District of Columbia for business, personal, and political reasons.

23.     **Defendant Daniel Scavino, Jr.** served at all relevant times as an Assistant to the President, Director of Social Media, and Deputy Chief of Staff for Communications, working at

the White House. Among other things, he managed the White House Twitter account and wrote many of former President Trump's Twitter messages, and he served as a liaison between the White House and its partners in the media. He is no longer employed by the federal government and is a resident of New York.

24.     **Defendant Julia Hahn** served at all relevant times as a Special Assistant to the President and Deputy White House Communications Director, working at the White House. Hahn previously worked for Laura Ingraham and for the Breitbart News Network, before following Steve Bannon (the network's former chairman) to the White House, where Bannon served as President Trump's Chief Strategist. Hahn is a resident of Virginia.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the claims in this action arise under the laws of the United States, including 42 U.S.C. § 1985(1)–(2).

26.     The Court is authorized to award the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and its equitable powers.

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## FACTUAL ALLEGATIONS

### A.     Lt. Col. Alexander Vindman's Personal and Professional Background

Journey From the Soviet Union to America

28.     Lt. Col. Vindman was born in Ukraine. His family immigrated to the United States in 1979, after fleeing the Soviet Union, when he and his twin brother Yevgeny were

three-and-a-half years old. Lt. Col. Vindman's mother supported the dream of leaving the Soviet Union, but died in 1978 before the family arrived in America.

29.     The Vindman family fled an arbitrary, tyrannical government with a pervasive culture of corruption, intimidation, and reprisal to seek a life in the United States that would be better for the boys not only in economic, but in moral terms.

30.     Upon their arrival in New York in 1979, the Vindmans had to start over from scratch. Lt. Col. Vindman's father worked multiple jobs to support the family, all while learning English at night. The Vindmans lived in Brooklyn, New York, where Alexander and Yevgeny learned English.

31.     Lt. Col. Vindman's family experience, including his father's sacrifice, instilled in him a deep appreciation for the United States and a sense of duty and service. Lt. Col. Vindman knew from a young age that he wanted to spend his life serving the country that gave his family refuge from authoritarian oppression.

<u>Service to the United States in the U.S. Army</u>

32.     Lt. Col. Vindman has dedicated his entire professional life to the United States of America, including by serving in the U.S. Army for more than two decades.

33.     He participated in Cornell University's Reserve Officers' Training Corps (ROTC), while attending the State University of New York at Binghamton in 1998. After graduating, he was commissioned as a second lieutenant in the Army.

34.     From 2000 to 2008, Lt. Col. Vindman served multiple overseas tours, including in South Korea, Iraq, and Germany. His Iraq tour was a combat deployment in support of Operation Iraqi Freedom. During that deployment, Lt. Col. Vindman was wounded in an improvised explosive device (IED) attack and was awarded a Purple Heart.

Service as a Foreign Area Officer

35.     In 2008, Lt. Col. Vindman relocated to Washington, D.C., and began his training for a career as an Army Foreign Area Officer, including studying Ukrainian at the military's Defense Language Institute.

36.     Foreign Area Officers are commissioned officers selected, trained, and educated to be the Army's "Soldier Statesmen." They are regionally-focused experts in political-military operations. This is a full-time career track, for which officers are typically selected after 7-9 years of experience. These officers attend a fully-funded graduate program and earn a Master's degree with a focus on their assigned region.

37.     From 2009-2010, Lt. Col. Vindman served through the Foreign Area Officer Program at the U.S. Embassy in Kyiv, Ukraine, where he supported security assistance and defense reform initiatives.

38.     From 2010-2011, he attended Harvard University's Graduate School of Arts and Sciences. After earning a Master of Arts degree in Russian, Eastern European, and Central Asian Studies, he attended the Command and General Staff Officer Course at Fort Lee.

39.     Lt. Col. Vindman then served as the Assistant Army Attaché in the Defense Attaché Office (DAO) in Moscow, Russia, from 2012-2015, where he was the principal officer responsible for the DAO Moscow's strategy, plans, and operations during the escalating conflict between Russia and Ukraine.

40.     In the summer of 2015, Lt. Col. Vindman attended the Joint Forces Staff College's Joint Professional Military Education course.

41.     In November 2015, the Army promoted him to Lieutenant Colonel.

42.     From 2015 through 2018, Lt. Col. Vindman served as the Chairman of the Joint Chiefs of Staff's politico-military advisor for Russia, drafting the military's National Military Strategy for Russia, the Global Campaign Plan for Russia, and overseeing the Joint Staff's Cross-Functional Team for Russia—strategic documents that continue to be the official doctrine governing U.S. military competition with Russia. In that role, he was the Department of Defense's Russia and Belarus Politico-Military Affairs Officer responsible for developing and coordinating military and defense policy within the Department of Defense and across the U.S. government.

Service on the National Security Council

43.     In July 2018, Lt. Col. Vindman was asked to serve at the NSC and then soon became the NSC Director for Eastern European, Caucasus, and Russian Affairs.

44.     The NSC was created by Congress in the National Security Act of 1947, and subsequently moved to the Executive Office of the President in 1949, where it has remained. The NSC includes "the President, the Vice President, the Secretary of State, the Secretary of Defense, the Secretary of Energy, the Secretary of the Treasury, and such other officers of the United States Government as the President may designate." 50 U.S.C. § 3021(c)(1).

45.     The NSC is not a military agency. According to the White House website, the NSC is "the President's principal forum for considering national security and foreign policy matters with his or her senior advisors and cabinet officials. Since its inception under President Truman, the Council's function has been to advise and assist the President and to coordinate matters of national security among government agencies."

46.     The Assistant to the President for National Security Affairs (known as the National Security Advisor) is a senior aide in the Executive Office of the President, who

participates in NSC meetings and is supported by NSC staff. The NSC staff has long been composed of employees of the NSC and personnel who are detailed to the NSC from the intelligence community, the Department of State, and other departments and agencies, which continue to pay their salaries.

47.     Lt. Col. Vindman's NSC Director position was a detail from the Department of Defense, governed by a series of specific memoranda between the Department of Defense and the NSC. Lt. Col. Vindman remained an active duty member of the Army while detailed to the NSC, and remained employed by the Department of Defense. He was not a civil servant, nor was he employed directly by either the NSC or the Executive Office of the President.

48.     Although Lt. Col. Vindman remained employed by the Department of Defense while detailed to the NSC, he performed the national security duties of an NSC Director, and not the duties of a military officer. In this NSC Director role, he was responsible for developing and coordinating U.S. policy for Russia, Ukraine, Moldova, Belarus, Armenia, Azerbaijan, and Georgia, as well as supporting the U.S. government's Europe and NATO policies.

49.     Lt. Col. Vindman's national security role at the NSC included developing, coordinating, and executing plans and policies to manage the full range of diplomatic, informational, military, and economic national security issues for the countries in his portfolio, including Ukraine. His role as a Director also involved coordination with interagency partners as well as interaction with foreign officials.

50.     In this national security role, Lt. Col. Vindman focused on defense and security issues, diplomacy, and economic development, including promoting reform and anti-corruption initiatives and bilateral and regional initiatives.

51.     He would regularly prepare internal memoranda, talking points, and other materials for the National Security Advisor and senior staff. He also was required to travel frequently, including to Ukraine, where he provided support for White House officials (including the National Security Advisor) in their interactions with foreign officials. While assigned to the NSC, Lt. Col. Vindman traveled to Europe, including to Ukraine, in support of National Security Council missions.

52.     Central to Lt. Col. Vindman's national security duties as a Director at the NSC was analyzing and reporting information to senior NSC and White House leadership, including information gathered through the development of rapport and relationships with counterparts in foreign governments, to assist and serve the mission and policies of the United States. Lt. Col. Vindman's work on behalf of the United States often involved conducting strategic communications to implement diplomatic initiatives. In this role, he conducted hundreds of bilateral meetings with senior foreign delegations and U.S. government officials.

53.     As a Director at the NSC and an original classification authority, Lt. Col. Vindman had the responsibility and authority to designate and safeguard a large amount of classified information.

54.     Lt. Col. Vindman's national security duties and responsibilities as a Director at the NSC also included providing support to the President and other federal officials in their telephone conversations with officials from other countries within his portfolio, including Ukraine. This involved providing, along with others at the NSC, advance support through talking points and listening to telephone communications with foreign leaders and officials.

55.     Finally, like other federal personnel, Lt. Col. Vindman's duties and responsibilities included the obligation to report waste, fraud, and abuse, and to comply with lawfully issued subpoenas, including Congressional subpoenas.

**B.      President Trump's Impeachment**

56.     During the course of his presidency, Trump zeroed in on former Vice President (and now President) Joseph Biden as his chief rival for re-election in 2020.

57.     Among other things, President Trump and his allies seized on Hunter Biden and his position as a board member for the Ukrainian oil and gas company Burisma, and used allegations regarding Hunter's efforts to leverage his relationship with his father for personal profit as a basis for attacking Vice President Biden.

58.     In April 2018, former New York City Mayor Rudy Giuliani joined the legal team defending President Trump in connection with Special Counsel Robert Mueller's investigation of Russian interference in the 2016 election and the Trump Campaign's alleged collusion with it.

59.     Giuliani had numerous business associations in Ukraine and assumed a central role in promoting allegations about the Bidens and Ukraine. In addition to the Burisma allegations, Giuliani pushed the false conspiracy theory that it was Ukraine, rather than Russia, that had interfered in the 2016 election and had done so to benefit former Secretary of State Hillary Clinton. Giuliani engaged in repeated efforts to convince Ukrainian officials to undertake investigations of these allegations. He also enlisted into his scheme other members of the Trump Administration, including the Attorney General, and individuals outside the Administration.

60.     On September 28, 2018, President Trump signed a spending bill for the Department of Defense that included $250 million in security aid under the Ukraine Security Assistance Initiative. The deadline for disbursing the money to Ukraine was September 30, 2019.

However, President Trump ordered Mick Mulvaney, his director of the Office of Management and Budget ("OMB") and Acting Chief of Staff, to freeze the funds.

61.     Throughout 2019, Giuliani, with the assistance of others, including Republican operatives, Trump Administration officials, and various allied media outlets, engaged in a concerted campaign to convince incoming Ukrainian President Volodymyr Zelensky to announce an investigation into the Bidens, as President Trump wanted. Zelensky had two interests that Giuliani and his colleagues sought to exploit: his desire to ensure that Ukraine received the urgently needed security aid that Congress had appropriated, and his wish for an Oval Office meeting with the President of the United States, which would elevate his stature at home.

62.     On July 25, 2019, President Trump and President Zelensky spoke by phone. During their conversation, Zelensky expressed his intent to use American military aid to buy weapons to defend Ukraine against Russia. President Trump replied that he first wanted Zelensky to "do us a favor" by investigating Ukraine's role in the 2016 election and announcing an investigation of the Bidens. Trump also suggested that Zelensky should coordinate his investigations with Rudy Giuliani and Attorney General William Barr.

63.     As part of his job duties as the NSC's singular Ukraine expert, Lt. Col. Vindman listened to this call along with other NSC staff. He was immediately concerned that President Trump's attempt to pressure Zelensky was improper, if not unlawful, and risked national security. After the call, he reported those concerns to John Eisenberg, Assistant to the President and the NSC's Legal Counsel. Eisenberg later instructed Lt. Col. Vindman not to discuss the call or his concerns with anyone outside of the White House.

64.     While Lt. Col. Vindman made his report through proper internal channels, actions by others inside the government soon transformed Vindman into a household name.

65.     As was subsequently widely reported, on August 12, 2019, an unidentified whistleblower (who was not Lt. Col. Vindman) filed a complaint with the chairmen of the Senate and House intelligence committees expressing an "urgent concern" about the July 25, 2019, telephone call and related matters. This triggered a chain of events that ultimately led Speaker of the House Nancy Pelosi to announce the opening of an impeachment inquiry into President Trump's actions involving Ukraine on September 24, 2019, which in turn led Congress to subpoena Lt. Col. Vindman to testify.

66.     President Trump and his associates reacted by employing their now familiar playbook and launching a coordinated assault in the press and through social media (and, in some cases, through other means) against anyone who might cooperate in the impeachment proceedings and testify against him. As President Trump himself made clear—announcing on September 29th that there would be "Big Consequences!" for people within his Administration who cooperated—the purpose was not simply to fight harmful narratives in the mainstream media, but rather to unlawfully intimidate witnesses and obstruct the proceedings.

**C.     The Conspirators Targeting Lt. Col. Vindman**

67.     The unlawful conspiracy targeting Lt. Col. Vindman included Defendants as well as President Trump and other close aides and associates not presently named as defendants. The fact that these conspirators agreed on a common purpose and engaged in a concerted effort to intimidate and retaliate against Lt. Col. Vindman is clear not only from the nearly identical timing and substance of their attacks and known instances of specific coordination and communication regarding Lt. Col. Vindman (detailed below), but also the close relationships (even interdependence) between the conspirators, their history of working together to target

perceived enemies of President Trump, and their clear opportunities and incentives to do so again with respect to the person they identified as the "star witness" of the impeachment.

68.     Defendants here are all part of a particularly close and coordinated network of actors within and outside of the White House.

69.     Defendant Scavino, among other things, managed one of President Trump's primary methods of communication—the White House Twitter account—and reportedly drafted many of the tweets on President Trump's personal account. In some cases, Trump dictated those tweets verbatim, while Scavino drafted others himself.

70.     Scavino's job was to do more than simply write tweets, though. He was a direct conduit to President Trump's base of supporters and "influencers" with sway over the same base who could shape narratives in the president's favor. *The New York Times Magazine* quoted a senior White House official as saying, "Dan talks to the base more than anybody else after the president . . . He's the conductor of the Trump Train, and these people know he's true blue, and he also knows all the influencers." Robert Draper, *The Man Behind the President's Tweets*, N.Y. Times Mag. (Apr. 16, 2018), https://tinyurl.com/354rvuwp. Scavino thus knew as well as anyone what it took to stir up the president's base of supporters, including the sometimes dangerous consequences of targeting individuals perceived as enemies of the president.

71.     And more than that, Scavino was one of President Trump's most trusted (and longest serving) advisors, to the point that Trump reportedly trusted his advice with respect to personnel decisions. He reportedly sometimes visited the Oval Office more than a half dozen times a day.

72.     Defendant Hahn, serving within the White House as a communications aide, was a direct conduit to allied media, as part of her job was to channel President Trump's preferred

16

messaging to surrogates and chosen media partners (including, on information and belief, Laura Ingraham and others at Fox News) in the form of talking points and other communications. Hahn previously worked for Ingraham on her radio show, starting as a producer in 2013 and ultimately rising to executive producer. Hahn later moved to the Breitbart News Network, where she worked for Steve Bannon before following him into the White House.

73.     President Trump also relied on his close relationships outside the White House to smear and intimidate his perceived enemies. His son, Donald Trump, Jr., frequently served as a surrogate for particularly distasteful attacks on his father's perceived enemies, using social media to spread unfounded rumors, amplify disinformation, and spread conspiracy theories.

74.     Trump Jr. has at all relevant times been in close and continuing communication with President Trump. But beyond any father-son relationship, Trump Jr. and his father coordinated their public messaging on matters involving Trump's presidency, businesses, and political and personal advancement. Steve Bannon has observed that Trump Jr. does not take any action without his father's approval. Michael Cohen, one of President Trump's former personal attorneys, testified under oath that he "absolutely" agreed with Bannon's assessment of the relationship between President Trump and Trump Jr., and further that Trump "would never let Don [Jr] do" anything important on his own. Instead, Trump Jr. acts only with President Trump's guidance and approval.

75.     During the relevant time period, Defendant Rudy Giuliani worked in close coordination with multiple conspirators, including President Trump, on various attacks against Trump's perceived enemies. Giuliani is a close friend of Trump and served as Trump's personal lawyer during the 2016 campaign and later while he was in office. Giuliani also served as an

advisor to Trump during the 2016 campaign, the Trump presidency, and Trump's unsuccessful campaign for reelection in 2020.

76.     As described above, Giuliani was at the center of the coordinated effort to coerce Ukraine into investigating the Bidens and publicly releasing derogatory information about Hunter Biden. Giuliani has, numerous times, emphasized that he acts in President Trump's interest, at his direction, and as his agent. In connection with the Ukraine scandal, public reporting combined with sworn testimony made clear Giuliani coordinated his actions with President Trump.

77.     Giuliani recruited two businessmen, Lev Parnas (who was recently convicted of campaign finance violations) and Igor Fruman (who recently pled guilty to campaign finance violations), to pressure Ukraine to investigate Hunter Biden. He met and communicated with them multiple times, and reportedly promised to represent them jointly with President Trump, a move that could allow them all to communicate under the shield of the attorney-client privilege. Trump Jr. also reportedly also met with Parnas and Fruman.

78.     President Trump and his associates also coordinated with key allies in the media to advance their narratives smearing people Trump perceived to be personal enemies. Specifically, Laura Ingraham and other on-air personalities at Fox News acted as informal advisors to President Trump, had direct access to his senior staff, and closely coordinated their public messaging with other conspirators on a regular basis, including President Trump, Donald Trump, Jr., Giuliani, and White House staff.

79.      The close relationship between Laura Ingraham and President Trump illustrates the unique interdependence and high level of coordination between the White House and Fox

News. Ingraham has been a friend, ally, and advisor to Trump since the 1990s, and she was an early public supporter of his entry into politics.

80.     After being invited by Trump, Jr., Ingraham made an impassioned speech supporting Trump at the Republican National Convention in 2016, campaigned with him, and helped him prepare for the presidential debates along with Giuliani and Roger Ailes. She reportedly spoke with Trump frequently on the phone—several times a month—during the campaign and after he was in the White House. She also was seriously considered as a candidate for press secretary at the beginning of President Trump's term, and it was rumored that she was later considered for director of communications. However, friends reportedly said Ingraham believed she ultimately would be more helpful to the Trump Administration as a member of the conservative media. Shortly after Trump took office, Ingraham landed her own primetime television show on Fox News.

81.     Ingraham interviewed President Trump at least six times on her show during the course of his presidency. And on at least one occasion in mid-2019, the Trump Make America Great Again Committee, a joint fundraising effort authorized by and composed of President Trump's 2020 re-election campaign and the Republican National Committee, sponsored an episode of Ingraham's podcast, *The Laura Ingraham Podcast*.

82.     During the impeachment process, Ingraham's background as law school graduate, Supreme Court clerk, and former practicing attorney, helped position her as President Trump's chief defender in the media, even as compared to other Fox News hosts.

83.     In December 2019, in the midst of the impeachment proceedings, President Trump brought Ingraham on stage with him at a Turning Point USA event in Florida,

encouraging the crowd to applaud her, saying, "How good is Laura? . . . What a job she does . . . her ratings are through the roof, congratulations."

84.     After the impeachment concluded, Ingraham continued her close relationship with President Trump. In April 2020, for example, Ingraham brought two doctors she frequently had as guests on her show to the White House for a private meeting with President Trump to discuss the coronavirus pandemic and advocate for the president to promote hydroxychloroquine as a solution.

85.     Later, Ingraham joined President Trump on the campaign trail as he sought reelection, and she was at the White House on election night in November 2020 (along with Rudy Giuliani and another Fox News anchor), and reportedly advised President Trump on how he should respond to the election results.

86.     Recent reporting also reveals that Ingraham (along with other Fox hosts and Trump Jr.) was in close communication with Trump's chief of staff, Mark Meadows, on January 6, 2021, and that she advised Meadows via a text message to his personal cell phone that the president's actions were "hurting *all of us*" (emphasis added) and "destroying his legacy," before going on her show that evening to advance unsubstantiated narratives about the insurrection.

87.     In fact, conservative writer Amanda Carpenter recently described Ingraham as a "crisis communications consigliere" to President Trump, while the *Washington Post* described her as a member of his "Cable Cabinet." *See* Amanda Carpenter, *Fox Hosts Begged Trump to Stop the January 6 Attack on the Capitol*, Bulwark (Dec. 13, 2021), https://tinyurl.com/2p8m87j5; Ashley Parker & Josh Dawsey, *Trump's Cable Cabinet: New Texts Reveal the Influence of Fox Hosts on Previous White House*, Wash. Post (Jan. 9, 2022), https://tinyurl.com/2xsv3dxn.

88.     The extent to which Ingraham worked closely with President Trump before and during his presidency, including using her platform at Fox News to advance his agenda, was no secret and appears to have had the full approval and support of Fox News. In fact, Ingraham represented just one of the remarkably close connections between Fox News and the Trump White House.

89.     The close ties between the Trump White House and Fox News further evidence the certainty that the network's lead voice on the impeachment (and likely others) agreed on a strategy in furtherance of a shared purpose with President Trump and the White House in responding to the impeachment and attacking Lt. Col. Vindman for testifying. As established by public reporting, the direct connections and coordination between the Trump White House and Fox News also included:

- Routine calls to the White House by other Fox News hosts to provide communications and policy advice to President Trump and/or his staff.

- According to reporting in various outlets, certain Fox News hosts, including Peter Hegseth, Lou Dobbs, and Sean Hannity, have each actually been patched into Oval Office meetings, by phone, to offer policy advice. And there are reports that at times Sean Hannity spoke to President Trump virtually every night after his show.

- As noted above, private meetings in the White House between President Trump and/or his staff and Fox News hosts.

- Routine calls to President Trump by Fox News owner Rupert Murdoch, who has been described as a top advisor that was at times in communication with President Trump by phone on a weekly basis.

- Frequent appearances by President Trump on Fox News. He made personal appearances approximately 40 times during his presidency, more than on any other network.

- Frequent appearances by Trump Jr. on Fox News shows. He made personal appearances approximately 80 times between 2016 and 2020. Nineteen appearances took place between July 2019 and February 2020, during the Ukraine scandal and resulting impeachment.

- Routine calls by President Trump or his staff to officials at Fox News to comment on and shape its coverage, including to complain about coverage he did not like.

90.     In fact, Trump's Attorney General, William Barr, had a private meeting with Rupert Murdoch at Murdoch's home in New York in early October 2019, just before Fox News released a poll suggesting that a majority of voters favored impeachment.

91.     Furthering the close coordination between Fox News and the Trump Administration was a revolving door between their senior staff. For example, from July 2018 to March 2019, former Co-President of Fox News Bill Shine served as Director of Communications and Deputy Chief of Staff for the White House, while Fox News continued to pay him, before joining the Trump Campaign. Similarly, after serving in several high-profile roles in the Trump White House from 2017 to 2018, Hope Hicks left to serve as Chief Communications Officer at Fox Corporation before returning to the White House as a Counselor to President Trump from 2020 to 2021. In total, more than 20 people have both worked for Fox News and served in the Trump Administration.

92.     There are also numerous personal connections between Fox News and President Trump's campaigns. Kimberly Guilfoyle, for example, was a host on Fox News before taking on

several high-level roles with Trump's re-election campaign (while also in a romantic relationship with Trump, Jr., to whom she is now engaged).

93.    Thus, while modern presidential administrations often have friendly relationships with members of the media and use (or try to use) the media to advance preferred messaging, the Trump Administration's relationship with Fox News was unprecedented in American history. As Nicole Hemmer, an assistant professor of presidential studies at the University of Virginia's Miller Center, put it: "It's the closest we've come to having state TV." Jane Mayer, *The Making of the Fox News White House*, New Yorker (Mar. 4, 2019), https://tinyurl.com/4yzwjtkh.

94.    Particularly relevant here, President Trump and his conspirators—including Defendants and other conspirators not named—routinely engaged in concerted efforts to attack Trump's perceived enemies, including by using surrogates at Fox News and other media outlets to do their bidding. Indeed, the attacks that were unleashed on Lt. Col. Vindman were part of a well-worn playbook that included public threats and smears, sometimes followed by retaliation when that was within their power. While in some instances the playbook was deployed to advance only political goals, in this case it was to advance an unlawful purpose of witness intimidation and obstruction of justice.

95.    President Trump and his allies, including Defendants, agreed on and coordinated multiple campaigns to attack President Trump's perceived political enemies, sometimes with the illegal objective of intimidating or retaliating against government officials for doing their jobs. The same conspirators did not all participate in each campaign of intimidation, but the objectives and tactics were similar and the message was always the same: if you speak out against President Trump, even as part of your official duties, before Congress, or under oath, you will face consequences.

96.     For example, President Trump, Fox News, Defendants Dan Scavino and Donald

Trump, Jr., and others orchestrated a public pressure campaign for the Department of Justice to

fire Andrew McCabe, the former FBI Deputy Director, and to have him criminally investigated

because he allowed investigations of President Trump. The campaign was successful. The

Department of Justice fired McCabe hours before he was set to retire, depriving him of his full

pension and benefits. McCabe ultimately sued and the parties recently announced a settlement

that will restore McCabe's full pension and retirement benefits and remove the firing from his

record.

97.     When President Trump and his allies, including Defendants Giuliani and Trump,

Jr., decided that Marie Yovanovitch, then the U.S. Ambassador to Ukraine, was an impediment

to Trump's personal political agenda related to the Bidens and Ukraine, they engaged in a

coordinated effort to attack her by amplifying false smears first leveled by Ukrainian prosecutor,

Yuriy Lutsenko. Lutsenko falsely accused Yovanovitch of speaking negatively about Trump and

giving Lutsenko a "do-not-prosecute list." The State Department ultimately recalled Yovanovitch

from her post on the stated grounds that President Trump had lost confidence in her.

98.     President Trump and his associates deployed the same playbook against others,

including other FBI agents who carried out their official duties to investigate allegations of

misconduct by candidate Trump and various members of Trump's presidential campaign. For

example, President Trump coordinated with his close media allies to publicly call for the firing

and criminal prosecution of FBI agents who worked on the Russian election interference

investigation and successfully (and wrongfully) drove several of them out of their government

jobs. In each instance, these concerted actions—especially those carried out on Fox News and

through social media—inspired third parties to threaten and harass President Trump's targets,
thereby predictably compounding the intimidation the campaign was intended to inflict.

99.    The unlawful conspiracy here followed the same playbook with an explicit and
unlawful purpose. The offensive against Lt. Col. Vindman started with direct and public threats
by President Trump followed by a campaign to smear and intimidate him, with the intended
effect of ruining his career and subjecting him and his family to further threats and harassment.
The campaign was waged on social media and on allied media outlets such as Fox News by
President Trump, members of his Administration including Defendants Scavino and Hahn, allies
outside the White House including Defendants Donald Trump, Jr. and Rudy Giuliani (who was
doing Trump's bidding as well as his own), Laura Ingraham and others at Fox News, and
ultimately, even certain members of Congress.

**D.    The Explicit and Unlawful Purpose of the Conspiracy Against Lt. Col. Vindman**

100.    On September 29, 2019, President Trump tweeted that there would be "Big
Consequences!" for people within his Administration who provided information on the Zelensky
telephone call and whom he said, ominously, that he "want[ed] to meet" and accused of
"SPYING":

 

**Donald J. Trump** ✔
@realDonaldTrump

Like every American, I deserve to meet my
accuser, especially when this accuser, the
so-called "Whistleblower," represented a
perfect conversation with a foreign leader in
a totally inaccurate and fraudulent way. Then
Schiff made up what I actually said by lying
to Congress......

29 Sep 2019 • 22:53

 

**Donald J. Trump** ✔
@realDonaldTrump

....In addition, I want to meet not only my accuser, who presented SECOND & THIRD HAND INFORMATION, but also the person who illegally gave this information, which was largely incorrect, to the "Whistleblower." Was this person SPYING on the U.S. President? Big Consequences!

29 Sep 2019 · 22:53

101.     Around the same time, President Trump used his authority as President of the United States to make clear that he did not want anyone in his Administration to cooperate in the impeachment proceedings and thereby pressured executive branch employees to defy their lawful duty to do so.

102.     In an October 8, 2019, letter to Congress, White House Counsel Pat Cippollone stated that "President Trump and his Administration cannot participate in your partisan and unconstitutional" impeachment inquiry. President Trump thereby made it clear to executive branch personnel that he did not want them to participate in the impeachment proceedings. The White House and senior political appointees at some executive agencies used Cipollone's letter to forbid specific employees from testifying.

103.     In Lt. Col. Vindman's case, President Trump did not rely on official channels. Instead, President Trump, Defendants in this lawsuit, and other associates engaged in a conspiracy for the unlawful purpose of intimidating and retaliating against Lt. Col. Vindman for performing his official duties and testifying truthfully before Congress.

**E.     Lt. Col. Vindman's Closed-Door Deposition in October 2019**

104.     On October 16, 2019, Lt. Col. Vindman received a written request to testify

before the U.S. House of Representatives Permanent Select Committee on Intelligence, Committee on Oversight and Reform, and Committee on Foreign Affairs. The Committees later issued a subpoena and Lt. Col. Vindman testified during a closed-door deposition on October 29, 2019 (almost a week later than originally planned).

105.    The day before Lt. Col. Vindman's planned testimony, on October 28, 2019, *The New York Times* ran a story identifying Lt. Col. Vindman as a witness and previewing his opening statement.

106.    On information and belief, President Trump and at least some of his conspirators were aware of Lt. Col. Vindman's scheduled testimony even before *The New York Times* article made it public information, and were ready to respond. They immediately launched a targeted campaign of intimidation and retaliation against Lt. Col. Vindman that would last through at least February 2020.

107.    On October 28th, the same evening that Lt. Col. Vindman's name as a witness first became widely known (and the day before his closed-door testimony), Fox News ran an episode of *The Ingraham Angle* featuring John Yoo and Alan Dershowitz as guests. Host Laura Ingraham discussed Lt. Col. Vindman's upcoming testimony. The discussion was filled with false innuendo and accusations designed to intimidate and smear Lt. Col. Vindman. Ingraham read from the *New York Times* article: *"[B]ecause [Lt. Col. Vindman] emigrated from Ukraine along with his family when he was a child and is fluent in Ukrainian and Russian, Ukrainian officials sought advice from him about how to deal with Mr. Giuliani, though they typically communicated in English."*

108.    Ingraham then remarked, *"Now, wait a second, John [Yoo]. Here we have a U.S. national security official who is advising Ukraine, while working inside the White House,*

*apparently against the President's interest, and usually, they spoke in English. Isn't that kind of*

*an interesting angle on this story?*"

109.   Ingraham recklessly accused Lt. Col. Vindman of acting "against the President's

interests" from within the White House, without any basis. In doing so, Ingraham advanced the

White House's targeted strategy of smearing anyone who dared to testify about the Zelensky

phone call, while consciously or recklessly avoiding the truth in order to advance a preconceived

narrative that Lt. Col. Vindman was disloyal to the United States. Moreover, Ingraham's sarcastic

tone in stating they "*usually*" spoke English suggested that because Lt. Col. Vindman did not

*always* speak English with the Ukrainians, he was trying to hide something or acting disloyally

when speaking in Ukrainian or Russian.

110.   After being prompted by Ingraham's innuendo, Yoo elaborated, saying,  *"I find*

*that astounding, and in—you know, some people might call that espionage."* Ingraham, shaking

her head in feigned disbelief, did not disagree or correct Yoo, then or at any time during the

remainder of the show. Nor did fellow panelist Alan Dershowitz. All three are licensed attorneys.

111.   It was immediately and widely understood that Ingraham had used her show to

accuse Lt. Col. Vindman of espionage and disloyalty to the United States. Espionage is a federal

crime and a violation of the Uniform Code of Military Justice (UCMJ), punishable by

imprisonment and even death. *See, e.g.*, 18 U.S.C. §§ 793-94, 798; 10 U.S.C. § 903a (art. 103a,

UCMJ). An accusation of espionage by someone held out as a legal expert against an active duty

military officer and Director of the National Security Council entrusted with protecting national

security is a most grave accusation, with severe career implications.

112.   Moreover, as a lawyer and Washington, D.C., insider, Ingraham knew that in

order to hold his NSC position, Lt. Col. Vindman was required to pass a number of background

checks and obtain security clearances, which precludes any reasonable belief that he was actively and openly working for a foreign government.

113.    Yoo and Dershowitz understood both the falsity and the gravity of the accusation. They soon undertook efforts to mitigate the damage they caused during the *Ingraham Angle* segment by publishing op-eds in defense of Lt. Col. Vindman. Their columns directly disclaimed the specific accusation of espionage that had been made against him. On October 30, 2019, Dershowitz published an op-ed in *The New York Daily News* entitled, *[Vindman Is a Patriot. Republicans Must Stop Their Smears](#)*. On November 1, 2019, Yoo published an op-ed in *USA Today* entitled, *[No, I Didn't Call Alexander Vindman a Spy. But Ukraine Did Engage in Espionage](#)*. Dershowitz also explained that he had asked Fox News for the opportunity to correct the record, which Fox News apparently denied.

114.    On October 29, 2019, rather than do anything to mitigate the accusations made the night before, Ingraham sought to bolster White House efforts to smear Lt. Col. Vindman. Ingraham called him the Democrats' "star witness" and lectured that his service to the country should not insulate him from criticism, especially given that he was still on active duty. Of course, she also knew that Lt. Col. Vindman's active duty status prevented him from effectively defending himself against such "criticism" due to the legal and practical limitations on officers speaking out publicly, especially with respect to official matters.

115.    Neither Fox News nor Ingraham ever retracted the false allegations, despite Lt. Col. Vindman's attorney's written request that they do so because the allegations were false and defamatory.

116.    As of the date of this filing, the video of the *Ingraham Angle* segment accusing Lt. Col. Vindman of espionage remains published on the Fox News website. *See*

*https://video.foxnews.com/v/6098620502001#sp=show-clips*. Rather than remove the clip or retract the false accusation, Ingraham (and other Fox News anchors) instead followed the playbook, making further unfounded accusations against Lt. Col. Vindman and amplifying false attacks against Lt. Col. Vindman by the White House and President Trump's other surrogates in subsequent days and weeks.

117.    The espionage accusation drew swift rebuke from some, but it also took hold across social media and right-wing media outlets.

118.    The next morning, Brian Kilmeade, co-host of the Fox News morning show *Fox & Friends*, said of Lt. Col. Vindman: *"He is from the Soviet Union, he emigrated here and has an affinity to the Ukrainian people."* Later in the show, Kilmeade continued to insinuate dual loyalties, professing without any basis to "know" Lt. Col. Vindman's personal feelings, saying, *"We also know he was born in the Soviet Union, emigrated with his family, young. He tends to feel simpatico with the Ukraine."*

119.    As intended, this narrative about Lt. Col. Vindman quickly echoed throughout conservative media outlets that often amplify President Trump's messaging.

120.    That same morning, for example, before Lt. Col. Vindman's testimony, One America News Network correspondent Jack Posobiec advanced the same theme, falsely tweeting: *"BREAKING: US Army Officer Alex Vindman has reportedly been advising the Ukrainian government, his home country, how to counter President Trump's foreign policy goals - NY Times."* Despite Posobiec's attribution, no *New York Times* article, before that date or since, has reported that Lt. Col. Vindman ever advised any foreign government how to counter the President's foreign policy goals, and he has never done so. Posobiec later specifically promoted Ingraham's knowingly false statements tweeting: *"What do you think about what Laura*

*Ingraham said about Vindman, a Ukrainian immigrant, advising Ukraine on national security issues?"*

121.    Notwithstanding the immediate efforts to smear and intimidate Lt. Col. Vindman through false accusations of disloyalty to the United States, later that morning he did his duty and appeared before Congress.

122.    On October 29, 2019, Lt. Col. Vindman testified before three committees of the U.S. House of Representatives, truthfully describing President Trump's July 25th call with President Zelensky and the concerns he had immediately raised within the NSC that Trump's conduct was inappropriate and potentially unlawful.

123.    Following Lt. Col. Vindman's testimony, the false and malicious attacks against him escalated, in direct retaliation for his testifying truthfully to Congress about the President's actions. The message from President Trump and his conspirators, and the media outlets they leveraged to smear Lt. Col. Vindman, was relentless and consistent. Defendants and other conspirators accused Lt. Col. Vindman of disloyalty to the United States, working for the Ukrainian government, and having partisan political motives for reporting the Zelensky phone call and then testifying against President Trump.

124.    Later on the day of his testimony, for example, Rudy Giuliani falsely tweeted: *"ANOTHER SCHIFFTY BACKFIRE: A US gov. employee who has reportedly been advising two gov's? No wonder he is confused and feels pressure."*



Giuliani's accusation that Lt. Col. Vindman was "advising two gov's," along with his baseless speculation about "confusion" or "pressure," was intentionally misleading and falsely implied that Lt. Col. Vindman had dual loyalties. Giuliani either knew as much and tweeted anyway, or he recklessly disregarded the truth.

125.    The next day Giuliani continued his false attack on Lt. Col. Vindman's loyalty, tweeting in response to a video of Congressman Adam Schiff thanking Lt. Col. Vindman for his testimony and his patriotism: *"Schiff is thanking him for his secret testimony and for giving advice to two countries. I thought he worked for US. . . ."*



Giuliani knew that Lt. Col. Vindman worked only for the United States and that the suggestion he instead worked for another country (or for both) was not only false and baseless, but also that his accusations struck directly at the heart of Lt. Col. Vindman's position at the NSC.

126.    On information and belief, in smearing Lt. Col. Vindman's reputation, Giuliani coordinated his efforts with President Trump, Defendants, and others in the president's inner circle, who were spreading the same narrative.

127.    The morning after Lt. Col. Vindman's testimony, another conspirator, Donald Trump Jr., appeared on *Fox & Friends* to further the campaign against Lt. Col. Vindman. Trump, Jr. falsely implied that Lt. Col. Vindman was engaged in improper and illegal communications with Ukraine, saying, "*it turns out he's, you know, talking to the Ukraine.*"

128.    During that appearance, Trump Jr. also advanced the coordinated message that Lt.

Col. Vindman was not trustworthy because of his personal political views, and that he unlawfully and inappropriately let those views influence his performance of his official duties. Trump Jr. labelled Lt. Col. Vindman a "leftist," saying, *"You only get total absolution if you are a leftist veteran, not a veteran, just a leftist. If you're on their side you can do no wrong."* Brian Kilmeade then offered, *"But we don't know if he's a leftist,"* allowing Trump Jr. to underscore the point with a sarcastic response, *"Oh yeah, of course. Sure."*

129.    President Trump also furthered the concerted attack on Lt. Col. Vindman following his testimony before Congress. He referred to Lt. Col. Vindman as a "Never Trumper" in a tweet, falsely suggesting that he had partisan motives for his testimony, and ridiculed the "concern" that Lt. Col. Vindman expressed:

 

**Donald J. Trump** ✔
@realDonaldTrump

Supposedly, according to the Corrupt Media, the Ukraine call "concerned" today's Never Trumper witness. Was he on the same call that I was? Can't be possible! Please ask him to read the Transcript of the call. Witch Hunt!

29 Oct 2019 • 13:09

Saying that the "concerned" "witness" must have been on a different call and should read the reconstructed transcript released by the White House falsely implied that Lt. Col. Vindman gave untruthful sworn testimony.

130.    When they accused Lt. Col. Vindman of being a "leftist" or a "Never Trumper," or having ulterior political motives, President Trump, Trump Jr., and other conspirators knew that they were accusing him of violating the law. The UCMJ and Department of Defense and service regulations prohibit political partisanship by active duty military officers. *See, e.g.*, 10

U.S.C. § 888 (punishing "contemptuous words against the President"); U.S. Dep't of Def. Directive 1344.10, Political Activities by Members of the Armed Forces (2008) (prohibiting "[a]ctivity supporting or relating to candidates representing, or issues specifically identified with, national or State political parties and associated or ancillary organizations").

131.    On November 2, 2019, when President Trump was asked whether he regretted calling Lt. Col. Vindman a "Never Trumper," he responded with a direct threat to reveal information about Lt. Col. Vindman in retaliation for his testimony. He told reporters, *"Well, you'll be seeing very soon what comes out and then you can ask the question in a different way."* And then when asked the following day what evidence he had, Trump promised, *"We'll be showing that to you real soon. Okay?"* The President thus threatened retaliation against a federal official who he believed had testified in a manner that hurt his political interests.

132.    The next day, Trump, Jr. amplified a false story—which he knew or should have known was false—that a military veteran named Jim Hickman had begun spreading in a private Twitter chat room and then on a more public thread on October 30-31, 2019. Hickman claimed that friends recently "reminded [him] of what happened"—that he supposedly overheard Lt. Col. Vindman "bash America" in front of Russian troops during joint military exercises in Germany in 2013, and that he reprimanded Lt. Col. Vindman for those statements.



133.   Lt. Col. Vindman never made such statements, was never reprimanded for any such statements, and never communicated with Hickman about any such statements, during the 2013 military exercises or at any point.

134.   When he repeated and amplified Hickman's story, Trump Jr. knew that it was not true or recklessly disregarded information showing its falsity. Hickman's credibility was self-evidently questionable. He had the hashtag #Q in his profile for a period of time, and reportedly wrote more than a hundred tweets recirculating QAnon-related theories, including hoaxes about Satanism and pedophilia. Hickman was also a motivated partisan, tweeting or retweeting messages like, "It's incredible how evil the Democrat party is," and a week before

36

falsely attacking Lt. Col. Vindman, he retweeted a Trump supporter urging: "STOP

IMPEACHMENT! STOP THIS COUP!"

135.    Beyond Hickman's obvious credibility issues, his sudden memory about Lt. Col.

Vindman was suspect because he admittedly did not speak Russian and any communication

between Lt. Col. Vindman and Russian military personnel would have been primarily in Russian.

Moreover, as exercise support, operating behind the scenes and out of view of any interaction

between Lt. Col. Vindman and Russian troops participating in the exercise, Hickman would not

be in a position to observe such a scenario.

136.    Retired General Mark Hertling, who commanded the United States Army in

Europe, and retired Brigadier General Peter B. Zwack, who was Lt. Col. Vindman's commanding

officer at the time, have both publicly pointed out the implausibility of Hickman's story.

137.    Trump Jr. amplified Hickman's lies by tweeting them to his approximately four

million followers in a patently false Gateway Pundit article, saying, *"Anyone who's been*

*watching for the past three years is not at all surprised that this would be their 'star witness.'"*



138.    The underlying "article" repeated Hickman's baseless accusations verbatim,

mostly by quoting his tweets with minimal commentary. It reflects no effort by the author to

verify Hickman's accusations or even to speak with him. Trump Jr. similarly made no effort to verify or contact the source of the false and obviously unreliable story before republishing it.

139.    To further magnify Hickman's false accusations, Trump Jr. retweeted a post by far-right media personality Charlie Kirk advancing the same false claims. Kirk wrote that Lt. Col. Vindman was "reprimanded by his superior 'for inappropriate and partisan behavior in the military'." Trump Jr. added his own commentary, saying: *I didn't know that Charlie. You would think the media would at least point that out as one of their talking points but strangely they haven't. All I've heard is that there's no way you could possibly question him or his motives because he was once in the military."*



140.    As intended, the Hickman story continued to spread across right-wing media—as President Trump and his conspirators were planning to take their attacks on Lt. Col. Vindman, and his loyalty to the United States, to a new level.

**F.    Aftermath of Lt. Col. Vindman's Private Testimony and Lead Up to His Public Testimony**

141.    Lt. Col. Vindman was scheduled to follow his earlier closed-door testimony with public testimony before Congress on November 19, 2019, again in response to a Congressional subpoena. Defendants and other conspirators knew of this testimony well before the scheduled date, and targeted Lt. Col. Vindman in an attempt to further smear him and intimidate him from testifying fully and truthfully, and to retaliate against him if he did.

142.    On November 18, the day before Lt. Col. Vindman's public testimony, President Trump and advisor Kellyanne Conway met in the Oval Office with Vice President Pence, political strategist and Fox News regular Mark J. Penn, and Fox News contributor Andrew Stein.

143.    The purpose of this Oval Office meeting was to discuss the strategy for responding to the impeachment proceedings, which, on information and belief, included Lt. Col. Vindman's testimony.

144.    In an article describing the meeting, *The Washington Post* reported sources saying that President Trump had, "called a variety of TV personalities, lawmakers and longtime New York and Palm Beach friends for advice on how to survive the [impeachment] investigation." Jacqueline Alemany & Josh Dawsey, *Former Clinton Strategist Mark Penn Counsels President Trump on Impeachment*, Wash. Post (Nov. 26, 2019), https://tinyurl.com/yckvxyhd.

145.    The *Daily Beast* similarly reported that "[o]fficials in the White House counsel's office, press shop, legislative affairs, and communications, along with Trump surrogates and allies on the Hill, have coordinated to develop their rapid-response game plans and party lines for each public impeachment hearing—to aggressively 'play offense,' as a senior Trump administration official characterized it." The article cited one source saying, "There was one time where [President Trump] kept saying that Republicans needed to fight harder. . . . He said he

wanted fireworks." Asawin Suebsaeng & Sam Stein, *Trump White House Blasts Out*

*Anti-Vindman Talking Points to Surrogates*, Daily Beast (Nov. 19, 2019),

https://tinyurl.com/544c6c8a.

146.    On November 19, 2019, the day after this Oval Office strategy meeting and the

morning of Lt. Col. Vindman's testimony, Defendant Julia Hahn distributed talking points to

surrogates and allies of President Trump. On information and belief, she did so at the direction of

her superiors at the White House, who included Dan Scavino. The purpose of these "talking

points" was to ensure a coordinated narrative among Fox News and other allies that would,

among other things, further their campaign to smear, intimidate, and retaliate against  Lt. Col.

Vindman.

147.    While some of the talking points stretched the truth, others were blatantly false

and defamatory. They all had the same unlawful purpose.

148.    One email from Hahn distributing the talking points had the subject line,

"Vindman Has Major Credibility Issues," and advanced the theme that,  *"Vindman has faced*

*accusations of poor judgement, leaking, and going around normal procedures."* The accusations

of "leaking" and "going around normal procedures" (suggesting that he operated outside the

chain of command) explicitly and falsely attacked Lt. Col. Vindman in furtherance of the

conspiracy.

149.    In an another email, Hahn also wrote, *"There was nothing wrong with the call*

*with Zelensky at all, Vindman was just upset that President Trump was leading foreign policy*

*instead of sticking to Vindman's talking points...But it's not Vindman's job to set foreign policy,*

*it's the President's."*

150.    Evidencing careful coordination, at or about the same time that Hahn distributed

the talking points, the Trump War Room tweeted the same content, saying,  *"Alexander Vindman*

*is an unelected bureaucrat who was upset that President Trump was leading foreign policy*

*instead of sticking to Vindman's talking points. He complained that what President Trump said*

*on the July 25 call 'was not in the preparation material that I had offered.'"*



The Trump War Room Twitter account at that time belonged to the rapid response team on

President Trump's reelection campaign, which was plainly coordinating its messaging with

Defendants.

151.    The November 19 talking points thus added another false narrative to those

previously peddled by Defendants and their conspirators—that Lt. Col. Vindman disrespected

the chain of command, was insubordinate, and even "leak[ed]" classified information (a potential

crime). This line of attack drew on, but blatantly misrepresented, testimony provided by Tim

Morrison, another impeachment witness.

152.    Morrison was the Senior Director for Russia and Europe on the NSC for three and

a half months in 2019, and Lt. Col. Vindman's immediate supervisor at the NSC during that time.

Morrison testified to Congress that Lt. Col. Vindman was a "tremendous patriot." While

Morrison testified that he would have preferred if Lt. Col. Vindman had kept him "in the loop"

by discussing the Zelensky telephone call with him before speaking to NSC counsel, he also made clear that Lt. Col. Vindman "did not violate any formal rules" by reporting the Zelensky phone call to NSC counsel. Morrison further testified to having no concerns at all about how Lt. Col. Vindman handled classified information or that he would ever leak information.

153.    Despite the misrepresentations in the emails and talking points, Hahn appears to have distributed them widely, including to Defendants and others at Fox News. On information and belief, this was not the only time during the impeachment proceedings that the White House circulated talkings points, internally and/or externally attacking Lt. Col. Vindman with the intent to further their agreed-upon strategy for intimidating him and retaliating against him for testifying.

**G.    Lt. Col. Vindman's Public Testimony in November 2019**

154.    Lt. Col. Vindman gave public testimony before the Permanent Select Committee on Intelligence during the late morning and afternoon on November 19, 2019. Despite the efforts to smear him with disinformation, intimidate him, and threaten him with repercussions, Lt. Col. Vindman testified truthfully regarding his observations of the July phone call between President Trump and Ukraine President Zelensky.

155.    As part of his opening statement, Lt. Col. Vindman said, *"I also recognize that my simple act of appearing here today, just like the courage of my colleagues who have also truthfully testified before this committee, would not be tolerated in many places around the world. In Russia, my act of expressing concern to the chain of command in an official and private channel would have severe personal and professional repercussions, and offering public testimony involving the President would surely cost me my life."*

156.    Lt. Col. Vindman's continued optimism proved largely wrong.

157.    President Trump's conspirators, including some Defendants, used the testimony as another opportunity to intimidate and retaliate against Lt. Col. Vindman by leaking classified information that they knew would be used during the hearing to unfairly attack Lt. Col. Vindman's loyalty to the United States and then immediately amplifying that false narrative as soon as it was made public.

158.    During Lt. Col. Vindman's public, televised testimony, Republican Counsel Stephen Castor relied on classified information to question Lt. Col. Vindman about interactions with Ukraine, publicly revealing information that could only have come from sources at the White House.

159.    Castor questioned Lt. Col. Vindman about a job offer he had received from Oleksandr Danyliuk, then head of Ukraine's National Security and Defense Council, earlier in the year during an official trip to Ukraine for President Zelensky's inauguration—specifically, an offer to serve as the Ukrainian Minister of Defense.

160.    As he testified, Lt. Col. Vindman not only declined Danyliuk's job offer unequivocally, he also reported it to his direct superior at the time (Dr. Fiona Hill), the NSC Deputy Senior Director (John Erath), and the NSC Security Office immediately upon his return to the United States, consistent with standard procedures for the diplomatic and intelligence communities applicable to such an overture from a foreign government. The conversations all took place in a sensitive compartmented information facility (SCIF).

161.    Lt. Col. Vindman also prepared a memo to document the job offer. In accordance with protocol and exercising his discretion as an original classification authority, Lt. Col. Vindman properly classified the memorandum as "Confidential" because, although it is not unusual for certain countries to seek out American talent and regional expertise, it pertained to

U.S. foreign relations and its unauthorized disclosure might have damaged U.S. national security, specifically America's relationship with Ukraine. He then sent the memo to the NSC Security Office via the NSC's classified email system.

162.     Lt. Col. Vindman heard no concerns about the job offer or his response to it from anyone at the NSC or elsewhere, and has never been informed that the memo was declassified. Thus, as far as Lt. Col. Vindman is aware, few people knew about the job offer and the information remained classified at the time Castor disclosed it during the hearing on November 19th.

163.     When Castor publicly questioned Lt. Col. Vindman about the job offer, it was immediately clear that the purpose was to disingenuously cast doubt on his loyalty to the United States in front of a large television audience.

164.     Among other things, Castor asked Lt. Col. Vindman whether the job offer was a "big honor" and pressed him as to why Danyliuk made multiple offers and whether it was because Lt. Col. Vindman "[left] the door open." In fact, as Lt. Col. Vindman testified, the "multiple" offers were all in the same conversation, and Lt. Col. Vindman's answer was a clear "no" to keeping any "doors open."

165.     Echoing the narrative introduced on Laura Ingraham's television show, Castor also asked whether Danyliuk made the offer in English or Ukrainian (the answer was English), apparently intending to suggest something secretive or duplicitous.

166.     Castor concluded by again promoting the theme of dual loyalties, asking Lt. Col. Vindman, *"And did you ever think that possibly if this information, you know, got out that it might create at least the perception of a conflict, that the Ukrainians thought so highly of you to offer you the Defense Ministry post, you know, on one hand, but on the other hand you're*

*responsible for Ukrainian policy at the National Security Council?"*

167. While it is not uncommon or generally improper to probe a witness's credibility, Castor and those at the White House who fed him the information about the job offer knew that the incident did not actually cast any doubt on Lt. Col. Vindman's trustworthiness, and therefore had no bearing on the purpose of the hearing or the credibility of Lt. Col. Vindman's testimony regarding President Trump's phone call with Zelensky.

168. But the true and established facts did not matter to President Trump and his conspirators. The simple fact of the job offer could readily be twisted into useful fodder for their campaign of intimidation and retaliation and they intended to use it to maximum effect as soon as Castor's questions made the information public.

169. Almost immediately after Lt. Col. Vindman was questioned about the job offer, the Republican National Committee's rapid response operation tweeted: *"Question: How often do American military officers get offered Defense Minister positions in foreign countries like Vindman says he was offered three times by Ukraine?"* The tweet sought to portray a single conversation as three separate incidents over a period of time to strengthen the false implication that something untoward was in the works.

170. At the same time, Laura Ingraham, who at this point had still never retracted her earlier endorsement of accusations that Lt. Col. Vindman was engaged in espionage, accused Lt. Col. Vindman of disloyalty, tweeting: *"Why would Ukraine offer the post of defense minister to a U.S. gov't official working in their region? What does that reveal, if anything, about how Ukraine perceived him?"*



171.    Not long after, Defendant Scavino furthered the false narrative of disloyalty,

tweeting from his official White House account, *"#ICYMI: Lt. Col. Vindman was offered the*

*position of Defense Minister for the Ukrainian Government THREE times!*

*#ImpeachmentSHAM."*



172.    Right on cue, President Trump then retweeted Scavino's message to his more than

66 million followers.

173.    As intended, the false narrative of disloyalty pressed by Defendants and other

conspirators immediately following Lt. Col. Vindman's testimony was immediately amplified by Fox News, in the right-wing media generally, and across social media.

174.    Fox News host Tucker Carlson picked up the false narrative later that evening, calling news of the job offer "remarkable" and stating as fact "for the record" that the job offer was a strange thing to ask of a military officer. Carlson clearly intended to convey that there was reason to distrust Lt. Col. Vindman's loyalty, saying: *"Alexander Vindman was born in Ukraine, speaks Ukrainian, and clearly has strongly held views about Ukrainian politics, views that may or may not align with U.S. policy on the subject. Now we learn that the Ukrainian government repeatedly asked Vindman to take formal control of the entire Ukrainian military, which, for the record, is a very strange thing to ask of an active duty American military officer."*

175.    Meanwhile, as Lt. Col. Vindman was testifying, Trump Jr. began promoting another agreed-upon narrative—the false accusation that Lt. Col. Vindman committed the crime of perjury.

176.    Among several tweets attacking Lt. Col. Vindman as he testified, Trump Jr. retweeted an article by *The Federalist*, adding his own commentary: *"Didn't he testify he had no idea who the whistleblower was? Sounds like perjury to me... but don't worry he will get away with it because he's pushing the Democrat's agenda. Vindman Just Admitted To Leaking To The Anti-Trump Whistleblower."*



177.   The assertion that Lt. Col. Vindman admitted to leaking information to a

whistleblower was obviously false. Lt. Col. Vindman's testimony as recounted in *The Federalist*

article does not show that he "leaked" anything to anyone. To the contrary, the video of his

testimony included in the article shows Lt. Col. Vindman testifying that he conveyed information

about the Zelensky call to two properly cleared individuals with a need to know the information,

consistent with applicable procedures and legal requirements. Nothing in that testimony is

inconsistent with his other testimony that he did not know the identity of the whistleblower.

Based on the video in the article itself, Trump Jr. thus knew or should have known that his

accusations of "perjury" were false.

**H.**     **Continued Public Attacks On Lt. Col Vindman**

178.     On November 20, 2019, Lt. Col. Vindman's then-counsel David Pressman sent a letter to Fox News demanding that the network correct and retract defamatory statements it had made regarding Lt. Col. Vindman. That letter made clear that the attacks on Lt. Vindman were causing significant harm, including inciting threats to his and his family's physical safety. The letter was widely publicized at the time, but neither Fox News nor Ingraham retracted their lies or corrected the record. To the contrary, they continued to publish their lies on the Fox News website.

179.     The concerted attacks against Lt. Col. Vindman by President Trump and his conspirators continued through February 2020 and even thereafter. As intended, the false narrative set in motion by the conspiracy continued to reverberate through other conservative media outlets and on social media.

180.     On December 13, 2019, during a press availability, President Trump mocked Lt. Col. Vindman and called him "another beauty." At the time, the president, like everyone else following the impeachment closely, was well aware of the pending proceedings and the possibility of a Senate trial in which witnesses, including Lt. Col. Vindman, could be called upon to testify again.

181.     The House of Representatives formally passed articles of impeachment against President Trump on December 18, 2019, at which point negotiations over the impeachment trial—including whether to allow witness testimony—began in the Senate.

182.     Fox News continued to amplify the coordinated narrative smearing Lt. Col. Vindman as the Senate vote loomed.

183.    On January 23, 2020, Tucker Carlson and Representative Devin Nunes, appearing

on Fox News's *Tucker Carlson Tonight*, falsely described Lt. Col. Vindman as a "spy," and

called for him to be fired and "go work for Ukraine." Both Carlson and Nunes had reason to

know from the prior testimony of multiple witnesses, prior reporting by Fox News, and prior

op-eds by Fox News guests Yoo and Dershowitz, that the accusation that Lt. Col. Vindman was a

spy was a publicly debunked falsehood.

184.    Later that same night, Laura Ingraham had Senator Marsha Blackburn as a guest

on *The Ingraham Angle*. Ingraham prompted Sen. Blackburn to repeat the false conspiracies first

leveled by Jim Hickman and the White House. Blackburn said about Lt. Col. Vindman, *"Here's*

*the thing. Look at what his commanders, Vindman's commanders, have said. And he has a*

*problem with judgment, that has been pointed out. He had one commander that said he is a*

*political activist in uniform. He has had problems with going outside his chain of command.*

*Which is exactly what he did here. And I talked to a lot of military members on a regular basis.*

*They have a real problem with some of the things and the manner in which he conducted himself*

*in this matter."*

185.    As Ingraham knew or should have known from reviewing the source materials, no

commander of Lt. Col. Vindman had ever said he was "a political activist in uniform" or that he

went "outside his chain of command." In fact, Morrison—Lt. Col. Vindman's superior at the

NSC—had testified exactly the opposite. He testified that Lt. Col. Vindman did *not* break any

rules by speaking with NSC counsel about his concerns regarding the Zelensky phone call.

186.    Ingraham also knew well the falsehoods Blackburn was likely to repeat when she

invited her to appear. Earlier that day, Blackburn tweeted false accusations against Lt. Col.

Vindman that had been debunked months before: *"How patriotic is it to badmouth and ridicule*

*our great nation in front of Russia, America's greatest enemy?"* A few minutes later, Blackburn

tweeted the false statement, *"Alexander Vindman broke the chain of command and leaked the*

*contents of the President's July 25th phone call to his pal, the "whistleblower." Over a policy*

*dispute with the President! How is that not vindictive?"*



187.    Yet Ingraham chose to amplify Sen. Blackburn's false statements. In fact,

Ingraham chose her guests specifically to amplify the agreed-upon narrative regarding Lt. Col.

Vindman. She invited the Senator to repeat her comments on the show and declined to contradict

them notwithstanding their falsity. The video of the *Ingraham Angle* segment advancing the false

attack on Lt. Col. Vindman also remains on the Fox News website as of the date of this filing.

*See https://video.foxnews.com/v/6126099608001#sp=show-clips.*

## I.     End of Impeachment & Lt. Col. Vindman's Assignment to the NSC

188.    The Senate voted against hearing witness testimony in the impeachment trial on January 31, 2020. Until then, neither Lt. Col. Vindman nor Defendants and their conspirators knew whether he would be called as a witness in that trial.

189.    Very soon thereafter, on February 5, 2020, the Senate voted to acquit President Trump, formally ending the impeachment proceedings, but not necessarily other investigations or proceedings centered on the Ukraine scandal. In fact, some time later, Lt. Col. Vindman was contacted by federal prosecutors in connection with a related investigation that would potentially involve additional testimony.

190.    The end of the impeachment proceedings emboldened President Trump and his conspirators to engage in further unlawful actions: threatening (and carrying out) further retaliation against Lt. Col. Vindman for having testified.

191.    To that point, the morning after the acquittal, White House Press Secretary Stephanie Grisham told reporters that remarks the president would be giving later that day would feature him demanding payback: *"He gave a little preview this morning at the prayer breakfast. He is going to be honest, going to speak with honesty and I think with a little bit of humility that he and the family went through a lot...But I think he's also going to talk about just how horribly he was treated **and, you know, that maybe people should pay for that**."*

192.    Early on February 7, 2020, while answering questions from the press outside of the White House, President Trump specifically and publicly expressed his displeasure with how Lt. Col. Vindman testified and threatened retaliatory action:

> Q: Mr. President, would you like to see Alexander Vindman out of your White House? Do you want Alexander Vindman out of your —
> THE PRESIDENT: Well, I'm not happy with him. Do you think I'm supposed to be happy with him? I'm not.

Q: Is he going to leave?
THE PRESIDENT: They'll make that decision.
Q: Will he leave?
THE PRESIDENT: You'll be hearing —
Q: Is he going to leave?
THE PRESIDENT: They'll make a decision.

193.    That day President Trump retweeted an old tweet by Judicial Watch's Tom Fitton,

saying, *"Vindman's behavior is a scandal. He should be removed from the @RealDonaldTrump*

*White House ASAP to protect our foreign policy from his machinations."*

194.    A few hours later, Lt. Col. Vindman and his twin brother were abruptly and

publicly escorted out of the White House, ending their NSC assignments and returning them to

the Department of Defense for reassignment. President Trump and individuals close to him

inside the White House clearly took this step in retaliation for Lt. Col. Vindman's testimony.

There is no indication that the Department of Defense participated in the decision.

195.    The president and his conspirators then bragged about the news of Lt. Col.

Vindman's retaliatory removal from the NSC, repeating their false narrative that Lt. Col.

Vindman was disloyal to the United States.

196.    Donald Trump, Jr. tweeted, *"On the bright side, he may still be able to take the*

*defense minister position in the Ukraine that he was offered a few times."*



197.    Trump Jr. later followed that with statements directly confirming the conspiracy

to remove Lt. Col. Vindman in retaliation for his testimony: *"Allow me a moment to thank—and*

*this may be a bit of a surprise—Adam Schiff. Were it not for his crack investigation skills,*

*@realDonaldTrump might have had a tougher time unearthing who all needed to be fired.*

*Thanks, Adam!"*



198.    Repeating the narrative of her conspirators, Ingraham said on her show that night,

*"The White House is finally doing some much-needed housekeeping. So keep it up. Get rid of the*

*radicals undermining from within and replace them with people who believe in your agenda, Mr.*

*President."* One of her invited guests, Dinesh D'Souza, said Lt. Col. Vindman was "*part of an*

*attempted sort of palace coup,"* and that *"the plot was defeated and now Trump wants to clean*

*house. If you want to call it payback, I'd say it's very necessary payback.*"

199.    Not to be outdone, the next day President Trump repeated false narratives about

Lt. Col. Vindman and confirmed the retaliatory motive for Lt. Col. Vindman's removal, tweeting:

*"Fake News @CNN & MSDNC keep talking about 'Lt. Col.' Vindman as though I should think*

*only how wonderful he was. Actually, I don't know him, never spoke to him, or met him (I don't*

*believe!) but, he was very insubordinate, reported contents of my 'perfect' calls incorrectly,*

*&...was given a horrendous report by his superior, the man he reported to, who publicly stated*

*that Vindman had problems with judgement, adhering to the chain of command and leaking*

*information.  In other words, OUT.”*



**Donald J. Trump** ✔
@realDonaldTrump

Fake News @CNN & MSDNC keep talking about "Lt. Col." Vindman as though I should think only how wonderful he was. Actually, I don't know him, never spoke to him, or met him (I don't believe!) but, he was very insubordinate, reported contents of my "perfect" calls incorrectly, &...

8 Feb 2020 • 14:41



**Donald J. Trump** ✔
@realDonaldTrump

....was given a horrendous report by his superior, the man he reported to, who publicly stated that Vindman had problems with judgement, adhering to the chain of command and leaking information. In other words, "OUT".

8 Feb 2020 • 14:41

200.   This tweet made several false statements, with knowledge that they were not true

or in reckless disregard for the truth:

a.   It was not true that Lt. Col. Vindman was given a "horrendous report by his

superior," as Tim Morrison's sworn testimony and the service and

performance record available to the White House confirm. Morrison's

testimony was clear that he did not make any "report" with respect to Lt. Col.

Vindman and the performance review he received from his previous direct
superior at the NSC, Fiona Hill, was uniformly positive.

b.  It also was not true that Lt. Col. Vindman had problems "adhering to the chain
of command." No NSC superior said that Lt. Col. Vindman violated any rules
in reporting the Zelensky call or violated the chain of command in any other
respect.

c.  Nor was it true that Lt. Col. Vindman leaked any information. To the contrary,
Lt. Col. Vindman denied providing information to anyone out of proper
channels, and his NSC superior, Morrison, testified that he did *not* personally
believe Lt. Col. Vindman had leaked anything.

These attacks on Lt. Col. Vindman, accusing him of behavior that likely would violate the UCMJ
and criminal law, were false, malicious, and made in retaliation against Lt. Col. Vindman for his
testimony.

201.    A few days later, President Trump again confirmed his retaliatory intent, telling
reporters: *"We sent him on his way to a much different location, and the military can handle him
any way they want."* He then publicly and falsely accused Lt. Col. Vindman of false testimony
and called for further retaliation, stating, *"That's going to be up to the military, we'll have to see,
but if you look at what happened, I mean, they're going to certainly, I would imagine, take a look
at that. . .What he did was just reported a false call."*

202.    On information and belief, acting at the direction of the president, National
Security Advisor Robert O'Brien later attempted to cover up the retaliatory nature of Lt. Col.
Vindman's removal from the White House, falsely explaining during a speaking engagement that
he made the decision alone (directly contrary to the President's public statements taking credit

for it), that the decision was part of downsizing the NSC, and that, *"It was just time for them to go back. Their services were no longer needed."* But he also made sure to criticize Lt. Col. Vindman's reporting of the Zelensky call and further President Trump's and his conspirators' false narrative by implicitly questioning Lt. Col. Vindman's motives and loyalty, saying, *"We're not a country where a bunch of lieutenant colonels can get together and decide what the policy is of the United States. We are not a banana republic."*

203.    Not content that he and his conspirators had inflicted enough damage, Defendant Trump Jr. launched another series of attacks against Lt. Col. Vindman in May 2020, picking up and knowingly or recklessly repeating the false claim that Lt. Col. Vindman committed perjury during his impeachment testimony and calling for him to be criminally charged.





204.    Trump Jr.'s tweet referenced an article published on Breitbart.com as supposed support for the false claim of perjury, but the article Trump Jr. referenced does not establish that Lt. Col. Vindman "[made] up things [leading] to an impeachment" or did anything unlawful. The article discusses a summary Lt. Col. Vindman wrote of an April 2019 call, and does not even address the July 2019 call that prompted the impeachment inquiry.

**J.    Attempt To Derail Lt. Col. Vindman's Promotion to Colonel**

205.    The concerted effort to intimidate and retaliate against Lt. Col. Vindman for testifying in the impeachment proceedings was not limited to public attacks and false smears.

206.    By the summer of 2019, Lt. Col. Vindman was on track for promotion to full Colonel in the U.S. Army in 2020. This would have been a significant promotion, marking a

notable change in seniority as well as compensation.

207.    Typically, promotions within the Army at this level are reviewed by the relevant promotion board and Army leadership, then Pentagon leadership, and then the White House, before confirmation by the Senate.

208.    In early 2020, Lt. Col. Vindman had a meeting with Major General Bradley Gericke, Director of Strategy, Plans and Policy in the Office of the Deputy Chief of Staff of the Army, during which it became clear that the Army had recommended him for the promotion to full Colonel. However, during that same meeting, Lt. Col. Vindman understood from General Gericke that Army officials were concerned the White House might intervene to prevent his promotion, or worse, delay *all* Army promotions in retaliation for his name being included on the promotion list.

209.    In fact, some of the Defendants and other conspirators were already engaged in an intentional, coordinated effort to derail Lt. Col. Vindman's promotion to Colonel in retaliation for his Congressional testimony.

210.    According to news reports, following Lt. Col. Vindman's public testimony on November 19, 2019, White House personnel prepared a list of unfounded allegations about Lt. Col. Vindman, supporting the narrative President Trump and his conspirators were pushing publicly about him. This list was sent to the Pentagon in an attempt to prevent him from being promoted. Among other things, the lists included a new and completely false allegation that Lt. Col. Vindman had created a hostile working environment for his coworkers at the NSC.

211.    This kind of effort by the White House to prevent or preempt an individual promotion was unusual, and certainly not the manner in which the NSC typically documented its evaluation of detailees, per the protocols and rules pertaining to those positions. The sole reason

for these acts was retaliation for Lt. Col. Vindman's testimony.

212.    The attempt to derail Lt. Col. Vindman's promotion was initially successful, in that the promotion list was considerably and unnecessarily delayed. From Lt. Col. Vindman's perspective at the time, his promotion was derailed and was not likely to go through.

213.    Eventually, the Army conducted an internal command-level investigation and cleared Lt. Col. Vindman of the wrongdoing baselessly alleged by the White House. His name was later included in the list of officer promotions that the Army shared with the White House in summer 2020 after months of delay.  But, as explained below, this was too little too late.

214.    The list of Army promotions was not released publicly right away due to further attempts by White House officials to pressure the Pentagon to remove Lt. Col. Vindman's name. In early July, Mark Meadows reportedly called Secretary of the Army Ryan McCarthy and Secretary of Defense Mark Esper to the White House to berate them for including Lt. Col. Vindman's name on the list.

215.    The Army eventually announced promotions publicly days after Lt. Col. Vindman announced his retirement and then released the list shortly thereafter.

216.    Even then, the White House would not let it go. A few months later, the Presidential Personnel Office prepared a memo recommending that Secretary of Defense Mark Esper be fired. One of the top reasons listed was that Esper: *"Approved the promotion of Lt. Col. Vindman, the star witness in the sham impeachment inquiry, who told Congress that the President's call with Ukraine 'undermined U.S. national security.'"* The message from the president and his conspirators continued: speak out and you will be punished.

217.    The coordinated effort to prevent Lt. Col. Vindman from being promoted to full Colonel is yet further evidence of the conspiracy to punish and retaliate against Lt. Col. Vindman

for the lawful performance of his duties.

**K.    The End of Lt. Col. Vindman's Government Service**

218.    The coordinated attacks on Lt. Col. Vindman rendered it impossible for him to continue to perform any role involving either national security or foreign affairs—which necessarily involves intelligence gathering and interacting with representatives of foreign governments—particularly in his region of specialty, including Russia and Ukraine.

219.    Lt. Col. Vindman's primary foreign policy work—and the work he planned to continue upon return to the military—was focused on Europe and Eurasia. And his work as an attaché (representing the United States while traveling to foreign countries and interacting with foreign countries) involved an element of intelligence collection, reporting, and analysis. After having been accused of espionage and treason, and generally painted as disloyal to the United States and aligned with Ukraine, Lt. Col. Vindman could no longer effectively do that work, particularly in Europe and Eurasia. He had become, and likely would always be, as per standing intelligence procedures, a *target* for foreign governments as a result of the accusations and false information spread about his disloyalty to the United States. This would directly interfere with his ability to do his work, a conclusion that was confirmed in conversations Lt. Col. Vindman had with others at the Department of Defense at the time.

220.    It was also clear that, as a result of the concerted campaign against him, Lt. Col. Vindman could no longer expect to be assigned to any positions in Europe and Eurasia despite his training, language skills, and experience in the region. Nor could he expect to be assigned to prestigious or challenging roles in other regions. Moreover, he could not count on the promotion he deserved, as explained above.

221.     Multiple colleagues at the Department of Defense encouraged Lt. Col. Vindman to pursue opportunities outside of the military as a direct result of the nature of the campaign to smear him as disloyal.

222.     Thus, following months of concerted attacks by President Trump, Defendants, and others, Lt. Col. Vindman made the difficult decision to retire from the military because his chosen career, the one he had spent years training for and performing at the highest levels, had been taken away from him by the actions of the President of the United States and his conspirators, both named and unnamed.

223.     Lt. Col. Vindman announced his retirement in early July 2020. He separated from active duty service effective July 31, 2020.

**L.     Harm to Lt. Col. Vindman and His Family**

224.     Lt. Col. Vindman and his family suffered significant reputational, emotional, and financial harm due to Defendants' actions.

225.     Lt. Col. Vindman suffered significant reputational harm due to Defendants' public attacks, including the false accusations of espionage and of being a traitor, a spy, and disloyal to the United States, and of committing perjury and leaking classified information.

226.     These accusations are especially harmful to a member of the United States military and carry special weight with respect to someone who works in intelligence. In particular, the accusations affected Lt. Col. Vindman's ability to serve as an attache, one of the principal roles of an Army Foreign Area Officer.

227.     The attacks on Lt. Col. Vindman thus prevented him from pursuing the kind of career for which he had been trained. As described above, he could no longer realistically expect to serve in Eastern Europe or Eurasia—the parts of the world in which he had significant

expertise—because his service and his loyalty were so publicly attacked. Likewise, he could not realistically expect to continue to do intelligence work in Europe or anywhere else.

228.    The harm was not only to Lt. Col. Vindman's military career, but also limited his ability to find work (and therefore earn a living) outside of the military in his fields of expertise.

229.    For example, Lt. Col. Vindman has been in conversations with multiple academic institutions, think tanks, speaking bureaus, and other organizations regarding his career options after leaving the military. He was told by a number of these non-governmental institutions that it was too risky to their appearance of non-partisanship and neutrality to associate with him following the public attacks on his character and loyalty in 2019 and 2020. Lt. Col. Vindman was also told that these organizations did not want to risk losing part of their audience or find themselves on the receiving end of the same harassment and intimidation that were directed toward him.

230.    Defendants' actions have also caused Lt. Col. Vindman to fear for the physical safety of himself and his family. As a result of this reasonable fear, Lt. Col. Vindman and his family changed their behaviors and incurred financial costs.

231.    Defendants' attacks on Lt. Col. Vindman had the intended and predictable result of inciting their followers to do the same and, in some instances, to take things even further.

232.    Lt. Col. Vindman was subject to a barrage of personal attacks—some of them threatening—by strangers on social media. Many of the messages echoed Defendants' attacks on Lt. Col. Vindman's loyalty to the United States.

233.    Lt. Col. Vindman and his wife, Rachel Vindman, also received threats from other members of the military through email and direct messages on Twitter and Facebook. After 20 years in the military, it was especially painful and disappointing to receive such threats from

fellow servicemembers. The Department of Defense investigated these threats and disciplined more than one of the perpetrators.

234.     Out of fear for their physical safety, Lt. Col. Vindman and his wife considered moving their family to a military base in late 2019 and early 2020. They ultimately decided not to do so, however, for fear that it would spur further unwanted media attention.

235.     Lt. Col. Vindman did ultimately request and receive added protection from the military for a period of time. The local police also provided additional patrols around the Vindman home in response to the fear of physical harm to the family.

236.     Ms. Vindman, in particular, feared that physical violence was the natural and foreseeable consequences of Defendants' highly public attacks on Lt. Col. Vindman. As a result, she and their daughter decided to leave the house less frequently to reduce their risk. The Vindmans also decided not to attend certain family and social events. And Ms. Vindman cut back on her work hours because she feared the attention she and her coworkers would receive while she was at work.

237.     Later in 2020, after Lt. Col. Vindman retired from the military, he paid to upgrade his home security system out of fear of continuing threats to his and his family's physical safety by supporters of President Trump.

238.     Lt. Col. Vindman also suffered harm due to the psychological effects, and associated physical effects, of Defendants' actions.

**M.**     **Purpose and Provisions of 42 U.S.C. § 1985**

239.     Section 1985 was enacted, among other things, to provide tools to ensure that the federal government is able to function effectively, and to guard against conspiracies to injure individuals exercising certain protected rights. Section 1985(1)-(2) of the statute, in relevant

parts, forbids conspiracies to interfere with federal officials holding office and carrying out their duties, as well as conspiracies to intimidate or retaliate against witnesses in court proceedings. Congress thus long ago recognized that we cannot have a functional government—and therefore a functional democracy—if federal officials are prevented from doing their jobs or if witnesses are prevented from testifying. Those provisions are just as essential for our democracy today.

240.    Two sections of the statute, 42 U.S.C. § 1985(1) and (2), are implicated by Defendants' campaign against Lt. Col. Vindman. Each of the two sections provides multiple means for establishing a violation.

241.    The first clause of 42 U.S.C. § 1985(1) prohibits conspiracies to prevent someone from holding federal office:

> If two or more persons in any State or Territory conspire to **prevent,** by force, intimidation, or threat, **any person from accepting or holding any office, trust, or place of confidence under the United States** . . . (emphasis added)

242.    The second clause of 42 U.S.C. § 1985(1) prohibits conspiracies to prevent a federal officer from discharging the duties of his office:

> If two or more persons in any State or Territory conspire to **prevent,** by force, intimidation, or threat, any person from accepting or holding any office. . . **or from discharging any duties thereof** . . . (emphasis added)

243.    The fourth clause of 42 U.S.C. § 1985(1) prohibits conspiracies to injure a federal officer for discharging the duties of his office:

> If two or more persons in any State or Territory conspire to . . . **injure** [any person] in his person or property **on account of his lawful discharge of the duties of his office** . . . (emphasis added)

244.    The first clause of 42 U.S.C. § 1985(2) prohibits conspiracies to deter witness testimony:

> If two or more persons in any State or Territory conspire to **deter,** by force, intimidation, or threat, **any party or witness in any court of the United States from**

**attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully** . . . (emphasis added).

245.    The second clause of 42 U.S.C. § 1985(2) prohibits conspiracies to injure a person on account of their witness testimony:

> If two or more persons in any State or Territory conspire **. . . to injure such party or witness in his person or property on account of his having so attended or testified . . .** (emphasis added).

246.    Section 1985(3) provides that any individual "injured in his person or property" by a conspiracy violating sections 1985(1) and (2) "may have an action for the recovery of damages . . . against any one or more of the conspirators."

## COUNT I
### (Conspiracy in Violation of 42 U.S.C. § 1985(1))

247.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

248.    At all relevant times, Lt. Col. Vindman held federal office. By reporting the content of former President Trump's July 2019 telephone call through proper channels to NSC authorities, and by complying with Congressional subpoenas and testifying before Congress as part of the impeachment proceedings against President Trump (including before the Senate if the trial had proceeded), Lt. Col. Vindman discharged official duties.

249.    Defendants knowingly and intentionally agreed on and conspired with each other and others with a shared purpose of preventing, by force, intimidation, or threat, Lt. Col. Vindman from holding and discharging the duties of his office. Defendants further agreed and conspired with each other and others to injure Lt. Col. Vindman in his person or property on account of his lawful discharge of his duties of office.

250.    As described more fully above, Defendants and their conspirators engaged in a

concerted effort to falsely portray Lt. Col. Vindman as disloyal to the United States, as a spy for a foreign country, and as a politically motivated saboteur. They further conspired to falsely accuse him of leaking classified information and perjury. They did so for the purpose of both intimidating him from testifying in the impeachment proceedings and other proceedings implicating President Trump and continuing to hold his office, and to retaliate against him for doing so. In the process, they knowingly and purposely destroyed Lt. Col. Vindman's ability to continue his career in national security and foreign affairs.

251.     Defendants' campaign against Lt. Col. Vindman was designed to inflict maximum damage on Lt. Col. Vindman by creating and spreading disinformation that they knew not only would be picked up by anchors at Fox News, but also amplified by other right-wing media outlets and across social media. Defendants knew that the foreseeable results of their attacks on Lt. Col. Vindman also would include even more dangerous threats against him and his family. And they intended to send a clear message that a similar fate would await anyone else who performed their official duties in a manner President Trump and his allies perceived as harmful to Trump and his presidency.

252.     Overt acts taken by Defendants and their conspirators in furtherance of the conspiracy to intimidate, retaliate against, and otherwise injure Lt. Col. Vindman in violation of 42 U.S.C. § 1985(1) include but are not limited to: holding meetings to coordinate strategy regarding impeachment witnesses, including Lt. Col. Vindman; preparing, issuing, and using talking points aimed at coordinating and advancing a false narrative about Lt. Col. Vindman's loyalty to the United States; publishing, repeating, and amplifying false claims that Lt. Col. Vindman was a spy for Ukraine and that he disparaged the United States to foreign officials; leaking classified information for the purpose of furthering the false disloyalty narrative; falsely

accusing Lt. Col. Vindman of lying under oath; removing Lt. Col. Vindman from the NSC; and attempting to derail Lt. Col. Vindman's promotion to full Colonel.

253.    These overt acts include not only the publication of false and misleading attacks against Lt. Col. Vindman, but also other conduct in furtherance of the conspiracy, such as wrongfully disseminating classified information, removing Lt. Col. Vindman and his brother from their White House jobs in retaliation for Lt. Col. Vindman's testimony, and attempting to derail Lt. Col. Vindman's promotion.

254.    The false and misleading attacks against Lt. Col. Vindman by Defendants and other conspirators, including President Trump, are reasonably understood to be statements of fact and were understood by people who saw, heard, and read them to be statements of fact. And neither Defendants nor other conspirators had any applicable privilege or legal authorization to make these false and misleading statements, or if they did, they abused such privilege or authorization.

255.    Moreover, as set forth in detail above, Defendants and other conspirators published a number of their statements with actual malice, knowingly or recklessly disregarding that they were false; misrepresenting testimony and other evidence to support their accusations; purposefully avoiding or intentionally disregarding substantial and publicly available evidence rebutting or disproving their accusations; advancing inherently implausible accusations; forming and sticking to a false preconceived narrative in spite of the facts; relying on facially unreliable sources; and—when specifically put on notice of the truth and asked to retract their falsehoods—doubling down on and further advancing the false narratives.

256.    As a natural and foreseeable result of this conspiracy and the overt acts taken in furtherance, Lt. Col. Vindman was injured in his person and property.

257.    As a direct and proximate result of Defendants' actions and those of their

conspirators, Lt. Col. Vindman has sustained significant financial, emotional, and reputational

harm, entitling him to damages in an amount to be proven at trial.

## COUNT II
### (Conspiracy in Violation of 42 U.S.C. § 1985(2))

258.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth

herein.

259.    Lt. Col. Vindman was subpoenaed and testified twice before Congress in 2019,

including his October 2019 closed-door testimony and November 2019 public testimony, and

was a potential (even likely) witness at the Senate impeachment trial unless and until the Senate

voted against calling witnesses at the end of January 2020. Throughout that time and after, he

was also a potential witness in other criminal and civil proceedings against Defendants and their

conspirators, named and unnamed.

260.    Defendants agreed on and conspired with each other and others with the shared

purpose of deterring Lt. Col. Vindman by force, intimidation, or threat, from attending and

testifying before the Court of Impeachment in the House of Representatives and/or Senate during

the impeachment process, and any subsequent related criminal or civil proceedings in the federal

courts. Defendants further agreed and conspired with each other and others to injure Lt. Col.

Vindman in his person or property on account of his having so attended and testified.

261.    As described more fully above, Defendants and their conspirators engaged in a

concerted effort to portray Lt. Col. Vindman as disloyal to the United States, as a spy for another

country, and as a politically motivated saboteur. They further agreed and conspired to falsely

accuse him of leaking classified information and perjury. They did so for the purpose of both

deterring him from testifying in the impeachment proceedings and other proceedings implicating

President Trump, and to retaliate against him for doing so. In the process, they knowingly destroyed his ability to continue his career in national security and foreign affairs. They also intended to send a clear message that a similar fate would await anyone else who testified truthfully against Trump.

262.    Overt acts taken by Defendants and their conspirators in furtherance of the conspiracy to intimidate, retaliate against, and otherwise injure Lt. Col. Vindman in violation of 42 U.S.C. § 1985(2) include but are not limited to: holding meetings to coordinate strategy regarding impeachment witnesses, including Lt. Col. Vindman; preparing, issuing, and using talking points aimed at coordinating a false portrait of Lt. Col. Vindman as disloyal to the United States; publishing, repeating, and amplifying false claims that he was a spy for Ukraine; leaking classified information for the purpose of furthering the false disloyalty narrative; publishing, repeating, and amplifying false and misleading information about Lt. Col. Vindman's job performance and false claims that he made derogatory comments about the United States to foreign officials; falsely accusing Lt. Col. Vindman of lying under oath; removing Lt. Col. Vindman from the NSC; and attempting to derail Lt. Col. Vindman's promotion to full Colonel.

263.    These overt acts include not only the publication of false and misleading attacks against Lt. Col. Vidnman, but also other conduct in furtherance of the conspiracy, such as wrongfully disseminating classified information, removing Lt. Col. Vindman and his brother from their White House jobs in retaliation for Lt. Col. Vindman's testimony, and attempting to derail Lt. Col. Vindman's promotion.

264.    The false and misleading attacks against Lt. Col. Vindman by Defendants and other conspirators, including President Trump, are reasonably understood to be statements of fact and were understood by people who saw, heard, and read them to be statements of fact. And

neither Defendants nor other conspirators had any applicable privilege or legal authorization to make these false and misleading statements, or if they did, they abused such privilege or authorization.

265.    Moreover, as set forth in detail above, Defendants and other conspirators published a number of their statements with actual malice, knowing or recklessly disregarding that they were false; misrepresenting testimony and other evidence to support their accusations; purposefully avoiding or intentionally disregarding substantial and publicly available evidence rebutting or disproving their accusations; advancing inherently implausible accusations; forming and sticking to a false preconceived narrative in spite of the facts; relying on facially unreliable sources; and—when specifically put on notice of the truth and asked to retract their falsehoods—doubling down on and further advancing the false narratives.

266.    As a natural and foreseeable result of this conspiracy and the overt acts taken in furtherance, Lt. Col. Vindman was injured in his person and property.

267.    As a direct and proximate result of Defendants' actions and those of their conspirators, Lt. Col. Vindman has sustained significant financial, emotional, and reputational harm, entitling him to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)    Declare that Defendants violated 42 U.S.C. § 1985(1) and (2);

(2)    Permanently enjoin Defendants from further violations of 42 U.S.C. § 1985(1) and (2);

(3)    Award compensatory and/or consequential damages in an amount to be determined at trial to compensate Plaintiff for the injuries he suffered as a

result of Defendants' unlawful conduct;

(4)    Award punitive damages as just and proper in light of Defendants' outrageous and malicious conduct and to deter such egregious conduct from being committed in the future;

(5)    Award nominal damages in recognition of the violation of Plaintiff's legal rights;

(6)    Award Plaintiff's reasonable attorneys' fees and litigation costs; and

(7)    Provide such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial of all issues so triable.

Dated:  February 2, 2022            PLAINTIFF LT. COL. ALEXANDER VINDMAN

By:  */s/ Genevieve C. Nadeau*

Genevieve C. Nadeau (Bar No. 979410)
PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Ste. 312
Watertown, MA 02472
P: 202-579-4582
F: 929-777-8428
genevieve.nadeau@protectdemocracy.org

Anne Tindall (Bar No. 494607)
Kristy Parker (*application for admission pending*)
Rachel Homer (Bar No. 1045077)
PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Avenue, NW, #163
Washington, D.C. 20006
anne.tindall@protectdemocracy.org
kirsty.parker@protectdemocracy.org
rachel.homer@protectdemocracy.org
P: 202-579-4582

Danielle E. Leonard (*pro hac vice motion forthcoming*)
Stacey Leyton (*pro hac vice motion forthcoming*)
Amanda C. Lynch (*pro hac vice motion forthcoming*)
ALTSHULER BERZON LLP
177 Post Street, Ste. 300
San Francisco, CA 94108
P: 415-421-7151
F: 415-362-8064
dleonard@altshulerberzon.com
sleyton@altshulerberzon.com
alynch@altshulerberzon.com