## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

**LT. COL. ALEXANDER VINDMAN**,

        *Plaintiff*,

v.

**DONALD TRUMP, JR.,
RUDOLPH GIULIANI, JULIA
HAHN, and DANIEL SCAVINO,
JR.**,

        *Defendants*.

<u>Case No.</u>: 1:22-cv-00257-JEB

## <u>DEFENDANTS DONALD TRUMP, JR. AND DANIEL SCAVINO, JR.'S</u>

## <u>MOTION TO DISMISS COMPLAINT</u>

Defendants Donald Trump, Jr., and Daniel Scavino, Jr., through their attorneys, Dhillon Law Group Inc., hereby move to dismiss Plaintiff Lt. Col. Alexander Vindman's Complaint, filed on February 2, 2022. This motion is made pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. This motion is based on the accompanying Memorandum of Points and Authorities, and the entire record and file herein.

Pursuant to LCvR 7(f), Defendants Donald Trump, Jr. and Daniel Scavino, Jr. request an oral hearing.

[*SIGNATURE PAGE TO FOLLOW*]

Dated: May 31, 2022                    Respectfully submitted,


                                       */s/ Harmeet K. Dhillon*
                                       Harmeet K. Dhillon, Esq.
                                       (Bar #CA00078)
                                       Karin M. Sweigart, Esq.
                                       (Bar #CA00145)
                                       Jesse Franklin-Murdock, Esq.
                                       (Bar #CA00147)
                                       Dhillon Law Group Inc.
                                       177 Post Street, Suite 700
                                       San Francisco, California 94108
                                       (415) 433-1700
                                       harmeet@dhillonlaw.com
                                       ksweigart@dhillonlaw.com
                                       jfranklin-murdock@dhillonlaw.com

                                       David A. Warrington, Esq.
                                       (D.C. Bar #1616846)
                                       Dhillon Law Group Inc.
                                       2121 Eisenhower Avenue, Suite 402
                                       Alexandria, Virginia 22314
                                       (703) 574-1206
                                       dwarrington@dhillonlaw.com

                                       *Counsel for Defendants Donald Trump, Jr.,
                                       and Daniel Scavino, Jr.*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 4

LEGAL STANDARD ........................................................................................................... 11

    I.    Federal Rule of Civil Procedure 12(b)(1) ......................................................... 11

    II.    Federal Rule of Civil Procedure 12(b)(6) ....................................................... 12

ARGUMENT ........................................................................................................................ 13

    I.    Vindman Failed to Allege the Plausible Existence of a Conspiracy. ............... 13

        A.    Vindman failed to plausibly allege the existence of *any* agreement. ............ 13

        B.    Vindman failed to plausibly allege a conspiratorial agreement with the goal of

        preventing Vindman from holding and discharging the duties of his office or testifying in

        any proceeding. ..................................................................................................... 15

        C.    Vindman did not allege any meeting, gathering, or synchronous communication

        between the over twenty alleged coconspirators that would have provided the opportunity

        for them to hatch their conspiracy. ....................................................................... 16

    II.    Even if Vindman Had Plausibly Alleged the Existence of a Conspiracy, He Failed to

    Allege Trump Jr. and Scavino Joined that Conspiracy. .......................................... 16

    III.    Vindman Presented No Actionable Defamation Claim that Would Allow Him to

    Sustain His § 1985 Claims. ..................................................................................... 19

        A.    Vindman complains about expression protected by the First Amendment. ................... 20

        B.    Vindman was a public figure and did not adequately allege malice. ............................. 25

        C.    Vindman complains about true statements. .................................................................. 28

i

D.   Several allegations are protected by privileges or statutory immunity. ......................... 29

  1.   Vindman complains of communications protected by the fair reporting privilege.... 29

  2.   Vindman complains of communications protected by the legislative privilege......... 30

  3.   Vindman complains of communications protected by the judicial proceeding

  privilege. .............................................................................................................. 31

  4.   Vindman complains of communications immune under Section 230. ....................... 32

IV.   Vindman is Legally Barred from Asserting a Claim under § 1985(2). .......................... 34

V.   Section 1985 Does Not Provide a Remedy for Matters Relating to Vindman's

Prospective Military Promotion. ............................................................................................. 36

VI.   The Political Question Doctrine Bars Consideration of Vindman's Removal from the

NSC. ....................................................................................................................................... 38

VII.   Scavino Is Entitled to Qualified Immunity. ................................................................. 41

VIII.   Vindman's Complaint Should be Dismissed with Prejudice. ....................................... 42

CONCLUSION ........................................................................................................................ 43

# TABLE OF AUTHORITIES

**Cases**

*Afro-Am. Publishing Co. v. Jaffe*,

    366 F.2d 649 (D.C. Cir. 1966) ................................................................ 22

*Armstrong v. Exec. Off. of the President*,

    90 F.3d 553 (D.C. Cir. 1996) .......................................................... 39, 40

*Armstrong v. Thompson,*

    80 A.3d 177 (D.C. 2013) ...................................................................... 28

*Arneja v. Gildar*,

    541 A.2d 621 (D.C. 1988) ................................................................... 31

*Ashcroft v. al-Kidd*,

    563 U.S. 731 (2011) ............................................................................ 42

*Ashcroft v. Iqbal*,

    556 U.S. 662 (2009) ............................................................................ 12

*Baker v. Carr*,

    369 U.S. 186 (1962) ...................................................................... 38, 40

*\*Bancoult v. McNamara*,

    445 F.3d 427 (D.C. Cir. 2006) ...................................................... 38, 39

*\*Barr v. Clinton*,

    370 F.3d 1196 (D.C. Cir. 2004) .................................................... 13, 19

*Bell Atl. Corp. v. Twombly*,

    550 U.S. 544 (2007) ................................................................ 12, 13, 14

*Bennett v. Google, LLC,*

    882 F.3d 1163 (D.C. Cir. 2018) .......................................................... 33

*\*Black Lives Matter D.C. v. Trump,*

    544 F. Supp. 3d 15 (D.D.C. 2021) ...................................................... 18

*\*Bois v. Marsh,*

    801 F.2d 462 (D.C. Cir. 1986) ............................................................ 37

*Bowie v. Maddox,*

    642 F.3d 1122 (D.C. Cir. 2011) .......................................................... 34

*Brady v. Livingood,*

    360 F. Supp. 2d 94, 104 (D.D.C. 2004) .............................................. 13

*Brown & Williamson Tabacco Corp. v. Williams,*

    62 F.3d 408 (D.C. Cir. 1995) .............................................................. 30

*Buckley v. Littell,*

    539 F.2d 882 (2d Cir. 1976) ............................................................... 21

*\*Bush v. Butler,*

    521 F. Supp. 2d 63 (D.D.C. 2007) ........................................... 13, 14, 18

*Carto v. Buckley,*

    649 F. Supp. 502 (S.D.N.Y. 1986) ..................................................... 21

*Chappell v. Wallace,*

    462 U.S. 296 (1983) ........................................................................... 36

*Clawson v. St. Louis Post-Dispatch, L.L.C.,*

    906 A.2d 308 (D.C. 2006) ................................................................... 22

*Competitive Enter. Inst. v. Mann*,

    150 A.3d 1213 (D.C. Cir. 2016) ........................................................................ 20

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,

    406 F. Supp. 3d 1258 ........................................................................................ 21

*Deripaska v. Associated Press*,

    282 F. Supp. 3d 133 (D.D.C. 2017) ................................................................. 25

*Deubert v. Gulf F.S.B.*,

    820 F.2d 754 (5th Cir. 1987) ...................................................................... 34, 35

*Doe v. McMillan,*

    412 U.S. 306 (1973) ......................................................................................... 30

*El-Shifa Pharm. Indus. Co. v. United States*,

    607 F.3d 836 (D.C. Cir. 2010)                                                                                   39

*Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*,

    117 F.3d 621 (D.C. Cir. 1997) ......................................................................... 13

*Farah v. Esquire Mag.*,

    736 F.3d 528 (D.C. Cir. 2013) ......................................................................... 19

*Firestone v. Firestone,*

    76 F.3d 1205 (D.C. Cir. 1996) ......................................................................... 42

*\*Fridman v. Orbis Bus. Intel. Ltd.*,

    229 A.3d 494 (D.C. 2020) .......................................................................... 25, 26

*Garrison v. Louisiana,*

    379 U.S. 64 (1964) ........................................................................................... 27

*Gertz v. Robert Welch, Inc.*,

    418 U.S. 323 (1974) ......................................................................................... 20

*Graves v. United States,

    961 F. Supp. 314 (D.D.C. 1997) ........................................... 34

Gross v. German Foundation Indus. Initiative,

    456 F.3d. 363 (3d Cir. 2006)................................................. 40

Guilford Trans. Indus., Inc. v. Wilner,

    760 A.2d 580 (D.C. Cir. 2000)......................................... 21, 24

Haig v. Agee,

    453 U.S. 280 (1981) ...................................................... 39, 40

Hall v. Clinton,

    285 F.3d 74 (D.C. Cir. 2002) ............................................... 13

Harlow v. Fitzgerald,

    457 U.S. 800 (1982) .......................................................... 41

Howard Univ. v. Best,

    484 A.2d 958 (D.C. 1984).................................................... 22

Jankovic v. Int'l Crisis Grp.,

    822 F.3d 576 (D.C. Cir. 2016) ...................................... 22, 26, 27

Japan Whaling Ass'n v. Am. Cetacean Soc.,

    478 U.S. 221 (1986) ...................................................... 12, 39

Jerome Stevens Pharms., Inc. v. FDA,

    402 F.3d 1249 (D.C. Cir. 2005) ........................................... 12

Klayman v. Zuckerberg,

    753 F.3d 1354 (D.C. Cir. 2014) ........................................... 33

*Kreis v. Sec'y of the Air Force*,

    866 F.2d 1508 (D.C. Cir. 1989) ............................................................. 36

*\*Kurd v. Republic of Turkey*,

    374 F. Supp. 3d 37 (D.D.C. 2019) ............................................. 13, 14, 18

*Lane v. Random House, Inc.*,

    985 F. Supp. 141 (D.D.C. 1995) ............................................................. 28

*Levy v. Am. Mut. Liab. Ins. Co.*,

    196 A.2d 475 (D.C. Cir. 1964) ............................................................... 22

*Liberty Lobby, Inc. v. Dow Jones & Co.*,

    838 F.2d 1287 (D.C. Cir. 1988) ....................................................... 20, 28

*\*Mazanderan v. McGranery*,

    490 A.2d 180 (D.C. 1984) ...................................................................... 31

*\*McAndrew v. Lockheed Martin Corp.*,

    206 F.3d 1031 (11th Cir. 2000) .............................................................. 35

*\*McCreary v. Heath*,

    No. 04–cv–0623, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005) ...................................... 18

*McFarlane v. Sheridan Square Press, Inc.*,

    91 F.3d 1501 (D.C. Cir. 1996) ............................................................... 26

*McSurely v. McClellan*,

    553 F.2d 1277 (D.C. Cir. 1976) .............................................................. 30

*Messina v. Krakower*,

    439 F.3d 755 (D.C. Cir. 2006) ............................................................... 31

*Michelin v. Jenkins*,

    704 F. Supp. 1 (D.D.C. 1989) ............................................................... 15

*Milkovich v. Lorain J. Co.*,

    497 U.S. 1 (1990) ....................................................................... 20, 21

*Mitchell v. Forsyth*,

    472 U.S. 511 (1986) ....................................................................... 41

*Moldea v. New York Times*,

    15 F.3d 1137 (D.C. Cir. 1994) ............................................................ 28

*Moldea v. New York Times*,

    22 F.3d 310 (1994) ......................................................................... 28

*\*Mollnow v. Carlton*,

    716 F.2d 627 (9th Cir. 1983)............................................................... 36

*Monitor Patriot Co. v. Roy*,

    401 U.S. 265 (1971) ....................................................................... 24

*Montgomery v. Risen*,

    197 F. Supp. 3d 219, 266 n.41 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) ............. 29

*Myers v. D.C. Hous. Auth.*,

    No. 1:20-CV-00700-APM, 2021 WL 1167032, at \*5 (D.D.C. Mar. 26, 2021)........................ 29

*New York Times Co. v. Sullivan*,

    376 U.S. 254 (1964) ....................................................................... 20

*Ning Ye v. Holder*,

    644 F.Supp.2d 112 (D.C. Cir. 2009) ...................................................... 28

*Ollman v. Evans*,

    750 F.2d 970 (D.C. Cir. 1984) ............................................................ 21

*Oparaugo v. Watts*,

    884 A.2d 63 (D.C. 2005) ................................................................... 33

*Orloff v. Willoughby*,

    345 U.S. 83(1953) ........................................................................ 36

*Papasan v. Allain*,

    478 U.S. 265 (1986) ...................................................................... 12

*\*Park v. Brahmbhatt*,

    234 A.3d 1212 (D.C. 2020) ............................................................... 31

*Pearson v. Callahan*,

    555 U.S. 223 (2009) ...................................................................... 41

*Prop. of the People, Inc. v. Off. of Mgmt. & Budget*,

    394 F. Supp. 3d 39 (D.D.C. 2019) ....................................................... 39

*Reichle v Howards*,

    566 U.S. 658 (2012) ...................................................................... 42

*Ricci v. Teamsters Union Local 456*,

    781 F.3d 25 (2d Cir. 2015) ............................................................... 33

*Roca Labs, Inc. v. Consumer Opinion Corp.*,

    140 F. Supp. 3d 1311 (M.D. Fla. 2015) .................................................. 33

*Rollins v. Wackenhut Servs., Inc.*,

    703 F.3d 122 (D.C. Cir. 2012) ........................................................... 42

*Rosenaur v. Scherer*,

 88 Cal. App. 4th 260 (2001) ................................................................... 22

*Scheuer v. Rhodes*,

 416 U.S. 232 (1974) ................................................................................. 12

*Schneider v. Kissinger*,

 412 F.3d 190 (D.C. Cir. 2005) ........................................................... 12, 38

*Schuler v. United States*,

 617 F.2d 605 (D.C. Cir. 1979) ................................................................ 12

*Shive-Ayala v. Pacelle*,

 Civ. No. 21-704 (RJL), 2022 WL 782412, at *3 (D.D.C. Mar. 15, 2022) .............................. 25

*Shulman v. Zsak*,

 485 F. App'x 528 (3d. Cir. 2012) ............................................................ 15

*Sigal Const. Corp. v. Stanbury*,

 586 A.2d 1204 (D.C. 1991) ..................................................................... 21

*Sparrow v. United Air Lines, Inc.*,

 216 F.3d 1111 (D.C. Cir. 2000) ............................................................... 12

*St. Amant v. Thompson*,

 390 U.S. 727 (1968) ........................................................................ 26, 27

*Tripp v. Dep't of Defense*,

 173 F. Supp. 2d 58 (D.D.C. 2001) ............................................................ 41

*Trudeau v. Fed. Trade Comm'n*,

 456 F.3d 178 (D.C. Cir. 2006) ................................................................ 12

*US Dominion, Inc. v. Byrne*,

   Civ. No. 1:21-cv-02131 (CJN), 2022 WL 1165935, at *7 (D.D.C. Apr. 20, 2022) ................ 33

*Vidurek v. Pollen*,

   No. 20-CV-6714 (CS), 2021 WL 4066503, at *13 (S.D.N.Y. Sept. 7, 2021) ......................... 35

*Waldbaum v. Fairchild Publications, Inc.*,

   627 F.2d 1287 (D.C. Cir. 1980) ...................................................................................... 25, 26

*Weyrich v. New Republic, Inc.*,

   235 F.3d 617 (D.C. Cir. 2001) ............................................................................................. 20

*White v. Fraternal Ord. of Police*,

   909 F.2d 512 (D.C. Cir. 1990) ............................................................................................. 29

**Statutes**

*42 U.S.C. § 1985 ........................................................................................................... passim

42 U.S.C. § 1985(1) ........................................................................................................ 15, 36, 41

42 U.S.C. § 1985(2) ............................................................................................................. passim

42  U.S.C. § 1985(3) ...................................................................................................................... 18

*47 U.S.C. § 230(c)(1) .................................................................................................................. 32

47 U.S.C. § 230(e)(3) ................................................................................................................... 32

50 U.S.C. § 3021(c) ...................................................................................................................... 39

50 U.S.C. § 3021(c)(1) ............................................................................................................ 39, 40

50 U.S.C. §§ 402(a)–(b) ............................................................................................................... 39

**Other Authorities**

Restatement (Second) of Torts § 581A, cmt. f (1977) ................................................................. 28

Restatement (Second) of Torts § 611 cmt. c (1977) .................................................................... 29

**Rules**

Fed. R. Civ. Pro. 12(b)(1) ................................................................................................... 11, 41

Fed. R. Civ. Pro. 12(b)(6) ................................................................................................... 12, 19

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1.................................................................................................... 30

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Politics is a rough and tumble business. Sometimes, feelings get hurt. Boiled to its

essence, Plaintiff Lt. Col. Alexander Vindman's ("Vindman") lawsuit asks this Court to salve his

wounds after a contentious political battle in which Vindman's political opponents said mean

things. But there is no federal cause of action to mollify hurt feelings—and the First Amendment

guarantees there never will be. This Court should dismiss Vindman's complaint and return him

to the court of public opinion where disputes such as these belong.

Vindman became a public figure due to his pivotal role in the 2019–2020 impeachment

inquiry, trial, and acquittal of former President Donald J. Trump ("President Trump"). In the

context of becoming a household name, Vindman feels he was treated unfairly—on Twitter, on

Fox News, on the floor of the United States House of Representatives, and elsewhere. In this suit

under 42 U.S.C. § 1985 ("§ 1985") against four of his self-perceived enemies, Vindman asks this

Court to adjudicate matters legally reserved for the court of public opinion, and manifestly not a

federal court adjudicating civil rights laws. In doing so, Vindman's fatally flawed allegations fail

to plausibly assert claims that, if proven, could result in liability under § 1985.

Vindman's strained attempt to manufacture a civil rights conspiracy from routine

political criticism suffers from at least three critical errors. First, Vindman does not plausibly

allege the existence of a conspiracy, meaning there can be no conspiracy to violate civil rights

under § 1985. Despite making frequent allusions to a "conspiracy" and "conspirators," Vindman

does not inform the Court who formed the conspiracy, how it was formed, or when it was

formed. His speculative and fantastical allegations include no mentions, much less details, of

meetings, documents, or conversations showing the four Defendants (or the more than twenty

other co-conspirators Vindman references) agreed to engage in *any* plan or scheme regarding

Vindman, let alone an illegal plan to violate his civil rights. Vindman alleges only the

unremarkable fact that President Trump's relatives, aides, and supporters expressed similar

opinions about the impeachment proceedings—opinions often critical of Vindman, the hearings'

"star witness." Vindman may have "exposed" the partisan and sometimes unpleasant nature of

politics, but that does not a conspiracy make. If multiple people similarly criticizing a public

figure added up to a civil rights conspiracy, our courts would have time for nothing else.

Second, even if Vindman could somehow allege that Defendants Donald Trump, Jr.

("Trump Jr.") and Daniel Scavino, Jr. ("Scavino") were part of a conspiracy targeting Vindman,

Vindman has not alleged the conspiracy had an impermissible purpose that would be actionable

under § 1985. For all the Complaint's protestation about the attacks made against Vindman, none

of the dozens of complained of statements constitute actionable defamation. And just like a §

1985 conspiracy claim cannot survive without a conspiracy, a § 1985 claim premised on

defamation cannot survive without defamatory speech. The statements of which Vindman

complains are opinions and questions drawn from his testimony and other undisputed, publicly

available facts—in other words, speech clearly protected by the First Amendment. Many of

statements he complains about are subject to the most fundamental defense in defamation law—

the truth.  The remaining speech is subject to the fair reporting privilege, the legislative privilege,

the judicial proceeding privilege, and Section 230 immunity. Vindman—a public figure—further

fails to clear the high bar of proving constitutional malice. Section 1985 is not a philosopher's

stone that somehow converts protected speech into a civil rights conspiracy.

Third, Vindman was not a party or a witness in a federal court proceeding, and thus has

no claim under § 1985(2). Section 1985(2) applies only to parties and witnesses "in any court of

the United States." And courts have been very clear: "court of the United States" means federal courts, and not other branches of government. Without an underlying federal court proceeding, a § 1985(2) claim is impossible as a matter of law.

The remaining acts of which Vindman complains fare no better. Section 1985 provides no remedy to military officers disputing command decisions by their superiors, which would include any alleged interference with or delay of Vindman's anticipated military promotion. All Vindman's superiors necessarily also would have had to be a part of the conspiracy, yet Vindman has provided no allegations related to their involvement. Vindman's removal from the National Security Council ("NSC") relates to a discretionary, national security decision by the executive branch, and is thus a political question. If this Court were to find otherwise, it would find itself embroiled in a separation of powers quagmire, having invaded the executive branch's purview to direct foreign policy.

Finally, even if all of Vindman's strained and conclusory allegations were true, he still could not pursue any claims against Scavino.  Scavino is entitled to qualified immunity, as Vindman is suing him for acts Scavino supposedly took (in nearly each instance, acts *others* took) while a government official, and the law on all these matters is clearly established *in Scavino's favor*. For this Court to find for Vindman as to any of his claims, it would present the first time a court has ever moved to restrict rhetorical and hyperbolic political expression in this extreme manner.

Likely knowing that his defamation claims were non-actionable, frivolous, and would be subject to anti-SLAPP liability (with attorneys' fees), Vindman instead burdened this Court with a fatally flawed defamation complaint masquerading as a civil rights conspiracy. No court has ever found a § 1985 conspiracy simply because members of one political party engaged in

similar criticism of an individual whose actions benefited a rival party. This Court should decline

Vindman's request to turn run of the mill politics into a new genre of political litigation.

For the reasons summarized above and discussed in detail below, this Court should dismiss

Vindman's Complaint as to Trump Jr. and Scavino, with prejudice.

## FACTUAL BACKGROUND[1]

While an officer in the United States Army, Vindman was the NSC Director for Eastern

European, Caucasus, and Russian Affairs. Compl. ¶¶ 43, 47. Vindman is suing Trump Jr., former

President Trump's eldest son; Rudolph Giuliani, President's Trump former personal attorney;

Scavino, former Assistant to the President, Director of Social Media, and Deputy Chief of Staff

for Communications in the Donald J. Trump administration; and Julia Hahn, Special Assistant to

the President and Deputy White House Communications Director in the Donald J. Trump

administration. *Id.* ¶¶ 21–24.

On July 25, 2019, Vindman listened to a telephone call between President Trump and

Ukrainian President Volodymyr Zelensky, and reported concerns about this call to John

Eisenberg, Assistant to the President and the NSC's Legal Counsel. *Id.* ¶¶ 62–63. An

unidentified whistleblower, who Vindman alleges is not him, filed a complaint about the call

with the chairmen of the Senate and House intelligence committees, leading to an impeachment

inquiry for which Vindman was subpoenaed to testify. *Id.* ¶ 65. Vindman thus became a

"household name" and the Democrats' "star witness." *Id.* ¶¶ 66–67.

According to Vindman, President Trump, Defendants, and others formed a conspiracy to

intimidate and retaliate against Vindman. *Id.* ¶ 67. President Trump, Defendants, and other

---

[1] Trump Jr. and Scavino assume the truth of the Complaint's allegations for the purposes of this
motion only.

conspirators would routinely attack President Trump's perceived enemies, and Vindman alleges

they campaigned to smear and intimidate him on social media and "allied media outlets such as

Fox News." *Id.* ¶¶ 94, 99.

Vindman was deposed before a House committee on October 29, 2019. *Id.* ¶ 104. The

day before his deposition, the *New York Times* identified Vindman as a witness and previewed

his opening statement. *Id.* ¶ 105. The same evening that the *Times* story ran, Fox News aired a

segment in which host Laura Ingraham discussed Vindman with John Yoo and Alan Dershowitz,

a discussion Vindman maintains "was filled with false innuendo and accusations." *Id.* ¶ 107.

The morning of his deposition, Fox News host Brian Kilmeade discussed Vindman's

personal connections to Ukraine and said that Vindman "feel[s] simpatico with the Ukraine," a

message echoed by other conservative media outlets. *Id.* ¶¶ 118–19. Despite the criticism from

media commentators, Vindman still appeared before Congress where he described President

Trump's phone call with President Zelensky and his concerns about the call. *Id.* ¶¶ 121–22. That

day, Ingraham called Vindman the "Democrats' 'star witness,'" and said his military service

should not insulate him from criticism. *Id.* ¶ 114.

The day of Vindman's deposition, President Trump called Vindman a "Never Trumper"

in a tweet. *Id.* ¶ 129. In the afternoon of his deposition and the next day, Defendant Giuliani

criticized Vindman on Twitter for providing advice to two countries. *Id.* ¶ 124–25. The morning

after Vindman's testimony, Trump Jr. stated on *Fox & Friends* that "it turns out [Vindman's],

you know, talking to the Ukraine." *Id.* ¶ 127. Trump Jr. also implied that Vindman is a "leftist"

during his *Fox & Friends* appearance. *Id.* ¶ 128. According to Vindman, President Trump and

Trump Jr.'s statements that Vindman was a "Never Trumper" and a "leftist" amounted to

accusations that Vindman violated the Uniform Code of Military Justice and Department of Defense service regulations. *Id.* ¶ 130.

On November 2, 2019, President Trump was asked whether he regretted calling Vindman a "Never Trumper," and stated, "Well, you'll be seeing very soon what comes out and then you can ask the question in a different way." *Id.* ¶ 131. When he was asked the next day what evidence he had, President Trump stated: "We'll be showing that to you real soon. Okay?" *Id.* According to Vindman, President Trump's statements constituted threats of retaliation. *See id.*

A military veteran named Jim Hickman stated on Twitter that he overheard Vindman "bash America" in front of Russian troops during joint military exercises in Germany, and then reprimanded Vindman for those statements. *Id.* ¶ 132. Trump Jr. "amplified" this story when he quote tweeted a *Gateway Pundit* article about Hickman's statement, stating, "Anyone who's been watching for the past three years is not at all surprised this would be their 'star witness.'" *Id.* ¶¶ 132, 137. Trump Jr. also quote tweeted a comment media personality Charlie Kirk made stating his belief that the media would not cover Hickman's statement, stating, "I didn't know that Charlie. You would think the media would at least point that out as one of their talking points but strangely they haven't. All I've heard is that there's no way you could possibly question him or his motives because he was once in the military." *Id.* ¶ 139. Vindman alleges that this incident never occurred, and that Trump Jr. knew it was false or recklessly disregarded information about its falsity, as Hickman had the hashtag #Q in his Twitter profile, wrote more than 100 tweets sharing QAnon-related theories, was a motivated partisan, and did not speak Russian, the language Vindman posits he would have been speaking in any communication with Russian military personnel. *Id.* ¶¶ 133–35. Two retired military officers argued that Hickman's

story was implausible, and Vindman states that Hickman would not have been in a position to observe any interaction between Vindman and Russian troops. *Id.* ¶¶ 135–136.

Vindman was scheduled to provide public testimony before Congress on November 19, 2019 in response to a Congressional subpoena, of which Vindman alleges "Defendants and other conspirators" were aware. *Id.* ¶ 141. The day before his public testimony, President Trump, White House advisor Kellyanne Conway, Vice President Mike Pence, Fox News "regular" Mark J. Penn, and Fox News contributor Andrew Stein met in the Oval Office to discuss the strategy for responding to the impeachment proceedings, which Vindman believes included his testimony. *Id.* ¶¶ 142–43.

The day of Vindman's public testimony, Defendant Hahn distributed talking points to President Trump's surrogates and allies. *Id.* ¶ 146. Defendant Hahn did so at the direction of her superiors, which included Scavino. *Id.* ¶ 146. Defendant Hahn sent an email distributing talking points that had the subject line, "Vindman Has Major Credibility Issues," and stated that "Vindman has faced accusations of poor judgement, leaking, and going around normal procedures." *Id.* ¶ 148. Defendant Hahn stated in another email that "[t]here was nothing wrong with the call with Zelensky at all, Vindman was just upset that President Trump was leading foreign policy instead of sticking to Vindman's talking points…But it's not Vindman's job to set foreign policy, it's the President's." *Id.* ¶ 149 (ellipsis in original). The "Trump War Room" Twitter account, an account belonging to a "rapid response team on President Trump's reelection campaign," tweeted a similar comment about Vindman on November 19, 2019. *Id.* ¶ 150.

During Vindman's public testimony, Republican Counsel Stephen Castor relied on classified information to question Vindman about interactions with Ukraine, revealing information Vindman believes could only have come from White House sources — a job offer to

serve as the Ukrainian Minister of Defense. *Id.* ¶¶ 158–59. After Castor's questioning, the Republican National Committee's "rapid response operation" tweeted: "Question: How often do American military officers get offered Defense Minister positions in foreign countries like Vindman says he was offered three times by Ukraine?" *Id.* ¶ 169. Laura Ingraham and Scavino also commented on Vindman's job offer on Twitter, and President Trump retweeted Scavino's tweet: "#ICYMI: Lt. Col. Vindman was offered the position of Defense Minister for the Ukrainian Government THREE times! #ImpeachmentSHAM." *Id.* ¶¶ 170–72. That evening, Tucker Carlson discussed the job offer on his television show, stating it was a "very strange thing to ask of an active duty American military officer." *Id.* ¶ 174.

Also, Trump Jr. tweeted an article published in the *Federalist* with the headline, "Vindman Just Admitted to Leaking to the Anti-Trump Whistleblower," commenting, "Didn't he just testify he had no idea who the whistleblower was? Sounds like perjury to me… But don't worry he will get away with it because he's pushing the Democrat's [sic] agenda." *Id.* ¶ 176 (ellipsis in original). Vindman argues that the article's headline contained a false assertion, and that the video of Vindman's testimony in the article should have led Trump Jr. to believe that his accusation of "perjury" was false. *Id.* ¶ 177.

On December 13, 2019, President Trump "mocked" Vindman to the press and called him "another beauty." *Id.* ¶ 180.

On December 18, 2019, the House of Representatives passed articles of impeachment against President Trump. *Id.* ¶ 181.

On January 23, 2020, Tucker Carlson and Representative Devin Nunes called Vindman a "spy" on Carlson's television show, and called for Vindman to be fired and "go work for Ukraine." *Id.* ¶ 183. That same night, Senator Marsha Blackburn appeared on Laura Ingraham's

television show and repeated "false conspiracies" against Vindman that were first leveled by

"Jim Hickman and the White House." *Id.* ¶ 184. Earlier that day, Senator Blackburn had levied

similar criticisms against Vindman on Twitter, and Vindman believes Ingraham chose her guests

"specifically to amplify the agreed-upon narrative" about Vindman. *Id.* ¶ 186–87.

      The Senate voted against hearing witness testimony in the impeachment trial on January

31, 2020, and acquitted President Trump on February 5, 2020. *Id.* ¶¶ 188–89. The morning after

President Trump's acquittal, White House Press Secretary Stephanie Grisham told reporters that

President Trump is "also going to talk about just how horribly he was treated and, you know, that

maybe people should pay for that." *Id.* ¶ 191. On February 7, 2020, President Trump stated that

he was "not happy" with Vindman. *Id.* ¶ 192. When pressed on whether Vindman would leave

the White House, President Trump stated, "[t]hey'll make that decision," and "[t]hey'll make a

decision." *Id.* That day, President Trump retweeted an old tweet by Tom Fitton of Judicial

Watch, which stated, "Vindman's behavior is a scandal. He should be removed from the

@RealDonaldTrump White House ASAP to protect our foreign policy from his machinations."

*Id.* ¶ 193.

      A few hours later, Vindman and his twin brother were publicly escorted out of the White

House, ending their NSC assignments, and were returned to the Department of Defense for

reassignment. *Id.* ¶ 194. In response, Trump Jr. tweeted, "On the bright side, he may still be able

to take the defense minister position in the Ukraine that he was offered a few times." *Id.* ¶ 196.

Trump Jr. also tweeted, "Allow me to thank—and this may be a bit of a surprise—Adam Schiff.

Were it not for his crack investigation skills, @realDonaldTrump might have had a tougher time

unearthing who all needed to be fired. Thanks, Adam!" *Id.* ¶ 197. That evening, Laura Ingraham,

and her guest, Dinesh D'Souza, praised Vindman's removal from the NSC. *Id.* ¶ 198. In two

tweets, President Trump criticized Vindman as insubordinate, stated that Vindman's superior gave him a "horrendous report," concluding, "In other words, 'OUT.'" *Id.* ¶ 199. A few days later, President Trump stated that Vindman was sent to a "much different location, and the military can handle him any way they want," surmising that the military would want to "take a look" at what happened, as Vindman "reported a false call." *Id.* ¶ 201. National Security Advisor Robert O'Brien later stated that he alone made the decision to remove Vindman from the NSC, and "implicitly question[ed] . . . Vindman's motives and loyalty[.]" *Id.* ¶ 202.

In May 2020, Trump Jr. criticized Vindman in two tweets, sharing a *Breitbart* article entitled, "Alexander Vindman Admits Making up Parts of Trump Call Summary." *Id.* ¶ 203. In one tweet, Trump Jr. wrote that Vindman "[made] up things [leading] to an impeachment," but Vindman argues this conclusion was not supported by the contents of the *Breitbart* article. *Id.* ¶ 204.

Vindman alleges that in the summer of 2019, he was on track for promotion to full Colonel in the Army in 2020. *Id.* ¶ 206. In early 2020, Vindman met with Major General Bradley Gericke, after which meeting Vindman assumed that the Army had recommended him for promotion, but that Army officials were concerned that the White House would intervene to prevent Vindman's promotion or delay all Army promotions. *Id.* ¶ 208. Unnamed White House personnel prepared a list of "unfounded allegations" about Vindman, including an allegation that Vindman created a "hostile working environment" for his coworkers at the NSC, and sent this list to the Pentagon to prevent Vindman's promotion. *Id.* ¶ 210. The Army's promotion list was initially delayed, and the Army conducted an internal command-level investigation, clearing Vindman of wrongdoing. *Id.* ¶¶ 212–13. Vindman's name was later included on the list of officer promotions the Army shared with the White House in summer 2020. *Id.* ¶ 213. The list was not

released publicly, and White House Chief of Staff Mark Meadows "berate[d]" the Secretaries of Defense and the Army for including Vindman's name on the list. *Id.* ¶ 214. Vindman announced his retirement in July 2020, and several days later, the Army released its list of promotions. *Id.* ¶¶ 215, 223. A few months later, the Presidential Personnel Office prepared a memo recommending Secretary of Defense Mark Esper's termination, listing Esper's approval of Vindman's promotion as one reason for terminating Esper. *Id.* ¶ 216.

Vindman alleges that he has suffered these damages as a result of Defendants' actions: reputational harm as a result of false accusations; the inability to perform intelligence work in Eastern Europe or Eurasia; limits on his ability to find work outside the military in his fields of expertise; and fear for his and his family's physical safety. *Id.* ¶¶ 225–30. Public sources of which the Court may take judicial notice belie Vindman's narrative. Since testifying in the impeachment inquiry, Vindman has transformed into a media darling and bona fide celebrity. Vindman is routinely featured in articles and television segments where he promotes his book, offers commentary on foreign affairs. discusses his life story and experience working in the Donald J. Trump administration, and rebukes media figures with whose opinions he disagrees. Vindman even had a cameo playing himself on the hit comedy show, *Curb Your Enthusiasm*. *See* Defendants Donald Trump, Jr., and Daniel Scavino, Jr.'s Request for Judicial Notice ("Trump Jr. and Scavino's RJN"), filed herewith.

## LEGAL STANDARD

### I.       Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim if it lacks subject matter jurisdiction. Through what is known as the "political question doctrine," "courts lack jurisdiction over political decisions that are by their nature committed to the political

branches to the exclusion of the judiciary." *Schneider v. Kissinger,* 412 F.3d 190, 193 (D.C. Cir. 2005) (cleaned up). The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

## II.      Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." In evaluating a defendant's motion to dismiss, the court must "treat the complaint's factual allegations as true . . . and must grant Plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted)); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1250 (D.C. Cir. 2005).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986). The facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). In evaluating the sufficiency of Plaintiff's Complaint under Rule 12(b)(6), the Court may consider "the facts alleged in the complaint, any documents either

attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." *Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

## I.   Vindman Failed to Allege the Plausible Existence of a Conspiracy.

To state a claim for relief under any subsection of § 1985, "plaintiffs must allege the elements of civil conspiracy, including: 'an agreement to take part in an unlawful action or lawful action in an unlawful manner.'" *Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004) (quoting *Hall v. Clinton*, 285 F.3d 74, 83 (D.C. Cir. 2002)). A plaintiff must further allege "an injury caused by an unlawful overt act performed by one of the parties to the agreement" and that "the overt act was done pursuant to a common scheme." *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007) (cleaned up).

Conclusory allegations claiming the existence of a conspiracy are not enough. *Bush*, 521 F. Supp. 2d at 68. A plaintiff must "allege the existence of [] events, conversations, or documents indicating that there was an agreement to violate his rights." *Id.* (cleaned up). Complaints lacking this specificity "fail to raise Plaintiffs' allegation of an agreement beyond the speculative and into the level of plausible." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C. 2019) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

## A.  Vindman failed to plausibly allege the existence of *any* agreement.

Allegations that defendants "'agreed among themselves' to subject [the plaintiff] to discriminatory acts" are "not susceptible to being interpreted as a conspiracy" without facts from which the court could "infer an *agreement* to discriminate…." *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004). In other words, the agreement must be more than an agreement to

13

engage in the actions which purportedly caused the § 1985 injury; defendants must be "acting in concert in furtherance of a shared goal" *to violate* the rights outlined in § 1985. *Id.* Allegations of "parallel conduct that could just as well be independent action" also "fail to establish the existence of an agreement." *Kurd*, 374 F. Supp. 3d at 52 (quoting *Twombly*, 550 U.S. at 557). "The mere repetition of a conclusory statement that a conspiracy exists and that all the alleged events occurred as a result of a conspiracy are insufficient as a matter of law." *Lemon v. Kramer*, 270 F. Supp. 3d 125, 142–143 (D.D.C. 2017).

Here, Vindman has done nothing more than repeatedly make the conclusory statement that a conspiracy exists and then surmise that all personal criticism he received came because of that "conspiracy." For example, in paragraph 67 Vindman states:

> The unlawful conspiracy targeting Lt. Col. Vindman included Defendants as well as President Trump and other close aides and associates not presently named as defendants. The fact that these conspirators agreed on a common purpose and engaged in a concerted effort to intimidate and retaliate against Lt. Col. Vindman is clear not only from the nearly identical timing and substance of their attacks and known instances of specific coordination and communication regarding Lt. Col. Vindman (detailed below), but also the close relationships (even interdependence) between the conspirators, their history of working together to target perceived enemies of President Trump, and their clear opportunities and incentives to do so again with respect to the person they identified as the "star witness" of the impeachment.

Compl. ¶ 67.

"Identical timing and substance," *id.*, does not a conspiracy make without alleging the existence of "events, conversations, or documents indicating there was an agreement to violate [plaintiff's] rights." *Bush*, 521 F. Supp. 2d at 68. Vindman includes no such allegations. "[C]oordination," "communication," "close relationships," and "incentives," Compl. ¶ 67, also "fail to raise Plaintiffs' allegation of an agreement beyond the speculative and into the level of plausible." *Kurd*, 374 F. Supp. 3d at 62. This "parallel conduct" "could just as well be

independent action," *id.* at 52, and Vindman has provided this Court with no allegations, much less plausible ones, that would allow it to infer that the activities here were anything but independent.

**B. Vindman failed to plausibly allege a conspiratorial agreement with the goal of preventing Vindman from holding and discharging the duties of his office or testifying in any proceeding.**

Even if there were sufficient allegations to claim there was a conspiracy to defame and retaliate against Vindman (and there are not), there are *no allegations* to suggest these actions were done with the goal of "preventing" Vindman from "holding and discharging the duties of his office," Compl. ¶ 249, or preventing him from testifying in impeachment proceedings, *id.* ¶ 261. Even if the Defendants and non-defendant coconspirators agreed to defame and retaliate against Vindman (speculative allegations at best), unless the coconspirators agreed to do so with the shared goal of stopping Vindman from doing his job and testifying, there is no § 1985 violation. 42 U.S.C. § 1985(1) (stating two or more persons must "conspire *to prevent*" plaintiff from "discharging any duties" of their federal office); 42 U.S.C. § 1985(2) (stating two or more persons must "conspire *to deter*" a party or witness from testifying); *Shulman v. Zsak*, 485 F. App'x 528, 531 (3d. Cir. 2012) (dismissing 42 U.S.C. § 1985(1) complaint that "failed to present enough facts from which a court could plausibly infer a conspiracy *to keep him from discharging his federal duties*.") (emphasis added); *see also Michelin v. Jenkins*, 704 F. Supp. 1, 4 (D.D.C. 1989) (holding that, "even assuming, *arguendo*" that a conspiracy existed, there were no allegations that defendants' acted because of an impermissible motive as required by § 1985). A conspiracy to defame Vindman would not be a § 1985 violation unless the conspirators agreed to these impermissible goals. Vindman has offered no allegations making this plausible.

15

**C.  Vindman did not allege any meeting, gathering, or synchronous communication between the over twenty alleged coconspirators that would have provided the opportunity for them to hatch their conspiracy.**

The Complaint claims that the four Defendants are but a small subset of the conspiracy's members. Compl. ¶ 6. Other non-defendant "conspirators targeting Vindman" mentioned in the Complaint include, President Trump, *id.* ¶ 67, Laura Ingraham, *id.* ¶ 78, Peter Hegseth, *id.* ¶ 89, Lou Dobbs, *id.*, Sean Hannity, *id.*, Rupert Murdoch, *id.*, William Barr, *id.* ¶ 90, Bill Shine, *id.* ¶ 91, Hope Hicks, *id.* ¶ 91, Kimberly Guilfoyle, *id.* ¶ 92, Brian Kilmeade, *id.* ¶ 118, Congressman Devin Nunes, *id.* ¶ 183, Senator Marsha Blackburn, *id.* ¶ 184, John Yoo, *id.* ¶ 110, Alan Dershowitz, *id.* ¶ 110, other Trump aides, *id.* ¶ 67, other on-air Fox News personalities, *id.*, the Republican National Committee, *id.* ¶169, Vindman's military superiors, ¶¶ 205–217, and more, with no indication that Vindman's current named list of over twenty "coconspirators" is exhaustive.

Given the size of this putative conspiracy, one would think the Complaint would detail some meetings, conversations, or documents where these individuals, or at least some subset of these individuals, gathered to come to the conspiratorial prerequisite "meeting of the minds." It does not. While full of amorphous gossip about the "coconspirators'" beltway connections, noticeably absent from the Complaint is a date, a time, a call, a meeting, an email, or any information that would suggest these individuals were together or synchronously in contact so that they could come to *any* common agreement, let alone one with the agreed upon purpose of stopping Vindman from testifying or doing his job.

**II.    Even if Vindman Had Plausibly Alleged the Existence of a Conspiracy, He Failed to Allege Trump Jr. and Scavino Joined that Conspiracy.**

A showing of a meeting of the minds is no more present for the Defendant "coconspirators" than it is for expansive list of non-Defendant "coconspirators." Paragraphs 67

16

through 99 of the Complaint—grouped together under the heading "The Conspirators Targeting Lt. Col. Vindman," Compl. ¶ 15—fail to allege when, where, why, or how Trump Jr. and Scavino willingly agreed to take part in the conspiracy. Vindman alleges that Scavino managed the White House Twitter account; was a "direct conduit to President Trump's base of supporters and 'influencers';" and was one of President Trump's "most trusted (and longest serving) advisors." Compl. ¶¶ 69–71. None of those are claims that Scavino knew of or joined the alleged § 1985 conspiracy against Vindman. Trump Jr. allegedly made "distasteful attacks on his father's perceived enemies" and coordinated with President Trump on matters involving President Trump's "presidency, businesses, and political and personal advancement." *Id.* ¶¶ 73–74. As with Scavino, at no point does Vindman ever allege facts relating to an event, conversation, or document showing that Trump Jr. agreed to engage in *any* concerted action regarding Vindman with the other Defendants, with President Trump, or with any other alleged conspirator. Instead, Vindman offers mere conclusory allegations, void of actual facts, that "President Trump and his allies, including Defendants, agreed on and coordinated multiple campaigns to attack President Trump's perceived political enemies" and that the "unlawful conspiracy here followed the same playbook." *Id.* ¶¶ 95, 99. A conspiracy to "attack President Trump's perceived political enemies" is not actionable under § 1985. Yet even if it were, Vindman has not even offered plausible allegations that Trump Jr. and Scavino agreed to participate in any such conspiracy.

A close examination of the rest of the Complaint also yields no allegations showing the plausible existence of a conspiracy involving Trump Jr. or Scavino. The closest the Complaint comes to alleging a meeting in which participants agreed to enter a conspiracy to stop Vindman from doing his job or testifying is a meeting purported to have occurred on November 18, 2019. Of course, the Complaint does not allege that this was a meeting where the conspiracy was

formed or the required conspiratorial meeting of the minds accomplished; instead, the Complaint states it was a meeting "to discuss strategy for responding to the impeachment proceedings." *Id.* ¶¶ 142–43. And while a meeting to discuss strategy is not equivalent to the formation of a conspiracy, even if it were, neither Trump Jr. nor Scavino (nor the other Defendants) were present at this meeting.

Vindman alleges that the day after this meeting, Defendant Hahn distributed a list of talking points at the direction of her superiors at the White House, including Scavino. *Id.* ¶ 146. Yet neither asking a subordinate to draft talking points, nor receiving talking points—especially if the talking points do not mention stopping Vindman from doing his job or testifying—shows the formation of any agreement to which Scavino was a party. *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 39 (D.D.C. 2021) ("Merely alleging that the defendant officials communicated, without alleging any details of those communications *that suggest an unlawful agreement*, cannot justify inferring the requisite agreement for a § 1985(3) conspiracy."); *Bush*, 521 F. Supp. 2d 63, 68 (dismissing conspiracy claims where plaintiff provided "no description of the persons involved in the agreement, the nature of the agreement, what particular acts were taken to form the conspiracy, or what overt acts were taken in furtherance of the conspiracy."); *Kurd*, 374 F. Supp. 3d at 62 (dismissing conspiracy claims where plaintiffs provided no allegations that defendants knew each other, communicated with each other, had an opportunity to make an agreement or made an agreement); *McCreary v. Heath*, No. 04–cv–0623, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005) (dismissing conspiracy claim when the plaintiff's "162–page complaint fail[ed] to allege the existence of any events, conversations, or documents indicating that there was ever an agreement or 'meeting of the minds' between any of the defendants").

18

In any event, there is no suggestion of a factual connection between the alleged talking points and any action taken by Trump Jr. All of the actions at issue took place not only during the impeachment timeframe, but also in the midst of an active presidential campaign during which both sides circulate talking points to their allies to advance their political position.

Throughout the Complaint, Vindman presupposes the existence of a conspiracy, but fails to offer supporting allegations that would allow him to maintain a § 1985 claim. At most, Vindman has alleged facts showing that, around the time he was a key witness in an impeachment proceeding against the President of the United States, there were government officials, commentators, and media personalities who criticized Vindman, sometimes in similar ways. Such speculative, bare-bones allegations against Trump Jr. and Scavino cannot survive a Rule 12 motion, and any claims based upon such allegations must be dismissed.

### III. Vindman Presented No Actionable Defamation Claim that Would Allow Him to Sustain His § 1985 Claims.

For a § 1985 claim premised on defamation to survive a Rule 12(b)(6) motion, the plaintiff must plausibly allege actionable defamation occurred. *Barr v. Clinton*, 370 F.3d 1196, 1203 (D.C. Cir. 2004). To state a claim for defamation under District of Columbia law, a plaintiff must allege "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Farah v. Esquire Mag.*, 736 F.3d 528, 533–34 (D.C. Cir. 2013) (cleaned up).

The Complaint lists dozens of public statements by various individuals including former President Trump, Trump Jr., Defendant Giuliani, Fox News personalities, and others. Just like the Complaint never states who exactly joined the conspiracy, the Complaint never identifies which statements it claims are defamatory, nor attempts to clear the obvious and multiple hurdles

19

to such claims, the First Amendment, associated privileges, and more. In any case, none of the statements mentioned in the Complaint present an actionable defamation claim.

### A.  Vindman complains about expression protected by the First Amendment.

The speech of which Vindman complains is political speech that occurred during a contentious public debate surrounding the impeachment of a President.  That Vindman found some of the opinions expressed to be offensive does not move that speech outside the ambit of the First Amendment's protections.

The Supreme Court has long enshrined "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (internal citation omitted). "Because the First Amendment protects speech as an expression of the fundamental right to freedom of thought, constitutionally speaking, 'there is no such thing as a false idea.'" *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. Cir. 2016), *as amended* (Dec. 13, 2018) (quoting *Milkovich v. Lorain J*. Co., 497 U.S. 1, 18 (1990)).

"Expressions of pure opinion, as embodiments of ideas, are generally entitled to constitutional protection." *Id.* "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)). For a challenged statement to be actionable as defamation, "it must at a minimum express or imply a verifiably false fact about [an individual]." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001); *see also Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1292 (D.C. Cir. 1988). "Assertions of opinion on a matter of public concern receive full constitutional protection if they do not

contain a provably false factual connotation." *Guilford Trans. Indus., Inc. v. Wilner*, 760 A.2d

580, 597 (D.C. Cir. 2000). "[I]f it is plain that a speaker is expressing a subjective view, an

interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of

objectively verifiable facts, the statement is not actionable." *Id.*

      If "an average reader would likely understand that particular words, in the context of an

entire article, were not meant to imply factual data but, rather, were intended merely to disagree

strongly with the views of the [plaintiff], those words would be protected despite their factual

content." *Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1211 (D.C. 1991). Thus, statements

that constitute "imaginative expression" and "rhetorical hyperbole" are not actionable because

they "cannot reasonably be interpreted as stating actual facts about an individual." *Guilford*

*Transp. Indus.*, 760 A.2d at 596–97 (quoting *Milkovich*, 497 U.S. at 20). "Opinions, however

rude, grating, obnoxious, or personally offensive, are simply not actionable." *Carto v. Buckley*,

649 F. Supp. 502, 506 (S.D.N.Y. 1986). Such statements are "used not to implicate underlying

acts but merely in a loose, figurative sense to demonstrate strong disagreement" with another's

ideas. *Mann*, 150 A.3d 1213, 1242 (quoting *Sigal*, 586 A.2d at 1210) (cleaned up).

      Political speech is provided significant leeway as "loosely definable, variously

interpretable statement[s] of opinion made inextricably in the contest of political social or

philosophical debate" are "obviously unverifiable." *Ollman v. Evans*, 750 F.2d 970, 987 (D.C.

Cir. 1984) (finding allegation that someone is "an outspoken proponent of political Marxism" not

defamatory); *Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir. 1976) (holding the use of "fascist"

and "radical right" were not statements of fact but "terms in the realm of political debate");

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1279 (holding

allegation non-profit was a "hate group" not defamatory); *Carto*, 649 F. Supp. at 510 (holding

allegation individual was "anti-Semitic" was protected opinion); *Rosenaur v. Scherer*, 88 Cal. App. 4th 260, 280 (2001) (holding use of words "thief" and "liar" protected as loose, figurative, or hyperbolic political language). "An action for defamation can be maintained only to the extent it does not interfere with First Amendment rights of free expression." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016).

"The plaintiff has the burden of proving the defamatory nature of the publication and the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it was addressed." *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (quoting *Levy v. Am. Mut. Liab. Ins. Co.*, 196 A.2d 475, 476 (D.C. Cir. 1964) and *Afro-Am. Publishing Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966)) (cleaned up). "[A] statement . . . may not be isolated and then pronounced defamatory, or deemed capable of defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire [publication]." *Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 313–14 (D.C. 2006).

Not until over 100 paragraphs into the Complaint does Vindman provide any actual alleged defamatory statement for the Court's review rather than a characterization of how he interpreted the statements of the "coconspirators." When he finally provides specific examples of alleged defamatory statements, those statements' audiences would have known that the speakers were expressing "strong disagreement," "imaginative expression" and "rhetorical hyperbole," not statements of fact.

In paragraphs 108–113, Vindman suggests that Laura Ingraham defamed him by "recklessly accus[ing]" Vindman of acting "against the President's interests," and using a "sarcastic tone" when stating Vindman "usually spoke in English" to his Ukrainian counterparts.

To the first point, whether someone is "acting against the President's interests" is not a provably false statement of fact. It is subjective opinion. That cannot be defamatory. Regarding the phrase "usually, they spoke in English," Ingraham was expressing a true statement. Ingraham and her guests then expressed their opinions—on Ingraham's opinion show—about what those facts might mean. There would have been no confusion that any of the guests were expressing a verifiable fact of which they possessed independent knowledge.

In paragraph 114, Vindman again spends a paragraph characterizing Ingraham's words and claiming they crossed a defamatory line, yet he provides only one actual phrase for the Court's consideration, stating Ingraham called him the Democrats' "star witness." Again, this is a subjective opinion that cannot be proven true or false.

In paragraph 115, Vindman complains Ingraham never retracted "false allegations" at his attorney's written request, but so far, he has not provided one false allegation that could have been retracted. Everything was an expression of opinion about undisputed facts, discussed on Ingraham's opinion show.

In paragraph 118, Vindman alleges that he did not care for Brian Kilmeade's opinion that Vindman holds "an affinity to the Ukrainian people."

In paragraph 120, he did not care for Defendant Giuliani's questioning whether a United States government employee had "reportedly been advising two gov's?," or Giuliani's opinion about a linked article including a quote from Representative Adam Schiff.

In paragraph 128, Vindman is incensed at Trump Jr.'s opinion, which cannot be proven true or false, that Vindman's personal political views may have impacted his performance of his duties.

Other protected opinions Vindman asks this Court to declare defamatory include: ¶¶ 184–186 (military members and members of Congress' disagreement with some of Vindman's decision making); ¶¶ 192–193, 197–202 (the expression of opinions that Vindman should be removed from the NSC, and that he was appropriately removed from the NSC); and ¶ 210 (reports that Vindman had created a hostile work environment at the NSC). And the list of protected opinions and rhetorical hyperbole Vindman wants the Court to declare defamatory goes on (paragraph 129, calling Vindman a "Never-Trumper witness"), and on (paragraphs 149–150, saying Vindman was upset that Trump did not want to follow his talking points), and on (paragraphs 169–170, 174, 183, discussing opinions and asking questions about the true fact that Vindman received a job offer to be the Ukrainian Defense Minister).

None of these opinions can be proven true or false. Further, within the context of how these statements appeared—Fox News opinion shows and Twitter in the midst of heated political debate about the President of the United States—all viewers or readers of these opinions would have known the speakers were "expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Guilford Trans. Indus., Inc.*, 760 A.2d at 597.

Discussing the "realities of our political life" in the early 1970s, the Supreme Court stated, "[c]harges of gross incompetence, disregard of the public interest, communist sympathies, and the like have usually filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent. If actionable defamation is possible in this field, one might suppose that the chief energies of the courts, for some time after every political campaign, would be absorbed by libel and slander suits." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 275 (1971). Fifty

years later, those sentiments still hold true. Vindman was a "victim" of heated political rhetoric, not defamation.

### B.   Vindman was a public figure and did not adequately allege malice.

"Where a plaintiff is a public figure, the third element of the defamation claim requires that she demonstrate by clear and convincing evidence that the defendant published the defamatory falsehood with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Shive-Ayala v. Pacelle*, Civ. No. 21-704 (RJL), 2022 WL 782412, at *3 (D.D.C. Mar. 15, 2022) (quoting *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 141 (D.D.C. 2017) (cleaned up). Public figures can be either regular public figures or limited purpose public figures. *Id.* "Limited-purpose public figures are those who assume roles in the forefront of particular public controversies to influence the resolution of the issues involved. *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504 (D.C. 2020). Determining whether someone is a public figure is a question of law. *Id.* District of Columbia courts follow a three-part test to determine whether someone is a limited-purpose public figure. First, the court decides "whether there is a public controversy and determines its scope," to decide "whether the controversy to which the defamation relates was the subject of public discussion *prior* to the defamation." *Id.* Next the court asks "whether 'a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.'" *Id.* (quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–97 (D.C. Cir. 1980)).

After the controversy is defined, the court examines whether the plaintiff "achieved special prominence in the debate, and either 'must have been purposefully trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Id.* (quoting *Waldbaum*, 627 F.2d at 1298). "Occasionally,

someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome." *Id.* (quoting *Waldbaum*, 627 F.2d at 1298). In those instances, "[u]nless he rejects any role in the debate, he too has 'invited comment' relating to the issue at hand." *Id.* (quoting *Waldbaum*, 627 F.2d at 1298). The defamatory statement must be "germane to the plaintiff's participation in the controversy." *Jankovic*, 822 F.3d at 589 (quoting *Waldbaum*, 627 F.2d at 1298).

Vindman's lawsuit involves the backdrop of a real public controversy, concerning a phone call—to which Vindman was privy—in which Vindman alleges the President of the United States attempted to inappropriately pressure Ukrainian President Zelensky to investigate Hunter Biden. Compl. ¶¶ 62–63. All of Vindman's alleged defamation relates to this public controversy, and the dispute's resolution impacted the entire country. Vindman achieved special prominence in the debate, described as Congressional Democrats' "star witness" in the impeachment proceedings. Vindman could realistically have been expected, because of his position as the "star witness," to have an impact on the dispute's resolution. Yet even if Vindman had only been caught up "involuntarily," he did not reject the role in the debate, and therefore "invited comment" relating to the issue. *Fridman*, 229 A.3d at 504. Vindman even alleges that he is a "household name." Compl. ¶ 64. In the intervening months, Vindman's public stature has grown by orders of magnitude as he has blossomed into a celebrity. *See* Trump Jr. and Scavino's RJN.

As a limited-purpose public figure, Vindman would have to plausibly allege malice to meet the Constitution's requirements for public figures to maintain an action for defamation. "The standard of actual malice is a daunting one." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968))

(cleaned up). "Few public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of his publication.'" *Id.* (quoting *St. Amant*, 390 U.S. at 731). Vindman must show that alleged defamatory statements were "made with knowledge [they were] false or with reckless disregard of whether [they were] false or not." Merely "show[ing] that [the] defendant should have known better" than to believe the truth of his publication does not suffice. *Jankovic*, 822 F.3d at 589; *see also St. Amant*, 390 U.S. at 731. Rather, the plaintiff must plausibly allege that "the defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant*, 390 U.S. at 731, or acted "with a 'high degree of awareness of … probable falsity.'" *Id*. (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).

Having failed to properly articulate any legally actionable defamation claim, Vindman further compounds his pleading deficits by failing to allege the Defendants or their alleged coconspirators "entertained serious doubts" or acted "with a high degree of awareness" of the probable falsity of their claims. To begin with, this is because all alleged defamatory claims were either true or protected opinions containing "imaginative expression" and "rhetorical hyperbole." But beyond that, Vindman's Complaint only alleges malice with conclusory allegations bereft of substance. *See, e.g.,* Compl. ¶ 255 (stating conspirators made their statements with "actual malice" "as set for in detail above," yet none of the "above" paragraphs include details that create a plausible inference of malice.) Vindman's Complaint contains no allegations from which the Court could find the "high degree of awareness" required to sustain his claims. Vindman, a limited-purpose public figure, has not plausibly alleged malice.

### C.   Vindman complains about true statements.

Truth and substantial truth are defenses to defamation. *Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013). "Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1296 (D.C. Cir. 1988) (quoting Restatement (Second) of Torts § 581A, cmt. f (1977)). It is an "absolute defense" to a defamation claim if the statements are "substantially true." *Ning Ye v. Holder,* 644 F.Supp.2d 112, 117 (D.C. Cir. 2009). The Court must "determine as a threshold matter whether a challenged statement is capable of a defamatory meaning; and whether it is verifiable—that is, whether a plaintiff can prove that it is false." *Moldea v. New York Times*, 22 F.3d 310, 316–17 (1994) (*Moldea II*) (citing *Moldea v. New York Times*, 15 F.3d 1137, 1142–45 (D.C. Cir. 1994) (*Moldea I*)). "The burden of proving falsity rests squarely on the plaintiff." *Lane v. Random House, Inc.,* 985 F. Supp. 141, 151 (D.D.C. 1995).

Vindman complains about a number of true statements that he, simply, does not like. Vindman objects to statements that he sometimes spoke to Ukrainian government officials in Ukrainian or Russian, Compl. ¶¶ 108–113, an undisputed fact. In paragraph 127, Vindman quotes a statement from Trump Jr. that "it turns out [Vindman's] you know, talking to Ukraine." Vindman was, in fact, talking to Ukraine; that was part of his job. In paragraph 148, Vindman complains about the statement that he "faced accusations of poor judgement, leaking, and going around normal procedures." Vindman *was* facing those accusations; the White House was making them. And in paragraph 171, Vindman complains about Scavino tweeting out that the Ukrainian government offered Vindman the position of Ukrainian defense minister three times, another true statement. Truth is an absolute defense to defamation, and Vindman cannot meet his burden of proving the falsity of any of these statements.

28

**D. Several allegations are protected by privileges or statutory immunity.**

The "issue of privilege antecedes the question of" defamation. *White v. Fraternal Ord. of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990). Here, several of Vindman's complained of statements are protected by the fair reporting, legislative, and judicial proceeding privilege, or by immunity granted under Section 230(c) of the Communications Decency Act ("Section 230").

> 1. Vindman complains of communications protected by the fair reporting privilege.

The fair reporting privilege provides conditional immunity to "*any person* who makes an oral, written, or printed report to pass on information that is available to the general public." *Myers v. D.C. Hous. Auth.*, No. 1:20-CV-00700-APM, 2021 WL 1167032, at *5 (D.D.C. Mar. 26, 2021) (quoting Restatement (Second) of Torts § 611 cmt. c (1977)). If the publishers' reporting "is a fair and accurate representation of an official report, the word is privileged, regardless of the veracity of the official report and even if the official documents contain erroneous information." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 266 n.41 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) (cleaned up).

Vindman complains about questioning by Republican Counsel Stephen Castor about an offer Vindman received to serve as Ukraine's Minister of Defense. Compl. ¶¶ 159, 164–166. To the extent Vidman complains that Castor's statements were overt acts in furtherance of the conspiracy, Castor's questioning would be covered by the fair reporting privilege as Castor received this information from government sources—Vindman speculates from the White House, Compl. ¶ 159—and Vindman does not dispute the claim's veracity. Similarly, Vindman's allegations that the Republican National Committee, Laura Ingraham, Scavino, President Trump, and Tucker Carlson, respectively, publicized Castor's questioning of Vindman about the offers to become the Ukrainian Minister of Defense are subject to the fair reporting privilege because

29

these allegations relate to these individuals' repeating Castor's questions and Vindman's answers during the House impeachment proceedings. *See id.* ¶¶ 169–172, 174. The fair reporting privilege forecloses claims of defamation related to these statements.

   2.  Vindman complains of communications protected by the legislative privilege.

The Speech and Debate Clause of the United States Constitution states: "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The legislative privilege is "absolute." *Brown & Williamson Tabacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995). The Clause confers on Members of Congress immunity for all actions "within the 'legislative sphere,' even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan,* 412 U.S. 306, 312–13 (1973). "The privilege also permits Congress to conduct investigations and obtain information without interference from the courts, at least when these activities are performed in a procedurally regular fashion." *Williams*, 62 F.3d at 416. "The law is clear that even though material comes to a legislative committee by means that are unlawful or otherwise subject to judicial inquiry the subsequent use of the documents by the committee staff in the course of official business is privileged legislative activity." *Id.* (quoting *McSurely v. McClellan*, 553 F.2d 1277, 1296 (D.C. Cir. 1976)).

Again, to the extent Vindman complains that Castor's statements were overt acts in furtherance of the conspiracy, Mr. Castor's statements are also protected by the legislative privilege. All questioning happened within the context of House impeachment hearings—official House business. Compl. ¶ 158. Regardless of the source of the information or materials Mr.

Castor utilized for his questioning, all statements made in the course of Castor's questioning are privileged.

      3.  <u>Vindman complains of communications protected by the judicial proceeding privilege.</u>

"The judicial-proceedings privilege 'affords an attorney [and his or her client] absolute immunity from actions in defamation for communications related to judicial proceedings.'" *Park v. Brahmbhatt*, 234 A.3d 1212, 1215 (D.C. 2020) (quoting *Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988)) (brackets in original) (other citation omitted); *see also Messina v. Krakower*, 439 F.3d 755, 760 (D.C. Cir. 2006) ("The judicial proceedings privilege . . . is well-settled in District of Columbia law." (citations omitted)). The privilege has two elements: "'(1) the statement must have been made in the course of or preliminary to a judicial proceeding; and (2) the statement must be related in some way to the underlying proceeding.'" *Park*, 234 A.3d at 1215 (quoting *Arneja*, 541 A.2d at 623).

District of Columbia courts apply the privilege broadly, "not only to formal judicial proceedings," but also to "quasi-judicial proceedings conducted by administrative bodies" and private arbitral tribunals. *Id.* (citations omitted). For example, a letter to the Public Vehicles Division of the D.C. Department of Mass Transportation about a tax driver's allegedly abusive behavior was subject to the privilege, as it was a formal complaint giving rise to a Hacker's License Appeal Board hearing. *See Mazanderan v. McGranery*, 490 A.2d 180, 181 (D.C. 1984). "[T]here is no fixed standard for quasi-judicial, nor is there a telltale sign one for one . . . . The ultimate inquiry is, and has always been whether the policy rationales for the privilege support its extension." *Park*, 234 A.3d at 1217. The purpose of the privilege is to "secur[e] to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients, and to assure all [others] concerned that they can speak truly, without fear of answering in a civil action

for defamation." *Id.* at 1216 (citations and internal quotation marks omitted) (brackets in original). Given that the privilege has been extended to proceedings before the D.C. Rental Accommodations Office and the D.C. Hacker's License Appeal Board, *id.* at 1216–17, the privilege must apply in the context of a presidential impeachment proceeding—a proceeding designed to adjudicate an accusation of high crimes and misdemeanors against the President of the United States.

Mr. Castor's statements, as alleged, also readily satisfy the second element of the absolute judicial-proceedings privilege, which examines the relationship between the statement and the proceeding. *Id.* at 1215. Vindman's allegations about Mr. Castor relate to his questions about Vindman's interactions with Ukraine, Compl. ¶ 158, and job offers a Ukrainian official extended to Vindman, *id.* ¶¶ 159, 162–68. Given that Vindman's testimony during the impeachment proceedings related to "his observations of the July [2019] phone call between President Trump and Ukraine President Zelensky," *id.* ¶ 154, there is a direct relationship between Mr. Castor's questions and the subject of the proceeding. Vindman cannot base a § 1985 claim on questions Mr. Castor posed to Vindman during the impeachment proceedings because such questions are subject to the absolute judicial-proceedings privilege.

4. Vindman complains of communications immune under Section 230.

Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). A later section of the Communications Decency Act adds that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id*. § 230(e)(3). Section 230 mandates dismissal of any claim where (i) the defendant is a "provider or user of an interactive computer service," (ii) the

32

information for which plaintiff seeks to hold defendant liable was "information provided by another information content provider," and (iii) the complaint seeks to hold defendant liable as the "publisher or speaker" of that information. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *Bennett v. Google, LLC*, 882 F.3d 1163, 1166–1168 (D.C. Cir. 2018). "In short, a person defamed on the internet can sue the original speaker, but typically cannot sue the messenger." *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015); *Oparaugo v. Watts*, 884 A.2d 63, 73 (D.C. 2005) (holding that the original publisher of a defamatory statement may be liable for another's republication of the statement); *US Dominion, Inc. v. Byrne*, Civ. No. 1:21-cv-02131 (CJN), 2022 WL 1165935, at *7 (D.D.C. Apr. 20, 2022) (discussing § 230 immunity "for someone who merely shares a link on Twitter") (citing *Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F. Supp. 3d 1311, 1321 (M.D. Fla. 2015)).

Vindman's Complaint impermissibly seeks to hold Trump Jr. liable for his republication of information created by other content providers. *See* Compl. ¶¶ 137, 139, 176, 203. In each of these allegations, Trump Jr. was a "user of an interactive computer service," in this case, Twitter. *Id.* The information for which Vindman seeks to hold Trump Jr. liable was created by other information content providers: Tom Fitton (*id.* ¶ 137), Charlie Kirk (*id.* ¶ 139), thefederalist.com (*id.* ¶ 176), and Breitbart.com (*id.* ¶ 203). And for each of these four complaints, Vindman seeks to hold Trump Jr. liable as the publisher or speaker of the information. *See*, *e.g.*, *id.* ¶ 203 (alleging that Trump Jr. was "knowingly or recklessly repeating" false claims). Section 230 immunity applies to prevent any defamation liability from attaching to Trump Jr.'s republication of other Twitter users' content.

**IV.      Vindman is Legally Barred from Asserting a Claim under § 1985(2).**

Even if Vindman had plausibly alleged a conspiracy, Vindman cannot establish the most fundamental element required for a § 1985(2) claim—that he was a party in a federal court proceeding. Under the relevant provision of § 1985(2), a plaintiff has a cause of action when two or more persons "conspire to deter, by force, intimidation, or threat, any party or witness in *any court of the United States* from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified." 42 U.S.C. § 1985(2) (emphasis added). Federal courts construe "court" in § 1985(2) narrowly. No court has ever extended the protections of § 1985(2) beyond a literal "court of the United States," at all, let alone to witnesses in impeachment proceedings. And the caselaw interpreting §1985(2) forecloses expanding the statute in this way.

The D.C. Circuit explained that it has "never interpreted" the phrase "any court of the United States" to "include an administrative agency like the EEOC, and other courts have explicitly foreclosed such a broad reading of the statute." *Bowie v. Maddox*, 642 F.3d 1122, 1132 (D.C. Cir. 2011) (citing *Graves v. United States*, 961 F. Supp. 314, 319 (D.D.C. 1997)) (cleaned up). The court's citation to *Graves* is instructive. In *Graves*, the court explained that "to state a claim under the first clause of § 1985(2), a plaintiff must allege (1) a conspiracy between two or more persons, (2) to deter a party, witness or juror from attending or testifying in any matter pending in any court of the United States, which (3) results in injury to the plaintiff." *Graves*, 961 F. Supp. at 319 (citations omitted). The court followed this recitation of law by citing *Deubert v. Gulf F.S.B.*, 820 F.2d 754 (5th Cir. 1987) for the proposition that an "underlying

proceeding *in federal court* is [a] requisite of [a] claim under the first clause of § 1985(2)." *Id.* (citing *Deubert*, 820 F.2d at 319) (emphasis added).

Courts in other jurisdictions have also confirmed the straightforward proposition that "any court of the United States" refers to federal courts, not other branches of government. The Eleventh Circuit held that "the phrase 'court of the United States' in § 1985(2) refers only to Article III courts and certain federal courts created by act of Congress." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). Citing *McAndrew*, the Southern District of New York recently held that "'court of the United States' refers exclusively to federal courts." *Vidurek v. Pollen*, No. 20-CV-6714 (CS), 2021 WL 4066503, at *13 (S.D.N.Y. Sept. 7, 2021).

Vindman's allegations about his role as a witness all relate to proceedings before the House of Representatives and the United States Senate, both legislative bodies, not federal courts. Allowing Vindman to pursue a § 1985(2) claim based on his role in impeachment proceedings would not only contradict the plain language of the statute, but also the sharply diverge from the consensus of federal courts as to the meaning of "any court of the United States" in § 1985(2).

Likely recognizing that his role in the impeachment proceedings does not bring him within the purview of § 1985(2), Vindman alleges that he was "contacted by federal prosecutors in connection with a related investigation that would potentially involve additional testimony," and that the Defendants and other conspirators sought to deter Vindman from "testifying in . . . other proceedings implicating President Trump." Compl. ¶¶ 189, 261. Yet there is no allegation that either Trump Jr. or Scavino or any of the so-called conspirators had any knowledge of this meeting, let alone any reason to suspect that Vindman may be a witness in some future

proceeding. Nor are there any facts to suggest any nexus between any action alleged and the

hypothetical court proceeding in which Vindman imagines Defendants want to stop him from

testifying in the future. So tenuous a claimed connection to a putative investigation which may or

may not ever have taken place, with no effort to tie these defendants to it, necessarily and wholly

fails to satisfy both legal and pleading standards.

Vindman was never a witness in "any court of the United States" relevant to this dispute,

and therefore cannot assert a claim under § 1985(2).

### V.  Section 1985 Does Not Provide a Remedy for Matters Relating to Vindman's Prospective Military Promotion.

Vindman has no remedy under § 1985 relating to any alleged interference with his

prospective promotion from Lieutenant Colonel to full Colonel. "Congress has enacted 'a

comprehensive internal system of justice to regulate military life'" and "Section 1985(1) is

completely foreign to that system." *Mollnow v. Carlton*, 716 F.2d 627, 631 (9th Cir. 1983)

(quoting *Chappell v. Wallace*, 462 U.S. 296, 302 (1983)). "'[J]udges are not given the task of

running the Army. The responsibility for setting up channels through which [complaints of

discrimination, favoritism, *et cetera*] can be considered and fairly settled rests upon the Congress

and upon the President of the United States and his subordinates." *Kreis v. Sec'y of the Air

Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 93–94

(1953)) (brackets in original).

In *Mollnow*, the Ninth Circuit reasoned that a military officer could not sue a superior

officer under § 1985(1) because it knew of "no civilian law that would prevent superior officers,

in the exercise of their wide discretion, from ordering a subordinate to refrain from performing a

specific duty," and that the "military could not function under those conditions." *Mollnow*, 716

F.2d at 631–32. Instead, the subordinate officer "would have the opportunity to attack the

decision before military tribunals," as "Congress established that procedure to address internal military matters." *Id.* at 632.

Even though Vindman did not sue any of his superior officers—in this case, at least—neither may he sue under § 1985 for matters relating to his prospective promotion. In holding that members of the military could not sue for damages for "service-connected injuries" under § 1983(3), the D.C. Circuit explained that "[a]llowing conspiracy claims to proceed would not only entail second guessing of military decisions by civilian courts and require testimony by military personnel about command decisions, it would also tend to pit a plaintiff's superiors against each other." *Bois v. Marsh*, 801 F.2d 462, 470 (D.C. Cir. 1986). These risks, along with the risks that an officer would "feel pressure to lay the blame for any alleged wrongdoing at the feet of his confreres," and the risk of "a subordinate officer [being] found liable . . .  merely by carrying out orders . . . would obviously tend to undermine military discipline." *Id.*

For Vindman to prove his allegations relating to his prospective promotion (which allegations, it bears mentioning, have nothing to do with Trump Jr., Scavino, or any Defendant), the following would all become triable issues of fact: Major General Bradley Gericke's representations to Vindman about his prospective promotion; the White House's communications with the Pentagon; the NSC's evaluation of Vindman and others; the reasons behind any delay in the Army's issuance of a promotion list in 2020; the Army's "internal command-level investigation of Vindman;" and communications between White House Chief of Staff Mark Meadows and the Secretary of the Army Ryan McCarthy and Secretary of Defense Mark Esper about promotion decisions. *See* Compl. ¶¶ 208, 210–14. In short, the Court would have to delve into military affairs and engage in the precise kind of fact-finding that the D.C. Circuit explained courts should not do. Vindman therefore cannot state a claim under § 1985 for

matters relating to his prospective promotion to full Colonel—such claims are legally and decisively foreclosed, no matter how phrased.

**VI.     The Political Question Doctrine Bars Consideration of Vindman's Removal from the NSC.**

The Court lacks jurisdiction over Vindman's Complaint to the extent that it is based on his removal from the NSC because the composition of the NSC is a political question. "[C]ourts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary." *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006) (quoting *Schneider v. Kissinger,* 412 F.3d 190, 193 (D.C. Cir. 2005)) (internal quotation marks omitted). A political question may be found in these circumstances:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)); *see also Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) ("To find a political question, we need only conclude one factor is present, not all."). Judicial review of the decision of "President Trump and individuals close to him inside the White House" to end Vindman's NSC assignment and return him to the Department of Defense for reassignment, Compl. ¶ 194, would involve more than one of these factors.

The NSC "consists of the President, the Vice President, the Secretary of State, the Secretary of Defense, the Secretary of Energy, the Secretary of the Treasury, and such other officers of the United States Government as the President may designate." 50 U.S.C. §

3021(c)(1). Aside from these statutory members, "the President . . . has the authority to name other members[.]" *Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 394 F. Supp. 3d 39, 45 (D.D.C. 2019) (citing 50 U.S.C. § 3021(c)).

> Under the National Security Act, the NSC is authorized to: (a) advise the President upon national security matters; (b) coordinate the policies and functions of other departments and agencies regarding national security matters; (c) assess and appraise the objectives and commitments of, and the risks facing, the United States; (d) consider policies on national security matters; and (e) make recommendations to the President.

*Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 560 (D.C. Cir. 1996) (citing 50 U.S.C. §§ 402(a)–(b)). "Insofar as the staff has been delegated authority to make policy recommendations for approval by the President, his NSA, or the statutory Council, the staff's functions are, of course, quintessentially advisory." *Id.* at 561. The NSC is thus "more like 'the President's immediate personal staff' than it is like an agency exercising authority, independent of the President." *Id.* at 567.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). The topic of "national security" is a "quintessential source[] of political questions" and is "'rarely [a] proper subject of judicial intervention.'" *Bancoult*, 445 F.3d at 433 (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)). "A plaintiff may not … clear the political question bar simply by 'recasting [such] foreign policy and national security questions in tort terms.'" *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842–43 (D.C. Cir. 2010) (quoting *Schneider*, 412 F.3d at 197) (brackets in original).

Vindman's allegations relating to his removal from the NSC present an issue that involves the President's selection of advisors relating to the subject of national security. The

Court cannot evaluate the propriety of Vindman's removal from the NSC without ultimately second-guessing the President's national security strategy and selection of NSC advisors who are akin to "the President's immediate personal staff." *Armstrong*, 90 F.3d at 567. This is precisely the kind of question barred by the political question doctrine. Any inquiry into Vindman's fitness to serve on the NSC would involve factual questions relating to the United States' national security policy under President Trump and how well Vindman's service as a National Security Director advanced or hindered that policy.

Applying the six *Baker* factors, it is further clear that any review of President Trump's decision to dismiss Vindman from the NSC would present a political question. First, there is "a lack of judicially discoverable and manageable standards for resolving" the question as the National Security Act gives the President the discretion to name members of the NSC beyond statutory members. *See Baker*, 369 U.S. at 217; 50 U.S.C. § 3021(c)(1). Second, if Vindman could somehow prove the remaining elements of either of his § 1985 claims, the finder of fact would need to disregard the President's discretion to select national security advisors to find that Vindman's dismissal from the NSC was an illegal act in furtherance of an illegal conspiracy, which displays "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government." *See Baker*, 369 U.S. at 217.

"Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig*, 453 U.S. at 292. Vindman seeks to litigate the propriety of President Trump's decision to remove Vindman from the NSC. Doing so would "impermissibly intrude on the Executive's role in formulating policy." *Gross v. German Foundation Indus. Initiative*, 456 F.3d. 363, 389 (3d Cir. 2006). Vindman's allegations relating

to his removal from the NSC therefore present a non-justiciable political question over which the

Court lacks jurisdiction, no matter how the claim is phrased. Fed. R. Civ. Pro. 12(b)(1).

## VII.    Scavino Is Entitled to Qualified Immunity.

Vindman is suing Scavino for acts Scavino allegedly took as Assistant to the President,

Director of Social Media, and Deputy Chief of Staff for Communications in President Trump's

White House. As a government official, Scavino is entitled to qualified immunity from suit as a

matter of law. "The doctrine of qualified immunity protects government officials 'from liability

for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*,

555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To

overcome qualified immunity, the plaintiff must establish a constitutional or statutory violation,

and the court must further "decide whether the right at issue was 'clearly established' at the time

of defendant's alleged misconduct." *Id.* at 231–32 (citations omitted). "Because '[t]he

entitlement is an immunity from suit rather than a mere defense to liability,' . . . the Supreme

Court repeatedly has stressed the importance of resolving immunity questions at the earliest

possible stage in litigation." *Tripp v. Dep't of Defense*, 173 F. Supp. 2d 58, 60–61 (D.D.C. 2001)

(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1986)) (other citations omitted).

Scavino has already established that he did not violate any of Vindman's constitutional or

statutory rights. Thus, if the Court agrees that Vindman failed to allege a § 1985(1) or (2) claim

against Scavino, Scavino is also entitled to qualified immunity because there was no

constitutional or statutory violation. Even if the Court somehow finds Vindman's allegations to

be sufficient to state a § 1985 claim, Vindman's rights under § 1985 were not "clearly

established." For a right to be "clearly established," "'existing precedent must have placed the

statutory or constitutional question beyond debate.'" *Reichle v Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This Motion presents a myriad of legal deficiencies in Vindman's Complaint. In order to resolve many questions this Motion presents in Vindman's favor, the Court would have to ignore generations of established precedent and then establish new law, which itself would prevent Vindman's rights from being "clearly established" at the time of Scavino's alleged actions. A novel claim can never be the basis of a successful qualified immunity challenge.

*First*, no court has ever allowed a § 1985 claim to proceed based on statements made by an attorney in an impeachment proceeding, and existing law shows that the judicial-proceedings privilege bars any such claim. *See* Section III.A.2, *supra*. *Second*, no court has ever held that a witness in an impeachment proceeding is entitled to the protections of § 1985(2), and the existing case law all points strongly to the conclusion that § 1985(2) applies only to federal court proceedings. *See* Section IV, *supra*. *Third*, no court has ever allowed a (former) military officer to maintain a § 1985 claim because of alleged interference with his prospective promotion, and the existing case law confirms that § 1985 does not protect matters relating officers' prospective promotions. *See* Section V, *supra*. *Fourth*, no court has ever determined that an individual's removal from the NSC could give rise to a § 1985 claim, and the existing case law shows that the political question doctrine would bar consideration of the issue. *See* Section VI, *supra*.

## VIII.   Vindman's Complaint Should be Dismissed with Prejudice.

A dismissal with prejudice is warranted when a trial court "determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Rollins v. Wackenhut Servs., Inc.,* 703 F.3d 122, 131 (D.C. Cir. 2012) *(*quoting *Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996)) (cleaned up). Vindman's allegations under 42

U.S.C. § 1985 cannot survive without actionable defamation. Even if Vindman could conjure up allegations of a synchronous meeting between the twenty odd named coconspirators, or an allegation that they all agreed to do something, or an allegation that that agreement was for an impermissible purpose, he cannot change the fact that none of the statements from which he claims injury were defamatory. As shown above, all challenged statements are protected by privilege, statutory immunity, the First Amendment, or a truth defense. Even if Vindman could allege new facts showing the plausible existence of a § 1985 conspiracy, that amendment would be futile because no new facts could make the complained of statements defamatory or the remaining incidents actionable.

## CONCLUSION

This Court should dismiss Vindman's Complaint with prejudice.

Dated: May 31, 2022                               */s/ Harmeet K. Dhillon*

                                                  Harmeet K. Dhillon, Esq.
                                                  (Bar #CA00078)
                                                  Karin M. Sweigart, Esq.
                                                  (Bar #CA00145)
                                                  Jesse Franklin-Murdock, Esq.
                                                  (Bar #CA00147)
                                                  Dhillon Law Group Inc.
                                                  177 Post Street, Suite 700
                                                  San Francisco, California 94108
                                                  (415) 433-1700
                                                  harmeet@dhillonlaw.com
                                                  ksweigart@dhillonlaw.com
                                                  jfranklin-murdock@dhillonlaw.com

David A. Warrington, Esq.
(D.C. Bar #1616846)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 402
Alexandria, Virginia 22314
(703) 574-1206
dwarrington@dhillonlaw.com

*Counsel for Defendants Donald Trump, Jr.,
and Daniel Scavino, Jr.*

**CERTIFICATE OF SERVICE**

I certify that this document or pleading was served via the Court's ECF Filing System on all users authorized and directed to receive such service on May 31, 2022.

/s/Harmeet K. Dhillon
Harmeet K. Dhillon