## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LT. COL. ALEXANDER VINDMAN,<br><br>     Plaintiff,<br><br>  v.<br><br>DONALD TRUMP, JR., RUDOLPH GIULIANI,<br>JULIA HAHN, and DANIEL SCAVINO, JR.,<br><br>     Defendants. | Civil Action No. 1:22-cv-00257-JEB |

### PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ...............................................................................................4

STANDARD OF REVIEW .................................................................................................6

ARGUMENT ......................................................................................................................6

I.    Vindman has stated a claim for violations of 42 U.S.C. § 1985(1) and (2)....................... 6

    A.    Vindman has adequately pleaded that Defendants conspired to violate the Klan Act. ...........................................................................................................7

        1.    Vindman has plausibly alleged that Defendants formed an agreement. ..... 7

            (a)    Vindman's allegations meet the legal standard. ............................ 9

            (b)    Defendants' counterarguments are unavailing............................. 16

        2.    Vindman has plausibly alleged that the purpose of the conspiracy was to intimidate and retaliate against him because he reported misconduct and testified in the impeachment........................18

        3.    Vindman has adequately alleged unlawful overt acts in furtherance of the conspiracy.................................................... 23

    B.    Vindman has stated a claim that the defendants violated § 1985(2).....................26

        1.    A court of impeachment is a "court of the United States" within the plain meaning of the statutory text.................................... 26

        2.    The purposes underlying § 1985(2) encompass conspiracies to tamper with witnesses in impeachment proceedings. ............................ 28

        3.    The authority cited by Defendants does not preclude application of § 1985(2) to a court of impeachment.................................... 29

    C.    Vindman's claims are not barred by the intracorporate conspiracy doctrine. ...........................................................................................30

II.    Vindman's claims are not barred by the First Amendment or any speech-related privilege or immunity. ......................................................................................31

**Page**

A.  The Court may hold Defendants liable for their course of conduct constituting a conspiracy without violating the First Amendment. ......................31

B.  The First Amendment does not shield the conspirators from liability for publishing verifiably false, defamatory statements with actual malice. ...............33

    1.  Vindman has adequately alleged that the conspirators published numerous verifiably false statements.....................................34

    2.  Vindman has adequately alleged that the conspirators made false statements with actual malice. ......................................................40

    3.  Defendants Trump, Jr. and Scavino are not shielded from liability by any privilege or statutory immunity.......................................47

C.  The conspirators' speech is evidence of the conspiracy. ........................................52

III.  Vindman is not precluded from seeking relief under § 1985............................................53

A.  Vindman is not seeking redress for the denial of his promotion or any other decision regarding his military employment. ................................................53

B.  The president's involvement in the unlawful conspiracy does not bar Vindman's § 1985(1) claims against other conspirators........................................54

C.  Vindman's claims are not barred by the political question doctrine. ...................56

IV.  Defendants Hahn and Scavino are not entitled to qualified immunity. ............................60

A.  Vindman's complaint states violations of clearly established law. ......................60

    1.  Section 1985(1) and (2) and its companion criminal laws gave the Defendants fair warning that their conduct was unlawful........................61

    2.  The Fourth Amendment precedent cited by Defendants does not support the requirement of more specific authority in this case...............65

B.  Defendants' arguments are not addressed to the well-pleaded allegations in Vindman's complaint and otherwise do not entitle them to qualified immunity. ................................................................................................68

    1.  Defendants' mischaracterization of Vindman's factual allegations does not entitle them to qualified immunity. ...........................68

    2.  Defendant Hahn is not excused from her unlawful conduct by following unlawful orders. ...........................................................70

**Page**

        3.     Defendants Hahn and Scavino are not entitled to qualified immunity based on the application of § 1985(2) to a court of impeachment. ............................................................................72

V.     None of Vindman's claims should be dismissed with prejudice. .................................... 73

CONCLUSION ..................................................................................................................73

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*\*Al-Tamini v. Adelson,*
   916 F.3d 1 (D.C. Cir. 2019) ........................................................................... 56, 58

*Anderson v. Creighton,*
   483 U.S. 635 (1987) ........................................................................................... 61

*Armstrong v. Exec. Off. of the President,*
   90 F.3d 553 (D.C. Cir. 1996) ............................................................................. 58

*Armstrong v. Thompson,*
   80 A.3d 177 (D.C. 2013) .................................................................................... 34

*Arthur Andersen LLP v. U.S.,*
   544 U.S. 696 (2005) ........................................................................................... 64

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011) ........................................................................................... 61

*\*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .............................................................................. 6, 8, 9, 15

*Baker v. Carr,*
   369 U.S. 186 (1962) ........................................................................................... 56

*Bancoult v. McNamara,*
   445 F.3d 427 (D.C. Cir. 2006) ........................................................................... 57

*\*Barr v. Clinton,*
   370 F.3d 1196 (D.C. Cir. 2004) ............................................................. 33, 34, 48

*\*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................. 7, 8, 9, 10

*Bennett v. Google,*
   882 F.3d 1163 (D.C. Cir. 2018) ......................................................................... 52

*Black Lives Matter D.C. v. Trump,*
   544 F. Supp 3d 15 (D.D.C. 2021) ...................................................................... 17

*Blakeney v. O'Donnell,*
   117 F. Supp. 3d 6 (D.D.C. 2015) ....................................................................... 31

*Blankenship v. Trump,*
   558 F. Supp. 3d 316 (S.D. W. Va. 2021) ........................................................... 40

iv

**Cases**                                                               **Page(s)**

*Boehner v. McDermott*,
484 F.3d 573 (D.C. Cir. 2007) ............................................................ 32

*Bowie v. Maddox*,
642 F.3d 1122 (D.C. Cir. 2011) .......................................................... 29

*Brent v. Ashley*,
247 F.3d 1294 (11th Cir. 2001) .......................................................... 71

*Bush v. Butler*,
521 F. Supp. 2d 63 (D.D.C. 2007) ....................................................... 16

*Butz v. Economou*,
438 U.S. 478 (1978) ............................................................................ 62

*Cadillac of Naperville v. NLRB*,
14 F.4th 703 (D.C. Cir. 2021) ............................................................ 33

*Carey v. Piphus*,
435 U.S. 247 (1978) ............................................................................ 37

*Carson v. Allied News Co.*,
529 F.2d 206 (7th Cir. 1976) .............................................................. 44

*Carter v. Church*,
791 F. Supp. 298 (M.D. Ga. 1992) ..................................................... 29

*Colten v. Kentucky*,
407 U.S. 104 (1972) ............................................................................ 67

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
447 U.S. 102 (1980) ............................................................................ 26

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ................................................................. 9, 17, 19, 25

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ............................................................................ 30

*D.C. v. Wesby*,
138 S. Ct. 577 (2018) ......................................................................... 66

*\*Dameron v. Wash. Mag., Inc.*,
779 F.2d 736 (D.C. Cir. 1985) ........................................................... 49

*\*Dennis v. Sparks*,
449 U.S. 24 (1980) ......................................................................... 47, 55

**Cases** Page(s)

*Deripaska v. Associated Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017) ............................................................. 46

*Deubert v. Gulf Fed. Sav. Bank*,
  820 F.2d 754 (5th Cir. 1987) ..................................................................... 29

*Dixon v. Int'l Bhd. of Police Officers*,
  504 F.3d 73 (1st Cir. 2007) ....................................................................... 32

*\*DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*,
  810 F.2d 1236 (D.C. Cir. 1987) ................................................................. 58

*Elkins v. D.C.*,
  690 F.3d 554 (D.C. Cir. 2012) ................................................................... 71

*\*El-Shifa Pharm. Indus. Co. v. U.S.*,
  607 F.3d 836 (D.C. Cir. 2010) ................................................................... 57

*\*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ................................................................... 51

*Farah v. Esquire Mag.*,
  736 F.3d 528 (D.C. Cir. 2013) ................................................................... 38

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996) ................................................................... 73

*Freeman v. Fallin*,
  310 F. Supp. 2d 11 (D.D.C. 2004) ............................................................. 65

*Gates v. Khokhar*,
  884 F.3d 1290 (11th Cir. 2018) ................................................................. 64

*Gilmore v. Jones*,
  370 F. Supp. 3d 630 (W.D. Va. 2019) ....................................................... 52

*Graves v. U.S.*,
  961 F. Supp. 314 (D.D.C. 1997) ............................................................... 29

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971) ................................................................................... 29

*Gross v. German Found. Indus. Initiative*,
  456 F.3d 363 (3d Cir. 1996) ..................................................................... 58

*\*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ........................................................... passim

vi

**Cases**                                                                          **Page(s)**

*Hall v. D.C.*,
   867 F.3d 138 (D.C. Cir. 2017) ............................................................................... 37

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ................................................................................ 47, 55, 61

*Harris v. Bowser*,
   369 F. Supp. 3d 93 (D.D.C. 2019) ......................................................................... 39

*Hartsfield v. Lemacks*,
   50 F.3d 950 (11th Cir. 1995) ................................................................................... 72

*Havens v. Mobex Network Servs., LLC*,
   820 F.3d 80 (3d Cir. 2016) ........................................................................................ 8

*Hildebrant v. Meredith Corp.*,
   63 F. Supp. 3d 732 (E.D. Mich. 2014) .................................................................. 44

*Hobson v. Wilson*,
   737 F.2d 1 (D.C. Cir. 1984) ...................................................................... 13, 17, 70

*\*Hope v. Pelzer*,
   536 U.S. 730 (2002) ........................................................................................ 62, 65

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   733 F. Supp. 2d 1348 (N.D. Ga. 2010) ................................................................. 16

*\*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) .................................................. 8, 10, 12, 14

*In re House Comm. on Judiciary*,
   414 F. Supp. 3d 129 (D.D.C. 2019) ................................................................ 27, 28

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ..................................................................................... 8

*Jankovic v. Int'l Crisis Grp.*,
   494 F.3d 1080 (D.C. Cir. 2007) ................................................................ 36, 42, 45

*\*Jefferson v. Harris*,
   170 F. Supp. 3d 194 (D.D.C. 2016) ...................................................................... 59

*Johnson v. D.C.*,
   528 F.3d 969 (D.C. Cir. 2008) ............................................................................... 64

*Jones v. Dirty World Ent. Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) .................................................................................. 51

**Cases**                                                                 **Page(s)**

*Kassem v. Wash. Hosp. Ctr.*,
   513 F.3d 251 (D.C. Cir. 2008) ................................................................. 6

*Katzenbach v. Original Knights of Ku Klux Klan*,
   250 F. Supp. 330 (E.D. La. 1965) .......................................................... 21

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ............................................................. 50

*Kurd v. Republic of Turkey*,
   374 F. Supp. 3d 37 (D.D.C. 2019) ......................................................... 18

*Kush v. Rutledge*,
   460 U.S. 719 (1983) .......................................................................... 7, 28

*La Liberte v. Reid*,
   966 F.3d 79 (2d Cir. 2020) ..................................................................... 52

*Lagayan v. Odeh*,
   199 F. Supp. 3d 21 (D.D.C. 2016) ......................................................... 16

*Lawrence v. Acree*,
   665 F.2d 1319 (D.C. Cir. 1981) ............................................................. 24

*League of United Latin Am. Citizens v. Pub. Int. Legal Found.*,
   2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ......................................... 20

*Marshall's Locksmith Serv. v. Google*,
   925 F.3d 1263 (D.C. Cir. 2019) ............................................................. 50

*Masson v. New Yorker Mag., Inc.*,
   501 U.S. 496 (1991) .............................................................................. 46

*Mayor & City Council of Baltimore v. Citigroup*,
   709 F.3d 129 (2d Cir. 2013) ................................................................... 10

*McAndrew v. Lockheed Martin Corp.*,
   206 F.3d 1031 (11th Cir. 2000) ................................................. 28, 30, 61

*McCord v. Bailey*,
   636 F.2d 606 (D.C. Cir. 1980) ............................................................... 28

*McCreary v. Health*,
   2005 WL 3276257 (D.D.C. Sept. 26, 2005) .......................................... 16

*Messerschmidt v. Millender*,
   565 U.S. 535 (2012) .............................................................................. 71

**Cases**                                                                                      **Page(s)**

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990) ........................................................................................... 36

*\*Mollnow v. Carlton*,
  716 F.2d 627 (9th Cir. 1983) ................................................................... 53, 67

*Monitor Patriot Co. v. Roy*,
  401 U.S. 265 (1971) ....................................................................................... 40

*Montgomery v. Risen*,
  197 F. Supp. 3d 219 (D.D.C. 2016) ................................................................ 36

*Moore v. Cecil*,
  488 F. Supp. 3d 1144 (N.D. Ala. 2020) .......................................................... 46

*Morast v. Lance*,
  807 F.2d 926 (11th Cir. 1987) ........................................................................ 29

*Myers v. D.C. Hous. Auth.*,
  2021 WL 1167032 (D.D.C. Mar. 26, 2021) ............................................... 48, 50

*Nelson Radio & Supply Co. v. Motorola*,
  200 F.2d 911 (5th Cir. 1952) .......................................................................... 30

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ....................................................................................... 33

*Nunes v. WP Co. LLC*,
  2021 WL 3550896 (D.D.C. Aug. 11, 2021) ..................................................... 42

*Nyambal v. Alliedbarton Sec. Servs.*,
  344 F. Supp. 3d 183 (D.D.C. 2018) ................................................................ 37

*Ollman v. Evans*,
  750 F.2d 970 (D.C. Cir. 1984) ........................................................................ 36

*Olsen v. Albright*,
  990 F. Supp. 31 (D.D.C. 1997) ....................................................................... 71

*Parisi v. Sinclair*,
  774 F. Supp. 2d 310 (D.D.C. 2011) ................................................................ 52

*People Helpers, Inc. v. City of Richmond*,
  789 F. Supp. 725 (E.D. Va. 1992) ................................................................... 21

*Pritchard v. Hamilton Twp. Bd. of Trustees*,
  424 F. App'x 492 (6th Cir. 2011) .................................................................... 64

| Cases | Page(s) |
|---|---|

*Ramirez v. Butte-Silver Bow Cnty.*,
298 F.3d 1022 (9th Cir. 2002) ................................................................. 71

*Robertson v. Sea Pines Real Estate Cos.*,
679 F.3d 278 (4th Cir. 2012) ..................................................................... 8

*Robinson v. U.S. Dep't of Educ.*,
502 F. Supp. 3d 127 (D.D.C. 2020) ...................................................... 6, 28

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
682 F.3d 1043 (D.C. Cir. 2012) ............................................................... 17

*Rumsfeld v. Forum for Acad. & Institutional Rts.*,
547 U.S. 47 (2006) .................................................................................. 32

*Schiavone Constr. Co. v. Time, Inc.*,
847 F.2d 1069 (3d Cir. 1988) .................................................................. 45

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) ................................................................. 57

*Screws v. U.S.*,
325 U.S. 91 (1945) .................................................................................. 60

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ............................................................ passim

*Silverman v. Newspaper & Mail Deliverers' Union of N.Y. & Vicinity*,
1999 WL 893398 (S.D.N.Y. Oct. 18, 1999) ............................................. 20

*Spagnola v. Mathis*,
809 F.2d 16 (D.C. Cir. 1986) .................................................................. 72

*Spirito v. Peninsula Airport Comm'n*,
350 F. Supp. 3d 471 (E.D. Va. 2018) ....................................................... 45

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ...................................................................... 41, 42, 44

*Stehney v. Perry*,
101 F.3d 925 (3d Cir. 1996) .................................................................... 59

*Stern v. U.S. Gypsum, Inc.*,
547 F.2d 1329 (7th Cir. 1977) ................................................................. 19

*Stewart v. Nat'l Educ. Ass'n*,
471 F.3d 169 (D.C. Cir. 2006) ................................................................... 6

x

**Cases**                                                                  **Page(s)**

*Stillman v. CIA*,
  517 F. Supp. 2d 32 (D.D.C. 2007) ........................................................ 32

*Tah v. Glob. Witness Publ'g*,
  991 F.3d 231 (D.C. Cir. 2021) ............................................................ 36

*Taylor v. Riojas*,
  141 S. Ct. 52 (2020) ......................................................................... 65

*Thompson v. Trump*,
  2022 WL 503384 (D.D.C. Feb. 18, 2022) ............................................ 59

*Tripp v. Exec. Off. of the President*,
  200 F.R.D. 140 (D.D.C. 2001) ..................................................... 11, 30

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020) ...................................................................... 27

*U.S. ex rel. Miller v. Bill Harbert Int'l Constr.*,
  608 F.3d 871 (D.C. Cir. 2010) ............................................................ 25

*U.S. v. Barnes*,
  295 F.3d 1354 (D.C. Cir. 2002) .......................................................... 26

*U.S. v. Bd. of Educ. of Greene Cnty.*,
  332 F.2d 40 (5th Cir. 1964) ......................................................... 21, 23

*U.S. v. Beaty*,
  288 F.2d 653 (6th Cir. 1961) .............................................................. 21

*U.S. v. Bruce*,
  353 F.2d 474 (5th Cir. 1965) .............................................................. 21

*U.S. v. Bundy*,
  2016 WL 3156310 (D. Or. June 3, 2016) ............................................ 64

*U.S. v. Deal*,
  6 Race Rel. L. Rep. 474 (W.D. La. 1961) ............................................ 21

*U.S. v. DeMott*,
  2005 WL 2314134 (N.D.N.Y. Sept. 22, 2005) ...................................... 19

*U.S. v. Fulbright*,
  105 F.3d 443 (9th Cir. 1997) .............................................................. 64

*U.S. v. Gartman*,
  1995 WL 265925 (4th Cir. May 9, 1995) ............................................ 20

**Cases**                                                                         **Page(s)**

*U.S. v. Jimenez Recio*,
537 U.S. 270 (2003) ............... 32

*\*U.S. v. Lanier*,
520 U.S. 259 (1997) ............... passim

*U.S. v. McLeod*,
385 F.2d 734 (5th Cir. 1967) ............... 21

*U.S. v. Morrison*,
98 F.3d 619 (D.C. Cir. 1996) ............... 64

*U.S. v. Nguyen*,
673 F.3d 1259 (9th Cir. 2012) ............... 19, 20

*U.S. v. North*,
910 F.2d 843 (D.C. Cir. 1990) ............... 70

*U.S. v. Payne*,
2017 WL 8941311 (D. Nev. Jan. 3, 2017) ............... 64

*U.S. v. Puma*,
2022 WL 823079 (D.D.C. Mar. 19, 2022) ............... 64

*U.S. v. Tarantino*,
846 F.2d 1384 (D.C. Cir. 1988) ............... 17

*U.S. v. Williams*,
553 U.S. 285 (2008) ............... 32

*U.S. v. Wilson*,
290 F.3d 347 (D.C. Cir. 2002) ............... 28

*US Dominion, Inc. v. Byrne*,
2022 WL 1165935 (D.D.C. Apr. 20, 2022) ............... 41, 49, 52

*\*US Dominion, Inc. v. Powell*,
554 F. Supp. 3d 42 (D.D.C. 2021) ............... 40, 41, 46

*Vidurek v. Pollen*,
2021 WL 4066503 (S.D.N.Y. Sept. 7, 2021) ............... 29

*Wasserman v. Time, Inc.*,
424 F.2d 920 (D.C. Cir. 1970) ............... 43

*Weyrich v. New Republic, Inc.*,
235 F.3d 617 (D.C. Cir. 2001) ............... 35

**Cases**                                                     **Page(s)**

*Whitaker v. Thompson*,
353 F.3d 947 (D.C. Cir. 2004) ........................................... 22

*\*White v. Fraternal Ord. of Police*,
909 F.2d 512 (D.C. Cir. 1990) ...................................... 38, 49

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) ........................................... 58

*\*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) ................................................ 22, 53

*Young v. Gannett Satellite Info. Network*,
734 F.3d 544 (6th Cir. 2013) ...................................... 42, 43

*Ziglar v. Abbasi*,
137 S. Ct. 1843 (2017) ........................................ 66, 67, 70

**Statutes**

10 U.S.C. § 903a ............................................................. 21

18 U.S.C.
§ 371 ...................................................................... 60
*§ 372 ........................................................... 60, 61, 64
§ 793 ...................................................................... 21
§ 794 ...................................................................... 21
§ 798 ...................................................................... 21
*§ 1512 ............................................................... 60, 64

*42 U.S.C. § 1985 ................................................... passim

47 U.S.C. § 230 ............................................................. 50

Pub. L. No. 42-22, 17 Stat. 13 (1871) ..................................... 61

**Constitutional Provisions**

U.S. Const.
*art. I ..................................................................... 27
art. III .................................................................... 27
amend. IV .................................................................. 66

**Miscellaneous Authorities**                                              **Page(s)**

166 Cong. Rec. S289 (daily ed. Jan. 21, 2020)............................................................. 27

Craig C. Donsanto & Nancy L. Simmons, Pub. Integrity Section, U.S. Dep't of Just.,
    *Federal Prosecution of Election Offenses* (7th ed. 2007),
    https://tinyurl.com/59zc99du ...........................................................................20, 23

The Federalist No. 65 (Alexander Hamilton) ............................................................... 28

Noah Webster, An American Dictionary of the English Language (1867),
    https://tinyurl.com/yzjrhmvy ..................................................................................... 20

U.S. Att'y's Off., D.C., *Capitol Breach Cases*, https://tinyurl.com/yckpzw33........................... 64

U.S. Senate, *About Impeachment*, https://tinyurl.com/3f7wuxeu.................................................. 27

Restatement (Second) of Torts (May 2022 update) (Westlaw) ...................................... 34

## **INTRODUCTION**

This case seeks accountability for an unlawful conspiracy among government officials and their allies outside of government to obstruct an impeachment proceeding against former President Donald Trump by intimidating and retaliating against Lt. Col. Alexander Vindman, a key witness in that proceeding. At the time of his testimony, Vindman was a career public servant and military officer detailed to the National Security Council, with no role in politics. The conspiracy was in many respects a classic effort at witness tampering and obstruction of justice and the very type of attack on a core function of the federal government that Section 2 of the Ku Klux Klan Act of 1871 was enacted to address. Through their campaign of intimidation and retaliation, Defendants and their co-conspirators sought to undermine an essential component of a democratic system of government built on the rule of law—Congress's authority and obligation to investigate alleged abuses of power by the president.

Vindman's complaint more than adequately states a claim for violations of the Klan Act, the relevant parts of which are codified at 42 U.S.C. § 1985(1) and (2). Those provisions prohibit intimidation or retaliation against federal officials aimed at preventing them from holding and discharging the duties of their office, as well as similar interference with witnesses in court proceedings. As the complaint alleges, after reporting his concerns about a phone call between President Trump and the President of Ukraine and being called to testify before Congress as part of its impeachment investigation, Vindman was immediately targeted by Defendants and their co-conspirators. Their purpose was to prevent and deter him from holding his office and discharging his duties, including testifying before Congress when called, and then to retaliate against him for his testimony. Those who agreed to participate in the coordinated effort— President Trump, Defendants, and others—manufactured and promoted false charges, including

that Vindman was disloyal to the United States, politically motivated, insubordinate, and a spy for Ukraine, and that he had committed crimes including espionage and perjury. The conspirators leaked classified information about Vindman to advance those false narratives, and threatened to and did destroy his career. In doing so, Defendants also unleashed a torrent of threats and harassment against Vindman and his family, and sent an unmistakable warning to other potential witnesses.

In the face of these allegations, Defendants essentially urge the Court to ignore the complaint and the law. Defendants notably do not contend, nor could they, that the facts Vindman actually pleaded fail to state a claim for violations of the Klan Act. Instead, they mischaracterize the complaint as merely expressing frustration over routine "rough and tumble" politics or, alternatively, as seeking redress for an employment dispute. Defendants also misconstrue decades of law governing conspiracies, the First Amendment, and applicable pleading requirements. The two Defendants who worked for the federal government also insist they could not have known that witness intimidation and obstruction of justice violate the law. Individually and collectively, Defendants' arguments fall short.

First, Vindman's complaint does not plead an employment dispute. Vindman does not seek review of, or a remedy for, any personnel action taken against him; nor has he sued anyone who was his supervisor or superior.  Rather, the public removal of Vindman and his brother from the National Security Council and White House efforts to block Vindman's promotion to colonel are pleaded as damning evidence of the intimidating and retaliatory purpose of the coordinated campaign Defendants and their co-conspirators waged against him.

Second, Defendants' effort to focus attention on only a few cherry-picked allegations regarding their own personal conduct ignores that the complaint alleges they participated in an

unlawful conspiracy. As such, Defendants each are liable for the full range of actions taken in furtherance of the conspiracy and the harm caused.

Third, Defendants' attempts to shield themselves with the First Amendment are unavailing. The First Amendment does not immunize Defendants' participation in an unlawful conspiracy merely because parts of the conspiracy were carried out through speech. Nor does it protect defamatory statements made with actual malice.

Finally, the two Defendants who served as federal employees cannot credibly claim qualified immunity on the ground that they were unaware that intimidating and retaliating against a federal official discharging his duties and testifying in a federal court proceeding was against the law—which is clear under the terms of both the Klan Act itself and corresponding criminal laws.

The question before this Court is whether Vindman has adequately pleaded a conspiracy to intimidate and retaliate against him in violation of the Klan Act based on the facts alleged in the complaint and the reasonable inferences they support, construed in the light most favorable to him—not based on a selective parsing of the complaint, or inferences drawn in Defendants' favor. Taken as a whole, the complaint easily clears that hurdle.

As Congress recognized as far back as Reconstruction, if conspirators can impede a federal official's ability to hold his job and carry out his responsibilities, or tamper with federal witnesses, the federal government—and therefore our democracy—cannot function. That is exactly what the complaint alleges Defendants did. Their motions to dismiss should be denied.

## FACTUAL BACKGROUND

While serving on a detail from the Department of Defense (DOD) to the National

Security Council (NSC) as its Director for Eastern European, Caucasus, and Russian Affairs,

Vindman listened to a phone call between President Trump and President Volodymyr Zelensky

of Ukraine. Compl. ¶¶ 3, 43, 47, 60, ECF No. 1. During the call, Trump attempted to coerce

Zelensky into undertaking an investigation of then former Vice President Joseph R. Biden and

his son, Hunter, in exchange for the release of security funds Congress had appropriated for

Ukraine. *Id.* Vindman was concerned that Trump's actions were potentially illegal, so he duly

reported the content of the call through appropriate internal channels at the NSC. *Id*. ¶¶ 4, 63.

After learning about the call from a different source, the House of Representatives opened an

impeachment inquiry. *Id.* ¶ 65.

Vindman was subpoenaed to testify as part of that inquiry. *Id.* ¶¶ 5, 104. He testified

twice, first in a closed-door deposition on October 29, 2019, before the House Permanent Select

Committee on Intelligence, Committee on Oversight and Reform, and Committee on Foreign

Affairs, and second in a public, televised hearing on November 19, 2019. *Id*. ¶¶ 5, 104, 122, 154.

None of Vindman's superiors at the NSC, DOD, or elsewhere in government instructed him not

to testify.  *See id.* ¶¶ 63-64, 101-04, 248.

President Trump and his allies recognized that Vindman was a compelling witness whose

truthful testimony would support impeachment, and they acted accordingly to impose, in

Trump's words, "Big Consequences" to prevent him from and then punish him for doing his job.

*Id*. ¶¶ 2, 66, 100, 106. To intimidate Vindman from testifying on October 29, November 19, and

any subsequent occasions, and retaliate against him after he did so anyway, Defendants Donald

Trump, Jr., Rudolph Giuliani, Daniel Scavino, and Julia Hahn, along with the president, external

ally Laura Ingraham, and potentially others, agreed to participate in a coordinated campaign to

destroy Vindman's reputation and make it impossible for him to continue serving in his government position or carry out the responsibilities of that position. *Id.* ¶¶ 6-12, 106-13, 218-19, 250, 261. They did this by falsely portraying him as disloyal to the United States, a spy for a foreign country, and a politically motivated saboteur, and by falsely accusing him of leaking classified information and perjury, among other smears. *Id*. ¶¶ 250, 261.

Defendants are each part of a group of close associates of and aides to President Trump who routinely coordinated efforts to support Trump's personal and political interests, including participating in various campaigns to publicly attack Trump's perceived enemies. *Id.* ¶¶ 21-24, 67-85, 89, 94-99. Giuliani was Trump's personal attorney and a central player in the coordinated effort to coerce Zelensky into announcing an investigation of the Bidens. *Id.* ¶¶ 22, 61, 75-77. Trump, Jr. is Trump's son, a key surrogate, and widely known to do his father's bidding. *Id.* ¶¶ 21, 73-74. Scavino was an Assistant to the President, Director of Social Media, and Deputy Chief of Staff for Communications. *Id.* ¶ 23. In those roles, he managed Trump's Twitter account and was a conduit to Trump's base of supporters. *Id.* ¶¶ 23, 69-71. Scavino also was among Hahn's White House superiors. *E.g.*, *id.* ¶ 146. Hahn was a Special Assistant to the President and Deputy White House Communications Director whose duties included managing relationships with and disseminating preferred messaging to conservative media such as Fox News. *Id.* ¶¶ 24, 72, 146. She worked for co-conspirator Laura Ingraham prior to joining the White House staff. *Id*. ¶ 24.

Defendants' concerted effort to intimidate and retaliate against Vindman was tailored to inflict maximum harm on Vindman both personally and professionally. The campaign effectively destroyed his ability to continue to serve in any national security position or foreign affairs role in government, and indeed, to continue the career he has pursued his entire adult life. *Id.* ¶¶ 10-11,

218-19, 251. It also had the intended and foreseeable effect of encouraging harassment and threats of violence against Vindman and his family. *Id.* ¶¶ 10, 12, 95-99, 230-37.

Vindman now seeks accountability for the injuries he has suffered as a result of the unlawful conspiracy. *Id.* ¶¶ 1, 247-67.

## STANDARD OF REVIEW

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008) (quotation marks omitted), "construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged," *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006). A court reviews the plaintiff's allegations supporting jurisdiction more closely under Rule 12(b)(1) than it would under Rule 12(b)(6). *Robinson v. U.S. Dep't of Educ.,* 502 F. Supp. 3d 127, 132 (D.D.C. 2020). However, a court must still "accept as true all of the factual allegations in the complaint" and draw all reasonable inferences in favor of the plaintiff. *Id.* To survive the motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).

## ARGUMENT

### I.   Vindman has stated a claim for violations of 42 U.S.C. § 1985(1) and (2).

The Klan Act protects the federal government's authority and ability to operate. It prohibits conspiracies to obstruct or injure federal officials for engaging in federal functions or to interfere with witnesses in court proceedings. The first relevant subsection, 42 U.S.C. § 1985(1), makes it unlawful for:

> two or more persons . . . [to] conspire to prevent, by force, intimidation, or threat,
> [1] any person from accepting or holding any office, trust, or place of confidence

> under the United States, [2] or from discharging any duties thereof; . . . [4] or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof . . . .

42 U.S.C. § 1985(1). The second relevant subsection, 42 U.S.C. § 1985(2), makes it unlawful for:

> two or more persons . . . [to] conspire [1] to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or [2] to injure such party or witness in his person or property on account of his having so attended or testified . . . .

*Id.* § 1985(2). The Klan Act provides a cause of action to any party injured as a result of an unlawful conspiracy. *Id*. § 1985(3); *Kush v. Rutledge*, 460 U.S. 719, 724 (1983).

### A.    Vindman has adequately pleaded that Defendants conspired to violate the Klan Act.

Vindman has adequately alleged a conspiracy in violation of 42 U.S.C. § 1985(1) and (2). A civil conspiracy requires "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The complaint contains facts that are more than sufficient to meet these elements.[1] At this stage, that ends the inquiry.

### 1.    Vindman has plausibly alleged that Defendants formed an agreement.

Vindman is required to plead "allegations plausibly suggesting" an agreement among Defendants and their co-conspirators. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). He need not "definitively '*show* an agreement'" at this stage, *SD3, LLC v. Black & Decker (U.S.)*

---

[1] Defendants do not contest that Vindman adequately pleaded that he was injured.

*Inc.*, 801 F.3d 412, 426 (4th Cir. 2015) (emphasis added) (citation omitted), because "[t]he plausibility standard is not akin to a probability requirement," *Iqbal*, 556 U.S. at 678 (quotation marks omitted). Thus, Vindman need only "raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Twombly*, 550 U.S. at 556. This is a low bar. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that proof" of the facts alleged "is improbable." *Id*. And contrary to Defendant Giuliani's argument (Mem. in Supp. of Giuliani's Mot. to Dismiss (Giuliani MTD) at 10, ECF No. 25-2), a court may "not require heightened fact pleading of specifics," *Twombly*, 550 U.S. at 570.

Further, while an agreement among conspirators may be explicit and demonstrated by direct evidence, such as a "document or conversation explicitly manifesting the existence of the agreement," it need not be. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 & n.23 (3d Cir. 2010); *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 91 (3d Cir. 2016). An agreement may instead be "tacit"—that is, understood or implied without being stated explicitly. *Halberstam*, 705 F.2d at 477. Indeed, "[c]onspiracies are often tacit or unwritten in an effort to escape detection," and therefore "necessitat[e] resort to circumstantial evidence to suggest that an agreement took place." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289-90 (4th Cir. 2012). Many types of circumstantial evidence can suggest an agreement, including "parallel conduct" by conspirators coupled with "plus factors." *In re Domestic Airline Travel Antitrust Litig.,* 221 F. Supp. 3d 46, 58-60 (D.D.C. 2016) (quotation marks omitted). But the basic question before the Court is whether Vindman has alleged sufficient facts to plausibly suggest that the attacks on him were the result of a concerted effort by Defendants to target him rather than just coincidental actions taken by each Defendant on their own.

Finally, allegations of a conspiracy must be evaluated "holistically" rather than piecemeal. *SD3*, 801 F.3d at 424. "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (alteration in original) (quotation marks omitted).

### (a)      Vindman's allegations meet the legal standard.

Far from relying on "conclusory" allegations or "threadbare" recitals of the elements of his claims, *Iqbal*, 556 U.S. at 678, Vindman has pleaded more than sufficient facts to "nudge[] [his] claims" that Defendants formed an agreement "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570. As detailed below, the complaint does not merely assert that Defendants formed an agreement to do something unlawful. It alleges numerous facts from which the Court can infer that they did so, including what Defendants did and why; when and how they did it; and their connections, and opportunities and motives to coordinate with each other. *See SD3*, 801 F.3d at 430. Defendants do not contest that Vindman has alleged parallel conduct targeting him for his participation in the impeachment proceedings. *See* Mem. in Supp. of Donald Trump, Jr. & Daniel Scavino, Jr.'s Mot. to Dismiss (Trump, Jr./Scavino MTD) at 13-14, 19, ECF No. 20; Mem. in Supp. of Julia Hahn's Mot. to Dismiss (Hahn MTD) at 11-16, ECF No. 26-1. The only question for the Court, then, is whether the complaint contains allegations sufficient to plausibly suggest that Defendants' parallel conduct was the product of a meeting of the minds.

Many different kinds of allegations can "suggest collusion, in addition to merely alleging parallel conduct." *In re Domestic Airline Travel*, 221 F. Supp. 3d at 58 (quotation marks omitted) (describing "plus factors"). These include but are not limited to: similar conduct or public statements that are close in time and in content, *id*. at 68-69 (citing *SD3*, 801 F.3d at 428-29); common motive to conspire, *Mayor & City Council of Baltimore v. Citigroup*, 709 F.3d 129, 136 (2d Cir. 2013); *SD3*, 801 F.3d at 431; an opportunity to conspire shown, for example, through "[a]llegations of communications and meetings among conspirators," *SD3*, 801 F.3d at 432; a prior history of coordination or communication that "facilitates" the formation of a conspiracy, *id*. (quotation marks omitted); and, of course, actual communication among alleged conspirators on the subject of the conspiracy, *see id*. In short, allegations of parallel conduct that are "placed in a context that raises a suggestion of a preceding agreement" are sufficient to plead a conspiracy. *Twombly*, 550 U.S. at 557.

Vindman's complaint alleges ample evidence to this effect. In fact, drawing all reasonable inferences in the light most favorable to Vindman, it is difficult to conclude that Defendants did *not* agree to the common scheme of intimidation and retaliation against him. It is even more difficult to conclude that the Complaint does not at least "raise a reasonable expectation that discovery will reveal evidence" of a meeting of the minds as opposed to a series of similar but independent actions, which is all it must do at this stage. *Id*. at 556.

*Defendants' close relationships and history of communication and coordination.* Vindman has pleaded ample facts demonstrating the close relationships and history of

communication and coordination among the four Defendants and the two identified non-defendant conspirators (Laura Ingraham and President Trump).[2]

The complaint alleges that Defendant Trump, Jr. is President Trump's son, close advisor, and surrogate, and that he was in constant close communication with his father and perceived by other advisors to act only with President Trump's approval. Compl. ¶¶ 21, 73-74. Defendant Giuliani was President Trump's personal attorney, advisor, and close friend. *Id.* ¶¶ 22, 75. Defendant Scavino was the White House Director of Social Media and Deputy Chief of Staff for Communications. *Id.* ¶ 23. He ran President Trump's personal and White House Twitter accounts and served as a conduit to the president's base. *Id.* ¶¶ 69-71. He also was among Defendant Hahn's White House superiors. *Id.* ¶ 146. Hahn served as a Special Assistant to the President and Deputy White House Communications Director. *Id.* ¶ 24. She had a close connection to Ingraham, having previously worked as the executive producer of Ingraham's radio show. *Id.* ¶ 72. And Ingraham, in turn, was in constant close communication with President Trump prior to, during, and after the relevant time frame, and was an especially close friend, supporter, and advisor to him. *Id.* ¶¶ 78-93. She was also one of President Trump's chief and most effective defenders in the media during the impeachment. *Id.* ¶ 82.

As part of this history among the conspirators, the complaint alleges previous instances of coordination between Defendants and President Trump (among others) to undertake similar public smear campaigns against other perceived common enemies. The complaint thus "identif[ies] a practice" or pattern—a playbook—that, even if "not illegal itself," makes the

---

[2] The complaint identifies only two specific non-defendant co-conspirators. *Contra* Trump, Jr./Scavino MTD at 16. Others may be revealed during discovery. *See Tripp v. Exec. Off. of the President*, 200 F.R.D. 140, 150-51 (D.D.C. 2001) ("[P]laintiff does not have to plead all the details of the conspiracy at this stage in the proceedings.").

formation of the agreement alleged here all the more plausible. *SD3*, 801 F.3d at 432 (quotation marks omitted); Compl. ¶ 96 (President Trump, Trump, Jr., and Scavino coordinating to attack Andrew McCabe); *id.* ¶ 97 (President Trump, Trump, Jr., and Giuliani, coordinating to attack Ambassador Marie Yovanovitch).

Overall, the complaint makes clear that Defendants and their co-conspirators, including President Trump and Ingraham, are part of a particularly close and interdependent network of allies that frequently worked together to protect and advance President Trump's personal and political interests. *Id.* at ¶¶ 67-99. It strains credulity that they would *not* have worked together to defend Trump during a direct threat to his presidency, just as they did only months later when he lost reelection. *Id.* ¶¶ 75, 85-86.

*Defendants' communications on the subject of the conspiracy.* The complaint further alleges that some Defendants and their co-conspirators not only have a long history of communication and coordination on other topics, but also concerning subjects closely related to the alleged conspiracy, if not the conspiracy itself. Public reporting and sworn testimony make clear that Defendant Giuliani frequently communicated and coordinated with President Trump regarding the effort to coerce Ukraine into investigating the Bidens, the very subject of the phone call about which Vindman testified. *Id.* ¶¶ 76-77; *see also id.* ¶¶ 22, 59, 61. Trump, Jr., too, was involved in the fallout of the same pressure campaign, and likely coordinated with both Giuliani and President Trump regarding that topic. *See id.* ¶ 97. This makes "collusion" rather than "merely parallel conduct" more likely.  *See In re Domestic Airline Travel.,* 221 F. Supp. 3d at 58 (quotation marks omitted); *SD3*, 801 F.3d at 432.

Moreover, the complaint describes communications specific to the topic of how to attack Vindman for participating in the impeachment proceedings. Most prominently, the complaint

describes the November 19 talking points regarding Vindman that Defendant Hahn distributed to external surrogates and allied media (like Ingraham) at the direction of her superiors, who included Defendant Scavino and President Trump. Compl. ¶ 146. The complaint also alleges other reported instances of the conspirators and others communicating about impeachment witnesses and President Trump's and his allies' response to them. *See id.* ¶¶ 142-43 (Oval Office meeting among allies the day before Vindman's public testimony); *id.* ¶ 144 (*Washington Post* article describing impeachment strategy discussions and President Trump's reliance on outside advisors); *id.* ¶ 145 (*Daily Beast* article describing President Trump exhorting allies to "play offense"). Further, Scavino's management of President Trump's Twitter account supports the inference that he communicated with Trump regarding his tweets about Vindman. *Id.* ¶¶ 23, 69-71, 100, 129-30, 172, 193, 199. Combined with other factors, these communications about or related to the subject of the alleged conspiracy are strong circumstantial evidence of an agreement.

*Defendants' similarly timed and worded statements and conduct, and admitted common motivation.* Vindman's complaint contains numerous additional allegations raising the plausible inference that the Defendants were "pursuing the same goal" pursuant to "a common plan" through their parallel conduct. *See Hobson v. Wilson*, 737 F.2d 1, 54-55 (D.C. Cir. 1984) (quotation marks omitted). For example, in late October and November 2019, Defendants, President Trump, and Ingraham launched the same defamatory attacks against Vindman at the same time, accusing him of disloyalty to the United States and loyalty to Ukraine, purportedly based on his heritage and communications with Ukrainian officials. Compl. ¶¶ 107-113 (Ingraham's defamatory October 28 TV segment); *id.* ¶¶ 124-25 (Giuliani's October 29 and October 30 tweets making similar statements); *id.* ¶¶ 132, 137, 139 (Trump, Jr.'s November 3

tweets alleging disloyalty). Nearly the same set of conspirators launched similar coordinated attacks again two weeks later as soon as Republican Counsel Stephen Castor, relying on classified information, publicly revealed that the head of Ukraine's National Security and Defense Council offered Vindman the post of Ukrainian defense minister. *Id.* ¶ 170 (Ingraham's November 19 tweet falsely asserting Vindman's dual loyalties); *id.* ¶ 171 (Scavino's November 19 tweet asserting the same); *id.* ¶ 172 (President Trump's November 19 retweet of Scavino's tweet); *see id.* ¶ 146-49 (Hahn's November 19 talking points making similar assertions); *id.* ¶¶ 176-77 (Trump, Jr.'s November 19 tweet matching the talking points' assertions); *id.* ¶ 150 (Trump War Room's November 19 tweet asserting the same). These statements, nearly identical in both content and timing, support an inference that the conspirators agreed on a shared purpose and strategy. *See In re Domestic Airline Travel*, 221 F. Supp. 3d at 68-69 (noting that parallel conduct need not be taken in "lockstep" (citing *SD3*, 801 F.3d at 428-29)). They also demonstrate that Defendants and their co-conspirators were not simply participants in an echo chamber that organically developed as a result of Vindman's public involvement with the impeachment, but rather played an intentional and concerted role in devising and seeding the false narratives about Vindman that then spread across traditional and social media as intended.

As another example, following President Trump's acquittal on February 5, 2020, and around the time of Vindman's February 7 removal from the NSC, Defendant Trump, Jr., President Trump, and Ingraham conveyed identical messages at roughly the same time to explain that President Trump would indeed impose "Big Consequences" (Compl. ¶ 100) on Vindman in direct retaliation for his testimony. *See id.* ¶ 191 (White House Press Secretary's February 6 announcement that President Trump thought "people should pay"); *id.* ¶ 192 (President Trump's February 7 statement, when asked whether he planned to fire Vindman, that he was "not happy

with him"); *id.* ¶ 193 (President Trump's February 7 retweet describing "Vindman's behavior" as a "scandal" and calling for Vindman's firing); *id.* ¶ 196 (Trump, Jr.'s February 7 tweet that Vindman still could take the Ukrainian defense minister post); *id.* ¶ 197 (Trump, Jr.'s separate February 7 tweet thanking Congressman Schiff for "unearthing" through the impeachment investigation "who all needed to be fired"); *id.* ¶ 198 (Ingraham's February 8 remark describing Vindman's firing as "much-needed housekeeping"); *id.* (Ingraham's guest's February 8 remark that Vindman's firing was "very necessary payback"); *id.* ¶¶ 199, 201 (President Trump's February 8 tweets tying Vindman's firing to his impeachment testimony); *id.* ¶ 201 (President Trump's February 11 statement to reporters that "[w]e sent [Vindman] on his way to a much different location" and that Vindman "reported a false call").

These statements are stark examples of the many instances of strikingly similar "mutually supportive activity" Vindman has pleaded. *Halberstam*, 705 F.2d at 481. *See, e.g.*, Compl. ¶¶ 128-31 (parallel conduct between Trump, Jr. and President Trump calling Vindman a "leftist" and "never Trumper").

Read as a whole, Vindman's complaint aligns with what courts have recognized as supporting an inference of agreement in a range of conspiracy cases. While the context here—an impeachment in which the president himself illegally attempted to tamper with a witness—may be unique, the core facts suggesting an unlawful conspiracy and the law governing those facts are well established. Taking the acknowledged parallel conduct and "plus factors" together, Vindman has pleaded more than sufficient facts to support the plausible inference that Defendants' conduct was the product of a coordinated and agreed upon strategy—and *plausibility*, not *probability*, is what he must show at this stage. *See Iqbal*, 556 U.S. at 678.

15

*(b)*     *Defendants' counterarguments are unavailing.*

Defendants' attempts to minimize the import of Vindman's allegations and demand direct evidence of an agreement misconstrue the facts and misstate the law.

Defendant Hahn's assertion that Vindman must allege a specific, in-person meeting during which an agreement was formed is wrong. Hahn MTD at 12. Vindman does not need to allege a "smoke-filled" room where Defendants nefariously spoke of an agreement. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010). The case Hahn relies on, *Bush v. Butler,* does not say otherwise; it simply explains that conversations are one way of demonstrating a conspiracy. 521 F. Supp. 2d 63, 68 (D.D.C. 2007). Indeed, *Bush* relies on *McCreary v. Health*, which emphasizes that the core of a civil conspiracy is a "meeting of the minds," and the inquiry at the motion to dismiss stage is whether the plaintiff has pleaded "facts from which the Court could infer that any conspiracy exists." 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005). Even so, Vindman *has* alleged much of the "who, what, when, and where" of Defendants' agreement to undertake this concerted effort against him, and complaints that do so "not surprisingly survive dismissal"—as this complaint should. *See SD3*, 801 F.3d at 430 (quotation marks omitted).

Similarly, Defendants' assertion that Vindman must detail a gathering, conversation, or other direct evidence of an agreement *among all of the conspirators* is wrong. *See* Trump, Jr./Scavino MTD at 16; Hahn MTD at 12-15. As explained above, it is well established that allegations of specific meetings or direct communications are not necessary. *See Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30-31 (D.D.C. 2016) (rejecting argument that a plaintiff is required to allege a specific "event, conversation, or document" or that "an express or formal agreement was entered into" (quoting *U.S. ex rel. Tran v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014)). And the plaintiff "need not prove a direct connection between all of the conspirators" at all. *U.S.*

16

*v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988). In fact, a "conspiracy may be established when each conspirator knows of the existence of the larger conspiracy[,] . . . even if he is ignorant of [the] precise identities" of the other conspirators. *Id.* Thus, it is enough that Defendants each agreed with at least one other conspirator to participate in the common scheme with a shared purpose, even if the conspirators never met or talked all together or otherwise formed a distinct agreement with each and every other conspirator. *Hobson*, 737 F.2d at 51 ("A plaintiff . . . need not prove that each participant in a conspiracy knew the exact limits of the illegal plan or the identity of all participants therein" (alteration in original) (quotation marks omitted)).

Defendants also argue that allegations of mere communication (Trump, Jr./Scavino MTD at 18), emails to the press (Hahn MTD at 13), or tweets (Giuliani MTD at 3-4, 7-10) are insufficient on their own to plead a conspiracy. But these arguments are not responsive to what Vindman has pleaded. Allegations of a conspiracy—an agreement to undertake unlawful acts or lawful acts for an unlawful purpose—must be evaluated holistically rather than "tightly compartmentaliz[ed into] the various factual components." *Cont'l Ore Co.*, 370 U.S. at 699. Vindman has pleaded numerous allegations which, taken together, allow the Court to infer that Defendants formed an agreement.

Other cases Defendants cite are similarly inapposite. *Black Lives Matter D.C. v. Trump* merely notes that allegations of communication alone are insufficient to demonstrate a conspiracy at the motion to dismiss stage. *See* 544 F. Supp 3d 15, 39 (D.D.C. 2021); Trump, Jr./Scavino MTD at 18. Similarly, *RSM Production Corporation v. Freshfields Bruckhaus Deringer U.S. LLP* simply reiterates that a plaintiff must plead an agreement among conspirators (which Vindman has done). *See* 682 F.3d 1043, 1051-52 (D.C. Cir. 2012); Hahn MTD at 13. And Vindman's complaint is not like the complaint at issue in *Kurd v. Republic of Turkey*, where

the plaintiff failed to allege that the defendants even knew each other or had the opportunity to communicate—facts that Vindman has pleaded. *See* 374 F. Supp. 3d 37, 62 (D.D.C. 2019); Trump, Jr./Scavino MTD at 14, 18.

Finally, Defendants (at times) seem not to contest that they formed an agreement to attack Vindman; instead, they assert that what they did was perfectly lawful. Defendant Hahn, for example, acknowledges that she agreed with President Trump, Defendant Scavino, and others to execute a "communications strategy." Hahn MTD at 10, 12, 16-17. That makes sense. We would expect a president, one of his top communications advisors (Scavino), a deputy (Hahn), and their top external advisors (Ingraham) and surrogates (Giuliani and Trump, Jr.) to coordinate and agree on their approach. It would be implausible if they did not—as Hahn herself seems to acknowledge. What makes this conduct an unlawful conspiracy, rather than just political strategy, is the unlawful *purpose* of the agreement (see *infra* at 18-23), and the unlawful acts Defendants took in furtherance of it (see *infra* at 23-25). A president's top advisors and surrogates agreeing on a strategy to publicly and privately attack a political opponent may qualify as "just politics." But a president agreeing with his top advisors and surrogates on an intentional and coordinated plan to intimidate and retaliate against a federal official for reporting and testifying about misconduct, and taking unlawful steps in furtherance of that plan, is a conspiracy. The *agreement* among Defendants is the least surprising part of it.

    **2.**    **Vindman has plausibly alleged that the purpose of the conspiracy was to intimidate and retaliate against him because he reported misconduct and testified in the impeachment.**

Vindman has pleaded sufficient facts supporting the inference that the purpose of Defendants' agreement was to intimidate and retaliate against him and was thus unlawful.

The first and second clauses of § 1985(1), and the first clause of § 1985(2), require Vindman to plead sufficient facts to make it plausible that Defendants conspired to *intimidate* him to prevent him from continuing to hold his office or perform the duties of his office, including by testifying during the impeachment proceedings. The fourth clause of § 1985(1) and the second clause of § 1985(2) forbid injuring a person "on account of" protected activity—in other words, *retaliation*—and do not require any showing of intimidation as the method or means of doing so. *See Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1336-37 & n.13 (7th Cir. 1977) (holding that the word intimidation "does not modify" the fourth clause of § 1985(1)); *U.S. v. DeMott*, 2005 WL 2314134, at *2 (N.D.N.Y. Sept. 22, 2005) (holding that the word "intimidation" does not modify the second clause of 18 U.S.C. § 372, the criminal companion to § 1985(1)).

Defendants Hahn and Giuliani once again ignore the allegations in the complaint and argue that their isolated actions do not constitute intimidation. Hahn MTD at 16-17; Giuliani MTD at 6. And Defendants Trump, Jr. and Scavino seem to ignore that § 1985(1) and (2) forbid retaliation in addition to intimidation. Trump, Jr./Scavino MTD at 15. But when viewed holistically, as it must be, the complaint contains ample allegations making it plausible that the purpose of the conspiracy (rather than each specific individual action) was intimidation and retaliation against Vindman. *See Cont'l Ore Co.*, 370 U.S. at 699.

Courts have recognized a wide range of conduct as intimidation, "not limited to displays or applications of force." *U.S. v. Nguyen*, 673 F.3d 1259, 1261, 1265-66 (9th Cir. 2012) (finding letter warning Hispanic voters of incarceration or deportation could "constitute[] a tactic of intimidation" under state voter intimidation law). Rather, intimidation is "any words or actions that are intended or designed to harass, frighten or threaten a person to do something that person would not otherwise do or not to do something that the person otherwise would do," *U.S. v.*

19

*Gartman*, 1995 WL 265925, at *4 (4th Cir. May 9, 1995) (per curiam) (interpreting the criminal witness tampering statute, 18 U.S.C. §1512), and "can be achieved through manipulation and suggestion." *See Nguyen*, 673 F.2d at 1265-66. A more limited definition "would leave unremedied myriad forms of interference." *Silverman v. Newspaper & Mail Deliverers' Union of N.Y. & Vicinity*, 1999 WL 893398, at *4 (S.D.N.Y. Oct. 18, 1999) (interpreting § 1985(2)).

This is consistent with Webster's dictionary definition from 1867, nearly contemporaneous with the passage of the Klan Act, which defines intimidation as "[t]o make fearful; to inspire with fear," and lists as synonyms, "[t]o dishearten; dispirit; abash; deter; frighten; [and] terrify." Noah Webster, An American Dictionary of the English Language 555 (1867), https://tinyurl.com/yzjrhmvy. Likewise, the Department of Justice defines voter intimidation (which is prohibited by a different part of the Klan Act) as any conduct designed to "deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety." Craig C. Donsanto & Nancy L. Simmons, Pub. Integrity Section, U.S. Dep't of Just., *Federal Prosecution of Election Offenses* 54 (7th ed. 2007), https://tinyurl.com/59zc99du.

Decades of case law interpret prohibitions on intimidation in a manner consistent with these definitions. In particular, threats of prosecution, disseminating false information about what could lead to prosecution, and falsely accusing someone of a crime are classic examples of intimidation. *See, e.g.*, *League of United Latin Am. Citizens v. Pub. Int. Legal Found.*, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (alleging felonious voter registration "in a clear effort to subject the named individuals to public opprobrium" can constitute voter intimidation); *Nguyen*, 673 F.3d at 1265-66 (sending letters to voters warning of incarceration or deportation resulting from illegal voting could "constitute[] a tactic of intimidation"); *People Helpers, Inc. v.*

20

*City of Richmond*, 789 F. Supp. 725, 731-33 (E.D. Va. 1992) (finding that excessive investigations by the city of a rental property may be intimidation); *U.S. v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (holding that excessive police investigations can be intimidation).

Threats of economic harm and job loss have also long been recognized as intimidation. *See, e.g.*, *U.S. v. Bruce*, 353 F.2d 474, 477 (5th Cir. 1965) (interfering with an insurance collector's business because of his efforts to register Black voters can be intimidation); *U.S. v. Bd. of Educ. of Greene Cnty.*, 332 F.2d 40, 46 (5th Cir. 1964) (Rives, J., concurring) (failing to renew a teacher's contract can constitute voter intimidation); *U.S. v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) (evicting Black tenant farmers or refusing to extend or renew their leases for the purpose of interfering with their voting rights is intimidation); *U.S. v. Deal*, 6 Race Rel. L. Rep. 474, 474-76 (W.D. La. 1961) (refusing to engage in business transactions with Black farmers because they attempted to register to vote is intimidation); *Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 339-43, 347-48 (E.D. La. 1965) (holding that boycotts and other forms of economic coercion can constitute intimidation).

Vindman's complaint adequately alleges numerous statements and actions by Defendants that fall within these well-recognized definitions of intimidation. Defendants' coordinated public smears of Vindman included accusations of serious crimes and attendant threats of legal consequences and job loss. Multiple Defendants and co-conspirators pushed the false smear that Vindman was disloyal to the United States. Compl. ¶¶ 107-110, 170 (Ingraham); *id.* ¶¶ 124-25 (Giuliani); *id.* ¶¶ 132, 137, 139 (Trump, Jr.); *id.* ¶ 171 (Scavino); *id.* ¶ 172 (President Trump). Treason and espionage are federal crimes and violations of the Uniform Code of Military Justice (UCMJ), punishable by imprisonment and even death. *See* 18 U.S.C. §§ 793-94, 798; 10 U.S.C. § 903a (art. 103a, UCMJ); Compl. ¶ 111. And even if such accusations do not lead to criminal

prosecution or conviction, making them publicly against a national security official is a sure way to prevent him from continuing to hold that job, or any similar job, in the future. Trump, Jr. also defamed Vindman by knowingly and falsely accusing Vindman of another felony—perjury—and encouraged prosecution for it. Compl. ¶¶ 175-77.

Defendants' actions directly interfering with Vindman's job (while not the basis of his damages claim) also demonstrate the purpose of the conspiracy. The complaint alleges that Defendants and others created a list of unfounded accusations about Vindman (which were later proven false) and shared that list with the Pentagon in an effort to block Vindman's promotion to colonel. *Id*. ¶ 210. White House officials, at the direction of President Trump, later directly pressured the Pentagon to remove Vindman from the list of Army promotions. *Id.* ¶ 214. And White House officials also later advocated that Defense Secretary Mark Esper be fired because he ultimately approved the promotion. *Id*. ¶ 216. Regardless of whether these actions were independently lawful or not, they speak to the *purpose* of the efforts against Vindman: to prevent him from continuing to hold his job, intimidate him from future testimony about the Trump-Zelensky phone call, and retaliate against him for reporting the phone call and testifying about it. *Cf. Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (lawful speech may be used to "establish the elements" of a claim "or to prove motive or intent"); *Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004) (The "use of speech to infer intent, which in turn renders an otherwise permissible act unlawful, is constitutionally valid.").

Moreover, Defendants and other conspirators openly stated that the purpose of their statements and conduct was intimidation and retaliation. President Trump himself publicly announced it when he tweeted on September 2 that there would be "Big Consequences!" Compl. ¶¶ 16, 66, 100. This is both a statement of the purpose of the conspiracy, and an implied threat to

deprive Vindman of his job—which can constitute intimidation. *See* Donsanto & Simmons, *supra*, at 54 (threat of job loss is voter intimidation); *Bd. of Educ. of Greene Cnty.*, 332 F.2d at 46. President Trump later publicly stated his intention to retaliate against Vindman for his testimony, (Compl. ¶¶ 131, 191, 192), subsequently confirmed that he removed Vindman and his brother from the NSC in retaliation for Vindman's testimony (*id.* ¶ 199), and then indicated that he would like the military to take further retaliatory action (*id.* ¶ 201). At the same time, two other conspirators—Ingraham and Defendant Trump, Jr.—further tied President Trump's actions to the purpose of the conspiracy as a whole by confirming that Vindman's removal from the NSC was in retaliation for his official actions and registering their support for that retaliation. *Id.* ¶¶ 196-97 (Trump, Jr.); *id.* ¶ 198 (Ingraham).

Defendants' arguments to the contrary once again fall short. They seemingly accept (as they must) that an agreement to intimidate and retaliate against Vindman for reporting misconduct and testifying about that misconduct, through defamation, inflicting public humiliation, threatening him with job loss, leaking classified information, and other unlawful and inappropriate actions, would be illegal. Instead, they seem only to contest whether Vindman's complaint sufficiently alleges that they formed an agreement for that purpose, again focusing on their individual actions and ignoring the totality of allegations of conspiracy in the complaint.

### 3. Vindman has adequately alleged unlawful overt acts in furtherance of the conspiracy.

Vindman has adequately alleged that conspirators engaged in unlawful overt acts in furtherance of the conspiracy. A conspiracy does not require each individual conspirator to take an unlawful overt act. *See Halberstam*, 705 F.2d at 481. Rather, so long as the plaintiff has pleaded an agreement to intimidate or retaliate, he need only allege that one conspirator took one unlawful overt act in furtherance of that agreement and that he was injured as a result. Moreover,

it is not necessary that each overt act meet the definition of intimidation or be independently actionable for a conspiracy claim to be valid. *Lawrence v. Acree*, 665 F.2d 1319, 1324 (D.C. Cir. 1981) ("We decline to deprive section 1985 and other civil conspiracy statutes of significant meaning by requiring that each overt act in furtherance of the conspiracy be independently actionable."). Here, Vindman has pleaded extensive facts demonstrating that several conspirators took several unlawful overt acts in furtherance of the conspiracy. That is more than sufficient.

First, Vindman pleaded multiple instances of defamatory statements made with actual malice. These include but are not limited to knowingly false statements regarding Vindman's supposed disloyalty and espionage (a crime), as well as false statements alleging that he perjured himself (another crime). *See, e.g.*, Compl. ¶¶ 124-25 (Giuliani); *id.* ¶¶ 132-34, 137, 139, 176-77, 203-04 (Trump, Jr.); *id.* ¶¶ 147-49 (Hahn); *see also id.* ¶¶ 107-115 (Ingraham or her guests); *id.* ¶¶ 199-200 (President Trump). See also *infra* at 33-47.

Second, Vindman alleges that conspirators at the White House unlawfully leaked classified information as part of the effort to further the false and defamatory narrative that Vindman was disloyal to the United States and possibly a spy. Compl. ¶¶ 157-67. Regardless of whether unlawfully sharing classified information is independently actionable by a plaintiff in a civil case, the conduct serves as an unlawful overt act in furtherance of the conspiracy—which is sufficient. *Lawrence*, 665 F.2d at 1324.

Third, Vindman alleges that Defendants and their co-conspirators engaged in numerous other overt acts in furtherance of the scheme to intimidate and retaliate against him, including President Trump's explicit, public threats (including promising "Big Consequences!") and public acknowledgement of retaliation; conspirators' meetings to coordinate strategy to intimidate him as a witness and retaliate against him; releasing public statements and tweets to intimidate and

24

retaliate against him (even if not defamatory); preparing and issuing talking points (even if not defamatory); and more. *See* Compl. ¶¶ 16, 66, 100-02, 142-44, 146-49, 192-94, 252-55, 262-65. These otherwise lawful acts were done for an unlawful purpose and therefore also constitute unlawful overt acts in furtherance of the conspiracy. *See Halberstam*, 705 F.2d at 477 ("a lawful act in an unlawful manner" can serve as a predicate for a civil conspiracy); *Cont'l Ore Co.*, 370 U.S. at 707 ("[I]t is well settled that acts that are in themselves legal lose that character when they become constituent elements of an unlawful scheme.").

Defendants' arguments to the contrary ignore both the actual allegations in the complaint and fundamental principles of conspiracy law. Defendants' attempts to respond only to the overt acts "attributable" to them, or to argue that they never agreed to specific actions taken by others, miss the point. *See* Hahn MTD at 16; Giuliani MTD at 5-8; Trump, Jr./Scavino MTD at 16-18. This is not how conspiracy liability works. "[O]nce the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy." *Halberstam*, 705 F.2d at 481. Each conspirator "need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action . . . so long as the purpose of the . . . action was to advance the overall object of the conspiracy." *Id.* A defendant can therefore be "liable . . .  based on the actions of [their] co-conspirators." *U.S. ex rel. Miller v. Bill Harbert Int'l Constr.*, 608 F.3d 871, 899-901 (D.C. Cir. 2010).

All told, the complaint more than sufficiently alleges a plausible conspiracy to intimidate and retaliate against Vindman for reporting misconduct and participating in the impeachment proceeding.

**B.      Vindman has stated a claim that the defendants violated § 1985(2).**

Defendants argue that § 1985(2) is inapplicable to Vindman's testimony because it took place in a congressional impeachment proceeding and not an Article III federal court. Hahn MTD at 22-23; Trump, Jr./Scavino MTD at 34-36.[3] However, this reading of the statute ignores its plain text, meaning, and underlying purposes.

**1.      A court of impeachment is a "court of the United States" within the plain meaning of the statutory text.**

Section 1985(2) of the Klan Act prohibits conspiracies to "deter by force, intimidation, or threat any party or witness in any court of the United States" from attending or testifying in court, or to injure any party or witness "on account of" his attendance or testimony. In determining whether a court qualifies as a "court of the United States" under § 1985(2), the "starting point for interpreting [the] statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).

"In construing a statute, we look first for the plain meaning of the text. If the language of the statute has a plain and unambiguous meaning, our inquiry ends so long as the resulting statutory scheme is coherent and consistent." *U.S. v. Barnes,* 295 F.3d 1354, 1359 (D.C. Cir. 2002) (quotation marks omitted). Whether statutory language is plain depends on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id*. (quotation marks omitted).

Applying this test, the statute speaks of a "court *of the United States*," not exclusively Article III courts, and should be construed to encompass impeachment proceedings. *See* 42 U.S.C. § 1985(2) (emphasis added). That a court of impeachment is a court of the United States

---

[3] Defendant Giuliani does not contest the application of § 1985(2) to impeachment proceedings.

is borne out by how impeachment proceedings operate and the function they serve—which is far different from a typical congressional hearing. When Congress exercises its power to impeach and try the president for abuses of his office, it sits as a "*court* of impeachment" and exercises "judicial power." *See, e.g.*, *In re House Comm. on Judiciary*, 414 F. Supp. 3d 129, 153 (D.D.C. 2019) (noting that "an impeachment trial is an exercise of judicial power provided outside Article III and delegated to Congress in Article I."), *vacated and remanded sub nom. on other grounds*, *Dep't of Just. v. House Comm. on Judiciary*, 142 S. Ct. 46 (2021); *see also* 166 Cong. Rec. S289 (daily ed. Jan. 21, 2020) (statement of Chief Justice John Roberts) ("The Senate will convene as a Court of Impeachment.").

The constitutional framework for impeachment proceedings underscores their function as limited-purpose "courts." According to Article I, the House has "the sole Power of Impeachment," U.S. Const. art. I, § 2, cl. 5, and functions as an investigative and charging body akin to a grand jury, *cf. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2046 (2020) (Thomas, J., dissenting) (discussing the House's investigative role in the impeachment process and noting "[t]he power to impeach includes a power to investigate and demand documents"). The Senate has the power to "try" presidential impeachments, with the Chief Justice of the United States—an Article III judge—presiding over the trial. U.S. Const. art. I, § 3, cl. 6. During trial, the Senate sits as a "High Court of Impeachment" and "managers" from the House of Representatives act as prosecutors. U.S. Senate, *About Impeachment*, https://tinyurl.com/3f7wuxeu. Impeachment is discussed in Article III, section 2, which provides that the "judicial Power" extends to all "*Cases*." U.S. Const. art. III, § 2, cl. 1 (emphasis added). Section 2 further specifies that "the Trial of all Crimes, except in *Cases* of Impeachment, shall be by Jury." *Id*. art. III, § 2, cl. 3 (emphasis added).

The *Federalist Papers* likewise show that the Constitution's framers viewed impeachment proceedings as "courts" and that they were primarily concerned with ensuring the appropriate setting, jurisdiction, prosecutors, and presiding officers for judging the conduct of high-ranking public officials. As Alexander Hamilton wrote, "A well-constituted *court* for the trial of impeachments is an object not more to be desired than difficult to be obtained in a government wholly elective." The Federalist No. 65 (emphasis added); *see In re House Comm. on Judiciary*, 414 F. Supp. 3d at 154 n.22 (noting that "Hamilton referred to the 'court,' the 'court of impeachments,' and the 'court for the trial of impeachments' a total of *seventeen* times" in the Federalist Nos. 65-66 (emphasis in original)).

### 2.    The purposes underlying § 1985(2) encompass conspiracies to tamper with witnesses in impeachment proceedings.

Interpreting the plain language of § 1985(2) as applying to courts of impeachment also fits the "broader context of the statute as a whole." *See Robinson*, 519 U.S. at 341; *U.S. v. Wilson*, 290 F.3d 347, 352 (D.C. Cir. 2002). As the Supreme Court has described, the Klan Act prohibits conspiracies to interfere with five broad categories of activity. *Kush*, 460 U.S. at 724-25. "Three of the five broad categories . . . relate to *institutions and processes of the federal government—federal officers, § 1985(1); federal judicial proceedings, the first portion of § 1985(2); and federal elections, the second part of § 1985(3)." Id.* (emphasis added). The legislative history of the Klan Act reveals an overarching concern with the "[r]estoration of civil authority" and "the need to preserve orderly government" against violent interference from those who reject the authority of the United States government. *McCord v. Bailey*, 636 F.2d 606, 615-16 (D.C. Cir. 1980); *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1041 (11th Cir. 2000) (noting that the Klan Act was "designed to proscribe conspiracies 'having the object or effect of frustrating the constitutional operations of government'").

The federal government's authority would unquestionably be undermined if constitutional proceedings to adjudicate a president's fitness for office could be thwarted by conspiracies to prevent witnesses from testifying or retaliate against them for doing so. This reading of the statute therefore comports with the Supreme Court's instruction that "Reconstruction civil rights statutes" are to be accorded "a sweep as broad as [their] language," *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971) (alteration in original) (quotation marks omitted).

### 3.     The authority cited by Defendants does not preclude application of § 1985(2) to a court of impeachment.

No authority contravenes the statute's plain text. Defendants cite a handful of decisions for the proposition that § 1985(2) applies only to "federal courts," which Defendants take to mean Article III courts. Hahn MTD at 22-23; Trump, Jr./Scavino MTD at 34-36. However, there is nothing in those cases requiring that "federal courts" be defined solely as Article III courts. Rather, they hold that § 1985(2) does not apply to federal administrative proceedings, such as those before the Equal Employment Opportunity Commission, *see Bowie v. Maddo*x, 642 F.3d 1122, 1132 (D.C. Cir. 2011); *Graves v. U.S.*, 961 F. Supp. 314, 319-20 (D.D.C. 1997); *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757-58 (5th Cir. 1987); *Morast v. Lance*, 807 F.2d 926, 929-30 (11th Cir. 1987); *Carter v. Church*, 791 F. Supp. 298, 300 (M.D. Ga. 1992), or to a plaintiff's self-styled common-law "grand jury," *see Vidurek v. Pollen*, 2021 WL 4066503, at *13 (S.D.N.Y. Sept. 7, 2021). None of these is anything like an impeachment proceeding expressly provided for by the Constitution and presided over by the Chief Justice of the United States, with separate investigative and trial components. Indeed, the cases Defendants cite are silent about courts of impeachment and say nothing to indicate a judicial proceeding that takes place within another branch of the federal government is not a "federal court."

**C.      Vindman's claims are not barred by the intracorporate conspiracy doctrine.**

Defendant Hahn argues that the intracorporate conspiracy doctrine bars the claims against her. Hahn MTD at 12-13, 29. This is as baffling as it is wrong.

First, the alleged conspiracy is not "intracorporate" at all. The intracorporate conspiracy doctrine, originally developed in the antitrust context, holds that a conspiracy cannot consist solely of a corporation and its agents. *See Nelson Radio & Supply Co. v. Motorola,* 200 F.2d 911, 913 (5th Cir. 1952). Here, the conspiracy that Vindman alleges consists of defendants from within the executive branch (Hahn and Scavino) and from outside of the government (Giuliani and Trump, Jr.). Because Defendants are not agents of the same corporate entity, the intracorporate conspiracy doctrine has no relevance. *See Tripp v. Exec. Off. of the President*, 200 F.R.D. 140, 150-51 (D.D.C. 2001) (holding the intracorporate conspiracy doctrine does not apply where some defendants are within the government and some are outside of it). As explained above, Hahn's assertion that the complaint "cannot" allege that she conspired with others outside the government (which it clearly does) misunderstands the basics of conspiracy law. *See* Hahn MTD at 29. The Court's analysis can end here.

Furthermore, the intracorporate conspiracy doctrine does not apply to conspiracies—like the one alleged here—that are also criminal in nature. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 785-86 & nn.14-15 (1984) (Stevens, J., dissenting) (collecting cases) ("[I]t has long been the law of criminal conspiracy that the officers of even a single corporation are capable of conspiring with each other or the corporation."). In *McAndrew v. Lockheed Martin*, the Eleventh Circuit held that a claim under § 1985(2) "necessarily alleges criminal activity in violation of 18 U.S.C. § 1512—the criminal statute prohibiting tampering with a witness—and a criminal conspiracy in violation of 18 U.S.C. § 371" and declined to apply the doctrine. 206 F.3d at 1039-40. The same is also true of a claim under § 1985(1), which has a direct criminal analog

in 18 U.S.C. § 372. Moreover, Vindman's complaint alleges conduct amounting to criminal

obstruction of justice. *See Blakeney v. O'Donnell*, 117 F. Supp. 3d 6, 15-16 (D.D.C. 2015) (citing

*McAndrew*) ("Courts in this district . . . have examined the doctrine extensively in relation to

Section 1983 and 1985 conspiracies, and concluded that it does not apply when the underlying

alleged scheme involves conduct that is outside the scope of employment and at least arguably

criminal.").

## II.     Vindman's claims are not barred by the First Amendment or any speech-related privilege or immunity.

Defendants each argue, incorrectly, that the First Amendment precludes their liability for

violating § 1985(1) and (2). Defendants Trump, Jr. and Scavino argue, also incorrectly, that various

speech-related privileges and immunities shield them from liability. While largely—and, as

explained above, mistakenly (see *supra* at 17, 19)—focusing on their individual statements in

isolation from the alleged conspiracy, Defendants contend that they engaged in protected speech by

merely expressing opinions on political matters and that the complaint fails to adequately allege

unlawful defamation. Hahn MTD at 17-21; Trump, Jr./Scavino MTD at 19-33; Giuliani MTD at

10-13. However, for several reasons, the First Amendment does not shield Defendants from

liability, nor do the privileges and immunities asserted by Trump, Jr. and Scavino.

### A.     The Court may hold Defendants liable for their course of conduct constituting a conspiracy without violating the First Amendment.

Vindman plausibly alleges an unlawful conspiracy to intimidate and retaliate against him.

That the conspiracy was enacted in part through speech does not preclude liability. "[I]t has

never been deemed an abridgement of freedom of speech or press to make a course of conduct

illegal merely because the conduct was in part initiated, evidenced, or carried out by means of

language, either spoken, written, or printed." *Rumsfeld v. Forum for Acad. & Institutional Rts.,*

31

547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502

(1949)). Indeed, "the essence of a conspiracy is an agreement to commit an unlawful act," and

such agreements will always involve speech to some degree. *U.S. v. Jimenez Recio*, 537 U.S.

270, 274 (2003) (quotation marks omitted). The Supreme Court has repeatedly affirmed that

agreements to engage in unlawful conduct are "a distinct evil" from the unlawful conduct itself,

and an evil that may properly be regulated notwithstanding the First Amendment. *Id.* (quotation

marks omitted); *U.S. v. Williams*, 553 U.S. 285, 298-99 (2008) ("Many long established criminal

proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech

(commercial or not) that is intended to induce or commence illegal activities.").

Defendants and their co-conspirators formed an agreement for the unlawful purpose of

intimidating and retaliating against Vindman and engaged in overt unlawful acts in furtherance

of that purpose. See *supra* at 7-25. Although some of the overt acts implicated speech, much of

that speech is beyond the bounds of First Amendment protection under well-established law. For

example, Vindman has plausibly alleged that conspirators unlawfully leaked classified

information to a House Republican counsel for the purpose of intimidating and retaliating against

Vindman. Compl. ¶¶ 157-68. "Courts have uniformly held that current and former government

employees have no First Amendment right to publish properly classified information to which

they gain access by virtue of their employment." *Stillman v. CIA*, 517 F. Supp. 2d 32, 38 (D.D.C.

2007); *see also Boehner v. McDermott*, 484 F.3d 573, 579 (D.C. Cir. 2007) (en banc). Vindman

has also plausibly alleged that conspirators unlawfully and directly threatened adverse

consequences for testifying in the impeachment hearings. *See, e.g.*, Compl. ¶¶ 100, 131-39,

191-94. Such threats of retaliation are also not First Amendment-protected. *See Dixon v. Int'l

Bhd. of Police Officers*, 504 F.3d 73, 83-84 (1st Cir. 2007) (jury reasonably could find speech

that "objectively could deter someone in [the plaintiff's] position from pressing her claims" or

that "interfered with [the plaintiff's] ability to do so by encouraging her colleagues to stand

against her" constituted threats and retaliation unprotected by the First Amendment); *cf. Cadillac*

*of Naperville v. NLRB*, 14 F.4th 703, 719 (D.C. Cir. 2021) (per curiam) ("[U]nder long-settled

Supreme Court precedent, when an employer's prediction that negative consequences will arise

from union activity contains the implication that the employer may of its own accord contribute

to those consequences, the statement constitutes a threat of retaliation . . . and as such [is] without

the protection of the First Amendment" (second alteration in original) (quotation marks omitted)).

And, as discussed in greater detail below, the conspirators published numerous false and

defamatory statements about Vindman with knowledge that their statements were false or with

reckless disregard as to whether they were false. All these unlawful overt acts are integral

components of the conspiracy and unprotected by the First Amendment.

### B.    The First Amendment does not shield the conspirators from liability for publishing verifiably false, defamatory statements with actual malice.

Defendants do not dispute that engaging in defamation to further an agreement forbidden

by 42 U.S.C. § 1985(1) and (2) can give rise to liability, provided that the First Amendment

hurdles set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), are cleared. *See Barr v.*

*Clinton*, 370 F.3d 1196, 1203 (D.C. Cir. 2004) ("First Amendment protections apply to section

1985 claims like the one presented here," which "rests entirely on [the plaintiff's] claim that [the

defendant's] conspiratorial publication . . . injured his reputation and mental state."); Trump,

Jr./Scavino MTD at 19-33; Hahn MTD at 17-21; Giuliani MTD at 10-13. To state a claim for

defamation, a plaintiff must allege "(1) that the defendant made a false and defamatory statement

concerning the plaintiff; (2) that the defendant published the statement without privilege to a

third party; (3) that the defendant's fault in publishing the statement amounted to at least

33

negligence; and (4) either that the statement was actionable as a matter of law irrespective of

special harm or that its publication caused the plaintiff special harm." *Armstrong v. Thompson*,

80 A.3d 177, 183 (D.C. 2013) (quotation marks omitted); *see also* Restatement (Second) of Torts

§ 558 (May 2022 update) (Westlaw).[4]

Vindman has amply alleged facts that meet these elements, including facts showing that

Defendants and their co-conspirators furthered the conspiracy through defamatory statements

that were both false and "published with actual malice, i.e., with knowing or reckless disregard

for [their] falsity." *See Barr*, 370 F.3d at 1202 (citing *New York Times Co.*, 376 U.S. at 279-80).[5]

Defendants' arguments to the contrary misconstrue both the complaint and the law.

### 1.    Vindman has adequately alleged that the conspirators published numerous verifiably false statements.

As the complaint alleges in detail, Defendants and their co-conspirators made numerous

statements in furtherance of the conspiracy that either assert false facts outright or plainly imply

verifiably false facts. Among other false statements, conspirators asserted or implied that Vindman

committed perjury. Compl. ¶ 176 (Trump, Jr.: "Sounds like perjury to me . . . ."); *id.* ¶ 129

(President Trump: "Was he on the same call that I was? Can't be possible!"); *id.* ¶ 201 (President

Trump: "What he did was just reported a false call."); *id.* ¶ 203 (Trump, Jr.: "You'd think that

someone would be criminally charged for making up things that lead to an impeachment based

on false premises."). They also accused him of espionage and loyalty to a foreign government.

*Id*. ¶¶ 107-16 (Ingraham endorsing accusations of espionage); *id.* ¶¶ 169-72 (Scavino, President

---

[4] Defendants do not dispute that the statements in question were published or that Vindman adequately alleged harm.

[5] Vindman agrees, for purposes of this motion, that he is a limited-purpose public figure. Scavino and Trump, Jr.'s Request for Judicial Notice, ECF No. 20-1, should therefore be denied.

Trump, and Ingraham, implying that the promptly rejected and properly documented job offer Vindman received unsolicited from Ukraine signaled disloyalty); *id.* ¶¶ 124-25 (Giuliani asserting that Vindman "has reportedly been advising two gov's" and questioning whether Vindman "worked for US"). They accused him of being a "leftist" and "Never Trumper," implying an improper partisan motive for his testimony. *Id.* ¶¶ 127-31 (Trump, Jr. and President Trump); *id.* ¶¶ 137-39 (Trump, Jr. republishing and endorsing false claims that Vindman "had to be reprimanded by his superior for 'inappropriate and partisan behavior in the military'"). They falsely claimed he had leaked information and had been insubordinate. *Id.* ¶¶ 148-49 (Hahn widely disseminating false claims that Vindman had "faced accusations of . . . leaking, and going around normal procedures"); *id.* ¶¶ 199-200 (President Trump falsely stating that Vindman was "very insubordinate" and "given a horrendous report by his superior," that he had problems "adhering to the chain of command," and that he had "leak[ed] information"). And they falsely claimed that he had created a hostile working environment for his coworkers at the NSC. *Id.* ¶ 210.

All these statements satisfy the threshold requirement that an actionable statement "express or imply a verifiably false fact about" Vindman. *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001). Some of the conspirators' statements are bald statements of false facts—for example, that Vindman was reprimanded by his superior for inappropriate and partisan behavior in the military (Compl. ¶¶ 132-40), received a "horrendous" report from his superior (*id.* ¶¶ 199-200), or leaked information or faced accusations of leaking (*id.* ¶¶ 148, 152, 199-200). Others are actionable opinions implying underlying verifiably false facts—for example, accusations of perjury (*id.* ¶¶ 129-30, 176-77, 201, 203-04), creating a hostile work environment (*id.* ¶¶ 210, 213), or being a "leftist" or "Never Trumper" despite his obligations as a member of the military (*id.* ¶¶ 127-31, 137-39). *See, e.g.*, *Milkovich v. Lorain J. Co.*, 497 U.S.

1, 21 (1990) ("[T]he connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false."); *Ollman v. Evans*, 750 F.2d 970, 980 (D.C. Cir. 1984) (en banc) ("A classic example of a statement with a well-defined meaning is an accusation of a crime."); Compl. ¶ 130 (citing UCMJ and DOD service regulations that prohibit partisan actions). Still other conspirators' statements deliberately manufacture a false and defamatory meaning from partial facts. Defendant Scavino, for instance, suggested that the unsolicited job offer Vindman received from Ukrainian defense official Oleksandr Danyliuk demonstrated that Vindman was disloyal to the United States by emphasizing that Vindman was offered the job "THREE times!"—without mentioning that the offers occurred in a single conversation and were promptly rejected—and coupling his comment with the hashtag "#ImpeachmentSHAM." Compl. ¶¶ 159-64, 171. Such statements are equally actionable where, as here, viewed in context they "convey[] materially true facts from which a defamatory inference can reasonably be drawn" and "by the particular manner or language in which the true facts are conveyed, suppl[y] additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference," which is false. *Tah v. Glob. Witness Publ'g*, 991 F.3d 231, 240 (D.C. Cir.) (quotation marks omitted), *cert. denied*, 142 S. Ct. 427 (2021); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 251 (D.D.C. 2016) ("[A]lthough Montgomery does not have to show that the challenged *statements* were literally false to succeed on a defamation by implication claim, he still must show that the challenged *implication* or *meaning* that a reader might reasonably derive from those true statements is false" (emphasis in original).), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).

Each of these statements is also readily capable of defamatory meaning. *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) ("When confronted with a motion to dismiss, a court must evaluate [w]hether a statement is capable of defamatory meaning, a

question of law" (quotation marks omitted).). It is well settled that false accusations of criminal conduct, like those implying that Vindman had engaged in espionage or perjury, are defamatory. *Hall v. D.C.*, 867 F.3d 138, 149 (D.C. Cir. 2017) ("A statement that falsely imputes a criminal offense is defamatory *per se*."). Even those statements that did not directly and falsely accuse Vindman of criminal activity are defamatory because they harmed his ability to serve in his chosen profession as a national security professional and member of the armed services by ascribing to him qualities like dual loyalty, insubordination, or improper partisanship incompatible with that profession. *See Carey v. Piphus*, 435 U.S. 247, 262 n.18 (1978) (finding statement constitutes defamation per se when it "imput[es] to a person a . . . matter affecting adversely a person's fitness for trade, business, or profession"); *Nyambal v. Alliedbarton Sec. Servs.,* 344 F. Supp. 3d 183, 192 (D.D.C. 2018) (finding defendant's act capable of defamatory meaning "because it calls into question his professionalism and tends to lower [him] in the estimation of a substantial, respectable group" (alteration in original) (quotation marks omitted)).

   In arguing that Vindman's complaint fails to adequately allege defamation, Defendants ignore many of the above-described verifiably false factual statements and actionable opinions made in furtherance of the conspiracy. Instead, they select a few of the conspirators' public statements and argue that those statements are not false, either because the statement is a non-actionable opinion or because the statement is true. Hahn MTD at 20-21; Trump, Jr./Scavino MTD at 20-24, 28; Giuliani MTD at 12-13. But Defendants' arguments are either wrong or beside the point. For example, Scavino and Trump, Jr. seek to isolate phrases from the October 28, 2019, episode of *The Ingraham Angle* to imply that none of the statements during that episode (with the exception of "usually, they spoke in English") contain factual content. Trump, Jr./Scavino MTD at 22-23. But to determine whether a statement "could reasonably be

understood as stating or implying actual facts . . . and, if so, whether those statements were verifiable and were reasonably capable of defamatory meaning, the publication must be taken as a whole, and in the sense in which it would be understood by the [audience] to whom it was addressed." *Farah v. Esquire Mag.*, 736 F.3d 528, 535 (D.C. Cir. 2013) (quotation marks omitted). Ingraham accused Vindman of working "against the President's interest" from inside the White House—insinuating an abuse of his government position unsupported by the *New York Times* story she quoted. Compl. ¶¶ 107-09. That comment—along with her innuendo regarding Vindman's ability to speak in languages other than English—prompted her guest John Yoo to say, "I find that astounding, and in—you know, some people might call that espionage," after which Ingraham signaled her agreement by shaking her head in mock disbelief and voicing no contrary opinion during the segment or at any point afterward. Compl. ¶¶ 108-16; *see White v. Fraternal Ord. of Police*, 909 F.2d 512, 526 (D.C. Cir. 1990) ("[T]he court should also consider dramatic intonations by the announcer in determining whether the broadcast conveys a defamatory meaning."). That the segment, taken as a whole, conveyed to viewers that Ingraham, Yoo, and fellow panelist Alan Dershowitz—all of whom are attorneys—had accused Vindman of espionage is clear; Yoo and Dershowitz's subsequent efforts to disclaim the accusation in published op-eds demonstrate as much. Compl. ¶ 113.

Scavino's and Trump, Jr.'s conclusory assertions that various statements are opinions also break down upon further analysis. For instance, Giuliani's statement that Vindman had "reportedly been advising two gov's," such that Vindman would be "confused" and "feel[] pressure" when testifying, can be proven true or false—either it previously had been reported that he was advising two governments in the inappropriate manner implied, or it had not. Compl. ¶ 124. *Contra* Trump, Jr./Scavino MTD at 23; Giuliani MTD at 2, 12. The same is true with

respect to the baseless assertion that Vindman created a hostile working environment for his colleagues at the NSC, which implies the existence of false facts. Trump, Jr./Scavino MTD at 24; Compl. ¶ 210. Others of the statements Scavino and Trump, Jr. highlight are evidence of the conspirators' retaliatory intent or coordination, regardless of whether they are independently actionable as defamatory. *See, e.g.*, Trump, Jr./Scavino MTD at 24 (referring to Compl. ¶¶ 192-93, 197-202, statements by President Trump, Trump, Jr., Ingraham, and National Security Advisor Robert O'Brien demonstrating the retaliatory intent motivating Vindman's removal from the NSC); *id.* (citing Compl. ¶¶ 169-70, 174, 183, statements by the Republican National Committee, Ingraham, Tucker Carlson, and former Rep. Devin Nunes advancing in similar fashion the false narrative that Vindman's loyalty was suspect due to Danyliuk's job offer). See also *infra* at 40-47, 52-53.

Defendants Hahn, Scavino, and Trump, Jr. also assert that the talking points that "Vindman has faced accusations of . . . leaking, and going around normal procedures" (Compl. ¶ 148) are true, relying on different but equally flawed arguments. Hahn contends that the talking points are true, citing an article that *post-dated* distribution of those talking points and that may well have been influenced by them. *See* Hahn MTD at 20 (citing an article purportedly based on Vindman's November 19, 2019, testimony as evidence that talking points sent out earlier that morning were true). Scavino and Trump, Jr. contend these same talking points were true because "the White House was making" the accusations, ignoring the plain, defamatory implication of the talking points that someone *aside from* the White House had *already made* such accusations. Trump, Jr./Scavino MTD at 28. In any event, to the extent there is a dispute about whether and when accusations were made, that is a factual question that cannot be resolved on a motion to dismiss. *See Harris v. Bowser*, 369 F. Supp. 3d 93, 104 (D.D.C. 2019).

Defendants seek to blur the falsity analysis here by characterizing the conspirators'
statements as political speech. But the conspirators used their public platforms to assassinate
Vindman's character because he was a witness in an impeachment proceeding against President
Trump, not simply to comment on his performance as a public official. In any event, it bears
emphasis that "there is no blanket immunity for statements that are 'political' in nature: as the
Court of Appeals has put it, the fact that statements were made in a 'political "context" does not
indiscriminately immunize every statement contained therein.'" *US Dominion, Inc. v. Powell*,
554 F. Supp. 3d 42, 57 (D.D.C. 2021) (quoting *Weyrich*, 235 F.3d at 626), *appeal dismissed*,
2022 WL 774080 (D.C. Cir. Jan. 20, 2022); *see also, e.g.*, *Blankenship v. Trump*, 558 F. Supp.
3d 316, 328 (S.D. W. Va. 2021) (holding that Trump, Jr. made a "provably false assertion of
fact" when he asserted on Twitter that a political candidate was a felon). The cases Scavino and
Trump, Jr. cite in support of the proposition that political speech receives strong protection do
not alter the analysis here. Trump, Jr./Scavino MTD at 21-22. The important First Amendment
interest in ensuring the free exchange of ideas is well protected by the requirements that a public
figure plaintiff plausibly allege both verifiable falsity and actual malice, as Vindman has done
here. *See, e.g.*, *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 276-77 (1971) (confirming that the
*New York Times* standard governs in the context of published comments regarding a candidate
for elected office).

### 2. Vindman has adequately alleged that the conspirators made false statements with actual malice.

Vindman also has plausibly alleged that Defendants and their co-conspirators made the
false statements enumerated in the complaint with knowledge that those statements were false or
with reckless disregard as to whether they were. Because "[s]eldom will a defendant confess his
state of mind and thus allow the plaintiff to prove actual malice with direct evidence,"

circumstantial evidence is often both necessary and sufficient to establish actual malice. *US Dominion, Inc. v. Byrne*, 2022 WL 1165935, at *5 (D.D.C. Apr. 20, 2022) (quotation marks omitted). The complaint sets forth detailed facts supporting the reasonable inference that the conspirators subjectively "entertained serious doubts as to the truth" of their defamatory statements. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). To take but a few examples of the allegations of actual malice: The morning after Vindman's October 29 testimony, Defendant Trump, Jr. appeared on *Fox & Friends* to imply that Vindman was engaging in unauthorized communications with Ukraine ("it turns out [Vindman is], you know, talking to the Ukraine") and improperly motivated in his testimony by his political views (labeling Vindman a "leftist"). Compl. ¶¶ 127-28. Seemingly acknowledging the complete absence of evidence that Vindman is a "leftist," Fox host Brian Kilmeade responded, "But we don't know if he's a leftist." *Id.* ¶ 128. Rather than take the opportunity to moderate his statements when reminded of the absence of support for them, Trump, Jr. further emphasized his accusations with a sarcastic response. *Id.* Knowingly creating a false implication—like suggesting that Vindman's interactions with Ukraine were improper—and committing to a baseless position when reminded there is no support for that position, as Trump, Jr. did with respect to his comment that Vindman is a leftist, support an inference of actual malice. *See Powell*, 554 F. Supp. 3d at 63 (defendant who "doubled down" on claims when made aware of countervailing evidence could not dismiss defamation claims).

Trump, Jr. also amplified a defamatory, false, and obviously dubious story posted online by a military veteran named Jim Hickman, despite clear evidence that the sole source for the allegations was unreliable and the obvious implausibility of those allegations. Compl. ¶¶ 132-39. "[W]hen a plaintiff offers evidence that a defendant has reason to doubt the veracity of [his]

source," as Vindman has in his complaint, then the defendant's "utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story demonstrates reckless disregard." *Jankovic*, 822 F.3d at 590 (quotation marks omitted); *see also St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.").

The allegations in the complaint also support the inference that Defendant Trump, Jr. made false accusations that Vindman committed perjury with actual malice. As the complaint elaborates, Trump, Jr.'s November 19 statements accompanied a link to *The Federalist*, which in turn included a clip of Vindman's testimony. In that clip—the purported source of the perjury allegations—Vindman states that he conveyed information about the Zelensky call to two properly cleared individuals with a need to know the information. He did not contradict his previous testimony that he did not know the identity of the whistleblower. Compl. ¶ 177. Despite the absence of any support for his accusation of perjury, Trump, Jr. baselessly accused Vindman of it, in addition to accusing him of having a partisan motive. *Id.* ¶¶ 176-77. The obvious disconnect between Trump, Jr.'s damaging accusations and the source he purportedly reviewed is sufficient to give rise to an inference of actual malice at the pleading stage. *See, e.g.*, *Young v. Gannett Satellite Info. Network*, 734 F.3d 544, 547-48 (6th Cir. 2013) (sufficient evidence for jury to conclude that Gannett's employees knew statement was probably false, given review of arbitrator's decision that did not support the statement and lack of any other evidence in support); *Nunes v. WP Co. LLC*, 2021 WL 3550896, at *5 (D.D.C. Aug. 11, 2021) (defendant's access to its own prior correct reporting inconsistent with its later incorrect reporting "could certainly give the paper reason to seriously doubt the truth of its later publication").

In May 2020, Defendant Trump, Jr. again accused Vindman of perjury and called for him to be criminally charged, tweeting, among other things: "You'd think that someone would be criminally charged for making up things that lead to an impeachment based on false premises," followed by a link to a November 19, 2019, *Breitbart.com* article. Compl. ¶¶ 203-04. Again, the purported source Trump, Jr. cited as support for his defamatory comments demonstrates that he knew or recklessly disregarded the falsity of his damaging accusations. The *Breitbart.com* article covered (in distorted fashion) testimony about a telephone call that occurred months before the July 25, 2019, call that prompted the impeachment inquiry; it does not even mention the July 25 call. *Id.* ¶ 204. Despite the complete absence of support for his statement in his purported source, Trump, Jr. nevertheless made a public accusation that Vindman lied when he testified about the call that gave rise to President Trump's impeachment. This strongly supports an inference of actual malice. *See Wasserman v. Time, Inc.*, 424 F.2d 920, 922 (D.C. Cir. 1970) (per curiam) (where *Time* knew that individuals pictured in a photograph were attorneys who had not been summoned before a grand jury but nevertheless implied that one of the attorneys had been called before the grand jury and released on bail, actual malice was a jury question); *Young*, 734 F.3d at 547-48.

The same day Vindman first testified, Giuliani tweeted: "A US gov. employee who has reportedly been advising two gov's? No wonder he is confused and feels pressure." Compl. ¶ 124. He followed those comments with a tweet stating that Congressman Adam Schiff was "thanking" Vindman "for his secret testimony and for giving advice to two countries. I thought he worked for US." *Id.* ¶ 125. Giuliani continued, calling Vindman a "phony" and stating that "[t]he truth will emerge," thereby suggesting that Vindman had not been truthful in his testimony. *Id.* Through his comments, Giuliani falsely accused Vindman of having divided loyalties, working for Ukraine, and committing perjury. Giuliani is an attorney familiar with the workings of the

federal government (including the security clearance process) and certainly would have understood the gravity of these accusations (including that he was accusing Vindman of crimes, which is defamatory *per se*), particularly given Vindman's sensitive national security role. Although Giuliani points to the assertion in the October 28, 2019, *New York Times* article that Ukrainian officials sought advice from Vindman regarding how to deal with Giuliani (Giuliani MTD at 9), a report that Ukrainian officials asked for advice from Vindman regarding how to handle Giuliani, who famously recruited businessmen to exert pressure on Ukraine (Compl. ¶¶ 76-77), cannot reasonably be read to support the assertion that Vindman "worked for" Ukraine rather than the United States, let alone the suggestion that Vindman had lied (*see id.* ¶¶ 124-25). In the absence of any factual basis, the reasonable inference is that Giuliani concocted accusations of dual loyalty and untruthfulness to advance the purposes of the conspiracy. *See St. Amant*, 390 U.S. at 732 (evidence that defendant fabricated story would support actual malice); *Carson v. Allied News Co.*, 529 F.2d 206, 212-13 (7th Cir. 1976) ("sheer fabrication" of allegation that woman broke up a marriage unsupported by anything in the record sufficient to submit actual malice question to jury); *Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732, 746 (E.D. Mich. 2014) (reasonable jury could infer that journalist fabricated story "[b]ecause there was nothing in the press releases or prior broadcasts that would have implied that the officers were accused of stealing drugs").

Scavino too furthered the aims of the conspiracy by knowingly or recklessly misrepresenting the facts. Immediately after Castor used the classified information regarding Danyliuk's job offer in a misleading series of questions, Scavino twisted select portions of that same information to suggest that it showed that the impeachment was a "sham." Compl. ¶ 171. He did so despite the fact that the testimony on which his tweet was based made clear that

Vindman promptly declined and properly reported the unsolicited offer and that it cast no doubt

on his credibility or loyalty. *Id.* ¶¶ 160-62, 167-68, 171. Scavino's deliberate, misleading

omission of readily available exculpatory information supports an inference of actual malice. *See*

*Schiavone Constr. Co. v. Time, Inc*., 847 F.2d 1069, 1092 (3d Cir. 1988) ("[T]he jury could find

clear and convincing evidence that Time's omission of the exculpatory clause significantly

altered the message of the memorandum, that Time knew its implication was false, and that Time

intended that false implication."); *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471,

481-82 (E.D. Va. 2018) (court could find that employees who made statements implying

improper shredding of evidence in fact were aware that shredding was an ordinary and regular

occurrence and entertained serious doubts about whether it was improper).

Also probative of actual malice is Defendants' and their co-conspirators' shared motive

to undermine Vindman and to derail the impeachment. Defendants' personal and professional

fortunes were closely tied to President Trump's, and achieving the aims of the conspiracy—

whether by publishing baseless allegations or otherwise—was to all Defendants' benefit. *See*

*Jankovic*, 822 F.3d at 590-91 (When "evidence of ill will or bad motive" is "probative of a

willingness to publish unsupported allegations," it is also "suggestive of actual malice"

(emphasis and quotation marks omitted)).

Defendants Scavino and Trump, Jr. simply ignore the detailed factual allegations

supporting an inference of actual malice with respect to numerous statements in the complaint.

*See* Trump, Jr./Scavino MTD at 26-27. Defendant Hahn, while acknowledging the allegations of

actual malice as to other conspirators (Hahn MTD at 18-19), misunderstands the allegations of

actual malice as to her. The complaint alleges that, in preparing the talking points, Hahn "drew

on, but blatantly misrepresented, testimony provided by Tim Morrison, another impeachment

witness" to state that Vindman was accused of operating outside of the chain of command and leaking classified information. Compl. ¶¶ 148, 151-52. In fact, Morrison testified that Vindman "did not violate any formal rules" by reporting the Zelensky call to NSC counsel instead of to him, and that he had no concerns regarding Vindman's handling of classified information. *Id.* ¶ 152. Hahn's preparation of talking points that were plainly based on Morrison's testimony— suggesting she reviewed that testimony—but that deliberately and significantly misrepresented its content is a strong indication that she acted with at least reckless disregard as to the falsity of her statements. *See Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 521 (1991) (finding a jury question as to actual malice where, inter alia, "many of the challenged passages resemble[d] quotations that appear on the tapes, except for the addition or alteration of certain phrases, giving rise to a reasonable inference that the statements have been altered"); *Powell*, 554 F. Supp. 3d at 62 (reliance on expert to support claims of election fraud could support finding of actual malice where expert had stated there is no credible evidence of fraud); *Moore v. Cecil*, 488 F. Supp. 3d 1144, 1172-73 (N.D. Ala. 2020) (actual malice sufficiently alleged where television ad had "deceptively juxtaposed" quotes and materially changed the meaning conveyed by the original articles (emphasis omitted)).

To the extent Hahn objects that these paragraphs do not invoke the precise "magic words" from *New York Times v. Sullivan*, that is no basis to grant her motion. The question is whether the complaint adequately alleges facts supporting an inference that conspirators published defamatory statements with actual malice. *See Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 143 (D.D.C. 2017) ("Certainly, a plaintiff may not need to invoke the magic words 'actual malice,' but the complaint must 'adequately allege facts that support an inference that Defendant published the defamatory statements with actual malice'" (citation and alterations

omitted).). For all the reasons discussed, Vindman's complaint satisfies that standard. And in any event, as Hahn acknowledges (Hahn MTD at 19-20), paragraphs 255 and 265 of the complaint expressly allege actual malice based on the preceding detailed allegations.

### 3. Defendants Trump, Jr. and Scavino are not shielded from liability by any privilege or statutory immunity.

Defendants Scavino and Trump, Jr. argue that they cannot be held liable for a handful of statements that they assert are protected by a variety of common law and statutory privileges and immunities. Trump, Jr./Scavino MTD at 29-33. They are wrong on all counts.

*Legislative and Judicial Immunity.* Defendants Scavino and Trump, Jr. seem to suggest they should escape liability based on immunities that *other* potential conspirators might assert, were they themselves defendants. But that is not how the law of either conspiracy or immunity works. Defendants Scavino and Trump, Jr. argue that Stephen Castor, the Republican counsel during the impeachment proceedings, is protected by both legislative and judicial immunity for his questioning of Vindman during the November 2019 public hearing. Trump, Jr./Scavino MTD at 30-32. Regardless of whether that is true, it has no bearing on Defendants' own liability. *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 810-11 (1982) (rejecting derivative immunity for presidential aides who allegedly conspired with a president who was himself absolutely immune from liability); *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) (holding that private parties who unlawfully conspired with a judge were not insulated from liability by judicial immunity even though the judge was immune). One conspirator's immunity does not insulate the others from liability.

Moreover, here as elsewhere, Defendants mischaracterize the nature of Vindman's allegations regarding the leak of classified information about the Ukrainian job offer. Vindman alleges that conspirators at the White House illegally leaked classified information about the job offer to further the purpose of the conspiracy, knowing that it would be used during the hearing

to attack Vindman's loyalty to the United States, and then amplified that false narrative as soon as the information was made public. Compl. ¶ 157. Neither the leaking of classified information nor the subsequent false attacks on Vindman's loyalty on social media and elsewhere fit within either legislative or judicial immunity. Castor's questioning during the impeachment proceeding is irrelevant to Defendants' and other conspirators' conduct in leaking that information, and then defaming Vindman based on it.

*Fair Report Privilege.* Defendants' attacks on Vindman concerning the job offer from Ukraine are not protected by the fair report privilege simply because the job offer was made public during a congressional hearing. *Contra* Trump, Jr./Scavino MTD at 29-30. As a threshold matter, Defendants cite no authority for the proposition that the privilege is applicable to conspiracy claims under 42 U.S.C. § 1985 or to any other claims besides the tort of defamation. *Barr*, 370 F.3d at 1202-03 (recognizing distinction between § 1985(1) and defamation claims). Even where it applies, the fair report privilege is a conditional one, grounded in state law, that bars liability only for "full and accurate" publications of official government records and proceedings. *Myers v. D.C. Hous. Auth.*, 2021 WL 1167032, at *3 (D.D.C. Mar. 26, 2021) (quotation marks omitted). "For the privilege to attach, the author of a statement must clear[ ] two major hurdles. The publication must be both fair and accurate and properly attributed to a qualified government source." *Id.* (quoting *Curtis Publ'g Co. v. Vaughan*, 278 F.2d 23, 29 (D.C. Cir. 1960)). Defendants fail on both counts.

That the statements in question fall far short of "full and accurate" is clear on their face. *See id.* (quotation marks omitted). None fairly describes Castor's questions and Vindman's answers. None includes the facts, made clear in both Vindman's memorandum and his subsequent testimony, that he refused the job offer and then properly reported it through official

channels. Compl. ¶¶ 159-62. Nor do they include the fact that neither the NSC nor anyone else in the government raised any concerns about the incident or Vindman's handling of it. *Id.* ¶ 162. Instead, the statements in question unfairly and inaccurately use select elements of Vindman's memorandum and testimony to portray him as having dual loyalties (or worse). *See Byrne*, 2022 WL 1165935, at *6 (regardless of whether "the linked affidavit itself receives protection under the fair report privilege[,] . . . [defendant's] own assertions preceding the hyperlink remain actionable."). "[I]f the reports are garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made, or if the reports are otherwise unfair or inaccurate, the privilege does not apply and the publisher is subject to liability." *Dameron v. Wash. Mag., Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) (citation and quotation marks omitted); *see also White*, 909 F.2d at 528 (privilege does not apply where "[n]ot once did [defendant] mention [the government source]"). Moreover, Defendants and their co-conspirators *knew* that the impression *they were giving* their considerable audiences was false. Indeed, as explained above, Vindman adequately alleges actual malice with respect to several of the same statements, effectively precluding application of the privilege to Defendants' "reports." See *supra* at 40-47.

Furthermore, none of the published statements in question mentions that the original source of the information on which they supposedly rely was a classified report written by Vindman himself. Compl. ¶¶ 161-62. Some even fail to mention Vindman's testimony or the impeachment proceedings generally. *Dameron*, 779 F.2d at 739 ("It must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings."). Accordingly, Defendants also fail

to satisfy the hurdle of attribution to a "qualified government source." *See Myers*, 2021 WL 1167032, at *3 (quotation marks omitted).

    *Communications Decency Act.* Defendant Trump, Jr.'s argument that he is immune under Section 230 of the Communications Decency Act from liability for some of his attacks on Vindman fares no better. Trump, Jr. argues that Section 230's prohibition against treating a "user of an interactive computer service . . . as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), insulates him from liability for retweeting certain content.[6] *See* Trump, Jr./Scavino MTD at 32-33. He conveniently ignores, however, that each of the four social media posts he claims are protected (*id.* at 33) include *his own* commentary and that he therefore was not simply sharing a link or retweeting someone else's content, but was himself a content provider and therefore not entitled to immunity. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) (emphasizing that § 230 confers immunity for publishing information from *another content provider*).

    Section 230 defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Thus, while a defendant may not be held liable for providing a "neutral means" of sharing third-party content, he may be held liable for creating or developing the offending content. *Marshall's Locksmith Serv. v. Google*, 925 F.3d 1263, 1270-71 (D.C. Cir. 2019) (quotation marks omitted). A number of circuits have held that a defendant "creates" or "develops" unlawful content when he

---

[6] Vindman disagrees that the term "user" in 47 U.S.C. § 230(c)(1) is properly understood to confer special immunity from civil liability for social media account holders who retweet or otherwise affirmatively share offensive or unlawful content originally posted by other account holders. However, even under that expansive reading of the statute, Defendant Trump, Jr.'s argument falls short because he also qualifies as an information content provider.

"materially contributes" to it. *See, e.g.*, *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014) ("[M]aterial contribution . . . means being responsible for what makes the displayed content allegedly unlawful."); *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (Section 230 immunity did not apply to a roommate matching service that "contribute[d] materially to the alleged illegality of the conduct"). That standard is easily satisfied here.

- In the tweets referenced in paragraphs 137 and 139 of the complaint, Trump, Jr. criticizes Democrats' use of Vindman as their "star witness" (his own term not included in the Tom Fitton tweet he was responding to), as well as the media's coverage of Vindman, and mockingly suggests that Vindman was himself protected from criticism because he was in the military. In doing so, of course, he both amplified and put his own spin on false accusations originally levied by Jim Hickman.

- In the tweet referenced in paragraph 176 of the complaint, Trump, Jr. not only amplified the false accusation that Vindman leaked information to the unnamed whistleblower, adding "*Didn't he testify he had no idea who the whistleblower was?*" He also went further than the *Federalist* article he was linking to by accusing Vindman of having committed the crime of perjury (a word that does not appear in the article).

- Finally, in the second tweet referenced in paragraph 203 of the complaint (the fourth tweet for which he claims immunity), Trump, Jr. again begins with his own commentary, once more falsely accusing Vindman of committing a crime: "*You'd think that someone would be criminally charged for making up things that lead to an impeachment based on false premises. But I guess that would only happen if they did it to a liberal!*" He then

linked to a *Breitbart* article that discusses testimony about a phone call *different* from the one that led to the impeachment, and thus misrepresented the article itself. Compl. ¶ 204.

Defendant Trump, Jr. therefore did far more than engage in neutral editorial functions like content collection, curation, and republication that have been held insufficient to overcome immunity in other cases. *See, e.g.*, *Bennett v. Google*, 882 F.3d 1163, 1166-68 (D.C. Cir. 2018); *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 315-16 (D.D.C. 2011). Nor, of course, did he simply pass along information he found posted by other users. Instead, he added his own inflammatory commentary, emphasizing or even adding to the defamatory nature of the falsehoods others had posted, sometimes even misrepresenting the underlying content—and all in furtherance of the specific unlawful purpose of witness intimidation and retaliation. Thus, this case is akin to *La Liberte v. Reid*, in which the Second Circuit found a defendant who reposted an allegedly defamatory photograph liable as a content provider because she authored her own caption and in doing so "intensified and specified" the allegedly defamatory content of the photo. 966 F.3d 79, 89 (2d Cir. 2020); *see also Byrne*, 2022 WL 1165935, at *7 ("While § 230 may provide immunity for someone who merely shares a link on Twitter, . . . it does not immunize someone for making additional remarks that are allegedly defamatory" (citations omitted).); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 661-62 (W.D. Va. 2019) (authors of articles who quoted and shared screenshots of third-party content not immune where they also added original headlines and their own statements).

## C. The conspirators' speech is evidence of the conspiracy.

Even if the Court concludes that some of Defendants' statements merit First Amendment or other protection, those statements are nevertheless evidence of the conspiracy. The First Amendment "does not prohibit the evidentiary use of speech to establish the elements" of a claim

"or to prove motive or intent." *Mitchell*, 508 U.S. at 489. Defendants' and their co-conspirators' consistent and relentless public attacks are powerful facts supporting the inference that they agreed to intimidate and retaliate against Vindman.

III.     **Vindman is not precluded from seeking relief under § 1985.**

Defendants Trump, Jr., Scavino, and Hahn contend that § 1985 provides no recourse for Vindman's injuries. However, defendants fundamentally misrepresent the nature of Vindman's claims and otherwise fail to establish that relief under § 1985 is unavailable here.

A.     **Vindman is not seeking redress for the denial of his promotion or any other decision regarding his military employment.**

Trump, Jr., Scavino, and Hahn contest Vindman's ability to sue under § 1985 for "matters relating to his prospective promotion" (Trump, Jr./Scavino MTD at 37), or "how a subordinate military officer should perform his job duties" (Hahn MTD at 22). According to these Defendants, resolving Vindman's claims would require the Court to "question[] . . . the judgment of [Vindman's] fellow officers" and "the Commander-in-Chief" (*id.* at 24), and otherwise "delve into military affairs" (Trump, Jr./Scavino MTD at 37).

These arguments fall short. Defendants rely principally on a Ninth Circuit decision concluding that "military officers may not sue their superiors under § 1985(1)." *Mollnow v. Carlton*, 716 F.2d 627, 631 (9th Cir. 1983); *see* Hahn MTD at 23-24; Trump, Jr./Scavino MTD at 36-38. But that decision is inapposite: As Trump, Jr. and Scavino acknowledge, "Vindman did not sue any of his superior officers" (Trump, Jr./Scavino MTD at 37), nor does he challenge any military personnel action. In fact, the Army *recommended* that Vindman be promoted. Compl. ¶ 213. Moreover, this case does not involve "a subordinate . . . attack[ing] an order he felt was unjust" (Hahn MTD at 24), as Vindman does not challenge any orders issued by the president or

53

his superior officers. Indeed, no one directed Vindman not to testify in Trump's impeachment proceeding.

Tellingly, Hahn's arguments on this point fail to address the vast majority of allegations in Vindman's complaint that are unrelated to internal military matters. And although Trump, Jr. and Scavino home in on a handful of allegations that would supposedly turn "military affairs" into "triable issues of fact" (Trump, Jr./Scavino MTD at 37 (citing Compl. ¶¶ 208, 210-14)), those allegations focus on actions taken by Defendants and their co-conspirators—*not* the actions of the military—and thus would not "entail second guessing of military decisions by civilian courts [or] require testimony by military personnel about command decisions." *See id.* (quotation marks omitted); *see also* Compl. ¶ 208 (concerning "White House . . . interven[tion] to prevent [Vindman's] promotion"); *id.* ¶ 210 ("White House personnel prepared a list of unfounded allegations about Lt. Col. Vindman."); *id.* ¶¶ 211-12 (concerning "effort by the White House to prevent or preempt an individual promotion"); *id.* ¶ 213 (concerning "wrongdoing baselessly alleged by the White House"); *id.* ¶ 214 (concerning "further attempts by White House officials to pressure the Pentagon to remove Vindman's name" from promotions list). These allegations are relevant to showing the *purpose* of the conspiracy; they do not form the basis of Vindman's damages claim. In sum, Defendants' efforts to graft *Mollnow* onto this case—and thereby hide behind the purported conduct of military officials—go nowhere.

### B. The president's involvement in the unlawful conspiracy does not bar Vindman's § 1985(1) claims against other conspirators.

Defendant Hahn argues that Vindman's § 1985(1) claim against her is barred because President Trump participated in the conspiracy. *See* Hahn MTD at 25-26. Hahn contends that, because Trump was generally responsible for overseeing the executive branch, he had unbridled control over Vindman's "official duties" under § 1985(1), and so Hahn cannot "violate[] federal

law by purportedly agreeing with the President to prevent [Vindman] from doing his job duties." *Id.* (quotation marks omitted).

Hahn's sweeping and unsupported argument goes too far. First, this case does not involve any dispute over the contours of Vindman's duties. None of Vindman's superiors—including President Trump—ordered Vindman not to "report[] the content of . . . Trump's July 2019 telephone call through proper channels to NSC authorities" or not to "comply[] with Congressional subpoenas and testify[] before Congress." Compl. ¶¶ 101-03, 248.

Second, there is no basis for Hahn's contention that President Trump's presidential immunity somehow insulates *her* from liability under § 1985(1). As noted, the Supreme Court has squarely rejected the idea that presidential aides such as Hahn "are entitled to a blanket protection of absolute immunity as an incident of their offices," even where the president himself is involved in the conspiracy. *Harlow*, 457 U.S. at 808; *see also Dennis*, 449 U.S. at 27 (private parties not insulated by judicial immunity). See *supra* at 47. That Hahn may have been following Trump's orders does not alter this conclusion; rather, it *confirms* the operation of the unlawful conspiracy. See *supra* at 7-23; see also *infra* at 70-72 (discussing how government officials are not permitted to follow unlawful orders).

Hahn also likens this case to an "internal personnel problem[]." Hahn MTD at 24-25 (citing, e.g., *Santistevan v. Loveridge*, 732 F.2d 116, 118 (10th Cir. 1984)). But that inaccurate comparison does her no good either because Vindman is *not* seeking redress for any employment decision. And contrary to Hahn's suggestion otherwise, the conspiracy alleged here extends well beyond the federal government and thus falls clearly within the ambit of § 1985. See *supra* at 6-29.

**C.      Vindman's claims are not barred by the political question doctrine.**

Defendants Trump, Jr. and Scavino argue that this Court lacks jurisdiction over the complaint "to the extent that it is based on [Vindman's] removal from the NSC because the composition of the NSC is a political question." Trump, Jr./Scavino MTD at 38. But Defendants misunderstand both Vindman's claims and the appropriate application of the political question doctrine. Vindman does not challenge or seek to remedy the decision to remove him from the NSC; nor do his claims require the Court to "evaluate the propriety" of his removal or his "fitness to serve on the NSC." *Id*. at 39-40. Rather, Vindman's removal from the NSC (along with his brother, in a very public manner) is alleged to be one of a number of overt acts in furtherance of Defendants' unlawful conspiracy (Compl. ¶¶ 8, 191-202, 252, 262), and the *only* question this Court will need to answer that relates to his removal is whether it is evidence of the existence and purpose of the conspiracy.

Trump, Jr. and Scavino also suggest that any claims "relating to the subject of national security" or foreign policy implicate political questions. Trump, Jr./Scavino MTD at 39-40. But the Supreme Court has long instructed that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962). Moreover, while Defendants argue that any one of the six factors enumerated in *Baker* supports finding a political question (Trump, Jr./Scavino MTD at 38), the D.C. Circuit has concluded that the first two are the most critical. *See Al-Tamini v. Adelson*, 916 F.3d 1, 12 (D.C. Cir. 2019) ("[I]f the first two *Baker* factors are not present, more is required to create a political question than apparent inconsistency between a judicial decision and the position of another branch" (citing *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-201 (2012)).).

The D.C. Circuit explains that "the presence of a political question" in cases implicating military and foreign policy conduct "turns *not* on the nature of the government conduct under

review but more precisely on *the question the plaintiff raises about the challenged action.*" *El-Shifa Pharm. Indus. Co. v. U.S.*, 607 F.3d 836, 842 (D.C. Cir. 2010) (emphases added). Evaluation of whether a claim raises a political question thus must "distinguish[] between claims requiring [courts] to decide whether [a national security or foreign policy decision] was wise—a policy choice[] and value determination . . . constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch—and claims [p]resenting purely legal issues such as whether the government had legal authority to act." *Id.* (fourth alteration in original) (quotation marks omitted).

Recognizing this distinction, in *each* of the cases that Defendants cite as holding that the political question doctrine foreclosed jurisdiction, the plaintiff's claims would have required the courts to evaluate the merits of a policy decision that was constitutionally committed to another branch, without judicially manageable standards. *See Schneider v. Kissinger*, 412 F.3d 190, 192, 195-97 (D.C. Cir. 2005) (tort claims against federal government and officials for torture and execution during 1970 Chilean military coup would require court to "second-guess" executive branch's foreign policy judgment by evaluating propriety of decision "to support covert actions against a committed Marxist who was set to take power in a Latin American country" (quotation marks omitted)); *El-Shifa*, 607 F.3d at 838, 843-44 (tort claims challenging decision to bomb Sudanese pharmaceutical plant and justification for bombing would require courts to "assess the merits of the President's decision to launch an attack on a foreign target"); *Bancoult v. McNamara*, 445 F.3d 427, 429-30 (D.C. Cir. 2006) (tort claims challenging depopulation of foreign

archipelago to construct naval base would require evaluation of policy decision to "establish . . . a regional military presence").[7]

The D.C. Circuit has explained the distinction: "whereas attacks on foreign policymaking are nonjusticiable, claims alleging non-compliance with the law are justiciable, even though the limited review that the court undertakes may have an effect on foreign affairs." *DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1238 (D.C. Cir. 1987) (citing *Population Inst. v. McPherson*, 797 F.2d 1062, 1068-70 (D.C. Cir. 1986)).[8]

Vindman's claims raise the question whether his very public dismissal from the NSC was effectuated in order to further defendants' unlawful conspiracy and was evidence of the purpose of that conspiracy, *not* whether his dismissal was lawful, justified, or within the president's authority. For that reason, it does not present a political question. *See also, e.g.*, *Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008) (political question doctrine did not bar constitutional and tort claims challenging disclosure of covert agent's identity); *Al-Tamimi*, 916 F.3d at 367 (tort claims alleging genocide in occupied territories did not present political question because raised "purely legal issue"); *DKT Mem'l Fund*, 810 F.2d at 1237-38 (constitutional and statutory challenge to agency's abortion-related withholding of funds alleges "non-compliance with the law," and does not require adjudication of "political and social wisdom of [agency]'s foreign policy"); *Thompson*

---

[7] *Armstrong v. Executive Office of the President* does not address the political question doctrine. 90 F.3d 553 (D.C. Cir. 1996). And *Gross v. German Foundation Industrial Initiative* held that the doctrine *does not preclude* claims where, as here, there is no need for the court to make a "policy determination of a kind clearly for nonjudicial discretion." 456 F.3d 363, 388-89 (3d Cir. 1996) (quotation marks omitted).

[8] A claim that does necessarily raise a political question can be dismissed on that basis "only if the political question is inextricable." *Al-Tamini*, 916 F.3d at 13-14 (quotation marks omitted). Thus, even if Vindman's removal from the NSC did present a political question, that would provide no basis to dismiss his § 1985 claims, which are premised on several other overt acts not challenged on political question grounds.

*v. Trump*, 2022 WL 503384, at *19-20 (D.D.C. Feb. 18, 2022) (rejecting political question challenge to § 1985 conspiracy challenges based on January 6 events, even though "adjudication here might involve a judgment of the President's speech" and "review of a President's claimed exercise of his general Article II executive powers" (quotation marks omitted)).

This Court has rejected reliance on the political question doctrine where a plaintiff who had resigned from an appointed federal government position after being falsely accused of legal and ethical violations asserted due process claims for harm to his reputation. *Jefferson v. Harris*, 170 F. Supp. 3d 194, 204, 210-11 (D.D.C. 2016). The court reasoned that the plaintiff was not seeking "judicial review of [the agency's] political decision to remove a Presidential appointee" nor "seeking reinstatement as a remedy," but "instead demand[ed] an opportunity to clear his name." *Id.* at 210 (citing *Doe v. Dep't of Just.*, 753 F.2d 1092, 1097-98, 1108 n.15, 1110 (D.C. Cir. 1985)). There, as here, because the plaintiff "does not [seek] to undo his discharge, [the political question] objection carries no weight." *Id.*; *see also Stehney v. Perry*, 101 F.3d 925, 928-29, 932 (3d Cir. 1996) (challenge to revocation of security clearance for refusal to take polygraph did not seek "review of the merits of NSA's revocation decision" but whether "NSA violated her constitutional and regulatory rights in revoking her clearance," and so was not barred).

Here, Vindman does not seek review of the validity of his removal from the NSC, or any remedy for that removal, such as reinstatement or damages for his loss of the NSC position. Thus, his claims will not require the Court to evaluate the merits of any decision that is constitutionally committed to another branch. In § 1985, Congress created a statutory prohibition on certain conspiracies against federal officials, which provides judicially manageable standards to determine whether a conspiracy violates that statute even if it might be inappropriate to review one of its constituent overt acts as a standalone matter of executive policy.

**IV.     Defendants Hahn and Scavino are not entitled to qualified immunity.**

Defendants Hahn and Scavino, who were political appointees employed by the White House at all relevant times, wrongly assert they are entitled to qualified immunity, and thus dismissal of the claims against them, because no clearly established law alerted them to the unlawfulness of their actions. Hahn MTD at 1-2, 26-30; Trump, Jr./Scavino MTD at 41-42.

Defendants' qualified immunity arguments overlook the practical differences between constitutional and statutory claims. Constitutional provisions are necessarily general and require more in the way of case law development to give notice of what they prohibit. By contrast, statutes—especially those imposing criminal liability—are usually enough in their own right to do so. And that is what we have here, where Vindman sues under a federal statute. The notice that Defendants claim to lack was provided by the terms of 42 U.S.C. § 1985(1) and (2), just as notice that the same conduct gives rise to criminal liability is provided by the Klan Act's relevant criminal counterparts, 18 U.S.C. §§ 371, 372, and 1512.

In sum, Vindman's complaint plausibly alleges that Defendants violated a federal statute whose requirements have been "made specific" by its express terms and there is no basis for Defendants' qualified immunity claim. *See Screws v. U.S.*, 325 U.S. 91, 104 (1945).

**A.     Vindman's complaint states violations of clearly established law.**

Vindman's complaint alleges that Defendants violated 42 U.S.C. § 1985(1) and (2), which prohibit conspiracies to prevent or deter by "force, intimidation, or threat" a federal official from occupying or discharging the duties of his office, or a witness from testifying in a "court of the United States." It further prohibits injuring a federal official on account of his discharging the duties of his office, or a witness on account of his testimony. The statute thus prohibits specific and narrowly defined conduct, which is also prohibited by three federal

criminal statutes. The criminal statute forbidding conspiracies to injure federal officers, 18

U.S.C. § 372, was enacted as part of the Klan Act. *See* Pub. L. No. 42-22, § 2, 17 Stat. 13, 13-14

(1871). It is a direct analogue to the first clause of § 1985(1) and repeats its language nearly

verbatim. *Compare* 18 U.S.C. § 372, *with* 42 U.S.C. § 1985(1). The witness tampering

prohibited by § 1985(2), which is titled "obstructing justice," is criminalized in 18 U.S.C §§ 371

and 1512. *See McAndrew*, 206 F.3d at 1039 (holding claim brought under § 1985(2) "necessarily

alleges criminal activity in violation of 18 U.S.C. § 1512 . . . and a criminal conspiracy in

violation of 18 U.S.C. § 371"). As explained below, § 1985(1) and (2) provide fair warning of

the conduct that violates the terms of the statute.

Although Defendants Hahn and Scavino repeatedly misconstrue the complaint, it alleges

that they engaged in conduct that precisely fits the prohibitions laid out in § 1985(1) and (2). If

the Court finds that Vindman has plausibly alleged that Defendants did these things, there can be

no serious argument that the complaint fails to allege a violation of clearly established law.

### 1.   Section 1985(1) and (2) and its companion criminal laws gave the Defendants fair warning that their conduct was unlawful.

Qualified immunity shields government officials from damages suits unless they are

alleged to violate "clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow*, 457 U.S. at 818. For a right to be clearly established, its

contours "must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While the law must

be defined at a level of generality sufficient to put the unlawfulness of an officer's conduct

"beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), liability is not limited to

situations where "the very action in question has previously been held unlawful" in a court

decision, *see Anderson,* 483 U.S. at 640. Rather, "officials can still be on notice that their

conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Regardless of whether a court has issued an opinion deeming a particular action unlawful, "it is not unfair to hold liable the official who knows or should know that he is acting outside the law." *Butz v. Economou*, 438 U.S. 478, 506 (1978). Defendants' arguments that they are entitled to qualified immunity unless their conduct repeats actions held unlawful in prior cases is therefore misplaced. *See* Hahn MTD at 26; Trump, Jr./Scavino MTD at 41-42.

 In *Hope v. Pelzer*, the Supreme Court considered whether state prison guards violated the Eighth Amendment's prohibition against imposing cruel and unusual punishment by handcuffing a shirtless prisoner to a hitching post and leaving him in the sun for hours, and if so, whether the guards were entitled to qualified immunity absent "materially similar" cases establishing they could not do such a thing. *See* 536 U.S. at 735-36 (quotation marks omitted). In holding that the Eighth Amendment violation was "obvious," the Court went on to hold that a requirement for "materially similar" cases to clearly establish the law was a "rigid gloss on the qualified immunity standard" that was "not consistent with our cases." *Id*. at 738-39 (quotation marks omitted). The Court explained that "[t]he salient question . . . is whether the state of the law" provides officials "fair warning" that their actions are unlawful. *Id.* at 740.

 "Fair warning" is a due process concept holding that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *U.S. v. Lanier*, 520 U.S. 259, 265 (1997) (quotation marks omitted). The Supreme Court explained the relationship between the "fair warning" principle and "clearly established law" in the civil context in *United States v. Lanier*. There, the Court considered a due process challenge by a state judge convicted under 18 U.S.C. § 242 of sexually assaulting multiple women under color of law in violation of their Fourteenth Amendment due process rights. *Id.* at 261. On appeal, the

defendant claimed he lacked notice that his conduct was unlawful because there were no Supreme Court decisions based on "fundamentally similar" facts holding that his particular actions violated the right to bodily integrity, and the appeals court agreed. *Id.* at 261-63 (quotation marks omitted). The court of appeals further held that the test for determining whether a criminal statute has provided "fair warning" was "substantially higher" than the "clearly established" standard used to assess the application of qualified immunity in civil cases.  *Id.* (quotation marks omitted).

In reversing the lower court decision, the Court explained that the "fair warning" test for determining whether a criminal statute is unconstitutionally vague is the same as "clearly established law" for purposes of applying qualified immunity, and that neither standard required the "extreme level of factual specificity" urged by the defendant. *Id.* at 267-70. As the Court wrote: "both [tests] serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *Id.* at 270-71. Accordingly, the Court held that Supreme Court precedent with "fundamentally similar facts" was not required to provide fair warning of a statute's prohibitions:

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.

*Id*. at 261, 270-71(third alteration in original) (quotation marks omitted). What is necessary for fair warning is that the right at stake be made "specific either by the express terms of the Constitution *or* laws of the United States *or* by decisions interpreting them." *Id.* at 267 (emphasis added) (quotation marks omitted).

The principles set forth in *Hope* and *Lanier* are directly applicable here, where the rights in question are set forth in counterpart statutes that make the same offense both a federal crime and the basis for civil liability. A "general statement[] of the law" in a criminal statute is capable of giving federal officials "fair warning" of what they cannot do. *See Lanier,* 520 U.S. at 271; *Gates v. Khokhar*, 884 F.3d 1290, 1296-97 (11th Cir. 2018) ("[I]t may be obvious from explicit statutory or constitutional statements that conduct is [unlawful]" (quotation marks omitted).); *cf. Pritchard v. Hamilton Twp. Bd. of Trustees*, 424 F. App'x 492, 506 (6th Cir. 2011) ("[L]aw enforcement officers should know the intricacies of criminal statutes."). The criminal companions to § 1985(1) and (2)—namely, 18 U.S.C. §§ 372 and 1512—have been repeatedly upheld as sufficiently clear that they are not void for vagueness; that is, they provide fair warning of the conduct that is proscribed. *See, e.g., U.S. v. Fulbright*, 105 F.3d 443, 446, 452 (9th Cir. 1997), *overruled on other grounds*, *U.S. v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc); *U.S. v. Bundy*, 2016 WL 3156310, at *3 (D. Or. June 3, 2016); *U.S. v. Payne*, 2017 WL 8941311, at *7 (D. Nev. Jan. 3, 2017), *report and recommendation adopted*, 2017 WL 480392, at *3 (D. Nev. Feb. 2, 2017); *U.S. v. Morrison*, 98 F.3d 619, 629 (D.C. Cir. 1996); *Arthur Andersen LLP v. U.S.*, 544 U.S. 696, 702-06 (2005); *U.S. v. Puma*, 2022 WL 823079, at *11 (D.D.C. Mar. 19, 2022). And the Department of Justice is presently using those statutes to prosecute hundreds of individuals in connection with the insurrection on January 6, 2021. U.S. Att'y's Off., D.C., *Capitol Breach Cases*, https://tinyurl.com/yckpzw33. Defendants' former employer, the United States, is therefore necessarily of the view that the statutes provide notice of what is unlawful.

A "reasonably competent" federal employee is presumed to know "the law governing his conduct," obviously including federal statutes. *See Johnson v. D.C.,* 528 F.3d 969, 976 (D.C. Cir. 2008) (quotation marks omitted). It should therefore have been more than apparent to Defendants

Hahn and Scavino that the law did not permit them to conspire to prevent or deter a public

official from performing the duties of his office, including testifying as a witness in an

impeachment proceeding, through intimidation, or to retaliate against him for doing so. *See Taylor*

*v. Riojas*, 141 S. Ct. 52, 53 (2020) (holding that "no reasonable correctional officer could have

concluded that, under the extreme circumstances of this case, it was constitutionally permissible"

to house a prisoner in unsanitary conditions for extended period of time, regardless of the absence

of a court decision saying so); *Freeman v. Fallin*, 310 F. Supp. 2d 11, 17 (D.D.C. 2004)

("Accepting the plaintiffs' allegations as true, the court concludes that here, the state of the law

certainly would have given the defendants fair warning that their actions were unconstitutional.").

### 2.     The Fourth Amendment precedent cited by Defendants does not support the requirement of more specific authority in this case.

Defendants ignore *Hope* and *Lanier* and urge this court to grant them qualified immunity

unless there is case law expressly applying § 1985(1) and (2) to their specific conduct. Hahn MTD

at 27; Trump, Jr./Scavino MTD at 42. But as *Hope* and *Lanier* make clear, no "single level of

specificity" suffices "in every instance" to provide fair warning, and court decisions that address

facts "materially" or "fundamentally" similar to those alleged in the complaint are not required

for this court to hold that Defendants violated clearly established law. *Lanier*, 520 U.S. at 270-71;

*Hope*, 536 U.S. at 738-39. This is especially so here, where the law Defendants are alleged to

have violated are set forth in counterpart civil and criminal statutes that prohibited their conduct.

Moreover, Defendants' arguments that additional granularity in the case law is required

to give them fair notice of the unlawfulness of their actions rest largely on decisions involving

Fourth Amendment or other constitutional claims brought under 42 U.S.C. § 1983 or *Bivens* and

are thus inapposite here. Hahn MTD at 26-27; Trump, Jr./Scavino MTD at 41-42. Cases

asserting violations of the Fourth Amendment or other constitutional rights are different from

Vindman's claims under § 1985(1) and (2). This is so because the Fourth Amendment is itself stated in general terms—such as the prohibition against "unreasonable" seizures and the issuance of warrants without "probable cause"—requiring case-by-case interpretation to give those terms clarity. *See* U.S. Const. amend. IV. As the Supreme Court put it in *District of Columbia v. Wesby*:

> We have stressed that the specificity of the rule is especially important in the Fourth Amendment context. Probable cause turn[s] on the assessment of probabilities in particular factual contexts and cannot be reduced to a neat set of legal rules. . . . Thus, we have stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.

138 S. Ct. 577, 590 (2018) (first ellipsis added) (citations and quotation marks omitted). In other words, the Fourth Amendment usually does not give "fair warning" of what it prohibits solely by virtue of its text. *See also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) ("The Fourth Amendment provides an example of how qualified immunity functions with respect to *abstract rights*. By its plain terms, the Amendment forbids unreasonable searches and seizures, yet it may be difficult for an officer to know whether a search or seizure will be deemed reasonable given the precise situation encountered" (emphasis added).).

But the same is not true of federal statutes that prohibit specified conduct, where the terms of the statute *do* give fair warning. "The fair warning requirement . . . reflects the deference due to the legislature, which possesses the power to define crimes and their punishment." *Lanier*, 520 U.S. at 265 n.5. The fair warning principle further takes account of the need for governments to have leeway to craft generally applicable laws. "It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky*,

407 U.S. 104, 110 (1972). If prosecutors had to wait to enforce the law until courts passed on each scenario that could arise under a statute, law enforcement would grind to a halt.

Indeed, as *Lanier* makes clear, the Supreme Court has recognized that fair warning need not be case specific even in the context of open-ended statutes like 18 U.S.C. §§ 241 and 242 and their civil counterpart 42 U.S.C. § 1983, all of which "incorporate constitutional law by reference." 520 U.S. at 265. Rather, the Supreme Court has "upheld convictions under § 241 or § 242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* at 269. This principle applies with even greater force to 42 U.S.C. § 1985(1) and (2) and their criminal counterparts, which focus on a short list of circumscribed conduct. Imposing a case-specific notice requirement would threaten enforcement of those criminal statutes.

The Supreme Court's decision in *Ziglar*, applying qualified immunity on the question of whether it was clearly established that an intracorporate conspiracy is actionable under §1985(3), does not alter the analysis here. *Ziglar*, 137 S. Ct. at 1868-69. Like § 1983 and § 242, the first two clauses of § 1985(3) import constitutional standards. *See Mollnow*, 716 F.2d at 630-31 (contrasting § 1985(1) and § 1985(3)). Sections 1985(1) and (2) do not. And so doubt as to the scope of § 1985(3)'s application provides no basis on which Hahn and Scavino could have thought it lawful to agree to intimidate and retaliate against a witness under the specific provisions of § 1985(1) and (2). Vindman's complaint easily states violations of those provisions and defendants are not shielded by qualified immunity.

**B.**     **Defendants' arguments are not addressed to the well-pleaded allegations in Vindman's complaint and otherwise do not entitle them to qualified immunity.**

As shown above, Defendants are wrong about the legal standard governing whether they had fair warning that their actions, as alleged in Vindman's complaint, were unlawful. Even so, this Court can also dispose of Defendants' qualified immunity arguments on the grounds they elide the facts Vindman has actually alleged and otherwise misstate the law.

**1.**     **Defendants' mischaracterization of Vindman's factual allegations does not entitle them to qualified immunity.**

Defendants do not seem to dispute that a conspiracy to intimidate and retaliate against a federal official for performing his duties, including testifying in a court of impeachment, through defamatory statements, leaking classified information, and other unlawful conduct, violates § 1985(1) and (2). What they do instead is conjure their own version of what the complaint alleges and argue that no legal authority gave them notice that they could not do these things. But Defendants cannot claim qualified immunity based on a lawsuit Vindman did not file.

First, Defendant Hahn argues that it is not clearly established that "circulating talking points can constitute intimidation or injury under § 1985." Hahn MTD at 30. But this is not all she is alleged to have done. Distributing the talking points—which contained defamatory statements that Hahn knew or recklessly disregarded were false—is an unlawful overt act in furtherance of the conspiracy that also tightly ties Hahn to the center of its operation, as well as evidence of the agreement among conspirators and the purpose of the conspiracy. See *supra* at 7-23. The overarching conspiracy was not simply an agreement between Hahn and her superiors to distribute talking points—it was an agreement to engage in a coordinated campaign to intimidate and retaliate against Vindman, of which the talking points were but a part. See *supra* at 23-25. Defendant Hahn does not, and could not, claim that it was unclear to her that conspiring

to interfere with a federal official's discharge of his duties and testimony was unlawful. That is forbidden on the face of the statute.

Second, Defendant Hahn claims that "no reasonable person" in her position "would believe that relaying White House talking points to the press lay outside First Amendment protection or would violate § 1985." Hahn MTD at 31. Again, that is not what the complaint says. The complaint alleges that Hahn formed an *agreement* for the *unlawful purpose* of intimidating and retaliating against a federal official. *E.g.*, Compl. ¶¶ 7, 16, 94, 99, 103, 147. Drafting and relaying the talking points were unlawful overt acts in furtherance of the conspiracy (because, as the complaint alleges, they were defamatory and made with actual malice), and were evidence of the agreement and its purpose. See *supra* at 7-25, 34-47. What matters for the qualified immunity analysis is that she had fair notice that entering into a conspiracy to violate the Klan Act was illegal—which she did.

Third, Defendants Hahn and Scavino continue to mischaracterize the complaint as alleging a personnel dispute. Hahn asserts that it is not clearly established that § 1985(1) applies to "a dispute about a military officer's job duties." Hahn MTD at 32. Scavino argues that it is not clear that a former military officer can use § 1985 to sue his superiors over interference with his promotion or removal from the NSC. Trump, Jr./Scavino MTD at 42. But there is no dispute over Vindman's military job duties, nor is he suing his superiors or challenging his removal from the NSC or the attempted denial of a promotion. See *supra* at 53-54. Rather, the complaint alleges that Defendants conspired with people inside and outside the government to intimidate and retaliate against Vindman. President Trump's participation in the conspiracy does not immunize anyone else for their own unlawful actions. That has long been settled by *Harlow*. See *supra* at 55.

69

Fourth, Defendant Hahn argues the Supreme Court's decision in *Ziglar,* 137 S. Ct. 1843, disposes of the case against her in light of its holding that it is not clearly established that 42 U.S.C. §1985(3) permits suits against federal employees for "intracorporate" conspiracies. Hahn MTD at 28-29. But as explained earlier (see *supra* at 30-31), the intracorporate conspiracy doctrine does not apply at all to this case.

Finally, Defendant Scavino argues that "no court has ever allowed a § 1985 claim to proceed based on statements made by an attorney in an impeachment proceeding." Trump, Jr./Scavino MTD at 42. However, the complaint alleges a conspiracy of which Defendant Scavino was a part, not a claim "based on" statements by one person. Scavino is liable for all of the reasonably foreseeable actions of his co-conspirators, as well as his own, in furtherance of the unlawful agreement. *Halberstam*, 705 F.2d at 481. Moreover, Scavino is not entitled to assert any immunity that might belong to the attorney in question. See *supra* at 47-48.

### 2. Defendant Hahn is not excused from her unlawful conduct by following unlawful orders.

In a move that should offend every federal employee who has honored his or her oath to uphold the law—as Vindman did—Defendant Hahn attempts to excuse herself from liability by claiming that she was just following orders (in her words, "merely following her superiors' direction") when she entered into a scheme to intimidate and retaliate against an impeachment witness. Hahn MTD at 28, 32-33. But federal employees are not entitled to claim the equivalent of a Nuremberg defense for their known unlawful actions. *See U.S. v. North*, 910 F.2d 843, 881 (D.C. Cir.) ("[W]e refuse to hold that following orders, without more, can transform an illegal act into a legal one."), *opinion withdrawn and superseded in part on reh'g on other grounds*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam); *Hobson,* 737 F.2d at 67 ("[T]his argument amounts to the contention that obedience to higher authority should excuse disobedience to law, no matter

how central the law is to the preservation of citizens' rights. We have no hesitation in rejecting [it].");  *cf. Olsen v. Albright*, 990 F. Supp. 31, 40 (D.D.C. 1997) ("The law recognizes that government employees are not to follow orders blindly.").

The cases Defendant Hahn cites to support her position involve search warrant applications that line police officers executed after preparation by supervisors. Hahn MTD at 32-33. They stand for the proposition that following the instructions of a supervisor, whom the line officer has reason to believe knows the law and facts, is *a factor* that weighs in favor of applying qualified immunity. *Messerschmidt v. Millender*, 565 U.S. 535, 553-54 (2012); *Elkins v. D.C.*, 690 F.3d 554, 568 (D.C. Cir. 2012). The holdings in those cases do not immunize officers who act while knowing their actions are unlawful, or excuse them from their duty to exercise independent judgment. *See Elkins*, 690 F.3d at 569 ("Whether an official's reliance is reasonable will always turn on several factors."); *Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022, 1027 (9th Cir. 2002) ("What's reasonable for a particular officer depends on his role in the search."), *aff'd sub nom. Groh v. Ramirez,* 540 U.S. 551 (2004).

And these cases certainly do not shield Hahn, who is alleged not simply to have carried out an order to distribute talking points or otherwise acted as a mere functionary. Rather, she is alleged to have entered into an agreement whereby she and others carried out a scheme to intimidate and retaliate against Vindman because of his role in the impeachment proceeding. To the extent the president directed her to do this, directing a subordinate to conspire to intimidate and retaliate against a federal officer and tamper with a federal witness is not a reasonable instruction, and Defendant Hahn was not entitled to follow it. *See Brent v. Ashley,* 247 F.3d 1294, 1306 (11th Cir. 2001) (Qualified immunity has been found only where "the record reflects no reason why [the subordinate officer] should question the validity of that order."); *Hartsfield v.*

*Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995) (subordinate officers may be liable under § 1983 if "they knew or should have known that their conduct might result in a [constitutional] violation").

> **3.    Defendants Hahn and Scavino are not entitled to qualified immunity based on the application of § 1985(2) to a court of impeachment.**

Finally, Defendants Hahn and Scavino assert that they are entitled to qualified immunity from Vindman's § 1985(2) claims because no court has yet held that § 1985(2) applies to impeachment proceedings. Hahn MTD at 32; Trump, Jr./Scavino MTD at 42. They are wrong.

First, the plain text of §1985(2) applies to proceedings in a court of impeachment as it does to any other "court of the United States," which renders the law clearly established. Next, regardless of whether it was clearly established before now that § 1985(2) is available as a remedy for tampering with an impeachment witness, the question for qualified immunity purposes is whether the *right* at stake is clearly established, not whether the *remedy* is. *See Spagnola v. Mathis*, 809 F.2d 16, 30-31 (D.C. Cir. 1986). And the right of federal witnesses to be free of intimidation and retaliation has been clear for decades.

The D.C. Circuit explained this distinction in *Spagnola*, holding that a defendant federal officer was not entitled to qualified immunity on a First Amendment retaliation claim, even though it was not clearly established that a *Bivens* claim was an available remedy for it. *Id.* at 31-32. "The mere fact that the procedures by which a right is to be vindicated are not 'clearly established' does not mean that the right itself is not clear. Confusion over a claimant's proper *remedy* implies nothing about the nature of the claimant's *right.*" *Id.* at 31 (emphasis in original). Likewise, here, the right of a witness to be free from intimidation and retaliation was well established by federal criminal statutes long before the actions alleged in the complaint took place.

**V.       None of Vindman's claims should be dismissed with prejudice.**

Defendants' motions should be denied for the reasons stated. However, if the Court

disagrees and determines that any part of Vindman's complaint should be dismissed, it should do

so without prejudice. Defendants argue that Vindman failed to adequately plead violations of the

Klan Act, and such alleged deficiencies could be cured in an amended complaint. *See Firestone*

*v. Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("A dismissal *with prejudice* is warranted only

when a trial court determines that the allegation of other facts consistent with the challenged

pleading could not possibly cure the deficiency" (emphasis in original) (quotation marks

omitted).).

**<u>CONCLUSION</u>**

Lt. Col. Vindman's complaint alleges facts making it more than plausible that the

Defendants conspired to intimidate and retaliate against him because he upheld his oath of office,

reported misconduct, and testified in an impeachment proceeding. Such attacks on the rule of law

demand accountability, which the Klan Act exists to provide. For these reasons, Defendants'

motions to dismiss should be denied.[9]

---

[9] Pursuant to Local Civil Rule 7(f), Vindman requests an oral hearing if it would be helpful to the
Court in answering any questions raised by the parties' briefing.

Respectfully submitted,

Dated:  July 29, 2022                    PLAINTIFF LT. COL. ALEXANDER VINDMAN

By:  _/s/ Genevieve C. Nadeau_____

Genevieve C. Nadeau (Bar No. 979410)
PROTECT DEMOCRACY PROJECT
15 Main Street, Ste. 312
Watertown, MA 02472
P: 202-579-4582
F: 929-777-8428
genevieve.nadeau@protectdemocracy.org

Kristy L. Parker (Bar No. 1542111)
Rachel F. Homer (Bar No. 1045077)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue, NW, #163
Washington, D.C. 20006
P: 202-579-4582
F: 929-777-8428
kristy.parker@protectdemocracy.org
rachel.homer@protectdemocracy.org

Stacey Leyton (*pro hac vice*)
Amanda C. Lynch (*pro hac vice*)
Juhyung Harold Lee (*pro hac vice motion forthcoming*)
ALTSHULER BERZON LLP
177 Post Street, Ste. 300
San Francisco, CA 94108
P: 415-421-7151
F: 415-362-8064
sleyton@altshulerberzon.com
alynch@altshulerberzon.com
hlee@altshulerberzon.com

## **CERTIFICATE OF SERVICE**

I certify that on this 29th day of July, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Respectfully submitted,

*/s/ Genevieve C. Nadeau*