## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LT. COL. ALEXANDER VINDMAN
c/o Protect Democracy Project, Inc.
2020 Pennsylvania Avenue, NW, #163
Washington, D.C. 20006

                Plaintiff,

v.

DONALD TRUMP, JR., RUDOLPH GIULIANI,
JULIA HAHN, and DANIEL SCAVINO, JR.,

                Defendants.

Civil Action No. 1:22-cv-00257-JEB

---

## BRIEF OF AMICI CURIAE FLOYD ABRAMS, ERWIN CHEMERINSKY, MARTHA MINOW, LAURENCE H. TRIBE, AND DAVID A. SCHULZ IN SUPPORT OF THE OPPOSITION OF PLAINTIFF TO DEFENDANTS' MOTIONS TO DISMISS

---

STEVEN A. HIRSCH - #171825
shirsch@keker.com
NIC MARAIS - # 277846
nmarais@keker.com
*Counsel of Record*
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:      415 391 5400
Facsimile:      415 397 7188

*Attorneys for Movants and Proposed Amici Curiae Floyd Abrams, Erwin Chemerinsky, Martha Minow, Laurence H. Tribe, and David Schulz*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  STATEMENT OF INTEREST ........................................................................................1

II.  INTRODUCTION ........................................................................................................3

III.  ARGUMENT ................................................................................................................5

    A.  Sections 1985(1) and 1985(2) are part of a suite of statutes, developed
    since the Civil War, prohibiting acts of political intimidation that often are
    carried out by means of speech. ....................................................................5

    B.  The Court's ruling on the defendants' motions to dismiss should clarify
    that §§ 1985(1) and 1985(2), like the other political-intimidation statutes,
    proscribe speech that falls within the historically unprotected category of
    "speech integral to illegal conduct." ..........................................................9

        1.  Under the integral-speech exception, a wide variety of crimes and
        torts are characteristically committed through speech, yet do not
        violate the First Amendment. ..........................................................9

        2.  Applying the integral-speech exception here will pose no danger to
        political speech. ..............................................................................14

IV.  CONCLUSION ..........................................................................................................17

1879009

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aque v. Home Depot U.S.A., Inc.*,
   629 F. Supp. 2d 1336 (N.D. Ga. 2009) ................................................................................12

*Barr v. Clinton*,
   370 F.3d 1196 (D.C. Cir. 2004) ....................................................................................10, 17

*Brever v. Rockwell Int'l Corp.*,
   40 F.3d 1119 (10th Cir. 1994) ........................................................................................6, 17

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006) ..............................................................................................................9

*Cox v. Louisiana*,
   379 U.S. 559 (1965) ............................................................................................................10

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) ............................................................................................................10

*Griffin v. Breckenridge*,
   403 U.S. 88 (1972) ..............................................................................................................15

*Haddle v. Garrison*,
   525 U.S. 121 (1998) ............................................................................................................17

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) ..........................................................................................................16

*Kush v. Rutledge*,
   460 U.S. 719 (1983) ..........................................................................................................6, 8

*N.Y. Times v. Sullivan*,
   376 U.S. 254 (1964) ....................................................................................................10, 11

*New York v. Ferber*,
   458 U.S. 747 (1982) ............................................................................................................10

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) ..............................................................................................................10

*Spagnola v. Mathis*,
   809 F.2d 16 (D.C. Cir. 1986) ..............................................................................................15

1879009

*Spagnola v. Mathis*,
    859 F.2d 223 (D.C. Cir. 1988) ........................................................................15

*Stern v. United States Gypsum, Inc.*,
    547 F.2d 1329 (7th Cir. 1977) ......................................................................17

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ....................................................................................6

*United States v. Alvarez*,
    567 U.S. 709 (2012) .......................................................................................10

*United States v. Rahman*,
    189 F.3d 88 (2d Cir. 1999) .......................................................................12, 13

*United States v. Rowlee*,
    899 F.2d 1275 (2d Cir. 1990) .......................................................................10

*United States v. Stevens*,
    559 U.S. 460 (2010) .......................................................................................15

*United States v. Weiss*,
    475 F. Supp. 3d 1015 (N.D. Cal. 2020) ....................................................13, 14

*United States v. Williams*,
    553 U.S. 285 (2008) .......................................................................................12

*Virginia v. Black*,
    538 U.S. 343 (2003) .......................................................................................10

*Windsor v. The Tennessean*,
    719 F.2d 155 (6th Cir. 1983) ........................................................................10

**State Cases**

*State v. Shackelford*,
    825 S.E.2d 689 (N.C. App. 2019) ................................................................13

*Matter of Welfare of A. J. B.*,
    929 N.W.2d 840 (Minn. 2019) ......................................................................13

**Federal Statutes**

18 U.S.C. § 2 .......................................................................................................12

18 U.S.C. § 241 ...................................................................................................12

18 U.S.C. § 371 ...................................................................................................12

18 U.S.C. § 372 ........................................................................................6, 12

18 U.S.C. § 373 ...............................................................................................12

18 U.S.C. § 1512 .........................................................................................7, 12

18 U.S.C. § 1751 ...............................................................................................13

18 U.S.C. § 1951 ...............................................................................................13

18 U.S.C. § 2384 ...............................................................................................13

21 U.S.C. § 846 .................................................................................................13

42 U.S.C. § 1985(1) ................................................................................... *passim*

42 U.S.C. § 1985(2) ................................................................................... *passim*

42 U.S.C. § 1985(3) .......................................................................................7, 8

52 U.S.C. § 10101(b) ..........................................................................................7

52 U.S.C. § 10307(b) .....................................................................................7, 8

**Constitutional Provisions**

U.S. CONST. Article I, § 3, cl. 6 .........................................................................6

**Other Authorities**

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Vote Intimidation,* 39 N.Y.U. REV. OF L. & SOCIAL CHANGE 173 (2015) ...............7, 8, 9

Eugene Volokh, *The Speech Integral to Criminal Conduct Exception*, 101 CORNELL L. REV. 981, 987 (2016).............................................................13, 14, 16

Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 FORDHAM L. REV. 145, 156 (2020).....................................................................7

1 RODNEY A. SMOLLA, SMOLLA AND NIMMER ON FREEDOM OF SPEECH § 10.35 (2021)..............................................................................................................11

*U.S. Senate, About Impeachment*, https://tinyurl.com/3f7wuxeu ...................6

iv

## I.    STATEMENT OF INTEREST[1]

Amici curiae are Constitutional and First Amendment scholars and practitioners who have an interest in the courts' striking an appropriate balance between, on the one hand, the First Amendment rights of free speech, association, and petition, and on the other, the government's ability to carry out its functions—which include preventing the political intimidation of witnesses in federal proceedings, especially presidential impeachment proceedings.[2]

**Floyd Abrams** is Senior Counsel at Cahill Gordon & Reindel in New York and has been a Visiting Lecturer at Yale Law School and a Lecturer in Law at Columbia Law School. For 15 years he taught as well at the Columbia Graduate School of Journalism as the Willian J. Brennan Jr. Visiting Lecturer in First Amendment law. For the last half century he has been counsel or co-counsel in numerous First Amendment cases of note including, among others, *New York Times Co. v. United States (Pentagon Papers Case)*, 403 U.S. 713 (1971); *Landmark Communications Inc. v. Virginia*, 435 U.S. 829 (1978); *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979); *Herbert v. Lando*, 441 U.S. 153 (1979); *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003); and *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010). He has written three books about the First Amendment—*Speaking Freely: Trials of the First Amendment* (2005); *Friend of the Court: On the Front Lines with the First Amendment* (2013); and *The Soul of the First Amendment* (2017). He has published numerous articles about the First Amendment and received numerous awards for his work in the area.

**Erwin Chemerinsky** is the Dean of the University of California Berkeley School of Law, where he holds the title of Jesse H. Choper Distinguished Professor of Law. He frequently argues appellate cases, including in the United States Supreme Court. He is the author of 14 books, including leading casebooks and treatises about constitutional law, criminal procedure,

---

[1] No party's counsel authored this brief in whole or in part; and no person, party, or party's counsel contributed money that was intended to fund preparing or submitting this brief, which was prepared on a *pro bono* basis.

[2] Amici have moved the Court under Local Civil Rule 7(o)(2) for an order granting leave to file this brief.

1

and federal jurisdiction, and has authored over 200 law-review articles. His most recent books are *Presumed Guilty: How the Supreme Court Empowered the Police and Subverted Civil Rights* (2021) and *The Religion Clauses: The Case for Separating Church and State* (2020) (with Howard Gillman). In 2017, *National Jurist* magazine again named Dean Chemerinsky as the most influential person in legal education in the United States. In 2016, he was named a fellow of the American Academy of Arts and Sciences.

**Martha Minow** is the 300th Anniversary University Professor at Harvard University and former dean of Harvard Law School. She is the author or editor of 18 books and has authored over 200 law-review articles. Her most recent books are *Saving the News: Why the Constitution Calls for Government Action to Preserve Freedom of Expression* (2021) and *When Should Law Forgive?* (2019). Her many public lectures include the 2017 Alexander Meikeljohn Lecture on the First Amendment at Brown University. A fellow of the American Academy of Arts and Sciences and a fellow of the American Philosophical Society, she has received nine honorary degrees from universities in three nations as well as numerous awards, including the Sacks-Freund Award for Excellence in Teaching, Harvard Law School. She currently serves on the board of public media entity GBH, and previously served on the board of the CBS Corporation.

**Laurence H. Tribe** is the Carl M. Loeb University Professor and Professor of Constitutional Law *Emeritus* at Harvard. He has written over 115 articles and books, including his treatise, *American Constitutional Law*, cited more than any other legal text since 1950. He has prevailed in numerous cases that he argued in the U.S. Supreme Court, including the following First Amendment cases: *United States v. United Foods*, 533 U.S. 405 (2001) (First Amendment precludes forcing mushroom growers to pay for generic advertising campaign unrelated to substantive regulation of mushroom market); *Sable Communications of California, Inc.. v. FCC*, 492 U.S. 115 (1989) (Congress may not abolish non-obscene "dial-a-porn" services where methods of keeping children from accessing such services are not shown to be unavailable); *Board of Education of Oklahoma City v. National Gay Task Force*, 470 U.S. 903 (1985) (First Amendment protects gay-rights advocacy in public schools); *Richmond*

2

*Newspapers v. Virginia*, 448 U.S. 555 (1980) (press and public have right to attend criminal trials). He also prevailed without argument in *Boston v. Anderson*, 439 U.S. 951, 1389 (1978) (state court may not prohibit free speech by municipality on referendum issue pending before the people in statewide election). Professor Tribe helped write the constitutions of South Africa, the Czech Republic, and the Marshall Islands. He was elected to the American Academy of Arts and Sciences in 1980 and was elected to the American Philosophical Society in 2010. He holds 11 honorary degrees.

**David A. Schulz** is a Floyd Abrams Lecturer in Law and Senior Research Scholar in Law at Yale Law School, where he is Co-Director of the Media Freedom and Information Access Clinic. He is also Senior Counsel for the Media Practice Group at Ballard Spahr, LLP, a national trial and appellate practice representing news and entertainment media in defamation, privacy, newsgathering, access, intellectual property, and related First Amendment matters.

## II.   INTRODUCTION

The defendants in this lawsuit have moved the Court to dismiss claims that the plaintiff has asserted under 42 U.S.C. §§ 1985(1) and 1985(2), originally parts of the Ku Klux Klan Act of 1871. Broadly speaking, these statutes in relevant part create civil causes of action against persons who conspire to use force, intimidation, or threats (1) to prevent federal officials from carrying out their duties (§ 1985(1)), or (2) to deter witnesses from testifying freely, fully, and truthfully in federal court proceedings (§ 1985(2)).

Invoking these statutes, the Complaint alleges a conspiracy among the defendants and others not yet named to intimidate plaintiff Lt. Col. Alexander Vindman to prevent him from testifying before Congress about the pivotal July 25, 2019 telephone conversation between President Trump and Ukrainian President Volodymyr Zelenskyy, and then to retaliate against him after he testified truthfully.[3] The complaint alleges a campaign of defamatory statements

---

[3] In that conversation, President Trump attempted to coerce President Zelenskyy into publicly undertaking an investigation into then-Vice President and now President Joseph R. Biden and his son, Hunter, in exchange for an official White House visit and the release of critically important security-assistance funds that Congress had directed be provided to Ukraine. Complaint ¶ 3.

made in furtherance of the conspiracy, portraying Vindman as a spy for Ukraine, a lawbreaker, and a perjurer. Defendants' campaign of threats, intimidation, and retaliation allegedly made it impossible for Lt. Col. Vindman to continue his career on the National Security Council or in the military.

The defendants' motions to dismiss argue that §§ 1985(1) and 1985(2), at least as applied here, violate their First Amendment right to engage in "political speech."[4] Amici believe that it is important not only to reject plaintiffs' First Amendment defenses, but to do so on grounds that preserve the effectiveness of political-intimidation statutes generally.

Sections 1985(1) and 1985(2) are part of a suite of political-intimidation statutes enacted at critical turning points in the nation's history—the post-Civil War Reconstruction and the civil-rights movement of the 1950s and 1960s. Among other things, these statutes prohibit threatening federal officials to prevent them from carrying out their duties and threatening individuals to prevent them from voting freely, testifying in federal judicial proceedings, supporting or failing to support federal candidates, or exercising their federal Constitutional and legal rights. To say that these statutes were hard-won would be a gross understatement. It took one of the bloodiest wars of the Nineteenth Century and a violently opposed civil-rights movement to put these laws on the books.

Because the political-intimidation statutes share common terms that implicate speech—"conspire," "intimidate," "threat"—they are collectively vulnerable to erosion by inapt interpretations and applications of the First Amendment. To prevent such a result, the Court should rely upon the long-recognized categorical exception to First Amendment coverage for speech that is integral to illegal conduct—speech, in other words, that is the very vehicle by which illegal conduct is committed. Applying that exception is peculiarly appropriate here, where the speech in question is integral to conduct that federal law has proscribed for 150 years,

---

[4] *See* Defendant Donald Trump, Jr. and Daniel Scavino, Jr.'s Motion to Dismiss Complaint (Doc. 20) at 20–27; Memorandum of Points and Authorities in Support of Defendant[ Rudolph Giuliani]'s Motion to Dismiss (Doc 25-2), at 10–13; Memorandum in Support of Defendant Julia Hahn's Motion to Dismiss (Doc. 26-1) at 17–21.

and where the testimony that the defendants sought to suppress and then punish concerned an impeachable abuse of power by the President of the United States. "[I]mpeachment is our system's last resort for avoiding genuine catastrophe at the hands of the president," and should occur only when "a president's prior misdeeds are so awful in their own right, and so disturbing a signal of future conduct, that allowing the president to remain in office poses a clear danger of grave harm to the constitutional order." LAWRENCE TRIBE & JOSHUA MATZ, TO END A PRESIDENCY: THE POWER OF IMPEACHMENT 23 (2018). Determining whether these stringent criteria have been met requires honest and uncoerced testimony by the witnesses to those misdeeds.

Below, amici accordingly urge the Court to apply a categorical First Amendment exception for speech integral to the forms of political intimidation proscribed by §§ 1985(1) and 1985(2). Amici believe that this approach not only accords with relevant First Amendment principles but also helps to ensure the continued efficacy of the nation's legal infrastructure for controlling political intimidation. As the events of recent years make clear, that infrastructure is as important to the survival of our democracy as it has ever been.

## III.   ARGUMENT

### A.   Sections 1985(1) and 1985(2) are part of a suite of statutes, developed since the Civil War, prohibiting acts of political intimidation that often are carried out by means of speech.

Sections 1985(1) and 1985(2) are part of a suite of political-intimidation statutes, enacted between 1871 and 1965, encompassing the intimidation of federal officials, witnesses, and voters. Each of these statutes targets the use, or threat to use, *coercion* to intimidate the target. Since each of these statutes contains terms describing forms of intimidation that are sometimes carried out by means of speech—i.e., "conspire," "intimidate," "threaten"—they are all potentially vulnerable to ill-considered First Amendment defenses.

**Intimidation of federal officials and federal witnesses.** 42 U.S.C. § 1985(1), originally part of the Ku Klux Klan Act of 1871 ("Klan Act"),[5] protects federal officials from intimidation aimed at preventing them from carrying out their duties. Section 1985(1) thus creates a civil cause of action, including a damages remedy, against persons who

> *conspire* to prevent, by force, *intimidation*, or *threat*, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce *by like means* any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof . . . .

A criminal counterpart to § 1985(1) exists at 18 U.S.C. § 372.

The first part of 42 U.S.C. § 1985(2), also originally part of Klan Act, creates a civil cause of action, including a damages remedy, against persons who

> *[c]onspire* to deter, by force, *intimidation*, or *threat*, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified . . . .[6]

---

[5] *See generally Kush v. Rutledge*, 460 U.S. 719, 724–29 (1983) (discussing origins and distinct components of 42 U.S.C. § 1985).

[6] This part of the statute speaks of a "court of the United States," not exclusively of Article III courts, and should be construed to encompass impeachment proceedings. The statute reaches interference with grand-jury witnesses, *see Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1125 (10th Cir. 1994), and the House functions as a grand jury in impeachment proceedings. *Cf. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2046 (2020) (Thomas, J., dissenting) (discussing House's investigative role in impeachment process and noting "[t]he power to impeach includes a power to investigate and demand documents."). The Complaint alleges a conspiracy to prevent Lt. Col. Vindman's House testimony and to retaliate against him for giving it. *See, e.g.*, Complaint ¶¶ 5–12.

Lt. Col. Vindman's complaint also alleges that the conspiracy against him was intended, in part, to intimidate him from testifying at the Senate impeachment trial. Complaint ¶¶ 180–187. The Senate has the power to "try" presidential impeachments, with the Chief Justice of the United States—an Article III judge—presiding over the trial. U.S. CONST. art. I, § 3, cl. 6. During trial, the Senate sits as a "High Court of Impeachment" and "managers" from the House of Representatives act as prosecutors. *U.S. Senate, About Impeachment*, https://tinyurl.com/3f7wuxeu. The fact that the Senate ultimately voted not to hear witness testimony should not affect defendants' liability here, because prior to that vote, the defendants still committed many overt acts in furtherance of their conspiracy to prevent Vindman from testifying at the Senate trial.

A criminal counterpart to § 1985(2) exists at 18 U.S.C. § 1512.

**Voter intimidation.** Three federal statutory provisions create civil causes of action for voter intimidation.[7]

1.  42 U.S.C. § 1985(3), another provision that was originally part of the Klan Act, features two so-called "support-or-advocacy clauses."[8] The first such clause protects voters from intimidation aimed at preventing them from giving support or advocacy to electors or candidates in federal elections. Section 1985(3)—which, like § 1985(1), is phrased as a conspiracy statute— creates a civil cause of action, including a damages remedy, against persons who

> *conspire* to prevent by force, *intimidation*, or *threat*, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States.

2.  Unlike §§ 1985(1) and 1985(3) of the Klan Act, § 131(b) of the Civil Rights Act of 1957, 52 U.S.C. § 10101(b), does not require proof of a conspiracy. Instead, it provides:

> No person, whether acting under color of law or otherwise, shall *intimidate*, *threaten*, coerce, or *attempt to intimidate, threaten*, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for [federal] office . . . .

3.  Another political-intimidation statute gaining increasing attention in voting-rights circles is § 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b).[9] Section 11(b) prohibits the intimidation *both* of voters *and* of public officials engaged in vindicating voting rights:

> No person, whether acting under color of law or otherwise, shall *intimidate, threaten*, or coerce, or *attempt to intimidate, threaten*, or coerce any person for voting or attempting to vote, or *intimidate, threaten*, or coerce, or *attempt to intimidate, threaten*, or coerce any person for urging or aiding any person to vote or

---

[7] *See* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Vote Intimidation*, 39 N.Y.U. Rev. of L. & Social Change 173, 177 n.17 (2015).

[8] *See* Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 Fordham L. Rev. 145, 156 (2020) (identifying the support-or-advocacy clauses).

[9] *See Voters Strike Back* at 176–77.

attempt to vote, or *intimidate, threaten*, or coerce any person for exercising any powers or duties under [federal laws relating to election monitoring and litigation].

**Intimidation with intent to deprive victims of equal protection.** Also fairly comprehended within the "political-intimidation statutes" are two additional parts of § 1985 "contain[ing] language requiring that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws." *Kush v. Rutledge*, 460 U.S. 719, 725 (1983). These include the second part of § 1985(2), which applies to conspiracies to obstruct the course of justice in state courts, and the first part of § 1985(3), which provides a cause of action against two or more persons who "conspire or go in disguise on the highway or on the premises of another." *Kush*, 460 U.S. at 725.

In passing these laws, "Congress act[ed] with a keen awareness of history." Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Vote Intimidation*, 39 N.Y.U. Rev. of L. & Social Change 173, 182 (2015) [hereinafter *Voters Strike Back*]. Congress passed the Klan Act in 1871 during Reconstruction and passed the Voting Rights Act during the civil-rights era of the 1960s. "These were defining national episodes. And these statutes were correspondingly ambitious in scope, seeking a real way to define the terms of national citizenship. In doing so, these laws grappled directly with the long history of exclusion in American politics." *Id.* at 181.

Thus, the statutes at issue in this lawsuit, §§ 1985(1) and 1985(2), should be viewed as part of a powerful suite of statutes that plays a vital role in stamping out all forms of political intimidation, old and new. But all of these statutes remain potentially vulnerable to the type of excessively protective and legally erroneous First Amendment defenses raised in this case. In particular, all of the political-intimidation statutes either (1) refer to *intimidation* (a type of conduct *often* carried out through the use of speech)[10] and to *threat* (a type of conduct *nearly*

---

[10] To "intimidate" is "to make timid or fearful; inspire or affect with fear; frighten, especially to compel action or inaction (as by threats)." *Voters Strike Back* at 196–97 (quoting Webster's Third New International Dictionary 1184 (1961)).

*always* carried out through the use of speech)[11] or (2) require proof of *conspiracy* (again, conduct effectuated through speech, using the mechanism of a conspiratorial agreement). *See generally Voters Strike Back* at 206.

Under an expansive application of the "whole code canon" of statutory interpretation, courts might hold that these shared terms should be construed consistently, even across different acts or titles of the United States Code. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 n.3 (2006); *see also Voters Strike Back* at 195 n.143 (suggesting that § 1985(1) is *in pari materia* with §§ 11(b) and 131(b)). And on that basis, courts might apply the same ill-considered defenses—rooted in a misreading of the First Amendment—to each of the political-intimidation statutes. Thus, the way the Court approaches the defendants' First Amendment defenses in this case could have repercussions for the entire suite of political-intimidation statutes—not just §§ 1985(1) and 1985(2).

**B.    The Court's ruling on the defendants' motions to dismiss should clarify that §§ 1985(1) and 1985(2), like the other political-intimidation statutes, proscribe speech that falls within the historically unprotected category of "speech integral to illegal conduct."**

To preserve the effectiveness of the political-intimidation statutes, including §§ 1985(1) and 1985(2), the Court should reject the defendants' First Amendment defenses on the ground that the speech on which their liability is premised is not protected "political speech" but speech falling within the historically unprotected category of "speech integral to illegal conduct."

**1.    Under the integral-speech exception, a wide variety of crimes and torts are characteristically committed through speech, yet do not violate the First Amendment.**

The protections afforded by the First Amendment "are not absolute," and the Supreme Court has "long recognized that the government may regulate certain categories of expression" that "are 'of such slight social value as a step to truth that any benefit that may be derived from

---

[11] A "threat" is "an expression of an intention to inflict evil, injury, or damage on another, usually as punishment for something done or left undone." *Voters Strike Back* at 197 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2382 (1961)).

them is clearly outweighed by the social interest in order and morality.'" *Virginia v. Black*, 538 U.S. at 343, 358–59 (2003) (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72 (1942)). These "content-based restrictions on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories of expression long familiar to the bar. Among these categories are . . . speech integral to criminal conduct." *United States v. Alvarez*, 567 U.S. 709, 717 (2012).

The leading case on this "integral-speech exception" to First Amendment coverage is *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490 (1949). In an often-cited opinion, the Supreme Court rejected "the contention that conduct [that is] otherwise unlawful is always immune from state regulation [merely] because an integral part of that conduct is carried on by" means of speech. *Id*. at 498.

Following *Giboney*, courts repeatedly have held that making a "course of conduct" illegal "has never been deemed an abridgment of freedom of speech . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Cox v. Louisiana*, 379 U.S. 559, 563 (1965) (quoting *Giboney*, 336 U.S. at 502). Thus, "[i]t rarely has been suggested that the constitutional freedom for speech . . . extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *New York v. Ferber*, 458 U.S. 747, 761–62 (1982) (quoting *Giboney*, 336 U.S. at 498). "Put another way, speech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990). The exception applies not only to speech integral to proscribed criminal conduct but also to speech integral to civilly actionable conduct, *see Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006), including defamation and related torts, so long as the plaintiff can show that the defendant acted with the requisite mental state.[12]

---

[12] When a public official alleges a conspiracy to use defamatory speech to hound them out of office or otherwise hinder their performance of their duties, the defendant may invoke the First Amendment-based protections of the *New York Times v. Sullivan* doctrine. *See Barr v. Clinton*, 370 F.3d 1196, 1202–03 (D.C. Cir. 2004); *Windsor v. The Tennessean*, 719 F.2d 155, 162 (6th

Examples abound of well-established crimes and torts committed in whole or in part through the use of speech. In the United States, a person may be guilty of a crime if he or she, for example, (1) agrees with or offers to agree with another to commit, requests another to commit, orders another to commit, threatens harm unless another commits, or otherwise induces another to commit, a crime; (2) by means of threat puts another in fear of imminent serious injury; (3) participates in a criminal endeavor by communicating—for example, by telling thieving friends the combination of the employer's safe; (4) warns a criminal how to escape from the police; (5) threatens harm if someone does not turn over his or her wallet, submit to intercourse, or perform some other act that he or she is free not to perform; (6) offers to bribe someone or offers to receive a bribe for performing an act that should be performed, if at all, free of inducements; (7) successfully encourages someone to commit suicide; (8) entices a child from custody; (9) perjures himself or engages in other falsehoods with respect to officials; (10) acquires property or some other material advantage by deception; or (11) falsely pretends to hold a position in public service with the aim of getting someone else to submit to pretended authority or act otherwise to his or her prejudice. 1 RODNEY A. SMOLLA, SMOLLA AND NIMMER ON FREEDOM OF SPEECH § 10.35, at 10-42.30–10-42.31 (2021) (citing KENT GREENAWALT, SPEECH, CRIME, AND THE USES OF LANGUAGE 6–7 (1989)). Speech is likewise integral to many recognized torts. A person may commit an actionable tort by making fraudulent representations with the intent that they be relied upon, by defaming someone, by inducing a contracting party to break their contract, by making statements that intentionally inflict severe emotional distress, and by many other means.

---

Cir. 1983). *Sullivan* famously held that a public official cannot recover "damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times v. Sullivan*, 376 U.S. 254, 279–80 (1964). Lt. Col. Vindman's complaint easily survives *N.Y. Times v. Sullivan* scrutiny, as it alleges numerous public statements made with "actual malice," including knowingly false statements about Vindman's purported disloyalty, spying, and perjury.

A variety of federal criminal offenses, many sounding in conspiracy, likewise pass

muster under the First Amendment despite being "characteristically committed through speech,"

*United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999), including the use of "conspiratorial or

exhortatory words" to facilitate "preparatory steps towards criminal action." *Id*. at 116; *see also*

*United States v. Williams*, 553 U.S. 285, 298 (2008) ("Many long established criminal

proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech

. . . that is intended to induce or commence illegal activities."). For example:

- 18 U.S.C. § 2(a) makes it an offense to counsel, command, induce, or procure the commission of an offense against the United States.

- 18 U.S.C. § 241 makes it a crime to conspire to injure, oppress, threaten, or intimidate any person to prevent or retaliate against their exercise of their rights under the Constitution or federal law.[13]

- 18 U.S.C. § 371 makes it a crime to conspire to commit any offense against the United States.

  18 U.S.C. § 372 makes it a crime to conspire to "prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office[.]"

- 18 U.S.C. § 373(a) punishes anyone who clearly intends to, and does, persuade another to commit a felony involving the illegal use of physical force against property or against a person.

- 18 U.S.C. § 1512(b) makes it a crime to use intimidation, threats, or corrupt

---

[13] This is the criminal counterpart to the second (post-semicolon) part of 42 U.S.C. § 1985(2). *See Aque v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009) (calling § 1985(2) "the civil counterpart to § 241").

means to persuade another to influence, delay, or prevent their testimony in an
official proceeding.

- 18 U.S.C. § 2384 criminalizes seditious conspiracies to "overthrow, put down, or
to destroy by force the Government of the United States, . . . or to oppose by force
the authority thereof, or by force to prevent, hinder, or delay the execution of any
law of the United States, or by force to seize, take, or possess any property of the
United States contrary to the authority thereof[.]"

- Other statutes criminalize conspiracies with specified objectives. *See, e.g.*, 18
U.S.C. § 1751(d) (conspiracy to kidnap); 18 U.S.C. § 1951 (conspiracy to
interfere with commerce through robbery, extortion, or violence); 21 U.S.C. § 846
(conspiracy to violate drug laws).

None of these provisions ever has been deemed violative of the First Amendment, although each
potentially implicates speech. *See generally Rahman*, 189 F.3d at 116–17.

At first glance, then, the reach of the historical integral-speech exception would appear to
be broad. But courts and commentators alike have observed that it would be "fatally
circular"[14]—and destructive of First Amendment protections—to hold that speech is unprotected
merely *because* some law pronounces it illegal or tortious, thereby making it "integral" to a
crime or tort. In other words, the integral-speech exception "can't justify treating speech as
'integral to illegal conduct,'" and thus unprotected, "simply because the speech is illegal under
the law that is being challenged. That should be obvious, since the whole point of modern First
Amendment doctrine is to protect speech against many laws that make such speech illegal."
Eugene Volokh, *The Speech Integral to Criminal Conduct Exception*, 101 Cornell L. Rev. 981,
987 (2016) [hereinafter *Speech Integral*]. This conclusion flows ineluctably from the fact that

---

[14] *United States v. Weiss*, 475 F. Supp. 3d 1015, 1033 (N.D. Cal. 2020); *see also Matter of
Welfare of A. J. B.*, 929 N.W.2d 840, 853 (Minn. 2019); *State v. Shackelford*, 825 S.E.2d 689,
703 (N.C. App. 2019) (Murphy, J., concurring).

13

"[t]he First Amendment limits Congress; Congress does not limit the First Amendment." *United States v. Weiss*, 475 F. Supp. 3d 1015, 1035 n.9 (N.D. Cal. 2020).

Accordingly, the "best understanding" of the integral-speech exception is this: "When speech tends to cause, attempts to cause, or makes a threat to cause some illegal conduct (illegal conduct *other than the speech itself*)—such as murder, fights, restraint of trade, child sexual abuse, discriminatory refusal to hire, and the like—this opens the door to possible restrictions on such speech." *Speech Integral* at 986–87. In this view, the integral-speech exception "should be seen less as a single exception than as a guide to generating other exceptions" which themselves must be defined "separately and narrowly, to protect potentially valuable speech." *Id*. at 987.

Here, the integral-speech exception "opens the door" to the recognition that, while the political-intimidation statutes' use of the terms "conspire," "threaten" and "intimidate" implies conduct typically carried out by means of speech, such conduct warrants no First Amendment protection. Granting Constitutional protection to the statutorily proscribed acts of political intimidation in the guise of "speech" would render the government incapable of carrying out its functions.

Amici therefore urge the Court to hold that speech integral to the types of political intimidation barred by these statutes falls squarely within the historically unprotected category of speech integral to illegal conduct.

### 2. Applying the integral-speech exception here will pose no danger to political speech.

The defendants argue that applying §§ 1985(1) and 1985(2) to their campaign of intimidation against Lt. Col. Vindman would infringe upon their political speech. Not so. The exception for historically unprotected speech integral to political intimidation is defined "separately and narrowly, to protect potentially valuable speech." *Speech Integral* at 987. It takes the precise shape of the conduct proscribed by long-standing political-intimidation statutes and is therefore inherently incapable of escaping its narrow confines and affecting speech that is otherwise protected.

14

It is true that the Supreme Court has disclaimed any "freewheeling authority to declare *new* categories of speech outside the scope of the First Amendment," at least where such declarations are based solely on a "highly manipulable balancing" of "the value of the speech against its societal costs." *United States v. Stevens*, 559 U.S. 460, 470, 471, 472 (2010) (invalidating federal statute banning animal-cruelty depictions). But the ban on speech integral to political intimidation is anything but "new." There are at least two compelling reasons to conclude that the approach suggested here is properly "grounded" in a "previously recognized, long-established category of unprotected speech." *Id*. at 471.

*First*, the Klan Act provisions defining and proscribing political intimidation are themselves "historical," as they date back as far as 1871—after the Civil War, when the nation was effectively re-established on new constitutional principles. Reconstruction historian Eric Foner has written that the changes wrought by the Thirteenth, Fourteenth, and Fifteenth Amendments were "[s]o profound . . . that the amendments should be seen not simply as an alteration of an existing structure but as a 'second founding,' a 'constitutional revolution,' . . . that created a fundamentally new document with a new definition of both the status of blacks and the rights of all Americans." ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION xx (2019). It may therefore be said that these prohibitions date all the way back to the nation's constitutional "re-founding"; yet they have weathered those 150 years without encountering significant First Amendment obstacles.

*Second*, the Supreme Court has long afforded Reconstruction-era civil-rights statutes "a sweep as broad as their language." *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1972) (citing *United States v. Price*, 383 U.S. 787, 801 (1966), and *Jones v. Alfred H. Mayer Co*., 392 U.S. 409, 437 (1968)). Recognizing this, the D.C. Circuit has observed that "§ 1985(1) is not a narrow and limited remedy but rather a statute cast in general language of broad applicability and unlimited duration," and that the overall scope of § 1985 has been called "enormous." *Spagnola v. Mathis*, 809 F.2d 16, 29 (D.C. Cir. 1986), *on reh'g*, 859 F.2d 223 (D.C. Cir. 1988). Courts never would have adopted these maximalist interpretations of the political-intimidation statutes had they

harbored concerns that those statutes infringe upon protected speech. Instead, they would have applied the constitutional-avoidance canon to trim those statutes back.[15] But they haven't done so.

Applying the integral-speech exception disposes of the defendants' First Amendment defenses to § 1985(1) liability in this case, while also ensuring the continued efficacy of the other political-intimidation statutes. To the extent that these statutes implicate speech, they do so mainly with respect to speech that "tends to cause, attempts to cause, or makes a threat to cause . . . illegal conduct *other than the speech itself.*" *Speech Integral* at 186–87. In the case of § 1985(1), the "other illegal conduct" that the affected speech tends to cause, attempts to cause, or makes a threat to cause is the use of physical or non-physical coercion to (1) "prevent . . . any person from accepting or holding any [federal] office . . . or from discharging any duties thereof"; (2) "induce . . . any [federal] officer . . . to leave [the locale] where his duties as an officer are required to be performed"; (3) "injure [a federal officer] in his person or property on account of his lawful discharge of the duties of his office"; or (4) "injure [a federal officer's] property so as to . . . impede him in the discharge of his official duties."

Similarly, in the case of the first part of § 1985(2), the "other illegal conduct" that the affected speech tends to cause, attempts to cause, or makes a threat to cause is the use of physical or non-physical coercion to "(1) deter . . . any party or witness in any court of the United States" from "attending such court" or "from testifying to any matter pending therein, freely, fully, and truthfully," or (2) "injure such party or witness in his person or property on account of his having so attended or testified."

The First Amendment presents no obstacle to Congress's prohibition of this plainly illegal conduct. Like other conspiracy statutes, §§ 1985(1) and 1985(2) do not proscribe speech as such, except insofar as speech is employed to effectuate an agreement to take unlawful action.

---

[15] "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).

Certainly, the statutes target no identifiable political or social viewpoint. Rather, they require plaintiffs to allege, "[a]mong other things, . . . the elements of civil conspiracy, including . . . an agreement to take part in an unlawful action or a lawful action in an unlawful manner." *Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004); *see also Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994).

Moreover, § 1985(1)'s purpose is the "[p]rotection of federal officials from force, intimidation, threat, or injury at the hands of those who would disrupt, obstruct, or prevent the formulation and execution of federal functions[.]" *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1338 (7th Cir. 1977). As such, the statute is "but a necessary incident of sovereignty. It is akin to the inherent governmental 'power of self-protection' which has been consistently recognized in other contexts, . . . and it advances the important federal interest in the effective operation of government." *Id*. Likewise, "[t]he gist of the wrong at which § 1985(2) is directed is . . . intimidation or retaliation against witnesses in federal-court proceedings." *Haddle v. Garrison*, 525 U.S. 121, 125 (1998). Congress's power to invoke these "necessary incident[s] of sovereignty" cannot be doubted.

The historically grounded integral-speech exception thus preserves the effectiveness of our nation's hard-won political-intimidation statutes while giving due regard to free-speech principles. Accordingly, amici urge that the Court should hold that the First Amendment does not protect speech integral to the forms of political intimidation proscribed by §§ 1985(1) and 1985(2).

## IV. CONCLUSION

For all the reasons stated above, when ruling on the defendants' purported First Amendment defenses to the plaintiffs' §§ 1985(1) and 1985(2) claims, the Court should hold that the First Amendment does not protect, and historically has not protected, speech integral to the forms of political intimidation proscribed by these statutes. Such a ruling will not only accord

with applicable law but also will preserve the efficacy of the political-intimidation statutes on which the health of our democracy depends.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated: August 5, 2022

By:   */s/ Steven A. Hirsch*
STEVEN A. HIRSCH, D.C. Bar Attorney No. 418647, *admission to the bar of this Court pending per Local Civil Rule 5.1(c)(2)*

*/s/ Nic Marais*
NIC MARAIS
*Counsel of Record*

STEVEN A. HIRSCH
NIC MARAIS
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

*Attorneys for Amici Curiae Floyd Abrams, Erwin Chemerinsky, Martha Minow, Laurence H. Tribe, and David A. Schulz*

1879009

## CERTIFICATE OF SERVICE

I certify that on August 5, 2022, a copy of the foregoing was filed with the Clerk using

the Court's CM/ECF system, which will send a copy to all counsel of record.

> */s/ Nic Marais*
> NIC MARAIS
> Keker, Van Nest & Peters LLP
> 633 Battery Street
> San Francisco, CA 94111-1809
> Telephone:  415 391 5400
> Facsimile:  415 397 7188
> nmarais@keker.com

1879009