IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LT. COL. ALEXANDER VINDMAN,

        Plaintiff,

    v.

DONALD TRUMP, JR., RUDOLPH
GIULIANI, JULIA HAHN, and DANIEL
SCAVINO, JR.,

        Defendants.

Civil Action No. 1:22-cv-00257-JEB

---

**BRIEF OF FEDERAL COURTS LAW PROFESSORS AS
*AMICI CURIAE* IN SUPPORT OF LT. COL. ALEXANDER VINDMAN'S
<u>OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

KATHLEEN R. HARTNETT (#483250)
khartnett@cooley.com
DAVID S. LOUK*
dlouk@cooley.com
KELSEY R. SPECTOR*
kspector@cooley.com
CAROLINE A. LEBEL*
clebel@cooley.com
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA  94111-4004
Telephone: +1 415 693 2000
Facsimile:  +1 415 693 2222

*Pro Hac Vice pending*

Counsel for *Amici Curiae*
Federal Courts Law Professors

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ........................................................................................ 1

I.    INTRODUCTION ...................................................................................................... 2

II.   THE SUPREME COURT'S PROFFERED RATIONALES FOR QUALIFIED IMMUNITY HAVE
      NO APPLICATION TO § 1985(1) AND (2)'S STATUTORY OFFENSES...................................... 3

      A.   Qualified immunity's common-law defenses rationale does not support its
           application to § 1985(1) and (2)'s statutory offenses alleged by Plaintiff
           here........................................................................................................ 4

           1.   Qualified immunity's rationale as a common-law tort immunity
                analogue developed exclusively in the context of constitutional tort
                litigation. ...................................................................................... 4

           2.   Qualified immunity's common-law-derived "good faith" reliance
                defense has no application to Plaintiff's § 1985(1) and (2) claims............ 6

      B.   Qualified immunity's "fair notice" rationale does not support its
           application to the § 1985 statutory offenses alleged by Plaintiff here. .................. 7

           1.   Qualified immunity's "fair notice" rationale was developed in
                specific response to constitutional tort litigation. ....................................... 7

           2.   Qualified immunity's "fair notice" rationale has no application to
                Plaintiff's § 1985(1) and (2) claims. ......................................................... 10

      C.   Qualified immunity's policy rationales do not support its application to the
           § 1985 statutory offenses alleged by Plaintiff here. ............................................ 12

           1.   Policy justifications for qualified immunity stem from the high
                volume of constitutional tort litigation—unlike the paucity of
                § 1985(1) and (2) suits. .......................................................................... 13

           2.   Qualified immunity's policy-based rationales do not extend to civil
                suits against government officers for the statutory misconduct
                offenses alleged here............................................................................... 14

III.  THERE IS NO DOCTRINAL BASIS TO EXTEND QUALIFIED IMMUNITY TO DEFENDANTS
      HERE. .................................................................................................................. 16

IV.   CONCLUSION........................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**

*Crawford-El v. Britton*,
    523 U.S. 574 (1998) ........................................................................................................5

*District of Columbia v. Wesby*,
    138 S. Ct. 577 (2018) .....................................................................................................16

*Filarsky v. Delia*,
    566 U.S. 377 (2012) ........................................................................................................6

*Gooden v. Howard Cnty., Md.*,
    954 F.2d 960 (4th Cir. 1992) ..........................................................................................3

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ..........................................................................................9, 13, 14

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ...................................................................................................9, 10

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ........................................................................................................5

*Johnson v. United States*,
    576 U.S. 591 (2015) ......................................................................................................12

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004) (en banc) ...................................................................17, 18

*Malley v. Briggs*,
    475 U.S. 335 (1986) ......................................................................................................14

*McCord v. Bailey*,
    636 F.2d 606 (D.C. Cir. 1980) ........................................................................................4

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ........................................................................................................5

*Mollnow v. Carlton*,
    716 F.2d 627 (9th Cir. 1983) ..........................................................................................3

*Monroe v. Pape*,
    365 U.S. 167 (1961) ........................................................................................................5

*Owen v. City of Independence*,
    445 U.S. 622 (1980) ........................................................................................................5

*Pearson v. Callahan,*
    555 U.S. 223 (2009)................................................................17

*Pierson v. Ray,*
    386 U.S. 547 (1967)..................................................................6

*Richardson v. Reyes,*
    No. 12-CV-00310, 2013 WL 5800769 (N.D. Cal. Oct. 28, 2013) .........................18

*Screws v. United States,*
    325 U.S. 91 (1945).................................................7, 8, 9, 10

*Timbs v. Indiana,*
    139 S. Ct. 682 (2019)................................................................5

*United States v. Bozell,*
    No. 21-CR-216, 2022 WL 474144 (D.D.C. Feb. 16, 2022) ............................12

*United States v. Fulbright,*
    105 F.3d 443 (9th Cir. 1997) (en banc) ....................................11, 12

*United States v. Grider,*
    No. 21-0022, 2022 WL 392307 (D.D.C. Feb. 9, 2022) ..............................12

*United States v. Lanier,*
    520 U.S. 259 (1997)..........................................9, 10, 17

*United States v. Lanier,*
    73 F.3d 1380 (6th Cir. 1996) ...........................................9

*United States v. Morrison,*
    98 F.3d 619 (D.C. Cir. 1996) ..........................................11

*United States v. Mostofksy,*
    No. 21-138, 2021 WL 6049891 (D.D.C. Dec. 21, 2021).........................12

*United States v. Puma,*
    No. 21-0454, 2022 WL 823079 (D.D.C. Mar. 19, 2022) ......................12

*Wooden v. United States,*
    142 S. Ct. 1063 (2022)...............................................11

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017).................................................2, 6, 16, 17

**Statutes**

18 U.S.C.
§ 242..................................................................................................................7, 8, 9
§ 371......................................................................................................................11
§ 372......................................................................................................................11
§ 1512..............................................................................................................11, 12

42 U.S.C.
§ 1983............................................................................................................ *passim*
§ 1985............................................................................................................ *passim*

An Act to Enforce the Provisions of the Fourteenth Amendment to the
Constitution of the United States, and for Other Purposes, 17 Stat. 13 (1871) .......................4

**Other Authorities**

Cong. Globe 42d Cong., 1st Sess. App. at 78 (1871) (remarks of Rep. Perry) ...........................15

David S. Louk, *The Audiences of Statutes*, 105 Cornell L. Rev. 137, 167 (2019) ......................11

*Developments in the Law—Section 1983 and Federalism*, 90 Harv. L. Rev. 1133,
1153 (1977)..............................................................................................................15

2 Federal Civil Rights Acts (3d ed.) § 15:2 ................................................................3

*Hearing on Examining Civ. Rights Litig. Reform, Part I: Qualified Immunity
Before the Committee on the Judiciary, Subcomm. on the Const. and Civ.
Justice, U.S. H. of Reps.*, 117th Cong. (Mar. 31, 2022) (written testimony of
Alexander A. Reinert), available at https://docs.house.gov/
meetings/JU/JU10/20220331/114567/HHRG-117-JU10-Wstate-ReinertA-
20220331.pdf ...........................................................................................................14

James E. Pfander, *Constitutional Torts and the War on Terror* 16–17 (2017) ............................6

Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L.
Rev. 1797 (2018) ...................................................................................................6, 14

Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. Chi. L. Rev. 605
(2021)......................................................................................................................10

Marshall S. Shapo, *Constitutional Tort:* Monroe v. Pape *and the Frontiers
Beyond*, 60 Nw. U.L. Rev. 277 (1965) ......................................................................15

Nathan S. Chapman, *Fair Notice Rationale for Qualified Immunity*, __ Fla. L.
Rev. 39–41 (forthcoming 2022)................................................................................10

Note, *Textualism as Fair Notice*, 123 Harv. L. Rev. 542 (2009)..................................................11

Richard H. Fallon, Jr., *Bidding Farewell to Constitutional Torts*, 107 Calif. L.
Rev. 933 (2019) ...................................................................................................10

William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018)...........4, 6, 10, 11

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are law professors who teach and write about federal courts litigation, including the doctrine of qualified immunity.

Professor Alexander A. Reinert is the Max Freund Professor of Litigation and Advocacy at the Benjamin N. Cardozo School of Law.  He conducts research on issues related to civil procedure, civil rights, and constitutional torts, among other topics, and has published numerous articles focused on the doctrine of qualified immunity.  Professor Reinert has actively litigated civil rights cases for more than 20 years, arguing at all levels of the federal judiciary.

Professor Joanna Schwartz is Professor of Law at UCLA School of Law.  She teaches Civil Procedure and courses on police accountability and public interest lawyering.  Professor Schwartz is one of the country's leading experts on police misconduct litigation.  Professor Schwartz additionally studies the dynamics of modern civil litigation.  She is co-author, with Stephen Yeazell, of a leading casebook, *Civil Procedure* (10th Edition), and her recent scholarship includes articles empirically examining the justifications for qualified immunity doctrine; the financial impact of settlements and judgments on federal, state, and local law enforcement officers and agency budgets; and regional variation in civil rights protections across the country.

Professor Stephen I. Vladeck holds the Charles Alan Wright Chair in Federal Courts at the University of Texas at Austin School of Law.  He has published numerous academic and popular articles on issues related to civil suits against federal officials and constitutional torts, among other topics, and is an expert on the origins and scope of qualified immunity doctrine.  Professor Vladeck has argued over a dozen cases before the U.S. Supreme Court, the Texas Supreme Court, and

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.  Affiliations of *amici* are provided for purposes of identification only.

various lower federal civilian and military courts; has testified before numerous congressional committees and Executive Branch agencies and commissions; and has served as an expert witness both in U.S. state and federal courts and in foreign tribunals.

Given their scholarly writings about and involvement in litigation related to qualified immunity, *amici* have an interest in the sound historical understanding—and practical application—of qualified immunity in federal litigation, including in this case.

## I.   INTRODUCTION

In their motions to dismiss, Defendants Hahn and Scavino, Jr. both argue, among other things, that qualified immunity shields them from Plaintiff's claims under 42 U.S.C. § 1985(1) and (2).  The Supreme Court has extended qualified immunity to government officials sued under § 1985(3) for constitutional torts.  *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017).  But it has never had occasion to decide whether qualified immunity may also be invoked as a defense to civil liability under § 1985(1) and (2), which create civil liability for certain statutory offenses.

The purpose of this brief is to explain why such a judge-made extension of qualified immunity is unwarranted.  Although 42 U.S.C. § 1985(3) creates civil liability for constitutional torts analogous to the liability created by 42 U.S.C. § 1983, the preceding subsections of § 1985— 42 U.S.C. § 1985(1) and (2)—differ from § 1985(3) in both their text and their ambit.  Rather than codifying a general civil liability for deprivation of constitutional rights, § 1985(1) and (2) create civil liability for specific, enumerated statutory offenses—offenses that are not only far more concrete than the constitutional torts proscribed by § 1985(3), but that have comparably concrete criminal analogues.

As this brief explains, the Supreme Court's justifications for qualified immunity from constitutional tort claims under § 1983 and § 1985(3) do not comfortably map onto the express statutory offenses defined in § 1985(1) and (2).  The Court has proffered three rationales for

qualified immunity in the context of constitutional torts: that it (a) derives its basis from analogous common-law "good faith" immunities available at the time of § 1983's enactment in 1871; (b) ensures government officials are provided "fair notice" of the law's requirements before being held liable for violations; and (c) minimizes undue disruption in government operations. Like a large (and growing) array of legal scholars and judges, *amici* have significant concerns about the validity of each of these rationales as a justification for the current scope of qualified-immunity doctrine in the context of constitutional tort litigation.

But the relevant point for present purposes is that—*whatever* their force in the constitutional tort context—*none* of these articulated rationales justifies extending qualified immunity to the kinds of statutory offenses Plaintiff alleges here under § 1985(1) and (2). Indeed, Defendants' motions to dismiss only reinforce that point by relying primarily on cases involving constitutional tort claims arising under § 1983 and § 1985(3). *See Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 970 (4th Cir. 1992) (applying identical standard for application of qualified immunity to § 1983 and § 1985(3) constitutional tort claims). Notably, litigation arising under § 1985(1) and (2) is relatively rare, compared to the much higher volume of constitutional tort suits under § 1983 and § 1985(3). *See, e.g.*, *Mollnow v. Carlton*, 716 F.2d 627, 630 (9th Cir. 1983) ("Our research discloses that § 1985(1) has been seldom discussed."); 2 Federal Civil Rights Acts (3d ed.) § 15:2 ("Relatively few cases have arisen under [§ 1985(1)]."). Accordingly, *amici* respectfully submit that this Court should not dismiss Plaintiff's suit against either Defendant Hahn or Defendant Scavino, Jr. on the basis of qualified immunity at this motion-to-dismiss stage.

## II.   THE SUPREME COURT'S PROFFERED RATIONALES FOR QUALIFIED IMMUNITY HAVE NO APPLICATION TO § 1985(1) AND (2)'S STATUTORY OFFENSES.

In entrenching the judge-made doctrine of qualified immunity, the Supreme Court has articulated three overlapping rationales. Whatever the merits of those rationales in the context of

constitutional tort claims under 42 U.S.C. §§ 1983 and 1985(3), they simply do not apply to the express statutory claims Plaintiff alleges under 42 U.S.C. § 1985(1) and (2).

**A.    Qualified immunity's common-law defenses rationale does not support its application to § 1985(1) and (2)'s statutory offenses alleged by Plaintiff here.**

First, the Supreme Court has repeatedly suggested that qualified immunity for government officials from constitutional tort claims under § 1983 constitutes the extension of the common-law "good faith" reliance defense that was available at the time of § 1983's enactment in 1871.  But that defense would have had no applicability to claims like those Plaintiff advances here, because there was no "good faith" defense to violations of explicit statutory commands.

**1.    Qualified immunity's rationale as a common-law tort immunity analogue developed exclusively in the context of constitutional tort litigation.**

The doctrine of qualified immunity first arose in the context of constitutional tort litigation concerning § 1985's neighboring provision, § 1983.   Both sections were enacted during Reconstruction as part of the 1871 Ku Klux Klan Act.  *See* An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes, 17 Stat. 13 (1871).  Specifically, the Klan Act (including § 1983 and § 1985) was enacted to respond to widespread lawlessness and rampant civil rights violations in un-reconstructed Southern states, and the harassment and intimidation, often with the explicit or tacit approval of state officials, of federal officers who were seeking to remedy those violations.  *See* William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 49 (2018); *see also McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (Act passed by Congress to protect civil rights, restore civil authority, remedy attacks on federal officials, and protect "federal courts' ability to proceed without improper influence").  The animating premise of the Klan Act was to create a *federal* civil remedy in order

to allow civil claims to be brought directly in federal court whether or not state courts were able and willing to provide adequate redress.

Like § 1985, § 1983 contains no express textual reference to any kind of immunity for government officials. *See Owen v. City of Independence*, 445 U.S. 622, 635 (1980) ("By its terms, § 1983 'creates a species of tort liability that on its face admits of no immunities.' Its language is absolute and unqualified; no mention is made of any privileges, immunities, or defenses that may be asserted." (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976))). Instead, qualified immunity is an atextual defense that developed as judge-made law. Its origins trace back to the substantial increase in § 1983 constitutional tort litigation in the mid-twentieth century, itself the result of the confluence of two separate developments in the Supreme Court's jurisprudence. First, through selective incorporation, the Supreme Court gradually applied most of the Bill of Rights to the states through the Due Process Clause of the Fourteenth Amendment. *See Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 759–61 (2010) (describing twentieth-century history of incorporation). Second, in *Monroe v. Pape*, the Court recognized that § 1983 authorized suits against state officers for violations of federal rights even when those violations were not themselves sanctioned by state law—rendering the availability and adequacy of state remedies irrelevant. 365 U.S. 167, 184 (1961).

Between them, these developments provoked a substantial increase in federal constitutional tort litigation under § 1983. *See Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("[*Pape*] changed a statute that had generated only 21 cases in the first 50 years of its existence into one that pours into the federal courts tens of thousands of suits each year."). In response, the Court soon considered whether government officials sued for constitutional torts under § 1983 could raise the common-law defense of good faith and probable

cause.  *See Pierson v. Ray*, 386 U.S. 547, 555–57 (1967).

The good-faith reliance rationale was putatively derived from the defense peace officers traditionally raised when plaintiffs sought compensation for allegedly unlawful searches and seizures—through common-law tort claims for trespass, false arrest, and/or false imprisonment. Citing to the *Restatement (Second) of Torts*, the Supreme Court in *Pierson* concluded that under the common law, a "peace officer who arrest[ed] someone with probable cause [wa]s not liable for false arrest simply because the innocence of the suspect [wa]s later proved." *Id.* at 555. Looking to the enactment history of § 1983, where "[t]he legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities," *id.* at 554, the Court concluded the defense of good faith and probable cause, which is "available to the officers in the common-law action for false arrest and imprisonment, is also available" as a defense to § 1983 liability. *Id.* at 557.[2]

### 2.      Qualified immunity's common-law-derived "good faith" reliance defense has no application to Plaintiff's § 1985(1) and (2) claims.

Regardless of whether qualified immunity's common-law basis is on sound footing, the key point is that this rationale was entirely tied to the analogy between the constitutional torts that could be enforced through § 1983 and traditional common-law torts. *See Abbasi*, 137 S. Ct. at 1870 (Thomas, J., concurring in part and concurring in the judgment) (noting that qualified immunity is available under Section 1983 "if it was 'historically accorded the relevant official' in

---

[2] Although the Court has repeatedly affirmed this basis for qualified immunity in the years since, *see Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (finding "common law protections 'well grounded in history and reason'" and not "abrogated 'by covert inclusion in the general language' of § 1983" (citation omitted)), that conclusion has been widely criticized on the basis that "history does not support the Court's claims about qualified immunity's common-law foundations."  Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1801 (2018); *see also* James E. Pfander, *Constitutional Torts and the War on Terror* 16–17 (2017); Baude, *supra*, at 55.

an analogous situation 'at common law'" (citation omitted)).  But that rationale provides no independent basis for recognizing qualified immunity as a defense to express statutory offenses that lack corresponding common-law tort analogues—like the statutory offenses alleged by Plaintiff here under § 1985(1) and (2).  Put another way, the onus ought to be on the moving Defendants to provide evidence that the common-law "good faith" reliance defense purportedly available to common-law tort claims circa 1871 was available then (or even anytime since) as a defense to allegations of witness tampering, obstruction of justice, and obstruction of official duties.  They have offered no such evidence here, which is telling.

>### B.     Qualified immunity's "fair notice" rationale does not support its application to the § 1985 statutory offenses alleged by Plaintiff here.

A second rationale that the Supreme Court has provided for the doctrine of qualified immunity is that it ensures "fair notice" for government officials.  Under this rationale, government officers must be afforded fair warning that their conduct violates the law before they may be held civilly liable for such violations.  As with the common-law immunity rationale, the fair-notice justification has been widely criticized by scholars and jurists.  Again, though, to whatever extent it holds water in the context of judicially expounded constitutional torts, it provides no principled basis for extending qualified immunity to § 1985(1) and (2).  After all, those express statutory offenses and their criminal analogues *already* provide state officials with fair notice; they would raise serious Fifth Amendment vagueness problems if they did not.

>#### 1.     Qualified immunity's "fair notice" rationale was developed in specific response to constitutional tort litigation.

Like the common-law tort defense rationale, the fair-notice rationale predates qualified immunity itself.  Indeed, it stems from the Court's interpretation of § 1983's companion criminal provision, 18 U.S.C. § 242, which proscribes the willful deprivation under color of law of any rights protected by the Constitution.  In *Screws v. United States*, the Court confronted a due-process

challenge to § 242 brought by local law enforcement officers who had been convicted of unlawful arrest and violation of a citizen's right to due process.  325 U.S. 91, 96 (1945).  The defendants argued that, because constitutional rights are not "always reducible to specific rules" and as "a body of legal principles" lack "the basic specificity necessary for criminal statutes," § 242's prohibition on the deprivation of such rights is so inherently vague as to be unconstitutional.  *Id.*

A plurality of the Court, noting Congress's amendment to § 242 in 1909 to add a willfulness scienter element to render the criminal prohibitions "less severe," concluded that this element requires "a specific intent to deprive a person of a federal right *made definite by decision or other rule of law*," which "saves the Act from any charge of unconstitutionality on the grounds of vagueness."  *Id.* at 103 (plurality opinion) (emphasis added).  Restricting liability to violations of rights "made definite," the *Screws* plurality reasoned, was justifiable, given § 242's criminalization of constitutional rights violations that "incorporate by reference a large body of changing and uncertain law."  *Id.* at 96.  Justice Rutledge, providing the necessary fifth vote in concurrence, nevertheless elaborated that "the argument of vagueness . . . ignores the nature of the criminal act itself and the notice necessarily given from" it, since § 242 outlaws not "crimes done by men in general" but those committed by "state officers in the course of official conduct and done with the aid of state power" such that "[t]hese facts, inherent in the crime, give all the warning constitutionally required"—for "one, so situated," such "misconduct can have no excuse of innocence or ignorance."  *Id.* at 129 (Rutledge, J., concurring in the result).  In other words, where criminal law prohibited the underlying conduct, that prohibition, to the extent that *it* was constitutional, provided the fair notice that many constitutional torts would otherwise lack.

As the qualified immunity doctrine developed over time, however, the relationship between § 1983's civil prohibitions and § 242's corresponding criminal prohibitions became muddled.

After the Court held in *Harlow v. Fitzgerald* that a right must be so "clearly established" that "a reasonable person would have known" of its violation, 457 U.S. 800, 818 (1982), it became unclear whether and to what extent the need for a constitutional right to be "clearly established" was co-extensive with, or more demanding than, *Screws*' requirement that § 242 provide fair notice of criminal liability for violations of constitutional rights.   Some lower courts, fusing the two doctrines together, had concluded that if the Supreme Court had only "enunciate[d] a right, but [left] some doubt or ambiguity as to whether that right [would] apply to a particular factual situation, the right [h]as not been 'made specific' as is required under *Screws*."   *United States v. Lanier*, 73 F.3d 1380, 1393 (6th Cir. 1996).

The Supreme Court resoundingly rejected that approach, unanimously holding it "unsound" that fair notice is satisfied "*only if* a prior decision of this Court has declared the right, and then only when this Court has applied its ruling in a case with facts 'fundamentally similar' to the case being prosecuted."   *United States v. Lanier*, 520 U.S. 259, 268 (1997) (emphasis added) (citation omitted).   Rather, the fair-notice standard articulated in *Screws* is indistinguishable from qualified immunity's "clearly established right" standard articulated in *Harlow*:

> [B]oth serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes.   To require something clearer than 'clearly established' would, then, call for something beyond 'fair warning.'

*Id.* at 270–71.   As the Court later put it in *Hope v. Pelzer*—concerning a § 1983 suit alleging violations of the Eighth and Fourteenth Amendments—"*Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." 536 U.S. 730, 741 (2002).

As with the common-law good-faith rationale for qualified immunity, scholars have

questioned whether qualified immunity, as a general matter, can be supported on fair notice grounds.  For instance, criminal prosecutions have generally been thought to present distinct and elevated fair-warning concerns inapplicable to civil suits like those arising under § 1983.  *See, e.g.*, Baude, *supra*, at 73–74.  And even in the constitutional tort context, there is reason to doubt whether qualified immunity actually aids in ensuring fair warning; in practice, law enforcement officers are "infrequently taught" the relevant constitutional rules and case law that would actually put them on notice concerning potentially unlawful conduct.  *See* Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. Chi. L. Rev. 605, 666–68, 673 (2021).

But that debate once again is inapposite here, as *Lanier* and *Hope* make clear that—even where qualified immunity applies—it is necessarily satisfied (and the immunity is defeated) by a statutory offense that itself provides "fair notice."

## 2. Qualified immunity's "fair notice" rationale has no application to Plaintiff's § 1985(1) and (2) claims.

Importantly, all of the Supreme Court's cases justifying qualified immunity on fair-notice grounds did so in the context of constitutional torts—in which the concerns raised in *Screws* are at least theoretically present.  But a different situation is presented by statutorily proscribed conduct—where the statutory elements themselves provide fair notice of the prohibited conduct. *See, e.g.*, Richard H. Fallon, Jr., *Bidding Farewell to Constitutional Torts*, 107 Calif. L. Rev. 933, 993 (2019) (noting that § 1983 "does not pose 'ordinary' questions of statutory interpretation"); Nathan S. Chapman, *Fair Notice Rationale for Qualified Immunity*, __ Fla. L. Rev. 39–41 (forthcoming 2022) (justifying the extension of qualified immunity to constitutional tort claims because such claims are "more unpredictable than most tort liability").

For instance, ordinary tools of statutory interpretation, including the "plain meaning" rule, already supply a basis to ensure that statutory prohibitions are interpreted in a manner ensuring

adequate notice.  *See* David S. Louk, *The Audiences of Statutes*, 105 Cornell L. Rev. 137, 167 (2019) ("[C]ourts often prioritize certain substantive canons and interpretive methods that assist in ensuring adequate notice and enhance the communicative capacity of the statute."); Note, *Textualism as Fair Notice*, 123 Harv. L. Rev. 542, 557 (2009) ("By seeking to discern the most reasonable, plain meaning of a statute, textualism by its very definition seeks to satisfy th[e] dictate of fair notice" "that no person be held to account under a law the content of which he was unable to know beforehand.").  And civil statutory prohibitions with criminal counterparts bring with them additional guarantees of the same—whether through Fifth Amendment vagueness concerns or other principles of statutory interpretation such as the rule of lenity.[3]  *See Wooden v. United States*, 142 S. Ct. 1063, 1082 (2022) (Gorsuch, J., concurring in the judgment) (noting "lenity's relationship to due process" and "fair notice"); Baude, *supra*, at 69 (describing "lenity" as "the oldest of the Court's justifications for qualified immunity").

Because at most qualified immunity's fair-notice inquiry is duplicative of the fair-notice concerns that already illuminate criminal prohibitions, where (as here) the civil offenses correspond to the criminal ones, there is no independent basis to apply qualified immunity.  In such circumstances, the Courts of Appeals have upheld convictions secured under those provisions as satisfying the constitutional fair-notice requirement.  *See, e.g.*, *United States v. Morrison*, 98 F.3d 619, 629–30 (D.C. Cir. 1996) (upholding 18 U.S.C. § 1512(b) conviction over defendant's contention that the term "corruptly" is unconstitutionally vague); *United States v. Fulbright*, 105 F.3d 443, 446, 452 (9th Cir. 1997) (upholding convictions under 18 U.S.C. § 372 and § 1503 because "the statutes are not impermissibly vague as applied"), *overruled on other grounds*, *U.S.*

---

[3] Section 1985(1)'s corresponding criminal provision is 18 U.S.C. § 372, and § 1985(2)'s are § 371 (conspiracy against the United States and its agencies) & § 1512 (witness tampering).

*v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc).  And courts in this District have consistently reached the same conclusion with respect to vagueness challenges by January 6th defendants charged under those same provisions.  *See, e.g.*, *United States v. Puma*, No. 21-0454, 2022 WL 823079, at *11 (D.D.C. Mar. 19, 2022) (upholding 18 U.S.C. § 1512(c) conviction because "the text of Section 1512(c), and the inclusion of the term 'corruptly,' 'give[s] fair notice of the conduct it punishes' and does not invite 'arbitrary enforcement'" (quoting *Johnson v. United States*, 576 U.S. 591, 596 (2015))); *United States v. Bozell*, No. 21-CR-216, 2022 WL 474144, at *6 (D.D.C. Feb. 16, 2022) (joining the "many other judges [who] have rejected" arguments that Section 1512(c) is unconstitutionally vague in other January 6th cases); *United States v. Grider*, No. 21-0022, 2022 WL 392307, at *7 (D.D.C. Feb. 9, 2022) (same); *United States v. Mostofksy*, No. 21-138, 2021 WL 6049891, at *11 (D.D.C. Dec. 21, 2021) (same).

These cases suggest that, in the context of pure statutory prohibitions with criminal analogues (such as those at issue here), qualified immunity serves no purpose separate and apart from the fair-notice requirement, and thus has no independent justification.  In other words, so long as a plaintiff plausibly alleges that a government officer has acted in a manner that is expressly prohibited by federal criminal statutes that are not themselves unconstitutionally vague, that should be enough to survive a motion to dismiss.

### C.    Qualified immunity's policy rationales do not support its application to the § 1985 statutory offenses alleged by Plaintiff here.

Apart from the common-law-immunity and fair-notice rationales, the Court has also justified qualified immunity on policy grounds, namely, that qualified immunity protects government officials from the burdens of litigation and so minimizes undue interference with government operations.

But these rationales have primarily been articulated in the context of constitutional tort

claims concerning alleged deprivations of constitutional rights.  By contrast, the extent to which qualified immunity can be justified on policy grounds for claims alleging pure statutory violations is less clear.  *Harlow*'s inclusion of statutory rights among those for which qualified immunity's "clearly established law" limitation extends was made in passing and with no additional context. *See* 457 U.S. at 818.  The Court has done little in the four decades since to explain how these policy rationales justify the independent application of qualified immunity in the context of pure statutory offenses like those at issue here.  And more specifically, the pragmatic bases the Court *has* put forward for qualified immunity—that qualified immunity protects against undue interference with government operations—are inapposite to the specific § 1985(1) and (2) violations alleged by Plaintiff.

### 1. Policy justifications for qualified immunity stem from the high volume of constitutional tort litigation—unlike the paucity of § 1985(1) and (2) suits.

The Supreme Court's "policy" rationales for qualified immunity reached their high-water mark in *Harlow*, in which the majority abandoned the exception to qualified immunity for officers who acted in subjective bad faith. *Id.* at 818.  In shifting to a purely objective "good faith"-reliance standard, the *Harlow* Court noted the "special costs" to judicial inquiries into claims of subjective good-faith reliance, such as "broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues," which "can be peculiarly disruptive of effective government." *Id.* at 817.

The Court in *Harlow* thus grounded qualified immunity in policy rationales for limiting government officials' exposure to litigation and undue interference:  "the diversion of official energy from pressing public issues," "the deterrence of able citizens from acceptance of public office," and "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *Id.* at 814

(internal quotation marks and citation omitted).  The Court has since repeatedly cited these grounds for extending qualified immunity to Defendants named in constitutional tort suits.  *See, e.g.*, *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("The *Harlow* standard is specifically designed to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment,' and we believe it sufficiently serves this goal." (quoting *Harlow*, 457 U.S. at 818)).

Like qualified immunity's other rationales, these policy justifications have also come under increasing scrutiny from scholars, including *amici*, who have questioned whether qualified immunity actually furthers those objectives.  *See, e.g.*, Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1803–14 (2018); *Hearing on Examining Civ. Rights Litig. Reform, Part I: Qualified Immunity Before the Comm. on the Judiciary, Subcomm. on the Const. and Civil Justice, U.S. H. of Reps.*, 117th Cong. (Mar. 31, 2022) (written testimony of Alexander A. Reinert, Max Freund Professor of Litig. & Advocacy Benjamin N. Cardozo School of Law), available at https://docs.house.gov/meetings/JU/JU10/20220331/114567/HHRG-117-JU10-Wstate-ReinertA-20220331.pdf (testimony identifying practical problems with the doctrine).

But again, to whatever extent the concerns animating the expansion of qualified immunity in *Harlow* are present in constitutional tort litigation, they are absent in cases like this one, which plausibly states express violations of § 1985(1) and (2).

### 2.    Qualified immunity's policy-based rationales do not extend to civil suits against government officers for the statutory misconduct offenses alleged here.

Whether the Court's policy-based rationales justify extending qualified immunity to constitutional torts, such rationales cannot support extending qualified immunity to Plaintiff's § 1985(1) and (2) claims.  Doing so would undermine, rather than enhance, the policy goals that

motivated Congress to enact § 1985.  This is especially the case where *federal* officials are the alleged perpetrators of enumerated offenses under § 1985(1) & (2), because individuals are less likely to be able to rely on enforcement by federal officials of their criminal analogues, leaving § 1985(1) and (2) as the only grounds for relief.  This reasoning only further counsels against extending qualified immunity at least to *federal* officials defending § 1985(1) and (2) claims for offenses like witness tampering and obstruction of justice.

The enactment history of § 1985 casts further doubt on any pragmatic justification for qualified immunity here.  The legislative history of the Ku Klux Klan Act, including the provisions now codified at §§ 1983 and 1985, makes clear that, despite the Act's name, Congress was not focused solely on the evils of the Klan.  Rather, Congress drafted the provision that became § 1985 precisely so that private citizens could hold government actors accountable who were passively complicit or actively involved in wrongdoing:  "Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; . . . [A]ll the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice."   Cong. Globe 42d Cong., 1st Sess. App. at 78 (1871) (remarks of Rep. Perry).

Academic scholarship about this period has identified a similar understanding of the impetus for the Act:  "[B]y early 1871 there was overwhelming evidence that through tacit complicity and deliberate inactivity, state and local officials were fostering vigilante terrorism against politically active [B]lacks and Union sympathizers."  *Developments in the Law—Section 1983 and Federalism*, 90 Harv. L. Rev. 1133, 1153 (1977) (citing Marshall S. Shapo, *Constitutional Tort:* Monroe v. Pape *and the Frontiers Beyond*, 60 Nw. U.L. Rev. 277, 279–80 (1965)).

Thus, from its origin, the Klan Act was undergirded by the need to hold government authorities accountable where they either turned a blind eye to or—worse yet—actively enabled or participated in nefarious conduct interfering with both civil rights and the administration of justice. Although Congress's primary objective was to address Southern states' unwillingness to protect (or overt efforts to undermine) residents' constitutional rights, the statute's reach deliberately extends to federal officials.

And if federal officials are themselves impeding the administration of justice, it defies belief that Congress would have wanted those same officials to have immunity from violations of those prohibitions under *any* circumstances. Although this last argument is specific to federal officials defending claims under § 1985(1) and (2)—rather than state officials defending alleged constitutional torts under § 1983—it reinforces the broader themes of why qualified immunity is such a poor fit for those statutes.

Put simply, the problems that qualified immunity was meant to solve simply do not arise where the civil liability at issue is for conduct that is in violation of express statutory prohibitions.

## III. THERE IS NO DOCTRINAL BASIS TO EXTEND QUALIFIED IMMUNITY TO DEFENDANTS HERE.

For all the reasons given above, qualified immunity should not be extended to Plaintiff's § 1985(1) and (2) claims. The authorities cited by the Defendants do not show otherwise; indeed, they counsel against extending traditional qualified immunity doctrine to Defendants' case.

As a threshold matter, many of the cases Defendants cite consider qualified immunity in the context of constitutional tort claims under § 1983 or § 1985(3). *See, e.g.*, ECF No. 26-1 (Mem. in Supp. of Julia Hahn's Mot. to Dismiss) ("Hahn Mot.") at 26–27 (citing, *e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (Section 1983 claim), and *Abbasi*, 137 S. Ct. at 1866 (Section 1985(3) claim)); *see* ECF No. 20 (Mem. in Supp. of Donald Trump, Jr. & Daniel

Scavino, Jr.'s Mot. to Dismiss) at 41–42 (citing, *e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (Section 1983 claim)).  For the reasons explained in the preceding Section, those cases are inapposite here.  In fact, the logic of the cases cited by Defendants *themselves* cautions against applying qualified immunity to the alleged statutory violations implicated in this suit with the same force as the constitutional violations alleged in those cases.  Unlike the "abstract rights" at issue in those cases, *see Abbasi*, 137 S. Ct. at 1866, the statutory rights at issue here are concrete.

Courts of Appeals have likewise recognized how inapt the qualified immunity inquiry is to § 1985 claims such as witness tampering.  In *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) (en banc), plaintiffs brought a § 1985(2) claim alleging a conspiracy against them by state and local officials because of their testimony in judicial proceedings.  The Fifth Circuit, sitting en banc, rejected defendants' claims to qualified immunity.  At issue was whether § 1985(2)'s prohibition of witness intimidation included expert witnesses in addition to fact witnesses.  Not only did the Fifth Circuit affirm that it did, but it held that this was "clearly established" in light of "the text's plain words."  *Id.* at 532.  Given § 1985(2)'s reference to "*any* party or witness," "[n]o reasonable official would find [the text] ambiguous on this point."  *Id.* (emphasis added).  The court then contrasted the need for a body of cases "to give clear shape to vague constitutional provisions referring to 'due process of law' or 'cruel and unusual punishments'" with § 1985(2)'s statutory prohibitions, for which "the text is itself sufficient to put reasonable officials on notice."  *Id.*

The Fifth Circuit found "untenable any general proposition that cases are necessarily required in order to create clearly established law."  *Kinney*, 367 F.3d at 352 n.16.  Citing *Lanier*, it noted that:

> [T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal. We doubt that the Police Officials would be willing to agree that the contents of the

Texas Penal Code or Title 18 of the U.S. Code are inherently incapable of giving notice of their own meaning, even as to phrases as transparent as "any . . . witness."

*Id.* (cleaned up).

Other lower courts have reached similar conclusions.  For instance, in *Richardson v. Reyes*, the district court denied qualified immunity for defendants accused of withholding medical treatment in retaliation for filing a lawsuit, reasoning that "[e]very reasonable official would understand that conspiring with others to punish Plaintiff for filing a lawsuit would violate Plaintiff's rights" and subpart one of 1985(2).  No. 12-CV-00310, 2013 WL 5800769, at *6 (N.D. Cal. Oct. 28, 2013).

Because Plaintiff has plausibly alleged statutory violations of provisions of § 1985(1) and (2) that have already been found to provide fair notice, there is no need to ask whether there is a sufficiently similar case that would have informed Defendants that their actions were illegal. Defendant Hahn advances an iteration of the argument rejected in *Kinney*, contending that case law does not establish that § 1985(2) applies to witnesses in congressional proceedings as opposed to witnesses in federal court, and that she is thus entitled to qualified immunity.  Hahn Mot. at 35. But that is once again applying constitutional tort reasoning out of context; the *text* of § 1985(2) clearly applies to witnesses *generally*—without limiting that group by reference to the legal proceedings in which they are serving as a witness.  Defendants cannot reasonably claim that they required prior case law to understand the plain meaning of a statute.  *Kinney*, 367 F.3d at 352; *Richardson*, 2013 WL 5800769, at *6 (rejecting qualified immunity argument because "[e]very reasonable official would understand[] that conspiring with others to punish Plaintiff for filing a lawsuit would violate Plaintiff's rights" and Section 1985(2)).

## IV.   CONCLUSION

None of the proffered justifications for qualified immunity—the common-law good-faith

reliance defense, the need for fair notice, or the prevention of undue government disruption—justifies the extension of qualified immunity to Plaintiff's § 1985(1) and (2) claims against Defendants Hahn or Scavino, Jr.  First, the common-law "good faith reliance" tort defense that served as the genesis for qualified immunity has no basis (historical or otherwise) for pure statutory offenses like those raised here.  Second, to the extent the qualified immunity inquiry is coterminous with fair notice, each of the enumerated offenses Plaintiff alleges under these statutes conveys fair notice to Defendants.  There is simply no argument that Defendants lacked fair notice that retaliating against a congressional witness who held a federal office constituted a violation of the clear text of § 1985(1) and (2), especially given judicial decisions finding the parallel criminal offenses provide fair notice.  Third, to whatever extent pragmatic considerations should be considered here, they weigh in favor of declining to extend qualified immunity to defendants.

Thus, *amici* respectfully submit that neither Defendant Hahn nor Defendant Scavino, Jr. should be dismissed from this case on the basis of qualified immunity.  *Amici* take no position on any of the other issues raised in the pending motions to dismiss.

Respectfully submitted,

Dated: August 5, 2022

By: /s/ *Kathleen Hartnett*

Kathleen R. Hartnett (DC Bar No. 483250)
khartnett@cooley.com

David S. Louk*
dlouk@cooley.com

Kelsey R. Spector*
kspector@cooley.com

Caroline A. Lebel*
clebel@cooley.com

COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA  94111-4004
Telephone: +1 415 693 2000
Facsimile:  +1 415 693 2222

*Pro Hac Vice pending*

Counsel for *Amici Curiae*
Federal Courts Law Professors

**CERTIFICATE OF SERVICE**

I certify that on August 5, 2022, a copy of the foregoing was filed with the Clerk using the Court's CM/ECF system, which will send a copy to all counsel of record.


_/s/ Kathleen Hartnett_
Kathleen R. Hartnett (DC Bar No. 483250)