**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LT. COL. ALEXANDER VINDMAN | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:22-cv-00257-JEB |
| | ) |
| DONALD TRUMP, JR., | ) |
| RUDOLPH GIULIANI, | ) |
| JULIA HAHN, and | ) |
| DANIEL SCAVINO, JR | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**REPLY IN SUPPORT OF
DEFENDANT JULIA HAHN'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 3

I.  Plaintiff Fails to State a Claim Against Hahn Under § 1985 .......................... 3

    A.  Plaintiff's response confirms that he pleaded no facts showing
        that Hahn entered into any agreement. .................................................. 3

    B.  Plaintiff's response identifies no allegation showing that Hahn
        agreed to the use of threats, force, or intimidation against
        Plaintiff. ..................................................................................... 6

    C.  The First Amendment protects Hahn from liability for
        disseminating White House talking points to the press. .......................... 10

    D.  Section 1985 does not apply in the circumstances of this case. ........... 15

        1.  Plaintiff was not a witness in a "court of the United
            States." .................................................................................. 15

        2.  An alleged conspiracy with the President involving a
            military officer's duties is not cognizable under § 1985(1) ......... 17

II. Qualified Immunity Applies in § 1985 Suits, and Hahn Is Plainly
    Entitled to It .................................................................................. 18

    A.  Qualified Immunity Applies to Nonconstitutional Statutory
        Claims, Including § 1985 Claims. ..................................................... 19

    B.  Qualified Immunity Is a Defense to a Well-Pleaded § 1985
        Claim. .......................................................................................... 22

CONCLUSION .................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Ariz. Democratic Party v. Ariz. Republican Party,*
  2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ...................................................... 9

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) .......................................................................... 18, 22

*Barr v. Clinton,*
  370 F.3d 1196 (D.C. Cir. 2004) ......................................................... 10, 13

*Barr v. Matteo,*
  360 U.S. 564 (1959) .............................................................................. 25

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................. 4

*Blakeney v. O'Donnell,*
  117 F. Supp. 3d 6 (D.D.C. 2015) .............................................................. 5

*Bray v. Alexandria Women's Health Clinic,*
  506 U.S. 263 (1993) ............................................................................. 7, 9

*Bush v. Butler,*
  521 F. Supp. 2d 63 (D.D.C. 2007) ............................................................ 4

*Clark-Williams v. Local 689, Amalgamated Transit Union,*
  37 F. Supp. 3d 361 (D.D.C. 2014) .......................................................... 13

*District of Columbia v. Wesby,*
  138 S. Ct. 577 (2018) ............................................................................ 18

*Edward J. DeBartolo Corp.*
  *v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
  485 U.S. 568 (1988) .............................................................................. 14

*Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.,*
  566 F.2d 289 (D.C. Cir. 1977) ............................................................... 22

*Ford v. Donovan,*
  891 F. Supp. 2d 60 (D.D.C. 2012) .......................................................... 21

*Gill v. United States,*
  415 F. Supp. 3d 127 (D.D.C. 2019) ........................................................ 18

*Gustave-Schmidt v. Chao,*
    226 F. Supp. 2d 191 (D.D.C. 2002) ........................................................................ 13

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ................................................................................ 19, 20, 25

*Herrmann v. Moore,*
    576 F.2d 453 (2d Cir. 1978)...................................................................................... 6

*Hobson v. Wilson,*
    737 F.2d 1 (D.C. Cir. 1984) ................................................................................... 4, 9

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ............................................................................................ 23, 24

*Keh v. Americus & Sumter Cnty. Hosp.,*
    377 F. App'x 861 (11th Cir. 2010)......................................................................... 15

*Kinney v. Weaver,*
    367 F.3d 337 (5th Cir. 2004) .................................................................................. 21

*Kurd v. Republic of Turkey,*
    374 F. Supp. 3d 37 (D.D.C. 2019) ....................................................................... 4, 6

*Kyle v. Bedlion,*
    177 F. Supp. 3d 380 (D.D.C. 2016) ....................................................................... 18

*Laukus v. United States,*
    691 F. Supp. 2d 119 (D.D.C. 2010) ....................................................................... 10

*Lawrence v. Acree,*
    665 F.2d 1319 (D.C. Cir. 1981) ......................................................................... 20, 21

*Masson v. New Yorker Mag., Inc.,*
    501 U.S. 496 (1991) ................................................................................................ 11

*McAllister v. United States,*
    141 U.S. 174 (1891) ................................................................................................ 16

*Mollnow v. Carlton,*
    716 F.2d 627 (9th Cir. 1983) .................................................................................. 17

*Montoya v. FedEx Ground Package Sys., Inc.,*
    614 F.3d 145 (5th Cir. 2010) .................................................................................... 9

*Moore v. Cecil,*
    488 F. Supp. 3d 1144 (N.D. Ala. 2020) ................................................................. 11

*N.Y. Times Co. v. Sullivan,*
376 U.S. 254, 258 (1964) ............................................................... 15

*Newsome v. EEOC,*
301 F.3d 227 (5th Cir. 2002) ............................................................ 4

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) ....................................................................... 19

*Okelanma v. Harris,*
2011 WL 13267155 (D.D.C. May 10, 2011) ...................................... 10

*Pope v. Bond,*
641 F. Supp. 489 (D.D.C. 1986) ...................................................... 18

*Rivas-Villegas v. Cortesluna,*
142 S. Ct. 4 (2021) ......................................................................... 25

*Taylor v. Riojas,*
141 S. Ct. 52 (2020) ................................................................. 23, 24

*Thompson v. Trump,*
2022 WL 503384 (D.D.C. Feb. 18, 2022),
*appeal docketed*, No. 22-7031 (D.C. Cir. Mar. 24, 2022) ..................... 9

*Tripp v. Dep't of Def.,*
173 F. Supp. 2d 58 (D.D.C. 2001) ................................................... 23

*United States v. Arthrex, Inc.,*
141 S. Ct. 1970 (2021) .................................................................... 17

*United States v. Lanier,*
520 U.S. 259 (1997) ....................................................................... 24

*United States v. Puma,*
2022 WL 823079 (D.D.C. Mar. 19, 2022) ........................................ 16

*US Dominion, Inc. v. Powell,*
554 F. Supp. 3d 42 (D.D.C. 2021) ................................................... 12

*Webb v. County of El Dorado,*
2016 WL 4001922 (E.D. Cal. July 25, 2016) ...................................... 6

*Winder v. Erste,*
905 F. Supp. 2d 19 (D.D.C. 2012) ................................................... 18

*Windsor v. The Tennessean,*
719 F.2d 155 (6th Cir. 1983) .................................................................... 19, 21, 22

*Wright v. Ill. Dep't of Children & Family Servs.,*
40 F.3d 1492 (7th Cir. 1994) ............................................................................ 6

*Ziglar v. Abbasi,*
137 S. Ct. 1843 (2017) ................................................................................ 20, 22

**Statutes & Rules**

18 U.S.C. § 241 ................................................................................................. 20

18 U.S.C. § 1505 ............................................................................................... 20

18 U.S.C. § 1512 ............................................................................................... 16

28 U.S.C. § 451 ................................................................................................. 16

Judiciary Act of 1789,
ch. 20, 1 Stat. 73 ........................................................................................ 16

Fed. R. Evid. 608 ............................................................................................... 8

**Other Authorities**

Alexander S. Vindman @AVindman,
Twitter.com (Aug. 13, 2022) ...................................................................... 15

*Deposition of Tim Morrison*:
*Hearing Before the Permanent Select H. Comm. on*
*Intelligence, joint with the H. Comm. on Oversight*
*and Reform and the H. Comm. on Foreign Affairs,*
116th Cong. (Oct. 31, 2019) ...................................................................... 13

Konstantin Toropin,
*Army Officer Tulsi Gabbard Faces Ire for Peddling Russian*
*Disinformation About Ukraine Biolabs,* Military.com (Mar. 14, 2022) ................. 15

## INTRODUCTION

Plaintiff's response confirms that his case against Julia Hahn hinges on whether circulating White House talking points to the press that questioned Plaintiff's credibility was a clearly established violation of 42 U.S.C. § 1985(1) or (2). For all the length of Plaintiff's opposition, the fact remains that sending talking points to the press is all Hahn is alleged to have done. On the merits and under qualified immunity, this is not enough.

*First*, on the merits: The allegations against Hahn do not satisfy the elements of § 1985, starting with the most basic element: an agreement. The complaint alleges no facts about what Hahn supposedly agreed to do, with whom, or how. Instead, Plaintiff hopes to conjure an agreement from parallel conduct—*i.e.*, that supporters of former President Trump disseminated messages similar to those contained in the talking points that Hahn sent to the press. But similarity of messaging among the like-minded in politics is hardly suggestive of agreement. *Infra* 3–6.

Still less can similarity of messaging support an inference of an agreement *to use force, intimidation, or threat* in violation of § 1985. Because there are no factual allegations that Hahn entered into any agreement with an unlawful purpose, Plaintiff's claims fail even if the Court were to find or assume that Plaintiff adequately alleges that Hahn agreed with someone to do her job. *Infra* 6–10.

Moreover, the First Amendment protects Hahn from liability for sending talking points to the press. Plaintiff tried to allege actual malice against others as to other statements, but not against Hahn—and not by oversight, as the talking-points

statements Plaintiff complains about were largely opinion rather than verifiable factual assertions and were in any event not false. *Infra* 10–15.

Finally, the circumstances of this case, and in particular Plaintiff's allegations against Hahn, do not fit into § 1985. A House Committee is not a "court of the United States." And an alleged conspiracy involving the President to interfere with a military officer's job duties is not cognizable under § 1985. *Infra* 15–18.

*Second*, under qualified immunity: At the very least, it was not "beyond debate" that Hahn's alleged conduct violated § 1985. Section 1985 has existed for more than 150 years, but neither Plaintiff nor his amici have uncovered even a single instance of a court finding that § 1985 prohibited conduct like Hahn's. If the Court were to conclude that merely sending talking points to the press rises to the level of "intimidation" under § 1985, the Court would be breaking new ground. Likewise, if the Court were to conclude that a dispute between a military officer and his Commander-in-Chief over the performance of his job duties can be brought as a § 1985 claim, the Court would be the very first to do so. Everything about Plaintiff's § 1985 claims is novel, and qualified immunity exists precisely to protect government employees like Hahn from personal liability when preexisting authority did not give them clear notice that their alleged conduct was unlawful. Plaintiff and his amici contend in response that qualified immunity should not apply to § 1985 claims, but both the Supreme Court and D.C. Circuit have held otherwise. Plaintiff's contention that the qualified immunity analysis in the § 1985 context is coextensive with the

analysis of whether the complaint states a claim is just another way of saying that qualified immunity doesn't apply and is equally foreclosed. *Infra* 18–25.

Plaintiff has not pleaded, and cannot plead, facts showing that Julia Hahn did anything or agreed to do anything that violated § 1985, let alone that she clearly violated this law. The Court should dismiss Plaintiff's claims against Hahn.

## ARGUMENT

### I.   Plaintiff Fails to State a Claim Against Hahn Under § 1985

#### A.   Plaintiff's response confirms that he pleaded no facts showing that Hahn entered into any agreement.

The most basic requirement for Plaintiff's conspiracy claims against Hahn is well-pleaded factual allegations—not legal conclusions—showing that Hahn entered into an agreement with the alleged conspirators. Hahn MTD 10–11. Plaintiff did not plead any facts relating to such an agreement—who Hahn agreed with, when and where and how, to do what. Instead, Plaintiff seeks to infer that Hahn entered into an agreement with the alleged conspirators, based only on the following facts:

- Hahn served as a Special Assistant to the President and Deputy White House Communications Director. Opp. 11; Compl. ¶ 24.

- Hahn previously worked on Laura Ingraham's radio show. Opp. 11; Compl. ¶ 24.

- Hahn circulated White House talking points to the media at the direction of her superiors. Opp. 12–13; Compl. ¶ 146.

Pleading that Hahn had professional relationships with some of the alleged conspirators—without pleading facts that would show that she agreed with them, what she agreed on, or in what manner—is insufficient. *See, e.g.*, *Newsome v. EEOC*,

301 F.3d 227, 232 (5th Cir. 2002) (per curiam) (allegations of a "'personal business relationship' . . . simply [are] not enough to allege a conspiracy"); *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007) ("To state sufficient facts to support an agreement, plaintiff should allege the existence of any events, conversations, or documents indicating there was an agreement between the defendants to violate his rights.").

Nor can Plaintiff sustain a conspiracy claim against Hahn by alleging that parts of the talking points Hahn circulated were adopted by the press. Opp. 13–14. Allegations of parallel conduct are not enough to plead conspiracy because they are "just as much in line with a wide swath of rational and competitive business strategy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Inferring a conspiracy from parallel conduct is even less plausible in the context of this case: it is hardly surprising or nefarious that political allies would pursue a similar political and communications strategy. Plaintiff suggests that parallel conduct shows that all the Defendants were pursuing "the same goal," Opp. 13 (quoting *Hobson v. Wilson*, 737 F.2d 1, 54–55 (D.C. Cir. 1984)), but "[a] common goal, never discussed explicitly or implicitly among the Defendants, does not constitute an agreement." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C. 2019).

Bereft of factual allegations showing an agreement by Hahn, Plaintiff contends that Hahn "acknowledges that she agreed with President Trump, Defendant Scavino, and others to execute a 'communications strategy.'" Opp. 18 (citing Hahn MTD 10, 12, 16–17). Hahn "acknowledge[d]" no such thing. On pages 10 and 17, Hahn at least used the quoted words "communications strategy." But the words that came before

4

were "even if": "even if Plaintiff had alleged facts showing that Hahn agreed to a White House communications strategy," Hahn MTD 10; "Even if Hahn agreed to a communications strategy," Hahn MTD 17. On page 16, Hahn said nothing remotely resembling the assertion in Plaintiff's opposition. And on page 12, Hahn made a legal argument: "an 'agreement' to do your job as directed by your supervisor within the Executive Branch cannot establish a conspiracy under § 1985." Each of the cited sentences simply notes that even *if* an agreement were found or assumed, another fatal defect would foreclose liability. Twisting *arguendo* arguments into purported admissions is an especially unfortunate tactic for a plaintiff whose claims are about allegedly false statements by others.

If Plaintiff's citation to page 12 of Hahn's motion was intended to refer to Hahn's statement that "[t]o the extent Plaintiff seeks to make a conspiracy out of Hahn's job, the intracorporate conspiracy doctrine poses an insurmountable obstacle," that statement likewise does not acknowledge any agreement. And Plaintiff has no real answer to it. Plaintiff argues that that doctrine does not apply because the conspiracy included people outside the White House. Opp. 30. But that just highlights Plaintiff's failure to plead facts showing that *Hahn* entered into an agreement with anyone outside the White House. Second, Plaintiff argues that the intracorporate conspiracy doctrine does not apply to conspiracies that are "'outside the scope of employment'" and "criminal in nature." Opp. 30–31 (quoting *Blakeney v. O'Donnell*, 117 F. Supp. 3d 6, 16 (D.D.C. 2015)). But Plaintiff alleges that Hahn was acting in the scope of her employment, Compl. ¶¶ 24, 72, 146, and courts have applied

this doctrine to bar the same claims as are at issue here. *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1507–08 (7th Cir. 1994) (applying doctrine to § 1985(2) claim); *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (same); *cf. Webb v. County of El Dorado*, 2016 WL 4001922, at *5 (E.D. Cal. July 25, 2016) (collecting cases) ("The majority of circuits to reach the issue have applied the doctrine to bar claims against public entities.").

Plaintiff faults Hahn and the other Defendants for "focus[ing] attention on only a few cherry-picked allegations regarding their own personal conduct." Opp. 2. But that is exactly the first task at hand: discerning whether Plaintiff adequately pleaded that Hahn agreed to take part in the alleged conspiracy. Before someone can be "liable for the full range of actions taken in furtherance of [a] conspiracy," Opp. 3, the person must be shown to have joined the conspiracy. Plaintiff's failure to allege facts showing that Hahn entered into an agreement with the purported conspirators is dispositive. The claims against her should be dismissed.

## B. Plaintiff's response identifies no allegation showing that Hahn agreed to the use of threats, force, or intimidation against Plaintiff.

Even if the Court finds or assumes that Plaintiff adequately pleaded that Hahn entered into some agreement with someone, the complaint fails to plead facts showing that Hahn entered into a conspiracy to violate § 1985. That would require meaningful factual allegations that Hahn entered into an agreement with the alleged conspirators with a specific illegal purpose. "It is not sufficient that the alleged conspiracy had the effect of curtailing" Plaintiff's rights. *Kurd*, 374 F. Supp. 3d at 62.

Instead, the "impairment must be a conscious objective" of the conspiracy. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993); Hahn MTD 15–17.

Plaintiff's opposition confirms this deficiency. Plaintiff repeatedly cites complaint paragraphs in an effort to show that he adequately alleged a conspiracy to participate in unlawful acts, but Hahn is conspicuous by her absence from these allegations. As a result, Plaintiff ends up confirming that he did not plead facts showing that *Hahn* agreed to use force, intimidation, or threat to prevent Plaintiff from testifying or discharging his duties.

Plaintiff's opposition establishes this pattern early. On page 4, for example, Plaintiff includes Hahn's name along with many others in a sentence claiming that Hahn and others "agreed to participate in a coordinated campaign to destroy Vindman's reputation and make it impossible for him to continue serving in his government position or carry out the responsibilities of that position." Opp. 4–5. Plaintiff then cites nineteen paragraphs of his complaint (¶¶ 6–12, 106–13, 218–19, 250, 261), only one of which even mentions Hahn—and only in a conclusory assertion that "[t]he conspirators included" her. Compl. ¶ 6. Among many other examples, *see, e.g.*, Opp. 21 (asserting that "Multiple Defendants and co-conspirators pushed the false smear that Vindman was disloyal to the United States," not mentioning Hahn and citing complaint paragraphs (¶¶ 107–10, 170, 124–25, 132, 137, 139, 171, 172) that do not mention her); Opp. 22–23 (asserting that "Defendants and other conspirators openly stated that the purpose of their statements and conduct was intimidation and retaliation," not mentioning Hahn and citing paragraphs (¶¶ 16, 66,

100, 131, 191, 192, 196–99, 201) that do not mention her); Opp. 32 (asserting that Plaintiff "plausibly alleged that conspirators unlawfully and directly threatened adverse consequences for testifying in the impeachment hearings," not mentioning Hahn and citing paragraphs (¶¶ 100, 131–39, 191–94) that do not mention her).

The simple truth is that Plaintiff's complaint is devoid of *any* allegation that Hahn agreed to the use of "force, intimidation, or threat" or other illegal conduct. The only factual allegations about Hahn describe her employment history and the sending of White House talking points to the press. And these talking points are worlds away from unlawful intimidation. One said that "Vindman Has Major Credibility Issues" and that "Vindman has faced accusations of poor judgment, leaking, and going around normal procedures." Compl. ¶ 148. "Intimidation" under § 1985 requires far more than merely attacking a witness's credibility. *Cf.* Fed. R. Evid. 608 ("A witness's credibility may be attacked or supported . . . ."). Plaintiff's amici inadvertently make this point when they emphasize that § 1985 targets "*coercion.*" Br. of Abrams, et al. 5. The other statement identified in the complaint was: "There was nothing wrong with the call with Zelensky at all, Vindman was just upset that President Trump was leading foreign policy instead of sticking to Vindman's talking points . . . . But it's not Vindman's job to set foreign policy, it's the President's." Compl. ¶ 149. Plaintiff never explains how this statement of opinion could rise to the level of illegal intimidation. *Cf.* Hahn MTD 21.

Judge Mehta's recent decision analyzing a § 1985(1) claim is instructive on the need to focus on what a complaint alleges that a given defendant did. In *Thompson*

*v. Trump*, the plaintiffs argued that Giuliani had "conspired to prevent Congress from discharging its duties on January 6th by force, intimidation, or threat." 2022 WL 503384, at *36 (D.D.C. Feb. 18, 2022), *appeal docketed*, No. 22-7031 (D.C. Cir. Mar. 24, 2022). Although the court found that Giuliani may have agreed with others to try to convince people that the election had been stolen, this was not enough to establish an agreement *to use threats, force, or intimidation* in violation of § 1985(1). *Id.* Even his statements at the January 6 rally—"So, let's have trial by combat" and "We're going to fight to the very end to make sure that doesn't happen"—were not enough to cross the line to "resemble[] a call to action" or "make him part of a § 1985(1) conspiracy." *Id.* at *37 (quotation marks omitted); *see id.* at *53 (granting Giuliani's motion to dismiss); *see also Ariz. Democratic Party v. Ariz. Republican Party*, 2016 WL 8669978, at *10 (D. Ariz. Nov. 4, 2016) (sending talking points does not show agreement to intimidate voters under § 1985); *cf. Bray*, 506 U.S. at 276 ("[T]he 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it.").

Here, no allegations come close to showing "a call to action" by Hahn for anyone to intimidate Plaintiff, and no allegations show that she personally "share[d] the general conspiratorial objective" alleged of intimidating or retaliating against Plaintiff. *Hobson*, 737 F.2d at 51 (quotation marks omitted). That is a sufficient basis for dismissing the claims against her. *See Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 150 (5th Cir. 2010) ("[W]e conclude that Montoya has simply not

demonstrated that the purported 'conspiracy' here had the unlawful object proscribed by § 1985(2).")). Hahn's motion emphasized the absence of any such allegations, MTD 15–16, so Plaintiff's choice to address this argument with respect to others—citing allegations about Ingraham, Giuliani, Trump, Jr., Scavino, and former President Trump, but not Hahn—is telling. *See* Opp. 21–23; *Okelanma v. Harris*, 2011 WL 13267155, at *1 n.1 (D.D.C. May 10, 2011) (Boasberg, J.) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (quoting *Laukus v. United States*, 691 F. Supp. 2d 119, 127 (D.D.C. 2010))).

### C. The First Amendment protects Hahn from liability for disseminating White House talking points to the press.

The D.C. Circuit has held that the First Amendment applies to § 1985 claims in a case just like this one, where an individual claimed that a presidential administration and allied media outlets conspired against him. *See Barr v. Clinton*, 370 F.3d 1196, 1198–99 (D.C. Cir. 2004). Accordingly, Plaintiff was required to allege facts showing that Hahn's speech was false and published with actual malice. *Id.* at 1203; Hahn MTD 17–21. Plaintiff appears to acknowledge as much and contends that he pleaded actual malice against Hahn. Opp. 40–47. Plaintiff is mistaken; to assert otherwise, his opposition takes liberties with his complaint.

As an initial matter, Plaintiff's opposition confirms (once again) that the only facts pleaded as to Hahn are that she sent White House talking points to the press. And Plaintiff does not dispute that one of the two statements identified in the complaint—the one contending that there was nothing wrong with the call with

Zelensky and that it was the president's job to set foreign policy, not Plaintiff's—is protected by the First Amendment and cannot serve as the basis of any liability. *See* Opp. 45–46. Plaintiff is thus left with the following: "Vindman has faced accusations of poor judgment, leaking, and going around normal procedures."

The complaint does not include even a conclusory allegation that Hahn circulated this talking point with actual malice, *i.e.*, while knowing or recklessly disregarding that it was false. *See* Hahn MTD 17–18. Plaintiff contends that "[t]he complaint alleges that, in preparing the talking points, Hahn 'drew on, but blatantly misrepresented, testimony provided by Tim Morrison, another impeachment witness.'" Opp. 45–46 (citing ¶ 151). But that misstates the complaint: the cited allegation says nothing whatever about whether *Hahn* knew this statement was false. It alleges that *the statement* "drew on" but misrepresented Morrison's testimony. Indeed, the complaint does not even allege that Hahn drafted this statement, and it reveals that Hahn notably did not participate in the alleged meeting the day before these talking points were disseminated. Hahn MTD 6.

Nor, in any event, does the complaint support Plaintiff's theory in his opposition that the talking points mischaracterized Morrison's testimony. The talking points neither alter quotations from Morrison about Plaintiff nor deceptively juxtapose Morrison's quotations to change the meaning that he originally conveyed. *Compare Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 521 (1991) (altering quotations and juxtaposing unrelated statements to create new meaning can indicate actual malice); *Moore v. Cecil*, 488 F. Supp. 3d 1144, 1172–73 (N.D. Ala. 2020); *US*

*Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 61–62 (D.D.C. 2021) (cited at Opp. 46). The talking points do not mention Morrison, much less falsely attribute statements regarding Plaintiff to him. *See* Compl. ¶¶ 146–49, 151–52. In fact, a review of Morrison's testimony shows that the talking-points statement was consistent with it:

```
 7        MR. MORRISON:  I had concerns about Lieutenant Colonel Vindman's
 8    judgment.
 9            BY MR. CASTOR:
10        Q    Judgment with respect to what?
11        A    Among the discussions I had with Dr. Hill in the transition
12    was our team, my team, its strengths and its weaknesses.  And Fiona
13    and others had raised concerns about Alex's judgment.
14        Q    Okay.  Did you ever have any concerns that he might leak
15    something?
16        A    No.
17        Q    Did anyone ever bring concerns to you that they believed
18    Colonel Vindman may have leaked something?
19        A    Yes.
20        Q    Would you tell us about that?
21        MS. VAN GELDER:  That is outside the scope.
```

```
12        MR. RATCLIFFE:  My question was, should -- if there were light
13    queries from the Ukrainian Government or Ukrainian officials to Colonel
14    Vindman about the withholding of security assistance or military aid
15    in mid-August, is that something he should have reported to you?
16        MR. MORRISON:  Yes.
17        MR. RATCLIFFE:  He did not?
18        MR. MORRISON:  I have no recollection of him doing so.
19        MR. RATCLIFFE:  And if he did not, would you consider that to be
20    a violation of the chain of command?
21        MR. MORRISON:  I would consider it to be an unfortunate habit he
22    picked up from his prior boss.
```

*Deposition of Tim Morrison*: *Hearing Before the Permanent Select H. Comm. on*

*Intelligence, joint with the H. Comm. on Oversight and Reform and the H. Comm. on Foreign Affairs*, 116th Cong. 82, 93 (Oct. 31, 2019).[1]

In short, even putting aside Plaintiff's failure to allege actual malice against Hahn, Morrison's testimony shows that the statement in the talking points was not false. Plaintiff says it was a "bald statement[] of false fact" to say that he "faced accusations of leaking," Opp. 35, but Morrison's testimony supports the statement: An undisclosed person expressed concern to Morrison that Plaintiff may have leaked something.

The D.C. Circuit's decision in *Barr* is remarkably on point (albeit with the shoe on the other political foot). There, a Republican congressman tried to use § 1985(1) to sue President Clinton, James Carville, and Larry Flynt for "gather[ing] and disseminat[ing] information about Barr" allegedly "to retaliate for his role in the Clinton impeachment proceeding." *Barr*, 370 F.3d at 1198. *Barr* provides a roadmap for how to handle Plaintiff's clams. Because the only relevant allegation against Hahn amounts to a defamation claim, Hahn is entitled to First Amendment protections. *Id.* at 1203. And because Plaintiff did not and cannot plead facts that would show actual malice against Hahn, her speech is protected by the First Amendment and is not prohibited by § 1985 and the claims against her should be dismissed. *See id.*

---

[1] "In ruling upon a motion to dismiss, a court may consider 'the facts alleged in the Complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice.'" *Clark-Williams v. Local 689, Amalgamated Transit Union*, 37 F. Supp. 3d 361, 365 (D.D.C. 2014) (Boasberg, J.) (quoting *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002)).

Plaintiff's amici try to deflect Hahn's First Amendment defense by arguing that the First Amendment does not apply to the speech prohibited by § 1985. Although as a literal matter some of what § 1985 prohibits consists of speech, amici submit that the prohibited speech amounts to "*coercion*" and thus is not entitled to First Amendment protection. Br. of Abrams, et al. 5. Hahn agrees: coercive conduct rising to the level of the "intimidation, force, and threat" prohibited by § 1985 is not protected, and § 1985, properly construed, is consistent with the First Amendment. The task that remains, however, is to construe those statutory terms with care to avoid sweeping in protected speech. *See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," courts "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Amici do not undertake that task: they acknowledge the actual malice standard, Br. of Abrams, et al. 10 n.12, but do not attempt to apply it. Their brief therefore does nothing to support Plaintiff's effort to impose liability on Hahn for disseminating talking points to the press.

Imposing liability for circulating White House talking points to the press would stretch § 1985 beyond its textual and constitutional bounds. If criticizing a public figure lieutenant colonel could give rise to liability in the guise of "intimidation," the

"profound national commitment to" free speech would be lost. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 258, 270 (1964).[2]

**D.   Section 1985 does not apply in the circumstances of this case.**

    **1.   Plaintiff was not a witness in a "court of the United States."**

Plaintiff's § 1985(2) claim fails because he has never been a witness in a "court of the United States." *See* Hahn MTD 22–23. Plaintiff argues that the Senate sitting in impeachment functions as a court and should be deemed a "court of the United States" under § 1985(2). But Plaintiff was never a witness in a Senate impeachment trial. Compl. ¶ 188; *cf. Keh v. Americus & Sumter Cnty. Hosp.*, 377 F. App'x 861, 865 (11th Cir. 2010) (per curiam) ("the defendants could not have conspired to prevent [plaintiff] from . . . testifying in court" where "she never attended court in connection with the" case, "no person ever prevented her from attending court," and "she was never prevented in any way from providing testimony").

Moreover, Plaintiff's argument that the Senate is a "court of the United States" is wrong. The term "court of the United States" is a defined term that "includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of International Trade and any court created by Act of Congress the judges of which are entitled to hold office during good

---

    [2] *See, e.g.*, Alexander S. Vindman @AVindman, Twitter.com (Aug. 13, 2022) ("You are a liar @TulsiGabbard. You lie for notoriety and self promotion. Worse yet, as an agent of Russian disinformation you promote Russian aggression and endanger America. You have picked a side. Your side is Russia and authoritarianism." (retweeted more than 8,000 times)); Konstantin Toropin, *Army Officer Tulsi Gabbard Faces Ire for Peddling Russian Disinformation About Ukraine Biolabs*, Military.com (Mar. 14, 2022) ("Gabbard is a lieutenant colonel in the Army Reserve").

behavior." 28 U.S.C. § 451. Plaintiff never identifies a single instance in which the term "court of the United States" has been used to refer to the Senate. *See* Opp. 26–29. Rather, this phrase has long referred exclusively to federal courts. *See, e.g.*, Judiciary Act of 1789, ch. 20, 1 Stat. 73 (entitled "[a]n Act to establish the Judicial Courts of the United States" and referring to the district and circuit courts created thereunder collectively as "courts of the United States"); *cf. McAllister v. United States*, 141 U.S. 174, 182 (1891) ("The judges of the supreme court of the territory are appointed by the President under the act of congress, but this does not make the courts they are authorized to hold courts of the United States."). Plaintiff makes much of the fact that the Senate sits as a "court of impeachment" and engages in court-like functions. Opp. 26–28. But courts have consistently rejected arguments to apply § 1985(2) to bodies that function like a court. Hahn MTD 22–23 (collecting cases).

Plaintiff's appeal to what he sees as the purposes of § 1985(2) is a giveaway that the statutory text is against him. Opp. 28–29. And even if policy concerns could override text, there is no need to fear that "constitutional proceedings to adjudicate a president's fitness for office could be thwarted." Opp. 29. Laws exist to protect the integrity of congressional proceedings. *See, e.g.*, 18 U.S.C. § 1512 (prohibiting tampering with a witness in an "official proceeding"); *United States v. Puma*, 2022 WL 823079, at *6 (D.D.C. Mar. 19, 2022) (an "official proceeding" includes proceedings before Congress). Section 1985(2) is not one of them.

## 2. An alleged conspiracy with the President involving a military officer's duties is not cognizable under § 1985(1).

Hahn's motion explained the constitutional and statutory problems that would arise if a military officer could turn a dispute with his superiors over his job duties into a § 1985(1) claim. MTD 23–26. In response, Plaintiff concedes that his suit does not rest on holding office. *See* Opp. 55, 69 (explaining that he is "*not* seeking redress for any employment decision" or "challenging his removal from the NSC or the attempted denial of a promotion"). Plaintiff's theory is thus that Hahn supposedly agreed with the President on a plan to interfere with a military subordinate's performance of his job duties—a theory that makes no sense given that the President decides what military officers' duties should be and how they should be performed.

Plaintiff protests that "this case does not involve any dispute over the contours of [his] duties," Opp. 55, but that is transparently incorrect. By the very terms of § 1985(1), Plaintiff's claim must be that the alleged conspirators, including former President Trump, tried to prevent him from "holding [his] office" or "discharging" his "duties" or tried to injure him because of "his lawful discharge of the duties of his office." And the dispute between Plaintiff and the alleged conspirators was over whether Plaintiff was properly performing his job duties. *See, e.g.*, Compl. ¶¶ 95, 103, 217, 248–49, 251. The Executive Branch could not function—to say nothing of the military—if a subordinate could take every dispute over how he should do his job and dress it up as a § 1985(1) claim. *Mollnow v. Carlton*, 716 F.2d 627, 632 (9th Cir. 1983); *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1978–79 (2021). Section 1985(1) "was not intended . . . to handle causes of action for misconduct by supervisors within a

government agency." *Pope v. Bond*, 641 F. Supp. 489, 497 (D.D.C. 1986). Plaintiff's

claim fails as a matter of law for this additional reason.

## II.   Qualified Immunity Applies in § 1985 Suits, and Hahn Is Plainly Entitled to It

Qualified immunity protects government employees like Hahn from suit unless

"existing precedent" "placed the statutory or constitutional question beyond debate."

*Gill v. United States*, 415 F. Supp. 3d 127, 140 (D.D.C. 2019) (Boasberg, J.) (quoting

*Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011)). Plaintiff's claims against Hahn can

survive a motion to dismiss only if it was established at the time that § 1985 would

"clearly prohibit [Hahn's] conduct in the particular circumstances before [her]."

*District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). And it is Plaintiff's burden

"to show that the official is not entitled to qualified immunity." *Kyle v. Bedlion*, 177

F. Supp. 3d 380, 388 (D.D.C. 2016) (K. Jackson, J.) (quoting *Winder v. Erste*, 905 F.

Supp. 2d 19, 28 (D.D.C. 2012)).

For all the reasons set forth above, Plaintiff's claims against Hahn fail on the

merits, at the first step of the qualified immunity inquiry. But at the very least,

Plaintiff's claims fail at the second step. Neither Plaintiff nor his amici managed to

identify even a single case in which anyone was found liable under § 1985 for conduct

remotely similar to what Plaintiff alleged against Hahn. In contrast, Hahn identified

multiple cases in which similar conduct was found *not* to have violated § 1985. *See*

Hahn MTD 28–32. Plaintiff's claims are so novel, on so many different elements and

issues, that under ordinary qualified immunity analysis it would be evident that the

law was not clearly established enough to overcome immunity.

Plaintiff and his amici thus contend that the Court should not apply ordinary qualified immunity analysis. Amici go so far as to argue that qualified immunity should not apply to claims alleging nonconstitutional statutory violations. Plaintiff couches his argument in slightly different terms, contending that any violation of § 1985 necessarily violates clearly established law. Opp. 60–61. But that amounts to the same thing: stated either way, the result is that qualified immunity has no applicability to § 1985 claims. Both arguments are foreclosed by binding precedent.

A.   **Qualified Immunity Applies to Nonconstitutional Statutory Claims, Including § 1985 Claims.**

Amici make a variety of arguments for why, in their view, qualified immunity should not apply to claims brought under statutes that do not track the Constitution. But as amici eventually acknowledge—albeit in a backhanded way—the Supreme Court has held that qualified immunity applies to nonconstitutional statutory claims. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982); Fed. Ct. Profs. Br. 13 ("*Harlow*'s inclusion of statutory rights among those for which qualified immunity's 'clearly established law' limitation extends was made in passing and with no additional context."). In *Harlow*, the plaintiff sued two presidential aides, Bryce Harlow and Alexander Butterfield, along with Richard Nixon, contending that they conspired to violate his constitutional and statutory rights. 457 U.S. at 802. Specifically, the plaintiff alleged that the defendants were civilly liable for "a violation of 5 U.S.C. § 7211 and 18 U.S.C. § 1505" and the First Amendment. *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982); *see also Windsor v. The Tennessean*, 719 F.2d 155, 163 (6th Cir. 1983) (describing same). The Supreme Court held that qualified immunity applied to those

claims: "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established *statutory or constitutional* rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818 (emphasis added). The Supreme Court made no distinction between the alleged statutory violations and constitutional violations. It held that qualified immunity applied to both. And that is that, regardless of whether amici believe the Supreme Court provided enough explanation.

Plaintiff and amici try to distinguish between nonconstitutional statutory violations with a criminal analogue and those without a criminal analogue; on their theory, qualified immunity should not apply to civil claims brought under statutes with criminal analogues. *See* Opp. 64; Fed. Ct. Profs. Br. 11. But that is no distinction at all: in *Harlow*, one of the nonconstitutional statutory claims was based on a criminal obstruction-of-proceedings provision, 18 U.S.C. § 1505. Still, the qualified immunity analysis and defense applied. *Harlow*, 457 U.S. at 818–20. Likewise, § 1985(3) has a criminal analogue (18 U.S.C. § 241), but the Supreme Court held in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), that the defendants were entitled to qualified immunity from § 1985(3) claims even "[a]ssuming the[] allegations [in support of those claims] to be true and well pleaded." *Id.* at 1866.

The D.C. Circuit has considered and rejected Plaintiff and amici's argument in the specific context of § 1985: "[W]e reject at the outset any notion that section 1985(1) precludes any official immunity defense." *Lawrence v. Acree*, 665 F.2d 1319, 1326 (D.C. Cir. 1981) (per curiam). In a § 1985(1) case, "as in a section 1983 case or a

federal constitutional tort case, [courts] should start with the assumption that defendants are entitled to *at least* qualified immunity for acts performed within the scope of their duties and then determine whether a broader immunity is appropriate by balancing the unavoidable harm to the person left unable to sue against the harm to effective government that the treat to suit would pose." *Id*. at 1326–27 (emphasis added). In line with Circuit precedent, this Court has explained that qualified immunity's "two-step inquiry . . . applies to violations of statutory rights." *Ford v. Donovan*, 891 F. Supp. 2d 60, 64 (D.D.C. 2012) (Boasberg, J.).

Other courts are in accord. In *Windsor*, the Sixth Circuit applied qualified immunity to bar a claim brought under § 1985(1), holding "that a reasonable person would not have known in 1980 that an agreement to defame a federal official in order to effect that person's discharge from federal employment violated section 1985(1)." 719 F.2d at 165. Amici cite one case in which the court held that the plaintiffs had overcome qualified immunity on a § 1985 claim, Fed. Ct. Profs. Br. 17–18, but that case applied the ordinary qualified immunity analysis, asking whether the defendant's conduct was "objectively unreasonable in light of clearly established law" after reviewing both the statutory text and relevant caselaw. *Kinney v. Weaver*, 367 F.3d 337, 355 (5th Cir. 2004) (en banc).

Amici's policy views are irrelevant given the binding precedent discussed above, but they also get things backward. As the D.C. Circuit recognized, violations of constitutional rights generally trigger *greater* judicial solicitude than violations of other rights. *See Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.*,

566 F.2d 289, 293–94 (D.C. Cir. 1977) (en banc). And "damage to reputation," like what Plaintiff alleges here, "is not as basic to a free society as the Fourth Amendment right to be free from arbitrary search and seizure of person or property, a right so precious that a remedy in damages has been inferred from the Constitution itself." *Id.* at 294. It would be odd for qualified immunity to provide a stronger shield for violations of foundational constitutional rights than violations of statutory rights.

**B.** **Qualified Immunity Is a Defense to a Well-Pleaded § 1985 Claim.**

Plaintiff's argument that "plausibly alleg[ing]" a violation of § 1985(1) or (2) necessarily means "alleg[ing] a violation of clearly established law," Opp. 61, is tantamount to amici's more overt argument that qualified immunity should not apply to § 1985 claims. After all, if every violation of § 1985 were a clearly established violation, there would be no scope for qualified immunity to operate and it would be meaningless—misleading, really—to say that it applied. As a result, the same binding precedent that forecloses amici's argument equally forecloses Plaintiff's.

As explained above, the Supreme Court has applied the ordinary two-step qualified immunity analysis to a claim under § 1985(3) that the Court explicitly "[a]ssum[ed]" to be "well pleaded." *Ziglar*, 137 S. Ct. at 1866. In the § 1985 context no less than in any other, "[t]he doctrine of qualified immunity gives officials 'breathing room to make reasonable *but mistaken* judgments about open legal questions." *Id.* (emphasis added) (quoting *al-Kidd*, 563 U.S. at 743). And other courts have applied the ordinary qualified analysis to § 1985(1) and (2) claims. *See Windsor*, 719 F.2d at 163 (dismissing an adequately pleaded § 1985(1) claim against a public official at step two of the qualified immunity analysis and against private defendants

on collateral estoppel grounds based on court decision that the underlying newspaper articles were not defamatory); *Tripp v. Dep't of Def.*, 173 F. Supp. 2d 58, 62 (D.D.C. 2001) (dismissing an adequately pleaded § 1985(2) claim under qualified immunity due to "the unsettled nature of § 1985(2) doctrine").

Plaintiff might be understood to argue that Hahn's conduct was so obviously unlawful that this Court should find the qualified immunity standard met. As the Supreme Court has noted, qualified immunity does not demand that "the very action in question has previously been held unlawful," though it does demand "that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). But the cases on which Plaintiff relies only illustrate why the alleged unlawfulness of Hahn's conduct was far from apparent.

In *Hope*, the Supreme Court evaluated qualified immunity in the context of the painful handcuffing of a shirtless prisoner to a hitching post for seven hours in the summer heat while guards taunted him, gave him water only once or twice, and provided no bathroom breaks. *Id.* at 738. In *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curiam), the Court analyzed qualified immunity in the context of a prisoner being held for six days in jail cells covered in feces in which the prisoner could not eat or drink for days and in which he was forced to relieve himself in a cold cell and left to sleep naked in sewage. *Id.* at 53. And in *United States v. Lanier*, the criminal fair-warning case Plaintiff touts (Opp. 62–63), the Court held that the lower court had applied the wrong standard to find no fair warning where the defendant was a former

judge who sexually assaulted several women, including one "whose daughter's custody remained subject to his jurisdiction." 520 U.S. 259, 261 (1997).

In these "extreme circumstances," the unlawfulness of the conduct was obvious, even without any direct precedent on point. *Taylor*, 141 S. Ct. at 53; *see also Lanier*, 520 U.S. at 271 ("There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages." (quotation marks omitted)). Hahn, in what could hardly be starker contrast, sent White House talking points to the press.

Precedent aside, Plaintiff's suggestion that § 1985(1) and (2) are so clear and specific as to leave no room for reasonable mistakes about how the statutes might apply in particular circumstances, Opp. 60–65, blinks reality. The Court need look no farther than this case to find a myriad of interpretive issues. When does political speech rise to the level of "intimidation"? Is the Senate a "court of the United States"? Can a military officer invoke § 1985 to claim that his Commander-in-Chief interfered with his duties? Although the text of § 1985 may resolve some issues, *see* Fed. Ct. Profs. Br. 17–18 (describing *Kinney*, where the issue was whether an expert witness was a witness), it does not resolve the issues here—or at least it does not resolve them in Plaintiff's favor. There are easy cases under constitutional provisions too, *Hope*, 536 U.S. at 740–41, and yet the Supreme Court has emphasized over and over again that qualified immunity's clearly-established requirement is needed to ensure that

government officials have fair warning of what conduct will subject them to liability. *See, e.g., Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam).

In fact, Plaintiff hardly discusses the particular circumstances surrounding Hahn's conduct at all. Plaintiff never explains how Hahn was supposed to know that circulating talking points to the press was (allegedly) unlawful. *Cf. Barr v. Matteo*, 360 U.S. 564, 575–76 (1959) (officer was immune from suit for libel based on unfavorable press release). If anything, Plaintiff acknowledges that his allegation that Hahn circulated talking points at the direction of her superior "weighs in favor of applying qualified immunity," Opp. 71, though Plaintiff criticizes this aspect of Supreme Court and D.C. Circuit precedent, Opp. 70.

At base, Plaintiff contends "[t]he complaint alleges that Hahn formed an *agreement* for the *unlawful purpose* of intimidating and retaliating against a federal official." Opp. 69. But reciting the elements of a statute is not enough to state a claim, and it is certainly not enough to show that Hahn's specific conduct violated clearly established law. *See Harlow*, 547 U.S. at 817–18 ("bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery"). Plaintiff's claims against Hahn should be dismissed. And because the defects raised in Hahn's motion cannot be cured, his claims should be dismissed with prejudice. *See* Hahn MTD 33–34.

## CONCLUSION

The Court should dismiss Plaintiff's claims against Hahn with prejudice.

Respectfully submitted,

Dated: August 29, 2022
/s/ Jeffrey S. Bucholtz
Jeffrey S. Bucholtz (D.C. Bar No. 452385)
Amy R. Upshaw (D.C. Bar No. 888156455)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
jbucholtz@kslaw.com
aupshaw@kslaw.com

Nicole Bronnimann (TX Bar No. 24109661)
KING & SPALDING LLP
1100 Louisiana Street
Houston, TX 77002
Telephone: (713) 751-3200
Facsimile:  (713) 751-3290
nbronnimann@kslaw.com

*Counsel for Defendant Julia Hahn*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

/s/ Jeffrey S. Bucholtz_____
Jeffrey S. Bucholtz (D.C. Bar No. 452385)