# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**LT. COL. ALEXANDER VINDMAN**,

                        *Plaintiff*,

v.

**DONALD TRUMP, JR.,
RUDOLPH GIULIANI, JULIA
HAHN, and DANIEL SCAVINO,
JR.**,

                        *Defendants*.

<u>Case No.</u>: 1:22-cv-00257-JEB

## <u>DEFENDANTS DONALD TRUMP, JR. AND DANIEL SCAVINO, JR.'S</u>
## <u>REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT</u>

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................ 1

II.  VINDMAN FAILED TO ALLEGE A CONSPIRACY ....................................................... 2

A.   The Existence of a Conspiracy Is Implausible. ..................................................... 2

B.   Trump Jr. and Scavino's Participation in the Alleged Conspiracy Is Implausible. ............ 6

C.   Vindman Failed to Plead Facts Showing an Illegal Agreement in Violation of Section 1985. ............................................................................................................ 8

D.   Vindman Failed to Allege an Unlawful Overt Act that Caused Him Injury. .................... 10

1.   Vindman failed to allege a single instance of defamatory speech. ................................ 11

2.   Vindman did not allege that Defendants entertained doubts about their claims. ........... 14

3.   Trump Jr. is not liable for others' defamatory statements. ............................................. 15

4.   Vindman's allegations regarding the handling of classified information are not actionable. ............................................................................................................ 16

5.   The remaining overt acts caused Vindman no injury. ................................................... 18

III. VINDMAN WAS NOT A WITNESS IN A "COURT OF THE UNITED STATES" ..... 20

IV.  SCAVINO IS ENTITLED TO QUALIFIED IMMUNITY ............................................ 22

V.   THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ............................ 25

VI.  CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Rumsfeld*,

    649 F.3d 762 (D.C. Cir. 2011) ................................................................. 22

*Acosta Orellana v. CropLife Int'l*,

    711 F. Supp. 2d 81 (D.D.C. 2010) ............................................................. 7

*Ashcroft v. al-Kidd*,

    563 U.S. 731 (2011) ................................................................................. 24

*Atherton v. D.C. Off. of Mayor*,

    706 F.3d 512 (D.C. Cir. 2013) ................................................................. 24

*Barr v. Clinton*,

    370 F.3d 1196 (D.C. Cir. 2004) ........................................................... 2, 19

*Bell Atl. Corp. v. Twombly*,

    550 U.S. 544 (2007) .............................................................................. 4, 8

*Black Lives Matter D.C. v. Trump*,

    544 F. Supp. 3d 15 (D.D.C. 2021) .............................................................. 8

*Boley v. Atl. Monthly Grp.*,

    950 F. Supp. 2d 249 (D.D.C. 2013) .................................................... 12, 15

*Bush v. Butler*,

    521 F. Supp. 2d 63 (D.D.C. 2007) .................................................... 2, 3, 4

*Competitive Enter. Inst. v. Mann*,

    150 A.3d 1213 (D.C. 2016) ...................................................................... 11

*D.C. v. Wesby*,

    138 S. Ct. 577, (2018) ............................................................................................. 24

*Dennis v. Sparks*,

    449 U.S. 24 (1980) ................................................................................................. 17

*Deripaska v. Associated Press*,

    282 F. Supp. 3d 133 (D.D.C. 2017) ....................................................................... 14

*Deubert v. Gulf F.S.B.*,

    820 F.2d 754 (5th Cir. 1987) .................................................................................. 20

*Doe v. Salisbury Univ.*,

    123 F. Supp. 3d 748 (D. Md. 2015) ....................................................................... 18

*Earnest v. Lowentritt*,

    690 F.2d 1198 (5th Cir. 1982) .................................................................................. 9

*Farah v. Esquire Mag.*,

    736 F.3d 528 (D.C. Cir. 2013) ............................................................................... 13

*Ford v. Donovan*,

    891 F. Supp. 2d 60 (D.D.C. 2012) ......................................................................... 23

*Gertz v. Robert Welch, Inc.*,

    418 U.S.323 (1974) ................................................................................................ 11

*Graves v. United States*,

    961 F. Supp. 314 (D.D.C. 1997) ............................................................................ 20

*Guilford Trans. Indus., Inc. v. Wilner*,

    760 A.2d 580 (D.C. 2000) ...................................................................................... 11

*Halberstam v. Welch*,

    705 F.2d 472 (D.C. Cir. 1983) ........................................................................ 3, 18

**\*Hall v. Clinton*,

    285 F.3d 74 (D.C. Cir. 2002) ................................................................. 2, 5, 18, 19

*Harlow v. Fitzgerald*,

    457 U.S. 800 (1982) ........................................................................................ 17, 23

*Havens v. Mobex Network Servs., LLC*,

    820 F.3d 80 (3d Cir. 2016) ...................................................................................... 3

*Hobson v. Wilson*,

    737 F.2d 1 (D.C. Cir. 1984) .................................................................................... 6

*In re Domestic Airline Travel Antitrust Litig.*,

    221 F. Supp. 3d 46 (D.D.C. 2016) ..................................................................... 3, 4

*In re Interest Rate Swaps Antitrust Litig.*,

    261 F. Supp. 3d 430 (S.D.N.Y. 2017) ................................................................... 4

*Klayman v. Zuckerberg*,

    753 F.3d 1354 (D.C. Cir. 2014) ........................................................................... 15

*Kurd v. Republic of Turkey*,

    374 F. Supp. 3d 37 (D.D.C. 2019) ................................................................. 2, 3, 8

*Lagayan v. Odeh*,

    199 F. Supp. 3d 21 (D.D.C. 2016) ......................................................................... 7

*McAndrew v. Lockheed Martin Corp.*,

    206 F.3d 1031 (11th Cir. 2000) ............................................................................ 20

*McCord v. Bailey*,

    636 F.2d 606 (D.C. Cir. 1980) ............................................... 21

*McCreary v. Heath*,

    No. Civ. A 04-0623, 2005 WL 3276257 (D.D.C. Sept. 26, 2005) ........................................... 3

*Myers v. Plan Takoma, Inc.*,

    472 A.2d 44 (D.C. 1983) ........................................................ 11

*Nixon v. United States*,

    506 U.S. 224 (1993, Stevens, J., concurring) ........................................... 21

*Nixon v. United States*,

    938 F.2d 239 (D.C. Cir. 1991), *aff'd*, 506 U.S. 224 (1993) ..................................... 21

*Robertson v. Sea Pines Real Est. Cos.*,

    679 F.3d 278 (4th Cir. 2012) ..................................................... 3

*SD3, LLC v. Black & Decker (U.S.) Inc.*,

    801 F.3d 412 (4th Cir. 2015) ..................................................... 5

*Shive-Ayala v. Pacelle*,

    Civ. No. 21-704 (RJL), 2022 WL 782412 (D.D.C. Mar. 15, 2022) .......................................... 14

*Spagnola v. Mathis*,

    809 F.2d 16 (D.C. Cir. 1986) ..................................................... 25

*Thompson v. Trump*,

    No. 21-CV-00400 (APM), 2022 WL 503384 (D.D.C. Feb. 18, 2022) ...................................... 19

*U.S. Dominion Inc. v. Powell*,

    554 F. Supp. 3d 42 (D.D.C. 2021) ........................................... 14

*U.S. Dominion, Inc. v. MyPillow, Inc.*,

    Civ. No. 1:21-cv-0445 (CJN), 2022 WL 1597420 (D.D.C. May 19, 2022) .............................. 7

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,

    No. CV 15-750 (RC), 2020 WL 686009 (D.D.C. Feb. 11, 2020)............................................. 17

*Windsor v. The Tennesseean*,

    719 F.2d 155 (6th Cir. 1983) ................................................................................................. 23

**Statutes**

42 U.S.C. § 1985................................................................................................................... passim

47 U.S.C. § 230(c)(1)................................................................................................................. 15

**Other Authorities**

50 Fordham L. Rev. 1210, 1224 (1982)..................................................................................... 22

*Black's Law Dictionary* 1496 (7th ed. 1999)............................................................................ 18

Janet A. Barbiere, *Conspiracies to Obstruct Justice in the Federal Courts: Defining the Scope of*

    *Section 1985(2)* ................................................................................................................... 22

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................................ passim

## I.      INTRODUCTION

In their Motion to Dismiss, Defendants Donald Trump, Jr. ("Trump Jr.") and Daniel Scavino, Jr. ("Scavino") explained that Plaintiff Lt. Col. Alexander Vindman's ("Vindman") Complaint failed to allege who the supposed conspirators are, and the acts for which Vindman believes they are liable. In his Opposition to the Motion to Dismiss, Vindman belatedly tries to remedy these defects. But Vindman's efforts fail, and his Opposition further exposes three fatal flaws in his Complaint that warrant its dismissal with prejudice.

First, Vindman provides the Court with no facts from which the Court could infer that either Trump Jr. or Scavino entered into a conspiracy of any kind—either with one another or with President Donald J. Trump ("President Trump"), Defendant Rudolph Giuliani ("Giuliani"), Defendant Julia Hahn ("Hahn"), or Laura Ingraham ("Ingraham") (the other alleged conspirators). Second, even if the Court were to credit Vindman's weak and tenuous allegations of "parallel conduct" (wholly unremarkable in the context of a President's advisors and allies), there are no facts from which the Court could infer that either Trump Jr. or Scavino agreed with the other supposed conspirators to intimidate or retaliate against Vindman. Third, Vindman acknowledges that he has no remedy under 42 U.S.C. § 1985 for matters relating to his anticipated military promotion or removal from the National Security Council ("NSC"), leaving Defendants' allegedly defamatory statements about him as the sole injury for which Vindman seeks recovery. Under controlling D.C. Circuit precedent, Vindman can only sue on these statements if they constitute defamation, which they do not.

Vindman further fails to provide this Court with any basis to rule, for the first time in American history, that § 1985(2) extends to impeachment proceedings in Congress. Finally, the novelty of Vindman's claims entitles Scavino to qualified immunity, as a matter of law.

## II.    VINDMAN FAILED TO ALLEGE A CONSPIRACY

Vindman flails as he tries to cobble together a legally cognizable conspiracy from a tenuous web of personal relationships and shared political goals. To survive this motion, Vindman must allege facts showing a conspiracy existed; that Trump Jr. and Scavino joined that conspiracy; and that the conspiracy had the illegal purpose of intimidating or retaliating against Vindman. Vindman not only fails to plead facts showing that any of these three things are plausible, but also fails to allege a single concrete injury for which § 1985 provides a remedy that can be traced to the supposed conspiracy.

### A.  The Existence of a Conspiracy Is Implausible.

Vindman cannot satisfy the governing standard for alleging a § 1985 conspiracy, and instead relies on a hodgepodge of out-of-circuit cases and antitrust cases, none of which apply here. In the § 1985 context, "plaintiffs must allege the elements of civil conspiracy, including: 'an agreement to take part in an unlawful action or lawful action in an unlawful manner.'" *Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004) (quoting *Hall v. Clinton*, 285 F.3d 74, 83 (D.C. Cir. 2002)).

To meet the plausibility threshold, "the plaintiff should allege the existence of [] events, conversations, or documents indicating that there was an agreement to violate his rights." *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007). Vindman tries to evade this requirement through his argument that *Bush* "simply explains that conversations are one way of demonstrating a conspiracy." Plaintiff's Opposition to Defendants' Motions to Dismiss (ECF No. 30) (hereinafter "Opp.") at 16. This is wishful thinking—the quoted language from *Bush* speaks for itself. Further, *Bush* is not the only case that enforces this requirement. In *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37 (D.D.C. 2019), the court explained that the failure to plead "'the existence of

2

any events, conversations, or documents indicating . . . an agreement or meeting of the minds'"

rendered the plaintiff's claim "speculative," rather than "plausible." *Kurd*, 374 F. Supp. 3d at 62

(quoting *McCreary v. Heath*, No. Civ. A 04-0623, 2005 WL 3276257, at *5 (D.D.C. Sept. 26,

2005)). Vindman posits that *Kurd* is inapplicable because in *Kurd*, "the plaintiff failed to allege

that the defendants even knew each other or had the opportunity to communicate." Opp. at 17–

18. But the *Kurd* court did not say that the claim would be plausible if the defendants knew each

other or had an opportunity to communicate. It articulated a higher standard, the *Bush* standard,

which Vindman cannot meet. Vindman's inability to allege a conversation between the alleged

conspirators or a document reflecting that a conspiracy existed betrays the fantastical nature of

the supposed conspiracy.

Unable to meet the controlling standard for pleading a conspiracy, Vindman asks the

Court to accept a lesser showing, namely "'parallel conduct' by conspirators coupled with 'plus

factors.'" Opp. at 8 (quoting *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46,

58–60 (D.D.C. 2016)). As with Vindman's citation to *In re Domestic Airline Travel Antitrust*

*Litigation*, most of the out-of-circuit cases Vindman cites in support of his argument that he

should be excused from alleging direct evidence of a conspiracy are plucked from the antitrust

context. *See* Opp. at 8 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323–24 & n.23

(3d Cir. 2010); *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 91 (3d Cir. 2016));

*Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 289–90 (4th Cir. 2012)). These cases have

no bearing on civil conspiracy claims. Vindman cites the remaining case, *Halberstam v. Welch*,

705 F.2d 472 (D.C. Cir. 1983), for the proposition that a "tacit" agreement is enough, but even

the *Halberstam* court recognized that a civil conspiracy claim based on a "tacit, as opposed to

explicit" agreement still requires "[p]roof." *Halberstam*, 705 F.2d at 477. Vindman has no

"proof," and instead assumes that a handful of alleged political allies who criticized him must have necessarily formed a conspiracy before engaging in such criticism—it could not possibly have been spontaneous. This inferential leap cannot bear the weight of *Iqbal/Twombly*.

Vindman's heavy reliance on antitrust law betrays the weakness of his Complaint. The *Domestic Airline Travel Antitrust Litigation* court's discussion makes clear that its analysis is specific to the antitrust context, explaining that "[d]irect evidence is extremely rare in antitrust cases," and that "[c]ircumstantial evidence in the antitrust context is evidence that tends to exclude the possibility of independent action." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 58 (internal citations and quotation marks omitted, some brackets in original). The basis of antitrust law is that rival firms should engage in independent action, rather than collusion. *See id.* In the context of a presidential administration, eliminating the possibility of "independent action" does not show the existence of a conspiracy—the President engaging in "parallel conduct" with his advisors is in no way like competing airlines making similar price moves. Even in the antitrust context, "[a]n inference of conspiracy will not arise when the conspirators' parallel conduct made perfect business sense" or where "there are obvious alternative explanations for the facts alleged[.]" *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 462 (S.D.N.Y. 2017) (internal quotation marks and citations omitted). The Court should therefore follow *Bush*, and require evidence of "events, conversations, or documents indicating that there was an agreement to violate [Vindman's] rights," *Bush*, 521 F. Supp. 2d at 68, rather than adopt a relaxed standard from a disparate area of law that has never been used in this context.

Lacking direct evidence of a conspiracy, Vindman instead relies on various forms of "indirect evidence," which, at most, show that the various Defendants sometimes worked

together or adopted similar political positions. Vindman first cites the "Defendants' close relationships and history of communication and coordination." Opp. at 10 (italics omitted). Vindman argues that a "prior history of coordination or communication that 'facilitates' the formation of a conspiracy" is indicative of a conspiracy. *Id.* (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015)). Once again, Vindman engages in sleight of hand by citing antitrust cases. Perhaps in the table-saw market (the subject of *SD3, LLC*), a history of coordination among rival firms shows a possible conspiracy. This case, however, involves the former President, his son, and his advisors. If close relationships and a history of communication and coordination were enough to show a conspiracy in this context, every presidential administration and its outside allies would be a presumptive conspiracy.

Vindman next relies on "Defendants' communications on the subject of the conspiracy." Opp. at 12 (italics omitted). Vindman offers communications between Giuliani and President Trump about the purported "effort to coerce Ukraine into investigating the Bidens" and Trump Jr.'s "involve[ment] in the fallout of the same pressure campaign" and "likely coordinat[ion] with both Giuliani and President Trump regarding that topic." *Id.* But the subject of the alleged conspiracy at the center of Vindman's Complaint is Vindman—not Ukraine or the Bidens. And on this, Vindman is silent.

Likewise, Hahn's distribution of talking points at Scavino's alleged direction and Scavino's management of President Trump's Twitter account may show that White House communications officials executed a communications strategy amid ongoing impeachment proceedings, but this in no way reveals "an agreement to take part in an unlawful action or lawful action in an unlawful manner." *Hall v. Clinton*, 285 F.3d 74, 83 (D.C. Cir. 2002). If it did, every organization with a communications department would be a presumptive conspiracy. As the D.C.

Circuit explained in *Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984), "[w]hen different people shown to be in contact with one another act at different times in a similar and *facially illegitimate* manner, an inference of prior agreement might be quite plausible." *Hobson*, 737 F.2d at 54 (citing *Halberstam*, 705 F.2d at 481)) (emphasis added). There is no facial illegitimacy here, as there is nothing inherently illegitimate about criticizing Vindman, which is a constitutionally protected activity.

Finally, Vindman relies on "Defendants' similarly timed and worded statements and conduct and admitted common motivation." Opp. at 13 (italics omitted). Once again, Vindman obfuscates reality by attempting to imply the existence of a conspiracy from the unremarkable fact that President Trump and his allies made similar comments about Vindman and his role in the impeachment proceedings. Vindman's argument that the alleged conspirators were "pursuing the same goal," *id.* (citing *Hobson*, 737 F.2d at 54–55), is unavailing in this context—there is nothing nefarious about political allies pursuing the same goal; this is commonplace.

In sum, Vindman alleges that the former President and several of his allies engaged in "parallel conduct," but failed to allege the existence of the type of evidence from which courts may infer the existence of a conspiracy in § 1985 cases.

### B.   Trump Jr. and Scavino's Participation in the Alleged Conspiracy Is Implausible.

Vindman's attempt to tie Trump Jr. and Scavino to the alleged conspiracy is even more tenuous than Vindman's attempt to allege the conspiracy's existence. Vindman cannot point to *any* communications between Trump Jr., Scavino, and the other alleged conspirators, and instead argues that "it is enough that Defendants each agreed with at least one other conspirator to participate in the common scheme with a shared purpose." Opp. at 17 (citing *Hobson*, 737 F.2d at 51). Vindman cannot even accomplish this much. There are no allegations in the Complaint

showing any agreement on the part of either Trump Jr. or Scavino to engage in any common scheme about Vindman—much less a common scheme involving illegal acts or legal acts done for an illegal purpose. A plaintiff's failure to "provide any indication of . . . how [specific defendants] . . . were parties to an agreement" is "[f]atal" to a conspiracy claim. *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010).

Vindman alleges that Trump Jr. made "distasteful attacks on his father's perceived enemies" and coordinated with President Trump on matters relating to his "presidency, businesses, and political and personal advancement." Compl. ¶¶ 73–74. Scavino, in turn, is alleged to have managed the White House Twitter account, to have been a "direct conduit to President Trump's base of supporters and 'influencers,'" as well as one of President Trump's "most trusted (and longest serving) advisors." *Id.* ¶¶ 69–71. Presupposing the existence of a conspiracy, Vindman pads these allegations with a general assertion that "President Trump and his allies, including Defendants, agreed on coordinated multiple campaigns to attack President Trump's perceived political enemies" and that the "unlawful conspiracy here followed the same playbook." *Id.* ¶¶ 95, 99. These allegations show that President Trump had advisors and allies. They do not show that Trump Jr. or Scavino agreed with each other or anyone else about Vindman, much less an agreement involving illicit means or ends. *See U.S. Dominion, Inc. v. MyPillow, Inc.*, Civ. No. 1:21-cv-0445 (CJN), 2022 WL 1597420, at *9 (D.D.C. May 19, 2022) (explaining that allegations of a "shared goal" and "conclusory allegations" of "shared histories and past business practices" cannot support a civil conspiracy claim).

Vindman erroneously relies on *Lagayan v. Odeh*, 199 F. Supp. 3d 21 (D.D.C. 2016) because that court took the position that pleading the existence of "an event, conversation, or document" was not necessarily "mandatory." Opp. at 16 (citing *Lagayan*, 199 F. Supp. 3d at 30–

31). Vindman's allegations about Trump Jr. all relate to tweets or statements he made to the media. *See* Compl. ¶¶ 127–28, 132–39, 176, 196–97, 203–04. Scavino, meanwhile, is accused of directing Hahn to issue talking points to President Trump's surrogates and allies and writing a single tweet critical of Vindman. *See id.* ¶¶ 146, 171. The *Lagayan* court excused the plaintiff from pleading an "event, conversation, or document" because the court was able to infer a conspiracy from the fact that "the defendants—all of whom were related to each other—together coordinated the plaintiff's international travel to the defendants' home in the United States." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 39 (D.D.C. 2021) (citing *Lagayan*, 199 F. Supp. 3d at 31). There are no comparable facts here that would enable the Court to infer that Trump Jr. and Scavino's conduct arose out of an agreement, rather than "mere parallel conduct," as each of Trump Jr. and Scavino's alleged acts could easily have occurred absent a conspiracy. *See id*; *see also Kurd*, 374 F. Supp. 3d 52 (explaining that "allegations of parallel conduct" must be "'placed in a context that raises a suggestion of a preceding agreement'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).

### C. Vindman Failed to Plead Facts Showing an Illegal Agreement in Violation of Section 1985.

Even if there were an agreement, Vindman failed to show that Trump Jr. or Scavino (or anyone else) formed the agreement with the purpose of intimidating or retaliating against Vindman. The mere possibility of an illegal agreement is not enough as the existence of "obvious alternative explanations[s]" makes a purported conspiracy implausible. *See Black Lives Matter D.C.*, 544 F. Supp. 3d at 40 (citation and internal quotation marks omitted, brackets in original).

Vindman falsely suggests that Trump Jr. and Scavino do not contest that there was "parallel conduct targeting [Vindman] for his participation in the impeachment proceedings." Opp. at 9. They directly contest that point. Mot. at 15 ("Even if the Defendants and non-

8

defendant coconspirators agreed to defame and retaliate against Vindman (speculative allegations at best), unless the coconspirators agreed to do so with the shared goal of stopping Vindman from doing his job and testifying, there is no § 1985 violation.").

Vindman's argument on this point amounts to a sleight of hand. He concedes that he must allege conduct that "target[s] him for his participation in the impeachment proceedings." Opp. at 9. But then when it comes time for Vindman to show his cards, he admits the alleged conspiracy's goals were to protect President Trump. Opp. at 9 (recognizing that the alleged conspirators "frequently worked together to protect and advance President Trump's personal and political interests," and stating that it "strains credulity that they would *not* have worked together to defend Trump during a direct threat to his presidency."). Here, the Court need not look any further than Vindman's own words to find for Defendants. Vindman has only provided allegations showing that the goal of the conspiracy was to "defend Trump during a direct threat to his presidency"—clearly lawful conduct—rather than to intimidate and retaliate against Vindman. *Id.* And Courts will not infer an illegal purpose simply because subsequent acts may possibly be consistent with that purpose. *See Earnest v. Lowentritt*, 690 F.2d 1198, 1203 (5th Cir. 1982) ("Assuming the [defendants] acted improperly, there is nothing in this record to indicate that they were motivated in any way other than by the obvious human incentive of monetary greed. Because there is no allegation nor showing of racially-based animus, the complaint must be dismissed.").

Vindman's assertion that President Trump's September 29, 2019, tweets (not September 2 as Vindman states) was a "statement of the purpose of conspiracy" is belied by the tweets themselves. Opp. at 22. First, Vindman did not receive a request to testify before the House until October 16, 2019, and the *New York Times* did not identify Vindman as a witness until October

28, 2019. Compl. ¶¶ 104–05. Nothing in the Complaint suggests President Trump knew of
Vindman's existence when he sent these tweets, much less that these tweets were about
Vindman. In any event, President Trump tweeted that he deserved and wanted to meet his
accusers, and that there would be "Big Consequences" if any of the individuals involved had
been spying on him, not that he and others had decided to intimidate and retaliate against anyone.
*Id.* ¶ 100. Nothing in President Trump's tweets suggests an agreement between President Trump
and the supposed conspirators about Vindman, let alone for the purported unlawful purposes
Vindman alleges. Nor do Trump Jr. or Ingraham's statements supporting President Trump give
the Court grounds to infer that these decisions arose out of a conspiratorial agreement (the
simpler explanation is that Trump Jr. and Ingraham had a similar opinion). *Contra id.* at 23.

### D.  Vindman Failed to Allege an Unlawful Overt Act that Caused Him Injury.

There can be no unlawful conspiracy to commit defamation without (1) a conspiracy, and
(2) defamation. Vindman has shown neither. Vindman recognizes his obligation to allege that
"one conspirator took one unlawful overt act in furtherance of [the conspiracy] and that he was
injured as a result." Opp. at 23. Yet most of the overt acts of which Vindman complains are
public statements (mainly tweets) that cannot support a § 1985 claim because they are protected
by the First Amendment as non-defamatory speech. Neither can Vindman rest a § 1985 claim on
the speculative notion that someone (not a Defendant or even an alleged conspirator) leaked
classified information. The remaining overt acts Vindman lists are not actionable because they
did not cause Vindman any injury.[1]

---

[1] In their Motion, Trump Jr. and Scavino established that Vindman has no remedy under § 1985
for any alleged interference related to his prospective promotion from Lieutenant Colonel to full
Colonel. *See* Mot. at 36–38. Trump Jr. and Scavino further established that the political question
doctrine bars consideration of Vindman's removal from the NSC. *Id.* at 38–41. Vindman

1. <u>Vindman failed to allege a single instance of defamatory speech.</u>

None of the supposed conspirators' statements about Vindman can serve as an unlawful overt act in furtherance of the conspiracy because they are not defamatory. "Because the First Amendment protects speech as an expression of the fundamental right to freedom of thought, constitutionally speaking, there is no such thing as a false idea." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016) (cleaned up). "Expressions of opinion are entitled to constitutional protection unless they imply the existence of undisclosed defamatory facts as the basis of the opinion." *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 47 (D.C. 1983). "Expressions of pure opinion, as embodiments of ideas, are generally entitled to constitutional protection." *Id.* "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)). "[I]f it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Guilford Trans. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000).

The First Amendment allows individuals to hold and express opinions others may not like—even opinions with which others may vehemently disagree. The law is concerned with whether it was "plain the speaker [was] expressing a subjective view" to his or her listeners, versus where the speaker claimed to be communicating "objectively verifiable facts." *Id.* When the audience is aware a statement expresses a speaker's opinion rather than a point of fact, it is not actionable defamation. *Id.*

_____

concedes in his Opposition that he is not seeking redress under § 1985 for any decision relating to his military employment or his removal from the NSC. Opp. at 53, 56.

Further, even if opinions do suggest the existence of facts that might be verifiable, those opinions are protected speech when drawn from fully disclosed facts. *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 259 (D.D.C. 2013) (cleaned up) ("Here, … the facts on which the opinion 'shady' was based were fully disclosed in the leaflet. There is no suggestion in the leaflet that the authors relied on privately held information outside of what was stated in the publication to substantiate the comments made about the plaintiffs therein."). When speakers provide their readers or listeners with the facts on which they base their opinions, that speech is protected. *Id.*

Vindman never provides the Court with any argument or suggestion that the readers or hearers of the statements at issue would have thought the complained-of statements communicated objectively verifiable facts rather than subjective opinions. Consider Vindman's first allegedly defamatory statement mentioned in his Opposition—Trump Jr.'s tweet, "Didn't [Vindman] testify he had no idea who the whistleblower was? Sounds like perjury to me…." Compl. ¶ 176; Opp. at 34. The context of the statement shows it is expressing Trump Jr.'s opinion ("to me") that Vindman committed perjury. But that opinion was not expressed in isolation. Trump Jr.'s statement told his readers what within Vindman's testimony he surmised constituted perjury—a suggested contradiction (discussed in an article linked to his tweet) about whether Vindman knew the identity of the whistleblower. *Id.* His statement referenced the very facts on which he based his "[s]ounds like perjury to me" opinion so that readers were free to examine the undisputed facts and draw their own conclusion. Trump Jr.'s statement is protected First Amendment speech under multiple theories—for this court to hold otherwise, it would need to break with decades of well-settled jurisprudence. This same analysis applies to Vindman's complaints about opinions expressed about the undisputed facts regarding his Ukrainian job offers, the suggestion in light of those job offers that he was advising two governments, and the

12

impact his actions had on the working environment at the NSC. Opp. at 34, 38. The Defendants are allowed to express their opinion about what undisputed, identified facts tend to prove, even if Vindman does not like their theories.

Vindman tries to recover from this insuperable defect in his argument by claiming that "the publication(s)" at issue "must be taken as a whole, and in the sense in which it would be understood by the [audience] to whom it was addressed." Opp. at 37 (quoting *Farah v. Esquire Mag.*, 736 F.3d 528, 535 (D.C. Cir. 2013)). But then he ignores the context in which the statements of which he complains were made—largely on Twitter and Fox News opinion shows. These are venues where audiences consume media *expecting* to hear statements of opinion.

Other glaring problems Vindman fails to address are the statements he claims are defamatory which cannot be proven true or false. These include allegations that Vindman was a "leftist" and "Never Trumper," Opp. at 34, and working "against the President's interest." *Id.* at 38. Whether these statements are true or false is in the eyes of the beholder—classic protected speech. Were this Court to adopt Vindman's defamation framework, it would be flooded with defamation cases every time an election opponent claims his or her rival is a socialist or a "RINO."[2]

Individuals may hold opinions about Vindman with which he disagrees. Further, Vindman has had ready access to media more than willing to come to his defense by the

---

[2] Vindman knows the law well himself. Despite arguing for a pinhole reading of the First Amendment here, outside the courtroom Vindman relied on the First Amendment's robust protections when he tweeted that Pennsylvania Republican gubernatorial candidate Doug Mastriano "is a regressive far-right conspiracy propagator, attacking the Country and U.S. Constitution he, as an Army officer, swore to defend," that U.S. Senator Tom Cotton "cheerled [sic] Putin" and has "blood on [his] hand [sic]," that media personality Tucker Carlson is an "anarchist" and an "arsonist of American democracy," and that President Trump "is a fascist." *See* Trump Jr. and Scavino's Second Request for Judicial Notice. Vindman cannot clutch his pearls in one hand while throwing rhetorical stones with the other.

"competition of ideas" intended by the First Amendment. *See Myers*, 472 A.2d at 47. Unless this Court wants to be constantly policing hurt feelings on the political playground, it should dismiss this case as none of the complained of speech is actionable defamation.

2. <u>Vindman did not allege that Defendants entertained doubts about their claims.</u>

To show the requisite malice, Vindman must plausibly allege that Defendants knew their statements were false or that they acted with reckless disregard as to whether they were false. *Shive-Ayala v. Pacelle*, Civ. No. 21-704 (RJL), 2022 WL 782412, at *3 (D.D.C. Mar. 15, 2022) (quoting *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 141 (D.D.C. 2017)) (cleaned up). Vindman fails this requirement.

Even if being a "leftist" were a provably false claim of fact (and it is not), Vindman does not present plausible allegations that Trump Jr. entertained doubts Vindman was a "leftist." Vindman claims Trump Jr.'s "doubling down" on his "leftist" claim after innocuous questioning shows malice, but this "doubling down" could just as easily show his true belief rather than his knowing falsity. *Powell* is inapposite on this point, as the defendant in *Powell* "doubled down" after being made aware of "countervailing evidence." *See U.S. Dominion Inc. v. Powell*, 554 F. Supp. 3d 42, 63 (D.D.C. 2021). Vindman does not suggest any countervailing evidence was presented to Trump Jr. here—if indeed "evidence" could be brought to bear on an opinion assertion incapable of objective proof.

Vindman seeks to impute malice into Trump Jr.'s decision to retweet a story by Jim Hickman, but Vindman presented no evidence that Trump Jr. knew the story was false or had reason to know the story's primary source was unreliable when he posted it. Trump Jr. was under no obligation to "confirm a story." Opp. at 42. Vindman's beef here is with Hickman, not Trump Jr. As shown above, Trump Jr.'s opinions about perjury are legally protected, as he made them

14

while providing his readers with the undisputed facts on which his opinions were based. *See Boley*, 950 F. Supp. 2d at 259. Moreover, Vindman has not alleged anything that would allow this court to conclude Trump Jr. doubted his claims. *Vindman* may question the reliability of *Breitbart* as a source, but he has not shown that Trump Jr. does. Opp. at 43.

As for Scavino, Vindman tries to conjure up a malice argument, once again, based on Scavino's protected opinions about Vindman's Ukrainian job offers. Opp. at 44. Whether or not Vindman declined these job offers or promptly reported them, the First Amendment allows Scavino to hold another opinion about what the undisputed fact that those job offers were repeatedly made tends to show. *See Boley*, 950 F. Supp. 2d at 259. As Vindman has not plausibly alleged actual malice as to these statements, his claims fail as a matter of law.

### 3. Trump Jr. is not liable for others' defamatory statements.

Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Vindman claims that he may sue Trump Jr. for others' allegedly defamatory statements because he "amplified" them. Opp. at 41. Vindman provides no legal support for his suggestion that "amplification" of another's defamatory speech without being a creator or developer of information can cause legal injury, because it is well-settled law that it cannot. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) (holding Section 230 barred recovery because the complaint never suggested the defendant "provided, created, or developed any portion of the [objectionable] content").

Vindman is correct that Trump Jr. may be liable for his own speech to the extent that it contains independent defamation, but that is not present in the complained-of tweets. Instead, Vindman continues with his thin-skinned complaints that Trump Jr.'s tweets "mocked" him,

Opp. at 51, Compl. ¶¶ 137–139, and expressed a protected opinion based on undisputed disclosed facts Trump Jr. alleges show Vindman perjured himself. *See* Section II.D.1, *supra*; Compl. ¶¶ 176, 203. As shown in Trump Jr. and Scavino's Motion, Vindman's real issue is with the claims made by the article's original content creators, not Trump Jr.[3]

4. Vindman's allegations regarding the handling of classified information are not actionable.

Vindman identifies the alleged "unlawful[] leaking [of] classified information" as one of the three kinds of overt acts the purported conspirators took in furtherance of the conspiracy. Opp. at 24. Vindman's theory fails because there are no facts in the Complaint connecting any purported conspirator with any leak of classified information. Even if the Court were to infer that one of the supposed conspirators were responsible for the leak—a real stretch—judicial and legislative immunity would still bar Vindman from maintaining a claim based on this classified information.

Trump Jr. and Scavino cannot be liable for any leak of classified information related to Vindman because there are no facts in the Complaint from which the Court may infer that *any* of the Defendants (or non-Defendant conspirators) are responsible for the leak. Vindman states that Republican Counsel Stephen Castor relied on classified information when he questioned Vindman during Vindman's public testimony and speculates with no factual basis that the information "could only have come from sources at the White House." *Id.* ¶ 158. Vindman is not only guessing that Castor received the classified information from a White House source, but also guessing that the White House source was a conspiracy member. To state a conspiracy claim, the plaintiff must answer "[w]hen and how, specifically, did at least one co-conspirator

---

[3] Trump Jr. and Scavino rest on their original arguments related to the legislative and judicial proceeding privileges and the fair reporting privilege.

knowingly commit at least one overt act in furtherance of [the] agreement?" *United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, No. CV 15-750 (RC), 2020 WL 686009, at *30 (D.D.C. Feb. 11, 2020). Vindman's vague and conclusory musings leave this question un-answered, as there are no facts tying any alleged conspirator to the release of classified information. Vindman's theory also lacks plausibility as there are no facts showing how Hahn or Scavino (the two alleged conspirators of President Trump who worked at the White House), let alone the alleged conspirators who did not work at the White House, could have accessed either the "sensitive compartmented information facility" or "the NSC's classified email system" where the classified information at issue was allegedly stored. Compl. ¶¶ 160–61.

Vindman is further unable to establish any redressable injury relating to the purported leak of classified information. According to Vindman, someone at the White House leaked classified information about job offers Vindman had received from the Ukrainian government, and then Republican Counsel Stephen Castor questioned Vindman about this information during the impeachment proceedings. Compl. ¶¶ 157–67. Trump Jr. and Scavino explained in their Motion that Vindman cannot sue Defendants based on Castor's questioning because Castor's speech was protected by legislative and judicial immunity. Mot. at 30–32. Vindman sidesteps the application of these privileges, arguing that Defendants are not shielded by immunities protecting Castor. Opp. at 47. Vindman cites two cases that stand for the unremarkable proposition that parties who conspired with a president or judge (both of whom enjoy sweeping immunities as a result of their office) may still be liable. *Id.* (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 810–11 (1982); *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).

Vindman's argument fails because Trump Jr. and Scavino are not arguing that they are immune because they conspired with someone who is immune (as with *Harlow* and *Dennis*) but

are instead arguing that they cannot be liable for speech (here, Castor's) that is not actionable as defamation. Trump Jr. and Scavino are not trying to shield themselves by immunity Castor enjoyed because of his office. Rather, Trump Jr. and Scavino's (unrefuted) argument is that they cannot be liable for Castor's speech, as the application of legislative and judicial immunities prevented that speech from being actionable. Thus, without any underlying conduct that caused Vindman a legal injury arising out of the leak of classified information, Vindman cannot recover against Trump Jr. or Scavino based on the supposed leak. *See Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 764 (D. Md. 2015) (dismissing civil conspiracy claim based on a conspiracy to defame when the "ancillary defamation action" failed to state a claim).

5. <u>The remaining overt acts caused Vindman no injury.</u>

Vindman's argument that a laundry list of meetings, tweets, and other statements were each overt acts lacks merit because none of the mundane incidents Vindman lists cause injury cognizable under § 1985. Opp. at 24–25. Conspiracy claims require "'an overt *tortious* act in furtherance of the agreement that causes injury,'" and "[t]he hornbook definition of a 'tort' is a 'civil wrong *for which a remedy may be maintained*.'" *Hall v. Clinton*, 285 F.3d 74, 83 (D.C. Cir. 2002) (quoting *Halberstam*, 705 F.2d at 479; and *Black's Law Dictionary* 1496 (7th ed. 1999)). None of the miscellaneous "overt acts" Vindman lists come anywhere close to this standard.

First, Vindman's characterization of two tweets President Trump wrote on September 29, 2019 (Compl. ¶ 100) as an "explicit, public threat" toward Vindman is preposterous, as there are no facts suggesting that President Trump had any knowledge of Vindman's role in the impeachment proceedings at this stage. *See* Section II.C, *supra*. Vindman also cites President

Trump's "public acknowledgement of retaliation," Opp. at 24, but cites no authority for the

dubious proposition that simply acknowledging retaliation is itself actionable.

Second, Vindman's argument that "meetings to coordinate strategy to intimidate him as a

witness and retaliate against him" constitute overt acts causing injury, *id.*, is nonsensical.

Vindman alleges just one meeting involving any of the purported conspirators: a November 18,

2019 meeting in the Oval Office between President Trump, Kellyanne Conway, Vice President

Mike Pence, Mark J. Penn, and Andrew Stein (none of the Defendants nor Ingraham allegedly

present) to "discuss the strategy for responding to the impeachment proceedings." Compl. ¶¶

142–43. Vindman has alleged no injury arising out of this meeting (nor could he), and it is thus

not an overt act causing injury, much less connected to Scavino or Trump Jr. *See Hall*, 285 F.3d

at 83.

Third, the Court should reject Vindman's argument that Trump Jr. and Scavino should be

liable because of "public statements and tweets" and "talking points," "even if not defamatory."

Opp. at 24–25. "[T]he constitutional protections available to defendants charged with defaming

public officials may extend to other civil actions alleging reputational harm or emotional harm

from the publication of protected speech," including § 1985 actions. *Barr*, 370 F.3d at 1202–03.

Vindman tries to avoid this rule by stating in vague terms that certain speech sought to intimidate

and retaliate against him. This argument fails because "speech cannot be deemed unprotected

merely because [the plaintiff] ha[s] alleged it to be part of a conspiratorial agreement to violate a

civil statute." *Thompson v. Trump*, No. 21-CV-00400 (APM), 2022 WL 503384, at *40 (D.D.C.

Feb. 18, 2022) (requiring speech to meet the *Brandenburg* standard for incitement to be

actionable). None of the purported speech is actionable unless Vindman establishes that it

defamatory, or otherwise in a category of speech outside the protections of the First Amendment, which Vindman has failed to do.

### III.   VINDMAN WAS NOT A WITNESS IN A "COURT OF THE UNITED STATES"

Vindman cannot state a claim under § 1985(2) because he was not a witness or party in any "court of the United States," as the statute requires. As explained in the Motion, courts have construed § 1985(2) narrowly, and have never extended its application beyond federal courts. Mot. at 34–36. As no court has *ever* applied § 1985(2) to an impeachment proceeding, Vindman is left only with semantic and policy-based arguments. None are enough to overcome the plain language of the statute and the weight of authority.

First, Vindman fails to grapple with the cases Trump Jr. and Scavino cited, stating, erroneously, that they only "hold that § 1985(2) does not apply to federal administrative proceedings . . . or to a plaintiff's self-styled common-law 'grand jury.'" Opp. at 29. In *Graves v. United States*, 961 F. Supp. 314 (D.D.C. 1997), the court explained that an "underlying proceeding in federal court is [a] requisite of [a] claim under the first clause of § 1985(2)." *Graves*, 961 F. Supp. at 319 (citing *Deubert v. Gulf F.S.B.*, 820 F.2d 754, 758 (5th Cir. 1987)). Vindman further ignores the Eleventh Circuit's holding that "the phrase 'court of the United States' in § 1985(2) refers only to Article III courts and certain federal courts created by act of Congress." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1035 n.2 (11th Cir. 2000). The Eleventh Circuit's construction of the phrase "court of the United States" necessarily excludes proceedings before Congress, which would include impeachment proceedings. *See id.* at 1039– 40 ("Clause 1 of § 1985(2) applies only to conspiracies to deter or alter testimony in any federal court proceeding. Section 1512, however, applies to attempts to prevent or influence testimony not only in federal courts but also before Congress, federal agencies, and insurance regulators.").

20

Vindman tries to piece together stray references to Congress sitting as a "court" of impeachment to argue what is patently false: that Congress is a federal court. Opp. at 26–27. Despite sporadic references to a "court of impeachment" and figurative language likening impeachment procedures to trials outside the context of § 1985, courts have viewed Congress sitting as an impeachment tribunal as distinct from a court. When the Supreme Court was faced with the question of whether impeachment proceedings are subject to judicial review, Justice Stevens discussed the "central fact that the Framers decided to assign the impeachment power to the Legislative Branch." *Nixon v. United States*, 506 U.S. 224, 238 (1993, Stevens, J., concurring). In its examination of the same question, the D.C. Circuit concluded that the "more plausible view" of the absence of any limitation on judicial interference in impeachment proceedings "is that the framers simply assumed that courts had nothing whatever to do with impeachments." *Nixon v. United States*, 938 F.2d 239, 243 (D.C. Cir. 1991), *aff'd*, 506 U.S. 224 (1993). Both *Nixon* opinions reveal that Congress's legislative character does not change when it exercises its impeachment power. Congress is not a court.

Even if the Court were to look beyond the plain meaning of the statute and the existing caselaw, the purpose of the statute does not support extending its application to impeachment proceedings. The D.C. Circuit's extensive discussion of the history and purpose of § 1985 in *McCord v. Bailey*, 636 F.2d 606 (D.C. Cir. 1980) makes clear that Congress was interested in preserving the integrity of federal courts when it enacted the statute—not impeachment proceedings. *See McCord*, 636 F.2d at 615 ("Reinforcing the sanctity of the *federal judicial process* for all citizens was one objective Congress had in mind when it enacted the source of section 1985 . . . . Restoration of civil authority, including restoration of the *federal courts' ability to proceed* without improper interference, was a major concern.") (emphasis added); *see*

*also* Janet A. Barbiere, *Conspiracies to Obstruct Justice in the Federal Courts: Defining the Scope of Section 1985(2)*, 50 Fordham L. Rev. 1210, 1224 (1982) ("The essential purpose of section 1985(2) . . . was to ensure the effective operation of the state and federal judiciary, as well as to provide an unhindered avenue of redress to those injured by Klan conspiracies." (citing cases)). Congress enacted § 1985 to safeguard the federal judiciary, not itself.

## IV.    SCAVINO IS ENTITLED TO QUALIFIED IMMUNITY

As a federal official during the relevant time period, Scavino is entitled to qualified immunity. Contrary to Vindman and the Federal Courts Law Professors *Amici Curiae* (the "Professors"), courts *routinely* grant government officials qualified immunity from statutory claims, including § 1985 claims. Scavino was dragged into this lawsuit for allegedly directing Hahn to circulate talking points about Vindman, and for tweeting (truthfully) that Vindman received three offers to serve as the Ukrainian Defense Minister. Compl. ¶¶ 146, 171. Vindman's claims against Scavino therefore rely on what can only be described as novel at best, and dubious at worst, constructions of conspiracy liability, the First Amendment, and § 1985 itself. Scavino therefore did not violate any "clearly established" right of Vindman's.

The Court should reject Vindman and the Professors' suggestion that qualified immunity does not apply to § 1985(1) and (2) claims. Opp. at 60; Brief of Federal Courts Law Professors as *Amici Curiae* ("Professors' Brief"). Citing no authorities, Vindman posits, "[c]onstitutional provisions . . . require more in the way of case law development to give notice of what they prohibit," but "statutes—especially those imposing criminal liability—are usually enough in their own right to do so."  Opp. at 60. Courts say otherwise. "Qualified immunity shields a government official from civil liability if his conduct 'does not violate clearly established **statutory** or constitutional rights of which a reasonable person would have known." *Ali v.*

22

*Rumsfeld*, 649 F.3d 762, 770 (D.C. Cir. 2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)) (emphasis added). The Sixth Circuit not only applied qualified immunity to a § 1985(1)

claim, but also found that the right at issue was not "clearly established." *See Windsor v. The*

*Tennesseean*, 719 F.2d 155, 165 (6th Cir. 1983) ("[W]e hold that a reasonable person would not

have known in 1980 that an agreement to defame a federal official in order to effect that person's

discharge from federal employment violated section 1985(1)."). This Court has itself previously

granted government officials qualified immunity from claims involving regulatory violations.

*See Ford v. Donovan*, 891 F. Supp. 2d 60, 68 (D.D.C. 2012) ("Because [plaintiff's] pleadings do

not support a conclusion that either [defendant] violated HUD regulations, both are entitled to

qualified immunity." (citation omitted)). The Professors are wrong that applying qualified

immunity would be "a judge-made extension of qualified immunity," Professors' Brief at 2—it

would be consistent with precedent.

Scavino is first entitled to qualified immunity because Vindman failed to allege colorable

violation of § 1985(1) or (2). The only possible way Scavino would be liable would be for the

Court to depart from "clearly established" law and hold that the President, his aides, his attorney,

and his son are liable under the Ku Klux Klan Act for engaging in similar criticism of a federal

official. Indeed, Defendants' criticism of Vindman is the main injury for which Vindman seeks

redress, as Vindman admits for the first time in his Opposition that he is not filing suit over "his

removal from the NSC or the attempted denial of a promotion." Opp. at 69. As explained in the

Motion, either claim would be novel and contrary to existing law, entitling Scavino to qualified

immunity. Opp. at 42.

Scavino is entitled to qualified immunity on both claims to the extent they are based on

the alleged leak of classified information (that Vindman cannot tie to any of the alleged

conspirators) and Republican Counsel Stephen Castor's use of that information during the impeachment proceedings. Vindman appears not to dispute that Castor's questioning was protected by legislative and judicial immunity, and just argues that the immunities do not insulate Trump Jr. and Scavino from liability. Opp. at 47. As explained above, a § 1985 claim based on speech must involve defamatory speech to withstand the First Amendment. *See* Section II.D.1, *supra*. The application of legislative and judicial immunity (among other things) prevents Castor's questioning from being defamatory. Scavino could not have possibly had notice that Castor's questioning of Vindman during the impeachment proceedings would have subjected him to liability under § 1985, and Vindman cites no cases under which a defendant was found liable for another individual's privileged speech. *See D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." (citation omitted)).

Second, Vindman's argument that it was "clearly established" that an impeachment proceeding is a "court of the United States" under § 1985(2) is belied by the creative arguments to which Vindman resorted on this point. Opp. at 72.  "'Clearly established' does 'not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Atherton v. D.C. Off. of Mayor*, 706 F.3d 512, 515 (D.C. Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). If § 1985(2)'s application to impeachment proceedings were "beyond debate," Vindman would have cited a case that held so, rather than reaching for semantic arguments and the *Federalist Papers*. Opp. at 28. Vindman's attempt to obfuscate the difference between a "right" and a "remedy" lacks merit. *Id.* at 72. The issue is not, as Vindman frames it, what Vindman's "proper remedy" is under § 1985(2)—it is

whether Vindman had any rights at all under § 1985(2) as a witness in an impeachment proceeding (as opposed to a federal court). *Contra id.* (citing *Spagnola v. Mathis*, 809 F.2d 16, 31 (D.C. Cir. 1986)). He did not.

## V.   THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Any amendment by Vindman would be futile. Despite pleading all facts at his disposal about Defendants and the other alleged conspirators, Vindman has failed to show any plausible conspiracy involving Trump Jr. or Scavino in violation of § 1985(1) or (2). Vindman has offered no additional facts to cure that fatal flaw in his Complaint. The Complaint is also riddled with legal defects that cannot be cured by amendment, including the non-defamatory nature of the speech at issue, and the fact that § 1985(2) does not protect witnesses in impeachment proceedings.

## VI.   CONCLUSION

This Court should dismiss Vindman's Complaint with prejudice.

Dated: August 29, 2022                                          Respectfully submitted,


                                   */s/ Harmeet K. Dhillon*
                                   Harmeet K. Dhillon, Esq.
                                   (Bar #CA00078)
                                   Karin M. Sweigart, Esq.
                                   (Bar #CA00145)
                                   Jesse Franklin-Murdock, Esq.
                                   (Bar #CA00147)
                                   Dhillon Law Group Inc.
                                   177 Post Street, Suite 700
                                   San Francisco, California 94108
                                   (415) 433-1700
                                   harmeet@dhillonlaw.com
                                   ksweigart@dhillonlaw.com
                                   jfranklin-murdock@dhillonlaw.com

                                   David A. Warrington, Esq.
                                   (D.C. Bar #1616846)

Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 402
Alexandria, Virginia 22314
(703) 574-1206
dwarrington@dhillonlaw.com

*Counsel for Defendants Donald Trump, Jr.,
and Daniel Scavino, Jr.*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing was served on all counsel of record via the Court's ECF system on August 29, 2022.

By: /s/ Harmeet K. Dhillon
Harmeet K. Dhillon