## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LT. COL. ALEXANDER VINDMAN,

      Plaintiff,

      v.                            Civil Action No. 22-257 (JEB)

DONALD TRUMP, JR., RUDOLPH
GIULIANI, JULIA HAHN, and DANIEL
SCAVINO, JR.,

      Defendants.

## MEMORANDUM OPINION

Lieutenant Colonel Alexander Vindman's name entered the public lexicon in 2019. Vindman was serving a detail on the National Security Council on July 25 of that year when he listened in during the now-infamous phone call between former President Donald Trump and Ukraine's President Volodymyr Zelensky, which conversation would lead to Trump's first impeachment. Vindman alleges that, after he reported concerns about the call through official channels and testified before the House Intelligence Committee, a group of conspirators formed an agreement to intimidate and unlawfully retaliate against him. He brings this action against some of those alleged conspirators — namely, Donald Trump, Jr., Rudolph Giuliani, Julia Hahn, and Daniel Scavino, Jr. — alleging that they thereby violated provisions of the Ku Klux Klan Act of 1871, codified at 42 U.S.C. § 1985(1) and (2). Defendants now move to dismiss the case.

History will be the final judge of Vindman's actions and the former Administration's response. This Court's task is to adjudicate something far narrower: whether Plaintiff's Complaint pleads facts sufficient to state a claim for civil conspiracy under Federal Rule of Civil Procedure 12(b)(6). As the Court will explain, Vindman must allege facts that plausibly suggest

two things: first, that each Defendant agreed with others not just to vigorously defend their boss, but to unlawfully intimidate or injure Vindman; and second, that one of the co-conspirators committed an unlawful act — *e.g.*, defamation — to further such scheme.

Plaintiff's pled facts, taken as true, certainly suggest that Defendants leveled harsh, meanspirited, and at times misleading attacks against him.  But political hackery alone does not violate § 1985.  Because Vindman does not sufficiently allege a violation of the 1871 Act, the Court will grant Defendants' Motions to Dismiss.

## I.   Background

### A.   Factual Background

The Court draws the facts from Plaintiff's Complaint and for purposes of these Motions presumes them to be true.  See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).

Vindman joined the United States Army more than two decades ago and over the years rose to the rank of Lieutenant Colonel.  See ECF No. 1 (Compl.), ¶ 32.  He was detailed to the National Security Council in 2018, where he served as Director for Eastern European, Caucasus, and Russian Affairs.  Id., ¶ 43.  While there, Vindman was one of several participants who listened in on a phone call that the NSC had arranged to allow Trump to congratulate Ukraine's Zelensky on his recent election.  Id., ¶¶ 62–63.  On that highly controversial call, Trump tried to coerce Zelensky to announce an investigation of members of the Biden family in return for the release of American military aid that Congress had appropriated.  Id., ¶¶ 60–63.  Plaintiff then reported his concerns about that call through internal NSC channels.  Id., ¶ 63.

That phone call soon came to the attention of the House of Representatives through a complaint from an unidentified whistleblower who was not Vindman.  Id., ¶ 65.  The House then

initiated an impeachment inquiry and subpoenaed Plaintiff to testify.  Id.  Vindman testified

twice, first in a closed-door deposition and then in a publicly televised hearing.  Id., ¶¶ 104, 122,

154.

On October 28, 2019, the day prior to Vindman's closed-door testimony, *The New York

Times* ran a story identifying him as a witness and previewing his testimony.  Id., ¶ 105.

Vindman consequently found himself dragged into a media firestorm, which continued through

his public testimony on November 19, 2019, and beyond.  Id., ¶¶ 107–40 (events around closed-

door testimony), ¶¶ 141–204 (around public testimony).  The Court discusses below the specific

roles Vindman alleges that each Defendant played in that firestorm.

In addition, Plaintiff contends that Defendants or their co-conspirators leaked classified

information that Republican Counsel Stephen Castor used to question him during his public

testimony.  Id., ¶¶ 157–59.  Specifically, Castor asked Vindman about an offer he had received

earlier that year to serve as Ukrainian Minister of Defense.  Id., ¶ 159.  Vindman testified that he

had unequivocally declined the offer and had filed a report documenting the event.  Id., ¶ 160.

He alleges that Defendants or their co-conspirators unlawfully leaked that report to House

Republicans to falsely insinuate that he might have had divided loyalties.  Id., ¶ 157.

Plaintiff contends that after his testimony he was retaliated against in various ways.  He

pleads that, following the former President's Senate acquittal, he was "abruptly and publicly

escorted out of the White House" and removed from his NSC post.  Id., ¶ 194.  While Vindman

notes that the President's National Security Advisor said that removing Vindman was his

decision alone, Plaintiff maintains that this statement was a false attempt to cover up the true

retaliatory nature of his removal by the former President and other co-conspirators, including

Defendants.  Id., ¶ 202.  Vindman also alleges that Defendants and other co-conspirators engaged

in an internal, coordinated effort to derail his promotion to Colonel.  Id., ¶¶ 209–17.  In the face

of concerted attacks by Defendants and others, Vindman states, he finally "made the difficult

decision to retire from the military."  Id., ¶ 222.

These events all caused significant harm to Plaintiff and his family.  Id., ¶¶ 224–38.

More than the "hurt feelings" that Defendants blithely identify, see ECF No. 20 (Trump, Jr. and

Scavino MTD) at 1, Vindman describes how Defendants' onslaught prevented him from

continuing his military career, id., ¶ 227; caused him to fear for the physical safety of his family,

id., ¶ 230; subjected him to personal threats online, id., ¶ 233; and caused his wife and daughter

to alter their behavior to stay safe.  Id., ¶ 236.  He paid this price because he complied with a

duly issued Congressional subpoena, not because he thrust himself into the fray.  Defendants'

actions had consequences, and while the Court is duty bound to apply governing legal standards,

it nonetheless pauses to recognize the real harm that their attacks inflicted on Vindman and his

family.

The crux of his present lawsuit is that each of the four Defendants entered into an

unlawful conspiracy to intimidate and harm him as a result of his role in these events.  The

Defendants are, from least to most centrally involved: Julia Hahn, former White House Deputy

Communications Director; Rudy Giuliani, a friend and close advisor of the former President's;

Daniel Scavino, Jr., the former President's Director of Social Media and Deputy Chief of Staff

for Communications; and Donald Trump, Jr., the former President's eldest son.  Id., ¶¶ 21–24.

The specific facts pled against each are as follows.

1. *Hahn*

Hahn was a White House media liaison and previously worked for Fox News host Laura

Ingraham.  Id., ¶¶ 24, 72.  She distributed talking points about Vindman to media surrogates at

the direction of more senior White House communications officers.  Id., ¶¶ 146–53.  Those

included the header "Vindman Has Major Credibility Issues," as well as the remark "Vindman

has faced accusations of poor judgment, leaking, and going around normal procedures."  Id.,

¶ 148.  Another sentence read, "There was nothing wrong with the call with Zelensky at all,

Vindman was just upset that President Trump was leading foreign policy instead of sticking to

Vindman's talking points. . . .  But it's not Vindman's job to set foreign policy, it's the

President's."  Id., ¶ 149.

        2.   *Giuliani*

     Plaintiff pleads that Giuliani was personally close with Trump and helped spread false

theories regarding the former President's 2016 and 2020 election rivals.  See Compl., ¶¶ 59–61,

76.  In particular, Vindman alleges that Giuliani recruited two Ukrainian businessmen to pressure

Ukraine to investigate Hunter Biden.  Id., ¶ 77.  On the phone call with Zelensky, Trump

suggested that Zelensky coordinate any investigation of the Bidens with Giuliani.  Id., ¶ 62.  The

Complaint also alleges that Giuliani "engaged in a coordinated attack" against Ambassador

Marie Yovanovitch, then the U.S. Ambassador to Ukraine.  Id., ¶ 97.

     Giuliani also sent two relevant tweets during the impeachment proceedings.  In the first,

on the day of Vindman's closed-door testimony, he tweeted: "ANOTHER SCHIFFTY

BACKFIRE: A US gov. employee who has reportedly been advising two gov's? No wonder he

is confused and feels pressure. However the only opinion that legally counts is Pres. Zelensky's.

Who has clearly said NO pressure. End of impeachment. End of Schiff."  Id., ¶ 124.  In the

second, the next day, Giuliani tweeted: "Schiff is thanking him for his secret testimony and for

giving advice to two countries. I thought he worked for US. Schiff is using this to cover-up

major Pay-for-Play Dem scandal. Ukraine corruption was not only one. Corrupt media is enabling this phony. The truth will emerge." Id., ¶ 125.

### 3. *Scavino*

Plaintiff alleges that Scavino served as the former President's Director of Social Media, a role in which he managed the White House Twitter account and wrote many of Trump's tweets. Id., ¶ 23. Scavino also was a close Trump confidant and one of his chief advisors, as well as one of Hahn's supervisors in the White House Communications shop. Id., ¶¶ 70–71, 146. Vindman alleges that Scavino participated in public campaigns to have former FBI Deputy Director Andrew McCabe fired and to attack Ambassador Yovanovitch. Id., ¶¶ 96–97. The day that Vindman testified, Scavino tweeted: "#ICYMI: Lt. Col. Vindman was offered the position of Defense Minister for the Ukrainian Government THREE times! #ImpeachmentSHAM." Id., ¶ 171. President Trump retweeted that tweet. Id., ¶ 172.

### 4. *Trump, Jr.*

Plaintiff pleads that Trump, Jr. serves as a surrogate for his father "for particularly distasteful attacks on his father's perceived enemies" and is among his closest confidants. See Compl., ¶¶ 73–74. Like Giuliani, he allegedly met with two Ukrainian businessmen about pressuring Ukraine to investigate Hunter Biden. Id., ¶ 77. He was a Fox News regular and also participated in public campaigns to fire McCabe and to attack Yovanovitch. Id., ¶¶ 89, 96–97.

The morning after Vindman's testimony, Trump, Jr. went on Fox News and made negative comments about him, saying, "[I]t turns out he's, you know, talking to the Ukraine" and suggesting Vindman was a "leftist." Id., ¶¶ 127–28. He also retweeted a Gateway Pundit article that falsely stated that Vindman had been reprimanded for inappropriate and partisan behavior while in the military, and he retweeted a remark by right-wing commentator Charlie Kirk about

the same.  Id., ¶¶ 133–40.  Later, when Vindman was removed from the NSC, Trump, Jr. tweeted

two comments: "On the bright side, he may still be able to take the defense minister position in

the Ukraine that he was offered a few times," id., ¶ 196, and "Allow me a moment to thank—and

this may be a bit of a surprise—Adam Schiff.  Were it not for his crack investigation skills,

@realDonaldTrump might have had a tougher time unearthing who all needed to be fired.

Thanks, Adam!," which he followed with a crying-laughing emoji and "#FullOfSchiff."  Id.,

¶ 197.

Several months later, after Vindman had been removed from the NSC, Trump, Jr.

tweeted twice more about him: "A name that's not appearing NEARLY enough in the 'news' –

VINDMAN.  Media covered his bogus Ukraine transcript constantly.  Dems yelled 'impeach!!'

NOW he admits to actually making up parts of it.  Another hoax exposed. And yet again the

media cover the fake scandal but not the TRUTH," and "You'd think that someone would be

criminally charged for making up things that lead to an impeachment based on false premises.

But I guess that would only happen if they did it to a liberal!  Alexander Vindman Admits

making up Parts of Trump Call Summary," linking to a Breitbart story with that title.  Id., ¶ 203.

B.  Procedural History

Vindman filed this lawsuit on February 2, 2022.  He contends that each Defendant agreed

with others to intimidate and unlawfully retaliate against him in violation of 42 U.S.C. § 1985(1)

and (2).  Each of the four Defendants — with Trump, Jr. and Scavino acting together — filed a

Motion to Dismiss, arguing that the facts Plaintiff pleads are insufficient to state a § 1985 civil-

conspiracy claim.  See Trump/Scavino MTD; ECF No. 25 (Giuliani MTD); ECF No. 26 (Hahn

MTD).  Those Motions are now ripe.

## II.      Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief may be granted.  In evaluating such a motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow, 216 F.3d at 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  Particularly where the defendant's allegedly unlawful conduct has "an obvious alternative explanation," the complaint must allege facts that "plausibly suggest[ ]" — and are "not merely consistent with" — the defendant's liability.  Twombly, 550 U.S. at 557, 567; accord Iqbal, 556 U.S. at 682; see also Iqbal, 556 U.S. at 680 (explaining that complaint in Twombly failed because defendants' alleged conduct "was not only compatible with, but indeed was more likely explained by, lawful . . . free-market behavior").

The court need not accept as true, then, "a legal conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint."  Id. (quoting Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  And it may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint[,] and matters of which [courts]

may take judicial notice." Equal Employment Opportunity Commission v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).

Rule 12 plays an especially important role in claims involving defamation. "[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." Kahl v. Bureau of Nat'l Affairs, Inc., 856 F.3d 106, 109 (D.C. Cir. 2017) (formatting modified). "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." Fairbanks v. Roller, 314 F. Supp. 3d 85, 89 (D.D.C. 2018) (internal quotations omitted) (quoting Palin v. New York Times Co., 264 F. Supp. 3d 527, 533 (S.D.N.Y. 2017)).

## III.   Analysis

Vindman's lawsuit contends that Defendants engaged in an unlawful conspiracy in violation of 42 U.S.C. § 1985, a civil-rights statute passed in the wake of Reconstruction. See ECF No. 43 (Brief of *Amici Curiae* First Amendment Scholars) at 4. As relevant here, § 1985 creates liability where "two or more persons in any State or Territory conspire to" commit proscribed offenses. See 42 U.S.C. § 1985(1)–(2). Vindman's two counts each allege two § 1985 violations, for a total of four central claims. His first count alleges that Defendants:

- "conspire[d] to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof," § 1985(1); see Compl., ¶¶ 241–42, 249; and

- "conspire[d] . . . to injure him in his person or property on account of his lawful discharge of the duties of his office." § 1985(1); see Compl., ¶¶ 243, 249.

His second count alleges that Defendants:

- "conspire[d] to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully," § 1985(2); see Compl., ¶¶ 244, 260; and

- "conspire[d] . . . to injure such party or witness in his person or property on account of his having so attended or testified." § 1985(2); see Compl., ¶¶ 245, 260.

Put another way, Vindman's first and third challenges allege that Defendants conspired to intimidate him from performing job functions or testifying before Congress, and his second and fourth allege that Defendants conspired to unlawfully retaliate against him for the same.

Because § 1985 punishes civil conspiracies, Plaintiff agrees that in order to prevail on any of his claims he must properly plead (for each) all of the general elements of a civil conspiracy. See ECF No. 30 (Pl. Opp.) at 7. Vindman also agrees that the four elements are those the D.C. Circuit articulated in its landmark case of Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983):

> (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

Id. at 477; see Pl. Opp. at 7 (citing Halberstam and reciting these elements).

"[T]he principal element of [a civil conspiracy]," which is captured by the first two Halberstam elements, "is an agreement between the parties to inflict a wrong against or injury upon another." Brady v. Livingood, 360 F. Supp. 2d 94, 104 (D.D.C. 2004) (formatting modified). Relevant here, an agreement to do something unsavory but lawful is not enough; the agreement must be to do something itself unlawful. The recent case of Thompson v. Trump, No. 21-400, 2022 WL 503384 (D.D.C. Feb. 18, 2022), furnishes a helpful example. There, in a separate § 1985 action, Judge Amit Mehta concluded that the plaintiffs "adequately pleaded that Giuliani was involved in a conspiracy to engage in a months-long misinformation campaign to convince Trump's supporters that the election had been illegally stolen." Id. at *36 (internal

quotations omitted).  But to state a § 1985 claim, that was not enough: "What Plaintiffs must plausibly establish is that Giuliani conspired to prevent Congress from discharging its duties on January 6th by force, intimidation, or threat."  Id.  Because "[t]here, they fall short," Judge Mehta concluded that the plaintiffs did not state a claim with respect to Giuliani.  Id. at *37. That analytic approach applies here, too.  It is not enough for Vindman to allege that Defendants agreed to do something inappropriate; he must specifically plead that they agreed "to participate in an unlawful act, or a lawful act in an unlawful manner."  Halberstam, 705 F.2d at 477.

Here, Plaintiff alleges that the unlawful or unlawfully performed act was both: 1) to deter him "by force, intimidation or threat" from performing his duties or testifying, and 2) to "injure him in his person or property" on account of having so performed or testified.  See 42 U.S.C. § 1985(1)–(2).  That latter phrase — to injure a plaintiff in his person or property — refers to compensable injuries under tort law.  That follows from the Supreme Court's holding in Haddle v. Garrison, 525 U.S. 121 (1998).  The Court there held that a plaintiff who had been fired from his at-will job to discourage his testimony stated a claim under § 1985(2) because the harm he alleged — a species of third-party interference with at-will employment relations — "has long been a compensable injury under tort law."  Id. at 126 (citing Cooley, 2 Law of Torts 589–91 (3d ed. 1906)).  This Court follows the Supreme Court's conclusion that, in the § 1985 context (subsections 1 and 2 use the same language), the phrase "injured in his person or property" refers to a tortious injury under principles of tort law.  See also id. at 127 (citing 3 W. Blackstone, Commentaries on the Laws of England 118 (1768), and quoting its language describing universe of common-law torts as "all private wrongs, or civil injuries, which may be offered to the rights of either a man's person or his property").  That also makes sense: a conspiracy must involve an agreement to do something unlawful, and so an agreement to lawfully injure a person (say, by

publishing their old embarrassing writings or halting donations to their campaign) cannot form the basis for one.

Having laid the legal and statutory groundwork, the Court will now assess whether the Complaint adequately states a claim under § 1985 and Halberstam.  Its analysis proceeds in two parts.  First, it considers how Vindman fares on the first and second Halberstam elements — that is, whether he has pled facts that plausibly suggest that any of the Defendants agreed among themselves or with others to participate in an unlawful or unlawfully performed act.  In doing so, Court assumes without deciding that Plaintiff has sufficiently alleged that Defendants formed an agreement to protect the former President by undermining Vindman's credibility, itself a lawful act.  But it ultimately concludes that Plaintiff has not pled facts that plausibly suggest, in the face of obvious alternative explanations, the further conclusion that Defendants agreed to do so in an unlawful manner.  While it is a fairly close question, Vindman's facts do not plausibly suggest that Defendants agreed to intimidate him so as to prevent him from testifying or doing his job, or to unlawfully retaliate against him.

Second and independently, assuming Vindman had plausibly alleged an unlawful agreement, the Court considers whether he has also plausibly alleged the fourth civil-conspiracy requirement: that a conspirator performed an unlawful overt act pursuant to the common scheme. It concludes that he clearly has not.  Plaintiff principally contends that various statements Defendants and their alleged co-conspirators made were defamatory.  The Court examines each statement and finds that none was defamatory under the demanding actual-malice standard.  It also determines that Vindman has not pled facts that suggest that any other co-conspirator committed any other unlawful overt act, such as leaking classified information.  For both reasons, then, his Complaint must be dismissed.

A.  <u>Elements One and Two: Agreement to Participate in Unlawful Acts</u>

Recall that a civil conspiracy requires "(1) an agreement between two or more persons;

(2) to participate in an unlawful act, or a lawful act in an unlawful manner."  <u>Halberstam</u>, 705

F.2d at 477.  Defendants initially assert that Vindman fails to plausibly allege the existence of

<u>any</u> agreement.  Even if he did plead facts sufficient for the Court to infer some agreement,

Defendants add, he does not plead facts suggesting that such agreement was to participate in an

unlawful or unlawfully performed act.  <u>See</u> Trump/Scavino MTD at 13–19; Giuliani MTD at 6–

7; Hahn MTD at 10–17.  As the Court agrees on the latter point, it need not decide the former.

 Vindman does not contend that Defendants entered into an <u>explicit</u> agreement to

intimidate or unlawfully injure him, nor is he required to.  As in "most civil conspiracy cases,"

he asks this Court "to infer an agreement from indirect evidence."  <u>Halberstam</u>, 705 F.2d at 486;

<u>see also</u> <u>id.</u> at 477 ("Proof of a tacit, as opposed to explicit, understanding is sufficient to show

agreement.").

That said, courts nevertheless hesitate to find that a plaintiff has plausibly suggested

illegal conduct where the pled facts have "an obvious alternative explanation" since a complaint

must allege facts that "plausibly suggest[ ]" — and are "not merely consistent with" — the

defendant's liability.  <u>Twombly</u>, 550 U.S. at 557, 567; <u>accord</u> <u>Iqbal</u>, 556 U.S. at 682; <u>see also</u> <u>id.</u>

at 680 (explaining that complaint in <u>Twombly</u> failed because defendants' alleged conduct "was

not only compatible with, but indeed was more likely explained by, lawful . . . free-market

behavior").  <u>Iqbal</u> itself is illustrative on this point.  There, the Court held that a plaintiff had

failed to state a claim for purposeful discrimination because he had not sufficiently alleged that

the decisionmakers took the challenged course of action "because of" the action's adverse effects

on an identifiable group.  <u>Iqbal</u>, 556 U.S. at 677.  The Court considered evidence that the

challenged policies disproportionately targeted Arab Muslims but noted that Al Qaeda was headed by and largely consisted of Arab Muslims.  "As between that 'obvious alternative explanation' for the arrests," the Court wrote, "and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion."  Id. at 682 (quoting Twombly, 550 U.S. at 567).  Plaintiffs accordingly must account for any such obvious alternative explanations, and they must plead facts to suggest that their legal conclusions are not merely conceivable but are plausible.  The D.C. Circuit has reiterated that point as well, holding that "allegations that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate . . . incentives, do not suffice to show illegality."  RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP, 682 F.3d 1043, 1051–52 (D.C. Cir. 2012) (internal quotation marks omitted).

A district court here has recently applied that lesson in a similar context.  In Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15 (D.D.C. 2021), Judge Dabney Friedrich considered whether several plaintiffs had stated a claim against former President Trump based on his clearing of Lafayette Square so that he could be photographed at St. John's Church.  Id. at 38–39.  Judge Friedrich held that those plaintiffs had alleged facts that, if true, showed only that the defendants were communicating with each other to jointly clear the square — not that they had formed an unlawful agreement to violate the plaintiffs' rights based on membership in a protected class.  Id. at 39 ("Merely alleging that the defendant officials communicated, without alleging any details of those communications that suggest an unlawful agreement, cannot justify inferring the requisite agreement for a [§ 1985] conspiracy.").  In so holding, Judge Friedrich noted that "the management of possible violence, enforcement of the impending curfew, and policing of demonstrators in Lafayette Square in advance of the President's travel across the

Square generate 'obvious alternative explanation[s]' for the defendants' communications and activities other than having formed an agreement to violate the plaintiffs' civil rights." Id. at 39–41 (quoting Iqbal, 556 U.S. at 682). In the face of those obvious alternative explanations, she concluded that the plaintiffs had not pled facts plausibly suggesting an invidious motive.

The question here is thus whether Plaintiff's Complaint pleads sufficient non-conclusory facts, see Iqbal, 556 U.S. at 678, to justify as plausible an inference that any Defendant entered into an agreement whose aim was to either intimidate Vindman or unlawfully injure him. The Court considers each in turn.

### 1. *Agreement to Intimidate Vindman*

Taken as true, the facts establish that Defendants worked together and had the common motive of defending Trump during his impeachment proceedings. They do not, however, show that any Defendant here joined with any other co-conspirator in the specific goal of intimidating Vindman from testifying or performing his job. See also Thompson, 2022 WL 503384, at *36 (defendant's agreement to convince others election had been stolen was alone not enough to establish further unlawful agreement violating § 1985); Black Lives Matter D.C., 544 F. Supp. 3d at 39; cf. Ziglar v. Abbasi, 137 S. Ct. 1843, 1868 (2017) (suggesting but not deciding that "officials employed by the same governmental department do not conspire when they speak to one another and work together in their official capacities").

Recall the facts pled against each Defendant, which are detailed above: Hahn circulated talking points that attacked Vindman's credibility; Giuliani twice tweeted comments critical of Vindman and enjoyed a close relationship with the former President; Scavino was a senior official on the White House Communications team and tweeted critically of Vindman on the day he testified; and Trump, Jr. called Vindman a "leftist" on Fox News and tweeted barbs about

him.  Without more, those facts do not make plausible an inference that any Defendant agreed with any others on the common goal of intimidating Vindman.  That is particularly so given the "obvious alternative explanation" for these facts, Iqbal, 556 U.S. at 682 — namely, that Defendants each sought to undermine the credibility of a key impeachment witness to weaken the case against Trump.

### 2.   *Agreement to Retaliate Against Vindman by Unlawful Means*

Plaintiff similarly does not plead facts that suggest a plausible inference that any Defendant agreed to otherwise unlawfully injure Vindman.  Here, the compensable actions that he alleges that Defendants agreed to take include defamation, leaking classified information, removing him from his NSC post, delaying his promotion, and causing his constructive termination.  See Pl. Opp. at 21–25.

The pled facts, however, do not plausibly suggest that any Defendant entered into any agreement with such an unlawful goal.  As to removal, non-promotion, and constructive termination, Plaintiff does not allege any facts that suggest that these Defendants, who had no power to take any such actions, entered into an agreement to do so, particularly in light of the National Security Advisor's statement that Vindman's NSC removal was his decision alone.  As to defamation, separate from whether any Defendant did in fact defame Plaintiff — a question the Court takes up below — the issue here is whether any of them agreed with any other person to do so.  As discussed, the facts pled against these Defendants include only allegations that they had targeted others in the past, that they worked together to defend the former President during his impeachment proceedings, and that they either circulated talking points or tweeted critically about Vindman.  As before, these facts do not allow for a plausible inference that any Defendant agreed with any other on the common goal of unlawfully injuring Vindman.  Again, that is

particularly so given obvious alternative explanations for their behavior.  See Iqbal, 556 U.S. at

682

### 3.  *Counterarguments*

Plaintiff offers several responses, none of which alters the Court's conclusion.  First, he

cites a series of antitrust cases for the proposition that conspiratorial agreement may be shown by

"parallel conduct" coupled with "plus factors."  Pl. Opp. at 8 (quoting In re Domestic Airline

Travel Antitrust Litig., 221 F. Supp. 3d 46, 58–60 (D.D.C. 2016)).  Vindman then explains how

Defendants' close relationships, history of coordination, communications relevant to the

impeachment effort, similar statements, and similar motives all plausibly suggest a common

plan.  Id. at 9–13.  While Plaintiff gives good reasons to think that Defendants formed some sort

of agreement, as this Court's analysis has assumed, he pleads no facts to suggest that such

agreement was for the unlawful end of intimidating or unlawfully retaliating against him.  It is

perfectly natural for a presidential Administration to coordinate internally and with outside allies

to defend its actions, which here offers a lawful obvious alternative explanation to Vindman's

charge of unlawful conspiracy.  See also Pl. Opp. at 12 (recognizing that it "strains credulity that

[Defendants] would not have worked together to defend Trump during a direct threat to his

presidency"); Black Lives Matter D.C., 544 F. Supp. 3d at 39 (allegations of coordination alone

insufficient to show agreement for purposes of § 1985 conspiracy).  Parallel conduct among

political allies does not alone plausibly establish unlawful conspiracy.

Second, Plaintiff contends that Defendants take too blinkered a view of what can count as

intimidation.  He identifies as examples various Defendants' tweets suggesting that he was

disloyal because he was offered a job in the Ukrainian government or implying that he

committed perjury.  See Pl. Opp. at 21–22.  But Defendants' intimations that Vindman had a

sympathetic relationship with Ukraine or that his filed report and testimony contained discrepancies, true or not, again suggest only that Defendants were looking for ways to undermine his credibility — not the further conclusion that Defendants had the specific aim to intimidate him out of testifying or performing functions of his job, or to unlawfully injure him by defaming him or otherwise.  Plaintiff accordingly has still not alleged facts rendering that conclusion plausible.

Third, Vindman offers more general observations about the troubling character of the former Administration.  He identifies other instances where he concludes that its members acted unlawfully, including with respect to Ambassador Yvonavitch and Hunter Biden, in order to suggest generally that the former President's team may have done so here, too.  Regardless of Plaintiff's conclusions regarding individuals' actions in those prior instances, however, he neglects to plead specific facts in support of his conclusions regarding Defendants' conduct here. Bare allegations that the Administration took a political hatchet to other perceived enemies in the past, without more, cannot sustain a claim that in this matter this set of Defendants conspired to commit unlawful acts.

The Court is also mindful of the broader implications of Plaintiff's argument.  Were a close relationship with a President, combined with a smattering of sharp public barbs, enough to state a claim under § 1985, every political fight would invite endless litigation about potential conspiracies.  Given the natural alternative explanation for such political rough-and-tumble — *i.e.*, that each side wants to present itself as credible and the other as not — more is needed to state a § 1985 conspiracy claim.  See also Black Lives Matter D.C., 544 F. Supp. 3d at 37–40.

B.  Element Four: Unlawful Overt Acts

A second and stronger reason also supports dismissal here: Plaintiff has not sufficiently

pled an unlawful overt act in furtherance of the common scheme.

Vindman acknowledges that to prevail on a claim for civil conspiracy, unlike criminal

conspiracy, he "also must prove that an unlawful overt act produced an injury and damages."

Halberstam, 705 F.2d at 477; see id. ("It is only where means are employed, or purposes are

accomplished, which are themselves tortious, that the conspirators who have not acted but have

promoted the act will be held liable.") (quoting W. Prosser, Law of Torts § 46, at 293 (4th ed.

1971)); see also Pl. Opp. at 23.  Civil conspiracy, in other words, "depends on performance of

some underlying tortious act."  Halberstam, 705 F.2d at 479; see also Second Amend. Found. v.

U.S. Conf. of Mayors, 274 F.3d 521, 524 (D.C. Cir. 2001).

Plaintiff identifies two unlawful overt acts.  First, he contends that conspirators made

defamatory statements about him; and second, he maintains that they unlawfully leaked

classified information to harm him.  See Pl. Opp. at 23–24.  Vindman also alleges "numerous

other overt acts in furtherance of the scheme" that are themselves otherwise lawful, such as

holding strategy meetings and issuing talking points.  Id. at 24–25.  Because civil conspiracy

requires at least one overt act that is itself unlawful, Halberstam, 705 F.2d at 477, these lawful

acts cannot satisfy this element.  The Court first considers whether Plaintiff has sufficiently pled

that Defendant or any other co-conspirator made any defamatory statements, and it then

examines the allegations of unlawful leaking.

1.  *Defamation*

    a.  Legal Standard

Vindman identifies "multiple instances of defamatory statements" as his principal

example of the conspiracy's unlawful overt acts.  See Pl. Opp. at 24.  He must thus satisfy two

requirements.  First, he must plead falsity; this is because truth is a complete defense to

defamation.  See, e.g., Moldea v. New York Times Co., 15 F.3d 1137, 1142 (D.C. Cir. 1994).

For a statement to be false, moreover, it must be "sufficiently factual to be susceptible of being

proved true or false."  Milkovich v. Lorain J. Co., 497 U.S. 1, 21 (1990).  Expressions of mere

opinion are thus actionable only where they imply defamatory facts.  See id. at 20–23.  For

example, "the statement 'In my opinion Jones is a liar because he cheats on his taxes' could be

libelous if the allegation of cheating were untrue."  Moldea, 15 F.3d at 1144; see also Weyrich v.

New Republic, Inc., 235 F.3d 617, 625 (D.C. Cir. 2001).  On the other hand, mere "loose,

figurative, or hyperbolic language" does not imply facts, Milkovich, 497 U.S. at 21; similarly,

where a statement is "obviously unverifiable," it constitutes non-defamatory opinion.  Ollman v.

Evans, 750 F.2d 970, 987 (D.C. Cir. 1984); see also Milkovich, 497 U.S. at 21–22.  Our circuit

has held, for instance, that political charges of "fascist" and "political Marxis[t]" constitute mere

"loosely definable, variously interpretable statement[s] of opinion . . . made inextricably in the

contest of political, social or philosophical debate."  Ollman, 750 F.2d at 987 (quoting Buckley

v. Littell, 539 F.2d 882, 895 (2d Cir. 1976)).  Such statements are subjective opinion rather than

objectively verifiable fact and so not actionable.  On a motion to dismiss, then, the court first

"must determine whether Plaintiff has alleged sufficient facts to plausibly establish that the

allegedly defamatory statement is false."  Libre By Nexus v. Buzzfeed, Inc., 311 F. Supp. 3d

149, 156 (D.D.C. 2018); see also id. at 155 n.2.

In addition to falsity, public figures, including limited-purpose public figures like Vindman, see Pl. Opp. at 34 n.5 (conceding such status), must allege that the statement was published with actual malice.  Barr v. Clinton, 370 F.3d 1196, 1202 (D.C. Cir. 2004).  This standard similarly applies in § 1985 cases.  Id.  The actual-malice standard derives from the landmark Supreme Court decision in New York Times v. Sullivan, 376 U.S. 254 (1964), and requires that a statement be made "with knowledge that it was false or with reckless disregard of whether it was false or not."  Id. at 280.  A defendant has acted recklessly if "the defendant in fact entertained serious doubts as to the truth of his publication" or acted "with a high degree of awareness of . . . probable falsity."  St. Amant v. Thompson, 390 U.S. 727, 731 (1968).

A plaintiff can "prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence."  Tavoulareas v. Piro, 817 F.2d 762, 789 (D.C. Cir. 1987).  "But it is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt."  Jankovic v. Int'l Crisis Grp., 822 F.3d 576, 589 (D.C. Cir. 2016).  Ill will by a defendant is not sufficient to demonstrate actual malice.  See Parsi v. Daioleslam, 890 F. Supp. 2d 77, 90 (D.D.C. 2012); see also Arpaio v. Zucker, 414 F. Supp. 3d 84, 92 (D.D.C. 2019) ("[T]he motivations behind defendants' communications — inspired by political differences or otherwise — do not impact whether defendants acted with actual malice as a matter of law.").  The actual-malice standard accordingly "is a daunting one."  McFarlane v. Sheridan Square Press, Inc., 91 F.3d 1501, 1515 (D.C. Cir. 1996) (internal citation omitted).

To survive a 12(b)(6) motion, then, a public-figure plaintiff must allege facts that support a plausible inference that a statement was false and made with actual malice.  Byd Co. Ltd. v. All. for Am. Mfg., No. 21-7099, 2022 WL 1463866, at *1 (D.C. Cir. May 10, 2022) (citing

Iqbal, 556 U.S. at 678).  That is, such a plaintiff must plead "nonconclusory facts alleging the [defendant] knew [its statement] was false or questioned its truth."  BYD Co. Ltd. v. All. for Am. Mfg., 554 F. Supp. 3d 1, 9 (D.D.C. 2021), aff'd, 2022 WL 1463866 (D.C. Cir. May 10, 2022); see also Hourani v. Psybersolutions LLC, 164 F. Supp. 3d 128, 141 (D.D.C. 2016) ("To allege actual malice, a plaintiff must assert that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.") (formatting modified), aff'd, 690 F. App'x 1 (D.C. Cir. 2017).

b.   Allegedly Defamatory Statements

This is a high bar that Vindman cannot clear.  Begin with Hahn, who Plaintiff alleges distributed talking points that said: "Vindman Has Major Credibility Issues," "Vindman has faced accusations of poor judgment, leaking, and going around normal procedures," and "There was nothing wrong with the call with Zelensky at all, Vindman was just upset that President Trump was leading foreign policy instead of sticking to Vindman's talking points. . . . But it's not Vindman's job to set foreign policy, it's the President's."  Compl., ¶¶ 148–49.  Plaintiff originally alleged neither that these statements were false nor that Hahn acted recklessly by circulating them.  See Hahn MTD at 18.  In his Opposition, he contends that one of these three statements — "Vindman has faced accusations of poor judgment, leaking, and going around normal procedures" — so qualifies.  See Pl. Opp. at 45–46.  Plaintiff's only basis for that conclusion is a suggestion that Hahn's circulated talking points "blatantly misrepresented" the underlying testimony on which they were based.  Id. (citing Compl., ¶¶ 148, 151–52).

Vindman does not plead any facts, however, that indicate that this talking point (or the others) was false.  Indeed, it appears to the Court that it is consistent with the underlying testimony.  See ECF No. 44 (Hahn Reply) at 12 (reprinting public-record testimony, where

witness made allegations similar to those the talking point raised).  In other words, there <u>were</u> such accusations; whether they were accurate or not does not matter for assessing the falsity of the statement.  Finally, Vindman does not allege that Hahn made that statement with any subjective belief that it was false, nor does he plead any facts to suggest that she held such a belief.  At bottom, he does not plead facts that state an unlawful overt act with respect to Hahn.

Giuliani's alleged defamation came in two tweets, which read: "ANOTHER SCHIFFTY BACKFIRE: A US gov. employee who has reportedly been advising two gov's? No wonder he is confused and feels pressure," and then, "Schiff is thanking him for his secret testimony and for giving advice to two countries. I thought he worked for US."  Compl., ¶¶ 124–25.  To the extent that these statements imply a false fact — *viz.*, that Vindman was "advising two gov[ernment]s" or "giving advice to two countries"— the Complaint pleads no facts that suggest that Giuliani knew that this was false, and it offers no evidence that it was so inherently improbable that only a reckless person would have made such statements.  Plaintiff's own Complaint points to a contemporaneous *New York Times* article that reported that "Ukrainian officials sought advice from [Vindman]."  Id., ¶¶ 105, 107.  Officials seeking advice is of course different from Vindman giving it, but that *Times* report does make it difficult for Plaintiff to plead that Giuliani had subjective knowledge of his statement's falsity.  Because the Court finds that Vindman has not nudged to plausible the inference that either tweet was made with actual malice, the Court cannot conclude that either constitutes an unlawful overt act.

Scavino's allegedly defamatory tweet meets the same fate.  His read: "#ICYMI: Lt. Col. Vindman was offered the position of Defense Minister for the Ukrainian Government THREE times! #ImpeachmentSHAM."  Id., ¶ 171.  The tweet was based on Vindman's testimony that he recalled being offered the position of Defense Minister three times, a fact that he himself pleads.

Id., ¶¶ 164, 169.  As Plaintiff thus cannot show that the facts in that tweet were false, this cannot be an overt act either.

So, too, with Trump, Jr.'s tweets and comments.  As described above, these are a bit more extensive.  Plaintiff alleges that Trump, Jr. made defamatory comments on Fox News, saying, "[I]t turns out he's, you know, talking to the Ukraine" and suggesting that Vindman was a "leftist."  Id., ¶¶ 127–28.  Vindman adds that Trump, Jr. also tweeted a variety of allegedly defamatory remarks, including:

- Retweeting a story that falsely stated that Vindman had been reprimanded for inappropriate and partisan behavior while in the military, with the comment: "Amazing. Of course anyone who's been watching this for the past three years is not at all surprised that this would be their 'star witness,'" later adding, "All I've heard is that there's no way you could possible question him or his motives because he was once in the military," id., ¶¶ 133–40;

- Commenting when Vindman was removed from the NSC, "On the bright side, he may still be able to take the defense minister position in the Ukraine that he was offered a few times," id., ¶ 196;

- Tweeting, "Allow me a moment to thank—and this may be a bit of a surprise—Adam Schiff. Were it not for his crack investigation skills, @realDonaldTrump might have had a tougher time unearthing who all needed to be fired. Thanks, Adam!," which he followed with a crying-laughing emoji and the hashtag "#FullOfSchiff," id., ¶ 197;

- Tweeting several months later, "A name that's not appearing NEARLY enough in the 'news' – VINDMAN. Media covered his bogus Ukraine transcript constantly. Dems yelled 'impeach!!' NOW he admits to actually making up parts of it. Another hoax

exposed. And yet again the media cover the fake scandal but not the TRUTH"; id., ¶ 203; and

- Adding shortly thereafter, "You'd think that someone would be criminally charged for making up things that lead to an impeachment based on false premises. But I guess that would only happen if they did it to a liberal! Alexander Vindman Admits making up Parts of Trump Call Summary," linking to a Breitbart story with that title.  Id., ¶ 203.

While the closest call of the four Defendants, Vindman pleads no facts that create a plausible inference that Trump, Jr. made false statements while subjectively entertaining serious doubts about them.  Begin with the Fox appearance where he called Vindman a "leftist," whatever that is supposed to mean.  Under binding Circuit precedent, that remark does not constitute or imply a statement of fact.  Rather, it is like the political charges of "fascist" and "political Marxis[t]" that our Circuit has held are "obviously unverifiable" as mere "loosely definable, variously interpretable statement[s] of opinion . . . made inextricably in the contest of political, social or philosophical debate."  Ollman, 750 F.2d at 987 (quoting Buckley, 539 F.2d at 895); see also Milkovich, 497 U.S. at 21 ("loose, figurative, or hyperbolic language" does not imply facts).

Moving next to the tweets, the Court starts with Trump, Jr.'s retweet of an article accusing Vindman of "Inappropriate and Partisan Behavior in Military."  Compl., ¶ 137.  The Complaint alleges that the article source's reliability was "self-evidently questionable" because the source at one point had the hashtag #Q in his profile (the Complaint does not specify for how long or whether it was there during the time Trump, Jr. retweeted the article) and because the source was "a motivated partisan" who "reportedly wrote more than a hundred tweets recirculating QAnon-related theories."  Id., ¶ 134.  These facts, taken as true, suggest that the

article Trump, Jr. retweeted stated or implied false conclusions.  But Plaintiff does not plead facts sufficient to suggest actual malice.  Trump, Jr. did not retweet the article source's tweets, which is what Plaintiff contends he had reason to know were false; rather, he retweeted only an article from Gateway Pundit based on those tweets, which he is not alleged to have known was false and which did in fact make such accusations of inappropriate and partisan behavior. Speakers are not presumed to have scrolled through the Twitter history of the source for every article that they re-tweet, and nothing in the pleadings suggests that Trump, Jr. saw (or should have seen) anything suggesting that the source was a QAnon supporter or otherwise a conspiracy theorist.

Plaintiff similarly falls short with respect to Trump, Jr.'s other tweets.  The sarcastic tweet that, "[o]n the bright side, [Vindman] may still be able to take the defense minister position in the Ukraine that he was offered a few times," Compl., ¶ 196, does not contain a verifiably false statement of fact, as explained above in connection with Scavino.  The tongue-in-cheek tweet thanking Adam Schiff, accompanied by a crying-laughing emoji and the hashtag "#FullOfSchiff," similarly does not make a verifiably false statement of fact; it sarcastically thanks a political antagonist.  Perhaps recognizing as much, the Complaint does not specifically allege that either of these tweets was defamatory and instead principally uses them to suggest that Vindman's firing was retaliatory.  Id., ¶¶ 195–201.

Trump, Jr.'s two final tweets suggest that Vindman admitted "making up" parts of his testimony.  Id., ¶¶ 203–04.  The Breitbart article that Trump, Jr. linked to in support was titled "Alexander Vindman Admits Making Up Parts of Trump Call Summary."  Id., ¶ 203.  Vindman alleges only that the article "does not establish that Lt. Col. Vindman made up things leading to

an impeachment." Id., ¶ 204.  Yet he needs to allege far more to establish actual malice — namely, that Trump, Jr. knew or should have known that the article was not true.

Faced with the lack of an unlawful defamatory statement by any Defendant, Plaintiff suggests that others, including Laura Ingraham, John Yoo, and former President Trump, are themselves co-conspirators who said defamatory things and so committed unlawful overt acts on behalf of the conspiracy.  But just as Vindman does not plead facts sufficient to plausibly suggest that any Defendant entered into a conspiratorial agreement, he similarly does not sufficiently allege that any such agreement included these other characters.  The Court, consequently, need not consider their statements.

That said, because former President Trump worked closely with each Defendant — he was the boss of some (Hahn, Scavino), close confidant of others (Giuliani), and father of one (Trump, Jr.) — the Court will nonetheless examine his statements to see whether any could constitute an unlawful overt act on behalf of the conspiracy.

Unfortunately for Plaintiff, several of the former President's tweets do not contain information specifically about Vindman and are pled only to show the purportedly unlawful nature of the conspiracy (those at Compl., ¶ 100); did not allege statements of fact (that at Compl., ¶ 129); or concerned material the Court has already held non-defamatory (that at Compl., ¶ 172, retweeting Scavino).  The only remaining tweets that Plaintiff specifically alleges were false and made with actual malice are those at paragraphs 199–201 of the Complaint, in which the former President tweeted:

> Fake News @CNN & MSDNC keep talking about "Lt. Col." Vindman as though I should think only how wonderful he was. Actually, I don't know him, never spoke to him, or met him (I don't believe!) but, he was very insubordinate, reported contents of my "perfect" calls incorrectly, &...was given a horrendous report by his superior, the man he reported to, who publicly stated that Vindman

had problems with judgement, adhering to the chain of command and leaking information. In other words, "OUT."

To the extent that this tweet contains or implies false statements, however, Vindman does not plead facts suggesting that Trump made these statements with actual malice. The Complaint repeatedly alleges that it was "not true" that Vindman had received a horrendous report by his superior, had problems adhering to chain of command, or leaked anything. See Compl., ¶ 200. But it pleads no facts to further suggest that Trump subjectively knew these statements to be untrue or that he had a high degree of awareness of their probable falsity.

The Court of course passes no judgment on the fairness or propriety of such attacks. As a limited-purpose public figure, however, Vindman was a man in the arena. Defendants may have played ugly, but Vindman does not plead facts suggesting that they acted with actual malice.

2. *Leaking*

Vindman also alleges a second overt unlawful act: that "conspirators at the White House" leaked classified information to House Republicans — namely, Vindman's report documenting that he received and declined an offer to serve as Ukrainian Minister of Defense — who then questioned him about it during his committee appearance. See Pl. Opp. at 24 (citing Compl., ¶¶ 157–67). While leaking classified information could indeed be an unlawful overt act, Plaintiff offers no basis for concluding that any Defendant leaked this information or formed an agreement with anyone who did so. Vindman contends only that "some Defendants" were involved in the leak but offers no non-conclusory facts to support that inference. See id. at 12. Indeed, none of the four Defendants held White House positions in the national-security space, and Plaintiff does not even plead that any of the four held security clearances. It is unclear, then, how Vindman theorizes that they could have obtained this information so as to help leak it. These conclusions are thus entirely speculative.

*      *      *

The Court will end where it began: by emphasizing the narrowness of the task before it. Plaintiff certainly pleads that Defendants each helped propagate harmful and unfair attacks against him.  The Court does not decide the validity of those attacks, regardless of whether some were outside the bounds of appropriate political discourse.  It instead looks only to whether Vindman's pleadings satisfy the civil-conspiracy elements that the D.C. Circuit articulated in Halberstam and the 12(b)(6) standard that the Supreme Court established in Iqbal.  Such inquiry yields the inescapable conclusion that they do not.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 8, 2022